# EXHIBIT "A"

FILED IN MY OFFICE
DISTRICT COURT CLERK
7/17/2012 2:52:50 PM
STEPHEN T. PACHECO
MG

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

------------------------------------------------------------------------x
                                        :

| | |
|---|---|
| THE NEW MEXICO STATE INVESTMENT COUNCIL, as Trustee, Administrator and Custodian of the LAND GRANT PERMANENT FUND and the SEVERANCE TAX PERMANENT FUND, | : |
| | : |
| Plaintiff, | : Case No. D-101-CV-201101534 |
| | : |
| vs. | : |
| | : |
| GARY BLAND, GUY RIORDAN, SAUL MEYER, RENAISSANCE PRIVATE EQUITY PARTNERS, LP d/b/a ALDUS EQUITY PARTNERS, LP, MARC CORRERA, ANTHONY CORRERA, ALFRED JACKSON, DANIEL WEINSTEIN, VICKY L. SCHIFF, JULIO RAMIREZ, BARRETT WISSMAN, WILLIAM HOWELL, MARVIN ROSEN, DANIEL HEVESI, ELLIOTT BROIDY, MILTON ROBERT CARR, and HENRY MORRIS, | : JURY TRIAL DEMANDED |
| | : |
| Defendants. | : |

------------------------------------------------------------------------x

### THIRD AMENDED COMPLAINT FOR MONEY DAMAGES

Plaintiff, the New Mexico State Investment Council ("NMSIC"), for its Second Amended

Complaint for Money Damages against the Defendants (the "Complaint"), herein alleges as

follows:

## SUMMARY OF ALLEGATIONS

1.      This action is brought by the Attorney General to obtain relief on behalf of the citizens of the State of New Mexico for an unlawful "pay-to-play" scheme perpetrated by the Defendants and others between 2003 and 2009.

2.      During the relevant time period, Gary Bland ("Bland"), the New Mexico State Investment Officer; and Saul Meyer ("Meyer") of Renaissance Private Equity Partners, LP d/b/a Aldus Equity Partners, LP ("Aldus"), an investment advisor to NMSIC, directed the process by which NMSIC made certain investments on behalf of New Mexico public trust funds.

3.      Bland, Meyer and Aldus had fiduciary duties to make and/or recommend investments based solely on the best interests of the public trust funds and their beneficiaries, the citizens of New Mexico.

4.      Bland, Meyer and Aldus breached their fiduciary duties and corrupted the integrity of the investment process.

5.      Bland, Meyer and Aldus wrongfully caused NMSIC to make investments on behalf of the public trust funds based on their own selfish interests and the personal, political and financial interests of politically-connected individuals and their associates, including Defendants named herein, rather than based solely on the best interests of the public trust funds and their beneficiaries, the citizens of New Mexico.

6.      Bland, Meyer and the politically-connected individuals who aided, abetted and profited from this pay-to-play scheme have been unjustly enriched and should be required to make restitution.

## THE PARTIES

7.      Plaintiff, NMSIC, is a state agency that serves as trustee, administrator and custodian of the Land Grant Permanent Fund ("LGPF") and the Severance Tax Permanent Fund ("STPF") (collectively the "Public Trust Funds"), which are established under the New Mexico Constitution for the benefit of the citizens of New Mexico, the real party in interest.

8.      The LGPF is New Mexico's largest sovereign wealth permanent endowment fund. The LGPF is funded with income and royalties from the sale and lease of public trust land.

9.      The STPF is another sovereign wealth permanent endowment fund.  The STPF is generally funded with severance taxes on the extraction of minerals and oil and gas from leases on public lands.

10.     The Public Trust Funds currently have a market value of approximately $15,000,000,000.

11.     Defendant Bland is a citizen of the State of New Mexico.

12.     Defendant Meyer is a citizen of the State of Texas.

13.     Defendant Aldus is a Texas limited partnership with a principal place of business in Dallas, Texas.

14.     Defendant Guy Riordan ("Riordan") is a citizen of the State of New Mexico.

15.     Defendant Marc Correra is a citizen of the State of Texas.

16.     Defendant Anthony Correra is a citizen of the State of New York.

17.     Defendant Alfred Jackson ("Jackson") is citizen of the State of Texas.

18.     Defendant Daniel Weinstein ("Weinstein") is a citizen of the State of California.

19.     Defendant Vicky L. Schiff ("Schiff") is a citizen of the State of California.

20.     Defendant Julio Ramirez ("Ramirez") is a citizen of the State of California.

21.     Defendant Barrett Wissman ("Wissman") is a citizen of the State of Texas.

22.     Defendant William Howell ("Howell") is a citizen of the State of New York.

23.     Defendant Marvin Rosen ("Rosen") is a citizen of the State of New York.

24.     Defendant Daniel Hevesi is a citizen of the State of New York.

25.     Defendant Elliott Broidy ("Broidy") is a citizen of the State of California.

26.     Defendant Milton Robert "Bob" Carr ("Carr") is a citizen of the District of Columbia.

27.     Defendant Henry "Hank" Morris ("Morris") is a citizen of the State of New York.

28.     In carrying out their scheme, the Defendants acted in concert with other individuals and business entities from whom the Attorney General intends to pursue recoveries at a later date.

29.     Defendant Daniel Hevesi and Defendant Morris conspired with one or more other Defendants.

## **JURISDICTION AND VENUE**

30.     This Court has jurisdiction over this action pursuant to Article VI, § 13 of the New Mexico Constitution.

31.     Venue is proper in this district because Plaintiff is a government entity whose principal office is located within this district.

32.    All of the Defendants have submitted themselves to the jurisdiction of this Court, because (a) the causes of action alleged herein arise out of the Defendants' commission of acts enumerated in NMSA 1978, § 38-1-16 (1971); (b) Defendants knowingly engaged in tortious activities directed toward the State of New Mexico that have caused injury within New Mexico; and (c) Defendants purposefully availed themselves of the privilege of conducting activities within New Mexico so as to establish the minimum contacts required to satisfy due process.

## FACTUAL BACKGROUND

### NMSIC's Alternative Investments

33.    NMSIC makes investments on behalf of the Public Trust Funds based on work performed under its supervision by the New Mexico State Investment Office ("NMSIO"), the State Investment Officer and third-party investment advisors.

34.    NMSIC invests the Public Trust Funds' assets primarily in core portfolios of public equities and fixed income instruments, but also invests a portion of the assets in alternative investments, including private equity funds, hedge funds, real estate and fixed income derivatives.

35.    Compared to the core portfolios of public equities and fixed income instruments, alternative investments generally present the prospect of superior returns and the risk of more substantial losses.  Alternative investments are more complex and difficult to evaluate than the investments in the core portfolios.

**The Marketing of Alternative Investments**

36.     Alternative investments are often sold by investment management firms that seek to amass a pool of money – or commitments to fund money – primarily from institutional investors, including state and municipal public pension funds and public trust funds.

37.     Investment management firms typically receive substantial fees from investors for their role in managing alternative investments.

38.     Investment management firms sometimes share a portion of the fees they receive from a state public trust fund or other source of capital with third-party marketers who play a role in securing the investment for the investment management firms.

39.     A third-party marketer can serve a legitimate purpose and earn a legitimate fee acting as an intermediary between an investment management firm seeking to raise capital and an investor seeking investment opportunities.  Third-party marketers are often called placement agents or finders.

40.     When the investor is a public pension or public trust fund, there is a danger that politically-connected individuals – usually people who make and solicit others to make political contributions to powerful public officials – will seek kickbacks in connection with the investment of public funds as a reward for their making and soliciting others to make political contributions to those powerful political officials.

41.     There is a danger that politically-connected individuals will use improper influence to exert pressure on those controlling the investment process for their own financial or political benefit or for the financial or political benefit of their associates.

42.     There is a danger that investment management firms that benefit from the efforts of politically-connected individuals will agree to pay kickbacks disguised as legitimate placement agent fees.

**The New York Pay-to-Play Scheme**

43.     Recent investigative and enforcement efforts by the U.S. Securities and Exchange Commission ("SEC") and the New York Attorney General ("NYAG") have revealed that such kickbacks were made as part of a "pay-to-play" scheme to defraud one of the largest public-pension funds in the country, the New York Common Retirement Fund ("NYCRF").

44.     According to the enforcement agencies, the primary perpetrators of the scheme were Alan Hevesi, the former New York State Comptroller; Morris, Alan Hevesi's top political advisor and chief fund-raiser; and David Loglisci ("Loglisci"), the former New York State Deputy Comptroller.  Beginning in 2003, Alan Hevesi, Morris and Loglisci devised and implemented a wide-ranging, illicit scheme to extract monetary payments and other benefits from investment management firms seeking to do business with the NYCRF.  Pursuant to the scheme, the NYCRF invested billions of dollars with numerous investment management firms. Those investment management firms paid millions of dollars to Morris and others in the form of bogus finder or placement agent fees in order to obtain investments from the NYCRF.

45.     Alan Hevesi, Morris and Loglisci have all pled guilty to criminal charges in connection with their roles in the New York scheme.  Alan Hevesi has been sentenced to a term of one to four years in prison.  Morris has been sentenced to and is currently serving a term of up to four years in prison.

46.     The New Mexico pay-to-play scheme that forms the basis for this action not only resembles the New York scheme in many respects, but also involves many of the same participants and investments.

47.     Indeed, as detailed herein, the intertwined New York and New Mexico schemes were part of a larger nationwide web of corruption that has eroded the public treasury and corroded the public trust.

### The New Mexico Pay-to-Play Scheme

### The Roles Played by Gary Bland and Anthony Correra

48.     One of the primary perpetrators of the pay-to-play scheme in New Mexico was Gary Bland, who, from January 14, 2003, through October 29, 2009, was the State Investment Officer.  During his tenure, Bland caused NMSIC to make alternative investments for the purpose of benefiting politically-connected individuals, rather than solely on the basis of the underlying merits of the alternative investments.  Collectively these investments involved a commitment of more than $2,000,000,000 of the Public Trust Funds' assets.

49.     Bland was appointed by and reported to the former governor of New Mexico, Bill Richardson ("Governor Richardson").  The search committee involved in hiring Bland as the State Investment Officer consisted of, among others, Riordan and Anthony Correra.

50.     During his tenure, Bland was one of the highest paid state employees in the State of New Mexico.  He received total salary payments of approximately $2,000,000.

51.     Under the New Mexico Constitution and statutes, Bland, as the State Investment Officer, chief administrator of NMSIO and a member of NMSIC, was a co-trustee of the Public

Trust Funds and owed the beneficiaries of the Public Trust Funds, the citizens of New Mexico, a

duty of loyalty to invest and manage the trust assets solely in the beneficiaries' interests.

Legislation enacted in 2010 removed the State Investment Officer as a member of NMSIC.

52.     As a co-trustee of the Public Trust Funds, Bland had a fundamental duty to

display, throughout the administration of the trusts, complete loyalty to the interests of the

citizens of New Mexico and to exclude all selfish interests and all consideration of the interests

of third persons.  Bland was not permitted, in any manner or to any degree, to subordinate the

interests of the Public Trust Funds' beneficiaries to his own interests or the personal, financial or

political interests of third parties.

53.     Anthony Correra was Governor Richardson's personal friend, fund-raiser and

confidante.  Anthony Correra personally, as well as through his family and entities he controls,

contributed tens of thousands of dollars to Governor Richardson's political campaigns and

political action committees.  Anthony Correra served as a trustee of Moving America Forward,

one of those political action committees and the largest contributor to Governor Richardson's

2006 gubernatorial campaign.  Anthony Correra was a member of the search committee involved

in hiring Bland.

54.     During Bland's tenure, Anthony Correra set himself up, with the knowledge,

approval and/or acquiescence of Bland and other government officials, as an unofficial

investment consultant to NMSIO and NMSIC and a *de facto* gatekeeper of the Public Trust

Funds' alternative investment portfolio.  In fact, during the early stages of Bland's tenure,

Anthony Correra had office space at the NMSIO building, as well as a state-issued phone

number, and he received mail at the New Mexico State Investment Council.

55.     While Anthony Correra had a background in the investment industry working as

an analyst and portfolio manager at various registered broker-dealers, he also had a history as a

securities fraudster.  In 1990, the SEC charged Anthony Correra with trading in stock and options

of various companies while in possession of inside information he obtained from a former

stockbroker who received tips from an attorney in the mergers and acquisitions department of a

major New York-based international law firm.  A federal district court permanently enjoined

Anthony Correra from violating the antifraud provisions of the federal securities laws and

ordered him to disgorge his illegal profits of $496,842.  The SEC barred Anthony Correra from

association with any broker, dealer, investment adviser or municipal securities dealer.

56.     Acting in his role as self-appointed consultant and gatekeeper, and often

purporting to speak on behalf of Governor Richardson, Anthony Correra instructed, requested

and/or suggested that Bland cause NMSIC to make alternative investments that would benefit

politically-connected individuals, many of whom made and solicited others to make

contributions, directly or indirectly, to or for the benefit of Governor Richardson's election

campaigns.  Anthony Correra did this to benefit, among others, his son Marc Correra, who

during Bland's tenure was improperly paid many millions of dollars in connection with

numerous investments made by NMSIC.

57.     Bland understood that to satisfy Anthony Correra, Marc Correra had to be paid in

connection with a substantial number of NMSIC alternative investments, even if those

investments were not in the best interests of NMSIC, and even if Marc Correra had nothing to do with bringing the investment to NMSIC's attention.  To meet that quota of deals benefiting Marc Correra, Bland at times recommended to investment management firms who were already in contact with NMSIC that they seek "marketing help" from Marc Correra.  Bland knowingly directed such investment management firms to Marc Correra for the sole purpose of enriching him.  And Bland knowingly caused NMSIC to make certain alternative investments for the primary purpose of benefiting the Correras, in breach of Bland's fiduciary duties to NMSIC.

58.    Also during Bland's tenure, Governor Richardson's supporters and senior members of Governor Richardson's staff requested of Bland that he secure political contributions from investment management firms that had received fees – or stood to receive fees – in connection with investments made by the Public Trust Funds.

59.    On numerous occasions, Bland purposefully ignored the input and advice of his staff regarding the best available potential investments for NMSIC, and instead approved and made investments primarily for the purpose of benefiting politically-connected individuals rather than solely on the basis of the underlying merits of the alternative investments.

60.    Anthony Correra knew or willfully disregarded the fact that Bland directed investment management firms to Marc Correra for the sole purpose of enriching him.  Anthony Correra also knew or willfully disregarded the fact that Bland caused NMSIC to make certain alternative investments for the primary purpose of benefiting the Correras, in breach of Bland's fiduciary duties to NMSIC.  In numerous instances, Bland and Anthony Correra knowingly concealed that Marc Correra had received payments in connection with NMSIC's investments.

**The Role Played by Meyer and Aldus**

61.     In 2003, NMSIC sought to engage a new advisor/consultant for its National

Private Equity Program.  Bland and others selected Aldus, even though it was just a fledgling

firm, having been founded only months before.  Indeed, NMSIC was only Aldus's second client.

Aldus secured the lucrative engagement as the advisor/consultant for NMSIC's National Private

Equity Program with help from several politically-connected individuals, including Jackson and

Ramirez.

62.     Aldus was run by Meyer.  Meyer was the Aldus partner with primary

responsibility for advising NMSIC.

63.     On January 20, 2004, Bland signed a Professional Services Contract with Aldus

on behalf of NMSIC; Meyer signed on January 21, 2004, on behalf of Aldus.

64.     Under the terms of the Professional Services Contract, Aldus agreed to provide

advisory services in connection with NMSIC's investment in private equity funds, including the

performance of due diligence and the presentation of recommendations about specific potential

investments.

65.     Over the course of Aldus's engagement, which was terminated on or about April

29, 2009, NMSIC paid Aldus more than $4,300,000.  In addition to receiving lucrative advisory

fees from NMSIC during that period, Aldus managed its own investment funds and sought to

garner additional investments for those funds.

66.    Under the terms of the Professional Services Contract, Meyer and Aldus, as agents of NMSIC, had fiduciary duties to act in the best interests of the Public Trust Funds and the citizens of New Mexico.

67.    In the Professional Services Contract, Aldus expressly warranted that it did not have and would not have any conflict of interest and promised to wholly indemnify the State of New Mexico against any and all losses, damages, costs, expenses, legal fees and liability resulting from investment advice and other services provided for in the Professional Services Contract where Aldus had an interest, direct or indirect, that conflicted in any manner or degree with the best interests of the Public Trust Funds and the citizens of New Mexico.

68.    Anthony Correra met with Meyer on numerous occasions and, purporting to speak on behalf of Governor Richardson, would often instruct, request or suggest that Meyer cause NMSIC to make investments in certain private equity funds.

69.    At one such meeting in or about 2004, Anthony Correra gave Meyer a significant cash payment and other valuable gifts.  On information and belief, Anthony Correra gave the payment and other gifts both to reward actions already taken by Meyer consistent with Anthony Correra's instructions, requests and suggestions and to encourage Meyer to take additional actions consistent with Anthony Correra's instructions, requests and suggestions.

70.    With Bland's knowledge, approval and assistance, Meyer and Aldus caused NMSIC to make alternative investments for the purpose of benefiting politically-connected individuals, including the principals of fund management firms and placement agent firms.

71.     Collectively, these investments involved a commitment of more than $1,000,000,000 of the Public Trust Funds' assets.

72.     Meyer used Aldus's position as an investment advisor to NMSIC to curry favor with powerful entities and individuals in the major financial centers and advance his own agenda for Aldus's business growth.  Meyer created a far-reaching scheme that extended beyond NMSIC and beyond New Mexico, pursuant to which he traded favors for his own personal benefit and for the benefit of his connections, friends, colleagues and associates.  Meyer maintained a national network of politically-connected individuals among whom he allocated favors and placement agent fees.

**The Involvement of Meyer and Aldus in the New York Pay-to-Play Scheme**

73.     Meyer and Aldus were also involved in the New York pay-to-play scheme and accused of wrongdoing by the SEC, the NYAG and the New York State Comptroller's Office.

74.     On March 19, 2009, the SEC filed a complaint in New York alleging that Aldus and an "Aldus Partner" had agreed in May 2004 to pay nearly $320,000 in sham placement agent fees to Morris in exchange for Aldus being selected to manage $175,000,000 of NYCRF assets. The SEC complaint further alleged that Aldus used the monies it was entrusted with managing for the NYCRF to invest in other funds, not for the benefit of the NYCRF, but in order to pay bogus placement agent fees associated with those investments to entities controlled by Morris.

75.     On April 30, 2009, the SEC filed an amended complaint in New York against Aldus, charging Meyer and Aldus directly with violations of the federal securities laws.

-14-

76.     Also on April 30, 2009, the NYAG arrested Meyer after filing a criminal complaint against him based on the activities described in the SEC complaint.

**Meyer's Admission of Wrongdoing in New York and New Mexico**

77.     On October 2, 2009, Meyer pled guilty to the criminal charges.  In his allocution, Meyer admitted wrongdoing not only in connection with the New York pay-to-play scheme, but also in connection with the New Mexico pay-to-play scheme.

78.     Meyer admitted that Aldus had fiduciary duties towards NMSIC and was "obligated to provide objective investment advice, free from conflicts, politics and other improper pressures."  He further admitted that, in order to generate business and fees for Aldus, he violated his fiduciary obligations and "succumbed to pressures exerted on [him] by pension fund officials and other politically connected individuals who [he] understood were motivated for personal, financial and political gain."

79.     In his allocution, Meyer further admitted that he made false representations and concealed material information in connection with investment transactions involving NMSIC.

80.     In his allocution, Meyer further admitted that, as an advisor to NMSIC,

> I had a fiduciary duty to act exclusively in the best interests of the State of New Mexico.  On numerous occasions, however, contrary to my fiduciary duty, I ensured that Aldus recommended certain proposed investments that were pushed on me by politically-connected individuals in New Mexico.  I did this knowing that these politically-connected individuals or their associates stood to benefit financially or politically from the investments and that the investments were not necessarily in the best economic interest of New Mexico.

-15-

81.     In December 2010, Aldus settled with the NYAG and agreed to pay restitution to the NYCRF through the payment of $1,000,000 in cash and the forfeiture of millions of dollars in fees owed to Aldus.  The NYAG stated that its investigation revealed that Aldus had paid Morris over $300,000 in exchange for securing pension fund investments for Aldus.

**Politically-Connected Individuals' Receipt of Improper Payments**

82.     Many politically-connected individuals benefitted financially and politically from alternative investments made by NMSIC.

83.     Politically-connected individuals received improper payments in at least two ways:  (1) in their capacity as so-called "placement agents;" and/or (2) in their capacity as principals of fund managers.  The placement agent fees paid by the fund managers to the politically-connected individuals were funded directly or indirectly by NMSIC's payments of management fees to the fund managers.  NMSIC's payment of management and incentive fees to the fund managers funded compensation payments and distributions to their principals.

84.     In some instances, Bland, Meyer and/or Aldus recommended to investment management firms that they pay a politically-connected individual masked as a placement agent.

85.     In some instances, Bland, Meyer and/or Aldus kept NMSIC from giving business to investment management firms that refused to hire a politically-connected individual whose services they recommended.

86.     The politically-connected individuals used entities in order to disguise their improper receipt of payments.  The politically-connected individuals caused sham agreements to be drafted and entered into by those entities and the investment managers to memorialize the

purported placement agent services to be performed and amounts to be paid, and frequently

caused a person other than the politically-connected individual to sign the agreement on behalf of

the purported placement agent.  Many of these written agreements were improperly dated "as of"

an earlier date to make it appear that placement agent services had been commenced or

performed as of such earlier date.  The politically-connected individuals, at times, used entities as

"sub-agents" of other placement agent firms in order to further disguise their improper receipt of

payments.  In such cases, the politically-connected persons caused sham agreements to be

drafted and entered into by the purported sub-agents.

87.     In many instances, the politically-connected individuals did little or no work in

connection with the investments for which improper payments were received.

88.     The many politically-connected individuals who received improper payments for

engaging in and facilitating the pay-to-play scheme include, but are not limited to, the following

Defendants:

**Marc Correra**

89.     Marc Correra, a politically-connected individual and the son of Anthony Correra,

aided and abetted the pay-to-play scheme and was unjustly enriched by millions of dollars in

connection with alternative investments made by NMSIC.

90.     Marc Correra was employed by Anthony Correra's company Sandia Asset

Management and was President of Crosscore Management, LLC before forming his own

companies, L2 Capital Management and SDN Advisors, LLC ("SDN Advisors").  He was later

employed as a registered representative of Cabrera Capital Markets and Ajax Investments, LLC.

91.     Marc Correra personally, as well as through his family and entities he controls, contributed thousands of dollars to Governor Richardson's political campaigns and political action committees.  Marc Correra served as Treasurer of Moving America Forward, a political action committee established by Governor Richardson.  In 2004, Governor Richardson named Marc Correra's wife, Claudia Correra, New Mexico's first "international protocol officer," a part-time role that entitled Claudia Correra to $20,000 per year.

92.     During Bland's tenure as State Investment Officer, Marc Correra received payments in excess of $14,000,000 in connection with alternative investments by NMSIC. Correra received at least $5,500,000 of that total from Vanderbilt Capital Advisors, LLC ("Vanderbilt") in connection with NMSIC's investments in six Vanderbilt collateralized debt obligation ("CDO") offerings.  Vanderbilt paid Marc Correra through an array of corporate entities including SDN Advisors, Crosscore Management, LLC and Cabrera Capital Markets.  In one instance, NMSIC invested $50,000,000 in a Vanderbilt CDO that rapidly lost nearly all of its value.  Marc Correra received $2,000,000 in connection with that deal pursuant to a sham agreement between Vanderbilt and SDN Advisors.  Marc Correra's compensation under that agreement was not contingent upon securing any investment commitments by NMSIC or another state agency; rather, Vanderbilt compensated Marc Correra $1,000,000 per year for "introductory services," expressly defined as merely "providing to Vanderbilt the name, address, telephone number and contact information of [NMSIC and another state agency]."

93.     Marc Correra performed little or no work in connection with any of those deals. For example, Marc Correra entered into sham "placement" agreements with investment

management firms that had already made contact with Bland, Meyer and/or Aldus.  In numerous instances, a third party placement agent was interposed as the party who purportedly introduced the investment management firm to NMSIC, and that third party placement agent in turn paid Marc Correra as a "sub-agent" pursuant to a separate agreement that Marc Correra caused to be drafted and executed to further conceal that he had received payments.

94.    For instance in 2004, Silver Creek Technologies Investors ("Silver Creek") approached NMSIC and Aldus to solicit NMSIC's investment in the Silver Creek Ventures II, L.P. private equity fund.  Aldus's due diligence questionnaire for Silver Creek, which was provided to NMSIC as part of the investment process, noted that Silver Creek was not utilizing a placement agent.  Meyer told Silver Creek that it would be a prerequisite to obtain a NMSIC investment to hire Marc Correra as a placement agent.  Thereafter, Silver Creek entered into a placement agent agreement with SDN Advisors, Marc Correra's firm, whereby SDN Advisors would be paid a fee equal to 2% of NMSIC's capital commitment to Silver Creek Ventures II, L.P.  The agreement between SDN Advisors and Silver Creek was dated "as of" an earlier date to make it appear that SDN Advisors had been previously engaged by Silver Creek.  Thereafter, NMSIC approved a $10,000,000 investment in Silver Creek Ventures II, L.P.  In Silver Creek's response to a placement agent questionnaire from the State Investment Office in 2009 (the "2009 NMSIO Questionnaire"), Silver Creek stated:  "We were advised by Aldus Equity (the private equity adviser to the State of New Mexico) to engage Marc Correra (of SDN Advisors) as his engagement could increase the prospects for investment from the State of New Mexico."  In response to a question regarding the nature of the services performed by the placement agent,

Silver Creek stated: "Silver Creek sent Marc Correra the Private Placement Memorandum and the PowerPoint presentation for Silver Creek Ventures II, L.P. Marc Correra made a hotel recommendation for our visit to New Mexico. Marc Correra met us for dinner the night before we made a presentation to the State of New Mexico's Private Equity Investment Advisory Committee." Silver Creek paid Marc Correra at least $188,333. To date, NMSIC has experienced a negative return on its investment with Silver Creek.

95.    Marc Correra knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and Marc Correra's interests, in breach of their fiduciary duties to NMSIC, and therefore that his receipt of those payments was improper. Marc Correra knowingly took steps, including entering into "sub-agent" agreements, to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest. Marc Correra knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

96.    In an affidavit filed in connection with her divorce from Marc Correra, Claudia Correra stated that: "In 2009, Marc advised me that he was facing substantial financial and legal problems. He informed me that we needed to leave the United States temporarily until things died down." Marc and Claudia Correra fled the United States for Paris, France and, upon information and belief, Marc Correra is still taking refuge there.

**Jackson**

97.     Jackson, another politically-connected individual, aided and abetted the pay-to-play scheme and was unjustly enriched by millions of dollars in connection with alternative investments made by NMSIC.  Jackson, both in person and through his agents, transacted business in New Mexico.  On information and belief, Jackson personally attended numerous meetings in New Mexico with Bland and others in furtherance of the pay-to-play scheme at which they discussed investments through which Jackson would receive payments.

98.     Jackson is a member of Capital Point Partners, LLC ("Capital Point"), an investment management firm in Houston, Texas that provides "mezzanine" securities to middle market companies throughout the United States.  He serves on numerous public and private boards, including the board of a municipal employees pension system.  In addition to managing funds through Capital Point, Jackson served as a placement agent with at least two firms, Inroads Group, Ltd., of which he is the founding partner, and Berean Capital, Inc.

99.     Jackson is a longtime Democratic fund-raiser.  Along with Riordan, Jackson served as an officer of Si Se Puede Boston 2004, Inc. ("Si Se Puede"), a political action committee.  Governor Richardson, who served as the convention chairman for the 2004 Democratic presidential convention, formed Si Se Puede to pay the expenses of the convention.  Jackson and Riordan helped Governor Richardson raise the funds necessary to pay those expenses.  Although a citizen of the State of Texas, Jackson personally contributed in excess of $9,000 to Governor Richardson's gubernatorial campaigns and 2008 presidential campaign.

100.    Similar to his conduct towards Marc Correra, Bland at times recommended to investment management firms who were already in contact with NMSIC that they hire Jackson as a purported third-party marketer.

101.    Jackson had a close relationship with Meyer and was one of a handful of politically-connected individuals who facilitated Aldus's appointment as NMSIC's advisor/consultant for its National Private Equity Program, even though Aldus was a firm without an established track record.  Jackson previously served on the board of a Texas investment fund that became an Aldus client.

102.    In order to repay Jackson for facilitating Aldus's lucrative appointment as NMSIC's advisor/consultant, as well as to curry favor with Jackson in hopes of securing additional investments for Aldus, Meyer and Aldus recommended that NMSIC invest in deals on which Jackson stood to receive payments, primarily so that Jackson would receive those payments, and not primarily because the investments were in the best interest of the Public Trust Funds.  In one instance, NMSIC invested $100,000,000 in Austin Capital Safe Harbor QP Fund, Ltd., generating payments of $2,100,000 for Jackson's firm Berean Capital, Inc.  On information and belief, Jackson met with Bland in Santa Fe on or about May 23, 2005, to discuss this investment.  In total, Jackson secured in excess of $3,400,000 in such payments in connection with alternative investments made by NMSIC.

103.    In connection with NMSIC's $100,000,000 investment in Austin Capital Safe Harbor QP Fund, Ltd., the management firm Austin Capital Management, Ltd. sought to and did remove from a draft side agreement any mention that Jackson on behalf of Berean Capital, Inc.

was involved in the solicitation of the investment.  However, several years later, in response to
the 2009 NMSIO Questionnaire, Austin Capital Management stated that Jackson had represented
it and the fund to NMSIC and had negotiated the compensation agreement paying Berean
Capital, Inc. $2,100,000.

104.     In addition to those payments, NMSIC made a direct investment in a fund
managed by Capital Point Management, L.P., thereby generating management fees for Capital
Point.  A substantial portion of those management fees, which were paid by NMSIC, went to
Jackson, who was a majority owner of Capital Point.

105.     Jackson knew or willfully disregarded the fact that the primary reason Bland,
Meyer and Aldus advised and directed NMSIC to make those alternative investments was to
serve their own interests and Jackson's interests, in breach of their fiduciary duties to NMSIC,
and therefore that his receipt of those payments was improper.  Jackson knowingly took steps to
conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's
breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of
interest.  Jackson knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a
*quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Weinstein and Schiff**

106.     Weinstein and Schiff were politically-connected individuals and the principals of
a placement agent firm known as DAV/Wetherly Financial, LP (collectively with its affiliates
"Wetherly").  Weinstein and Schiff aided and abetted the pay-to-play scheme and were unjustly

enriched; Wetherly was paid more than $2,250,000 in fees in connection with alternative investments made by NMSIC.

107.    Weinstein was a fund-raiser for various California politicians and had influence with the California Public Employees' Retirement System ("CalPERS").  Schiff was a former director of the board for the Los Angeles City Employees' Retirement System ("LACERS").  In 2004, the Los Angeles City Ethics Commission issued a memorandum identifying Schiff's potential conflict of interest as a member of the LACERS board and principal of Wetherly. Nevertheless, in January 2005, the LACERS board, of which Schiff remained a member, approved an investment of $10,000,000 in a fund that was a Wetherly client.  Schiff resigned from the board two months thereafter.  Wetherly clients received an additional $30,000,000 in investments from LACERS over the following two years.

108.    Although based in California, Wetherly and its current and former executives contributed at least $31,000 to Governor Richardson's gubernatorial campaigns, presidential campaign and political action committees.  Wetherly associated with Ramirez, an unlicensed placement agent who had a relationship with Governor Richardson.  As early as 2003, Ramirez and Weinstein met with Governor Richardson and his staff to discuss, among other things, Governor Richardson's political action committee Moving America Forward.

109.    Through Wetherly, Weinstein and Schiff received payments in connection with several investments by NMSIC, and in several of those instances Wetherly split payments with Marc Correra, whom Wetherly purported to engage as a "sub-agent" in an effort to conceal his

involvement.  Those investments occurred over the same time period in which Wetherly entered into corrupt arrangements in New York.

110.    Schiff was also a member of AVP Advisors, LLC ("AVP"), an investment manager of real estate funds.  In 2007, NMSIC invested $50,000,000 in AVP's American Value Partners Fund I.  Even though AVP already had a relationship with NMSIC's real estate fund consultant, and Schiff knew Bland personally, AVP entered into a contract with Wetherly (of which Schiff was a registered representative and owner), purportedly to act as a placement agent in connection with the sale of interests in AVP's American Value Partners Fund I to NMSIC, for a fee of $250,000.  AVP in turn entered into a "Selected Dealer Agreement" with Ajax Investments, LLC (where Marc Correra was registered), to act as a "sub-agent" with respect to the investment.  In that agreement, Wetherly agreed to pay 100% of its $250,000 "placement" fee from AVP to Ajax Investments, LLC.  The purpose of that sub-agent agreement was to conceal the *quid pro quo* payment to Marc Correra.  AVP did not pay a placement agent fee in connection with any other investment in its fund, including investments made by any other state or municipal entity, including the North Carolina Department of State Treasurer, CalPERS, the California State Teachers' Retirement System ("CalSTRS"), and the New York City Employee Retirement System ("NYCERS").  To date, NMSIC's investment with AVP has lost approximately half of its value.

111.    In order to curry favor with Weinstein in hopes of securing investments in Aldus by CalPERS, Meyer and Aldus recommended that NMSIC invest in deals on which Weinstein

stood to receive payments, primarily so that Weinstein would receive those payments, and not primarily because the investments were in the best interest of the Public Trust Funds.

112.    Weinstein and Schiff knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and the interests of Marc Correra, Weinstein and Schiff, in breach of their fiduciary duties to NMSIC, and therefore that their receipt of those payments was improper.  Weinstein and Schiff knowingly took steps to conceal their receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Weinstein and Schiff knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

### Ramirez

113.    Ramirez, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with alternative investments made by NMSIC.

114.    Ramirez served as former California Governor Gray Davis's deputy chief of staff, and served as a political consultant for a number of California Democratic campaigns.  Ramirez was an unlicensed broker for Wetherly and later a licensed broker for Park Hill Group, LLC.  Ramirez received payments in connection with at least eight alternative investments by NMSIC.

115.    Ramirez, a citizen of the State of California, personally contributed $5,000 to Governor Richardson's 2002 gubernatorial campaign and $2,300 to Governor Richardson's 2008

presidential campaign.  Ramirez also contributed approximately $7,000 to a political action

committee that was the second largest contributor to Governor Richardson's 2008 presidential

campaign.

116.    Ramirez had a close relationship with Meyer.  Ramirez was one of a handful of

politically-connected individuals who facilitated Aldus's appointment as NMSIC's

advisor/consultant for its National Private Equity Program, even though Aldus was just a

fledgling firm.

117.    Upon information and belief, Ramirez received payments in excess of $2,000,000

in connection with alternative investments made by NMSIC.  For example, on a NMSIC deal in

2004, an investment management firm, Aurora Management Partners, LLC, entered into a

"placement" agreement with Wetherly, and neither the firm nor Wetherly disclosed that payments

were made to Ramirez, an unlicensed placement agent.  Despite repeatedly denying that Ramirez

was paid in connection with the investment, the firm admitted in the 2009 NMSIO Questionnaire

that Ramirez had in fact received payments in connection with that deal.  On a later deal, an

investment management firm, Vincente Capital Partners, LLC (formerly known as Kline Hawkes

Growth Equity Fund Advisors, LLC), paid "placement" fees to both Ramirez and Marc Correra.

Although that firm had discussed with Aldus a potential investment by NMSIC, and had done so

without the involvement of Ramirez or Marc Correra, Aldus directed Vincente Capital Partners,

LLC to enter into "placement" agreements for the benefit of Ramirez and Marc Correra in order

to secure an investment from NMSIC.  To date, NMSIC has experienced a negative return on its

investment with Vincente Capital Partners, LLC.

118.    Meyer and Aldus were willing to recommend that NMSIC invest in deals for which Ramirez stood to receive payments, primarily so that Ramirez would receive those payments, and not primarily because the investments were in the best interest of the Public Trust Funds, and even directed investment management firms that were already in contact with NMSIC to enter into "placement" agreements with Ramirez.  This was done in order to repay Ramirez for facilitating Aldus's appointment as NMSIC's advisor/consultant and to ensure that Ramirez would continue to favor Aldus in New York by concealing prior corrupt deals and arranging new deals among Aldus, Ramirez and Morris.

119.    Ramirez knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and Ramirez's interests, in breach of their fiduciary duties to NMSIC, and therefore that his receipt of those payments was improper.  Ramirez knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Ramirez knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Riordan**

120.    Riordan, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with alternative and fixed income investments made by NMSIC.

121.    Riordan, a former Democratic fund-raiser and friend of Governor Richardson who was associated with Wachovia Securities, LLC ("Wachovia"), contributed at least $41,560 to Governor Richardson's gubernatorial campaigns.  Governor Richardson appointed Riordan as a New Mexico State Game Commissioner.  Along with Jackson, Riordan served as an officer of Si Se Puede, a political action committee.  Governor Richardson, who served as the convention chairman for the 2004 Democratic presidential convention, formed Si Se Puede to pay the expenses of the convention.  Jackson and Riordan helped Governor Richardson raise the funds necessary to pay those expenses.  Along with Anthony Correra, Riordan served as a trustee of Moving America Forward and was a member of the search committee involved in hiring Bland as the State Investment Officer.  Riordan was a close personal friend of Bland.  The two would often go hunting together.

122.    In early 2004, NMSIO was looking for an advisor for its New Mexico Private Equity Program and for the management of a conventional fixed income portfolio.  Riordan went to Fort Washington Investment Advisors, Inc. (with its affiliates, including Fort Washington Capital Partners, LLC, "Fort Washington") and told them he could get them approved as a private equity and fixed income advisor for NMSIC.  Knowing Riordan had made a deal with Fort Washington to get paid on NMSIC business, Bland caused NMSIO to appoint Fort Washington as an investment advisor.

123.    Riordan had no written agreement with Fort Washington at the time Bland appointed Fort Washington as an investment advisor.  Approximately six months later, Fort Washington and Riordan entered into a written solicitation agreement.  The agreement provided

that Fort Washington would pay Riordan a percentage of all of NMSIC's payments to Fort
Washington.  In addition to acting as an investment advisor, Fort Washington also acted as a fund
manager for the New Mexico Co-Investment Fund.  Without doing any work, Riordan was
entitled under the agreement to receive a percentage of all of Fort Washington's fees from the
fund.

124.    In 2005, the SEC accused Riordan of paying kickbacks to former New Mexico
State Treasurer Michael Montoya in return for state business for Wachovia.  After an evidentiary
hearing and an appeal, the SEC found that Riordan had committed securities fraud, barred him
from associating with any broker or dealer, and ordered him to cease and desist from committing
or causing any future antifraud violations, to disgorge $938,353.78 (plus prejudgment interest)
and to pay a civil monetary penalty of $500,000.

125.    Riordan, through Wachovia, received improper payments in connection with
investments by NMSIC in a fixed income portfolio, the New Mexico Private Equity Program
(including the New Mexico Co-Investment Fund) and a private equity fund.

126.    Riordan knew or willfully disregarded the fact that the primary reason Bland
appointed Fort Washington as both an investment advisor and a fund manager was to serve the
interests of Bland and Riordan, in breach of Bland's fiduciary duties to NMSIC, and therefore
that Riordan's receipt of a percentage of Fort Washington's fees was improper.  Riordan
knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's
breach of his fiduciary duties – from any members of NMSIC without a disabling conflict of

interest. Riordan knowingly facilitated the pay-to-play scheme of Bland as a *quid pro quo* for favors and benefits in New Mexico.

**Howell**

127.    Howell, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with alternative investments made by NMSIC.

128.    Howell is a close friend of Meyer who also has served as a Democratic fund-raiser. Although a citizen of New York, Howell personally contributed $10,000 to Governor Richardson's 2006 gubernatorial campaign.

129.    In 2006, Howell traveled to New Mexico to meet with Marc Correra and discuss business.

130.    Howell received payments in connection with at least two investments by NMSIC. Those investments, in funds named GSC Recovery III, L.P. and InterMedia Partners VII, L.P., generated payments for Howell in excess of $600,000. The general partner of GSC Recovery III, L.P. has declared bankruptcy.

131.    Meyer and Aldus recommended that NMSIC invest in funds peddled by Howell primarily so that Meyer and Aldus could curry favor with Howell, who had substantial connections in the investment world and could assist Aldus in selling interests in its own funds. Meyer and Aldus also recommended that NMSIC invest in Howell's funds to repay Howell for helping Meyer and Aldus preserve their position as the investment advisor of an unrelated private equity fund.

132.    In May 2004, the GSC Recovery III, L.P. fund entered into an agreement with Howell's company, Pension Enhancement Consulting ("PEC"), to pay placement agent fees in connection with NMSIC investments in the fund.  GSC Recovery III, L.P. stated in 2005 that no "placement agent" had been enlisted in seeking an investment from NMSIC.  Three years later, after NMSIC had approved a $30,000,000 investment in the GSC Recovery III, L.P. fund, GSC Recovery stated in response to the 2009 NMSIO Questionnaire that Howell received $450,000 for "acting as a placement agent" in connection with NMSIC's investment in that fund.

133.    The other investment fund, InterMedia Partners VII, L.P., is managed by InterMedia Partners, L.P., a principal of which, Leo Hindery, Jr., contributed in excess of $50,000 to Governor Richardson's campaigns.  InterMedia Partners, L.P. entered into an agreement with Howell and PEC, effective February 2006, to pay placement agent fees in connection with NMSIC investments in the fund.  Bland asked Meyer to give special consideration to an investment by NMSIC in InterMedia Partners VII, L.P., and NMSIC invested $30,000,000 in that fund.  InterMedia Partners, L.P. acknowledged in response to the 2009 NMSIO Questionnaire that Howell had been paid $150,000 for "consulting services" in connection with NMSIC's investment.

134.    Despite receiving the aforementioned payments for purportedly serving, *inter alia*, as a placement agent, Howell swore in an affidavit dated June 9, 2011 that he "has never transacted any business in the State of New Mexico," "did not introduce or refer InterMedia to any New Mexico investment," has never had "contact with any governmental officials of the State of New Mexico," and "did not participate in the recommendation an due diligence process

to place the investment [in GSC Recovery III, L.P.]."  He has also sworn that the only occasion

on which he traveled to New Mexico was in April 2006, when he "had dinner with Marc Correra

in Santa Fe" and engaged in "a general discussion of my clientele and the potential for working

together [with Marc Correra] in the future."

135.    Howell has acknowledged making payments to Marc Correra.  In his June 9,

2011, affidavit, Howell swore that:  (1) GSC Recovery III contacted Marc Correra's firm, SDN

Advisors, when an unspecified "issue" arose "before the investment was finally approved" by

NMSIC; (2) SDN Advisors provided unspecified "assistance . . . on behalf of GSC Recovery III"

in seeking a commitment from NMSIC; (3) after NMSIC made that investment, "[p]ayments by

GSC Recovery III to SDN Advisors for this service were made through Monroe Street, LLC, a

Florida limited liability company" which had "assumed the obligations of Pension Enhancement

Consultant [sic] under its agreement to act as a consultant to GSC Recovery III;" (4) Howell is

"the managing member" of Monroe Street, LLC; and (5) on two occasions, Howell "*personally*

funded the payments for Monroe Street, LLC [to SDN Advisors], on behalf of GSC Recovery

III."[1]

136.    Howell knew or willfully disregarded the fact that the primary reason Bland,

Meyer and Aldus advised and directed NMSIC to make those alternative investments was to

serve their own interests and Howell's interests, in breach of their fiduciary duties to NMSIC,

and therefore that his receipt of those payments was improper.  Howell knowingly took steps to

_____

[1] Emphasis added.

conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's

breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of

interest.  Howell knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a

*quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Rosen**

137.    Rosen, another politically-connected individual, aided and abetted the pay-to-play

scheme and was enriched substantially and unjustly in connection with alternative investments

made by NMSIC.

138.    Rosen formerly served as CEO and Finance Chairman of the Democratic National

Committee.

139.    In connection with multiple alternative investments made by NMSIC, including

Fenway Partners Capital Fund III ("Fenway") and the Optima Fund Limited ("Optima"), Rosen

received between $300,000 and $900,000 in payments through Diamond Edge Capital Partners,

LLC ("Diamond Edge"), of which he is a partner.  After Rosen approached senior members of

Governor Richardson's staff, Anthony Correra instructed Bland, Meyer and/or Aldus to advise

and direct NMSIC to make investments for which Rosen stood to receive payments.

140.    The placement agent agreements for those deals were signed by a Diamond Edge

employee named Lori Schiaffino.  Those agreements did not mention Rosen.  However, several

years later, in response to the 2009 NMSIO Questionnaire, two of those investment funds

identified Rosen as the purported placement agent and contact person on those deals.

141.    One of those investments involved Fenway.  Marc Correra was paid a placement agent fee equal to 2% of the amount NMSIC invested in the fund.  Despite the fact that Diamond Edge (through Rosen) did not introduce Fenway to NMSIC and performed no work in connection with NMSIC's investment in Fenway, Diamond Edge and Rosen were paid a fee equal to 1% of the amount NMSIC invested in the fund for purportedly serving as a placement agent.  To date, NMSIC has experienced a negative return on its investment in Fenway.  Another deal involved Optima, which initially, and before engaging Diamond Edge, actively pursued an investment from NMSIC.  NMSIC evaluated the fund at that time and decided against awarding Optima an allocation.  A few months later, after Optima had entered into a placement agreement with Diamond Edge, Bland directed NMSIC to invest in Optima, which he then characterized as a fund showing good performance.

142.    Rosen knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and Rosen's interests, in breach of their fiduciary duties to NMSIC, and therefore that his receipt of those payments was improper.  Rosen knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Rosen knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Daniel Hevesi**

143.    Daniel Hevesi, another politically-connected individual and the son of Alan Hevesi, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with at least one alternative investment made by NMSIC.

144.    Daniel Hevesi was the managing director of Praetorian Securities, LLC, and through that entity he received payments in connection with at least one investment by NMSIC in the Catterton Partners VI, L.P. ("Catterton VI") fund.  In preparing an investment memorandum for that deal, Meyer and Aldus did not disclose that Daniel Hevesi or Praetorian Securities, LLC stood to receive payment.  In late February 2006, Meyer and Aldus secured an investment of $200,000,000 from the NYCRF, then under the control of Daniel Hevesi's father Alan Hevesi.  Approximately one week later, Meyer and Aldus recommended that NMSIC invest $30,000,000 in the Catterton VI fund.  Shortly thereafter, NMSIC approved an investment of $25,000,000.  That investment made no mention of Daniel Hevesi's involvement.  Daniel Hevesi later thanked Meyer personally "for 'NM'."

145.    Meyer and Aldus were willing to give special consideration to potential NMSIC investments on which Daniel Hevesi stood to receive payment so that Daniel Hevesi would favor Meyer and Aldus in New York and provide protection in case Aldus's corrupt relationship with Morris soured, and Aldus would need to curry favor directly with Alan Hevesi.

146.    Daniel Hevesi knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and Daniel Hevesi's interests, in breach of their fiduciary duties to

NMSIC, and therefore that his receipt of those payments was improper.  Daniel Hevesi

knowingly took steps to conceal his receipt of those improper payments – and to conceal

Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC

without a disabling conflict of interest.  Daniel Hevesi knowingly facilitated the pay-to-play

scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and

elsewhere.

**Morris**

147.    Morris, another politically-connected individual, aided and abetted the pay-to-

play scheme and was enriched substantially and unjustly in connection with alternative

investments made by NMSIC.  As detailed *supra*, Morris was one of the principal perpetrators of

the New York pay-to-play scheme and pled guilty to criminal charges.  Morris has been

sentenced to and is currently serving a term of up to four years in prison.

148.    Over the same time period in which he entered into corrupt arrangements in New

York, Morris, through his company Searle & Co., stood to improperly receive payments in

connection with at least two alternative investments by NMSIC.  Those investments were in

funds managed by Carlyle Investment Management, LLC ("Carlyle") and Quadrangle GP

Investors II, L.P. ("Quadrangle").  Carlyle entered into a "placement" agreement with Searle &

Co. after Aldus had conducted its due diligence on the fund at issue, and Morris did no work in

connection with that fund.  In response to the 2009 NMSIO Questionnaire, Carlyle failed to

disclose Morris as the contact person and negotiator of the remuneration agreement on behalf of

Searle & Co.  Quadrangle entered into a "placement" agreement with Searle & Co. in connection

with any commitment by NMSIC, but after it secured the investment refused to pay Searle & Co. because Morris's company did not perform any work to earn a fee.

149.    Meyer and Aldus were willing to give special consideration to potential NMSIC investments on which Morris stood to receive payment, and even directed investment management firms to enter into "placement" agreements with Morris, in order to ensure that Morris would continue to favor Aldus in New York by concealing prior corrupt deals and arranging new deals among Aldus, Ramirez and Morris.

150.    Morris knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and Morris's interests, in breach of their fiduciary duties to NMSIC, and therefore that his receipt of those payments was improper.  Morris knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Morris knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

### **Wissman**

151.    Wissman, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with alternative investments made by NMSIC.

152.    Wissman was the manager of the Dallas-based hedge fund Hunt Financial Ventures ("HFV").

153.    Wissman arranged for HFV to make bogus placement agent payments to Marc Correra as *quid pro quo* to secure NMSIC investments in at least three of Wissman's hedge funds, Vintage Classic, LLC, HFV Multi-Strategy Limited and TAG Relative Value Offshore Fund Ltd.  Through HFV, Wissman received management fees paid directly by NMSIC in connection with those investments.

154.    Wissman knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus advised and directed NMSIC to make those alternative investments was to serve their own interests and the interests of Wissman and Marc Correra, in breach of their fiduciary duties to NMSIC, and therefore that his receipt of those payments was improper. Wissman knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Wissman knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Broidy**

155.    Broidy, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with at least one alternative investment made by NMSIC.

156.    Broidy, founder and Chairman of California-based venture fund Markstone Capital Group LLC ("Markstone"), is a former finance committee chairman for the Republican National Committee.

157.    In response to a due diligence questionnaire in 2003, which was provided to NMSIC in connection with NMSIC's investment, Markstone stated that it was not engaging any placement agent in connection with any potential investment by NMSIC.  Nonetheless, Broidy and Markstone paid a "placement" fee to Carr as directed by Bland or someone within Governor Richardson's administration, as a *quid pro quo* to obtain NMSIC's investment in Markstone. Carr was not a registered representative of a registered broker-dealer, and therefore a payment of a placement agent fee by Broidy to Carr violated federal and New Mexico securities laws. Through Markstone, Broidy received management fees paid directly by NMSIC in connection with those investments.

158.    Broidy knew or willfully disregarded the fact that the primary reason Bland, Meyer and Aldus directed NMSIC to make that alternative investment was to serve their own interests and Broidy's and Carr's interests, in breach of their fiduciary duties to NMSIC, and therefore that Broidy's receipt of those payments was improper.  Broidy knowingly took steps to conceal his receipt of those improper payments – and to conceal Bland's, Meyer's and Aldus's breach of their fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Broidy knowingly facilitated the pay-to-play scheme of Bland, Meyer and Aldus as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

**Carr**

159.    Carr, another politically-connected individual, aided and abetted the pay-to-play scheme and was enriched substantially and unjustly in connection with at least one alternative investment made by NMSIC.  On information and belief, Carr, both in person and through his

agents, transacted business in New Mexico.  Carr personally attended at least one meeting in

New Mexico with Bland and others in furtherance of the pay-to-play scheme at which they

discussed at least one investment through which Carr would receive a payment.

160.    Carr, a former Congressman from Michigan, is a close friend and supporter of

Governor Richardson.  They served together in the U.S. House of Representatives.  Carr has

never been a registered representative of a registered broker-dealer.

161.    In May 2003, Markstone was in the process of soliciting NMSIC for an

investment in a private equity fund.  In a due diligence questionnaire response, Markstone stated

that it was not using a placement agent.  Later that year, Carr forwarded information about

Broidy and Markstone to a member of Governor Richardson's staff, who in turn forwarded that

information to Bland.  Carr then contacted Bland directly, describing himself as "[a] friend of

Bill Richardson & yours."  On December 5, 2003, Carr attended at meeting in Santa Fe with

Bland and Broidy to discuss an investment by NMSIC in Markstone.  Thereafter, political

pressure was brought to bear on Bland to approve a NSMIC investment in Markstone in order to

ensure that Carr, Governor Richardson's friend, was paid a fee.  Bland recommended the

investment and it was approved by NMSIC.  Carr received a $100,000 fee from Markstone.

Markstone also paid other placement agents in connection with the same NMSIC investment.

162.    Carr knew or willfully disregarded the fact that the primary reason Bland directed

NMSIC to make that alternative investment was to serve his, Broidy's and Carr's interests, in

breach of Bland's fiduciary duties to NMSIC, and therefore that Carr's receipt of those payments

was improper.  Carr knowingly took steps to conceal his receipt of those improper payments –

and to conceal Bland's breach of his fiduciary duties – from any members of NMSIC without a disabling conflict of interest.  Carr knowingly facilitated the pay-to-play scheme of Bland as a *quid pro quo* for favors and benefits in New Mexico and elsewhere.

163.   The actions of Bland, Meyer and Aldus described above were designed not to further the interests of NMSIC, the Public Trust Funds and their beneficiaries, but to further their own adverse personal interests and interests of the politically-connected individuals referenced above, to the detriment of NMSIC, the Public Trust Funds and their beneficiaries.  The pay-to-play scheme described above was not disclosed to NMSIC members who did not have a disabling conflict of interest.

## FIRST COUNT

### (Breach of Fiduciary Duty Against Bland, Meyer and Aldus)

164.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 168 of this Complaint as if fully set forth herein.

165.   Bland, Meyer and Aldus breached their fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by wrongfully causing NMSIC to make investments on behalf of the Public Trust Funds based on their own selfish interests and the personal, political and financial interests of politically-connected individuals and their associates, including Defendants named herein, rather than based solely on the best interests of the Public Trust Funds and their beneficiaries, the citizens of New Mexico.

166.   Bland knew that Meyer and Aldus owed fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico.

167.    Bland further breached his fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by knowingly and intentionally providing substantial assistance and encouragement to Meyer and Aldus to breach their fiduciary duties.

168.    Meyer and Aldus knew that Bland owed fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico.

169.    Meyer and Aldus further breached their fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by knowingly and intentionally providing substantial assistance and encouragement to Bland to breach his fiduciary duties.

170.    The Public Trust Funds and their beneficiaries have been damaged by Bland's, Meyer's and Aldus's breaches of their fiduciary duties.

171.    Bland, Meyer and Aldus breached their fiduciary duties in a manner that was willful, wanton, reckless and oppressive.

## SECOND COUNT

### (Breach of Contract Against Aldus)

172.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 176 of this Complaint as if fully set forth herein.

173.    Aldus breached the Professional Services Contract by providing investment advice and other services to NMSIC when it had an interest that conflicted with the best interests of the Public Trust Funds and the citizens of New Mexico.

174.    The Public Trust Funds and their beneficiaries have been damaged by Aldus's

breach of the Professional Services Contract.

## THIRD COUNT

**(Aiding and Abetting Breach of Fiduciary Duty Against Riordan, Marc Correra,
Anthony Correra, Jackson, Weinstein, Schiff, Ramirez, Wissman, Howell,
Rosen, Daniel Hevesi, Broidy, Carr and Morris)**

175.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

179 of this Complaint as if fully set forth herein.

176.    Riordan, Marc Correra, Anthony Correra, Jackson, Weinstein, Schiff, Ramirez,

Wissman, Howell, Rosen, Daniel Hevesi, Broidy, Carr and Morris (collectively the "Aiding and

Abetting Defendants") knew that Bland, Meyer and Aldus owed fiduciary duties to the Public

Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico.

177.    The Aiding and Abetting Defendants aided and abetted Bland's, Meyer's and

Aldus's breaches of their fiduciary duties to the Public Trust Funds and the beneficiaries of those

trust funds, the citizens of New Mexico, by knowingly and intentionally providing substantial

assistance and encouragement to Bland, Meyer and Aldus in connection with one or more

alternative investments made by NMSIC.

178.    The Public Trust Funds and their beneficiaries have been damaged by the Aiding

and Abetting Defendants' aiding and abetting Bland's, Meyer's and Aldus's breaches of their

fiduciary duties.

179.    In a manner that was willful, wanton, reckless and oppressive, the Aiding and Abetting Defendants aided and abetted Bland's Meyer's and Aldus's breaches of their fiduciary duties.

180.    In light of the foregoing, the Aiding and Abetting Defendants should be held equally liable with Bland, Meyer and Aldus.

## FOURTH COUNT

### (Unjust Enrichment Against All Defendants Except Aldus)

181.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 185 of this Complaint as if fully set forth herein.

182.    Defendants knowingly unjustly enriched themselves at the expense of and to the detriment of the Plaintiff, the Public Trust Funds and the citizens of the State of New Mexico.

183.    Defendants' retention of monies wrongfully collected, directly and indirectly, from the Plaintiff, the Public Trust Funds and the citizens of the State of New Mexico violates fundamental principles of justice, equity and good conscience.


WHEREFORE, Plaintiff prays for relief and judgment as follows:

1.    Compensatory damages.

2.    Restitution and disgorgement of moneys unjustly obtained.

3.    Punitive damages.

4.    Statutory interest.

5.    Such other and further relief as this Court may deem necessary and just.

-45-

Dated: July 17, 2012

GARY K. KING,
Attorney General of New Mexico


By   /s/ Scott Fuqua
      Scott Fuqua
      Assistant Attorney General
      P.O. Drawer 1508
      Santa Fe, New Mexico 87504
      (505) 827-6920
      (505) 827-5826 (Fax)


      and


Special Assistant Attorneys General

      Kenneth W. Ritt
      Clifford E. Nichols III
      Day Pitney LLP
      One Canterbury Green
      Stamford, Connecticut 06901
      (203) 977-7300
      (203) 977-7301 (Fax)


      *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 17, 2012, I served a true and correct copy of the foregoing on counsel of record via filing with the Odyssey File and Serve system.


 /s/ Scott Fuqua_____
Scott Fuqua

# EXHIBIT "B"

FILED IN MY OFFICE
DISTRICT COURT CLERK
2/25/2016 4:22:47 PM
STEPHEN T. PACHECO
Avalita Kaltenbach

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

THE NEW MEXICO STATE INVESTMENT COUNCIL,
as Trustee, Administrator and Custodian of the LAND
GRANT PERMANENT FUND and the SEVERANCE
TAX PERMANENT FUND,

       Plaintiff,     Case No. D-101-CV-2011-01534

vs.

GARY BLAND, *et al.*,

       Defendants.

## PLAINTIFF'S MOTION FOR ORDER COMPELLING
## DEPOSITION OF DEFENDANT ANTHONY CORRERA

  Plaintiff, the New Mexico State Investment Council ("NMSIC"), hereby moves, pursuant
to Rule 1-037(D)(3) of the Rules of Civil Procedure for the District Courts, for an order
compelling the defendant Anthony Correra to appear at his deposition and answer questions
under oath.

  In support of the motion, Plaintiff makes the following supporting points:

  1.  On December 10, 2015, Plaintiff served a notice calling for the deposition of
defendant Anthony Correra to be taken at the offices of Day Pitney in New York starting at
10:00 a.m. on Tuesday, February 22, 2016.  A copy of the notice is attached as Exhibit A.

  2.  On February 16, 2016, Anthony Correra's counsel sent an e-mail to Plaintiff's
counsel asking whether his client's deposition could be postponed until March, because Mr.

Correra's wife, Tina, had broken her hip.  In a second e-mail, Anthony Correra's counsel said

that, if not, "we will figure out how to make it work Wednesday."  Copies of the e-mail referred

to in this motion are attached as Exhibit B.

      3.      On February 17, 2016, Plaintiffs' counsel responded by e-mail saying that the

deposition could not be postponed and reminding Anthony Correra's counsel that the deposition

was noticed to start on Tuesday, not Wednesday.

      4.      Anthony Correra's counsel then sent an e-mail in which he asked to have the

deposition start on Wednesday, because "I cannot get here Tuesday morning."

      5.      Plaintiff's counsel reminded Anthony Correra's counsel by e-mail that that the

deposition could not be pushed back, because defendant Marc Correra's deposition was noticed

to start on Thursday, February 25.

      6.      After speaking with counsel for defendant Marc Correra, Anthony Correra's

counsel sent an e-mail to Plaintiff's counsel with a proposal that he take the depositions of

Anthony and Marc Correra on February 24, 25 and 26, 2016, with earlier start times.

      7.      On February 18, 2016, Plaintiff's counsel sent an e-mail in which he advised

counsel for Anthony and Marc Correra that Plaintiff agreed to the proposal.

      8.      On February 19, 2016, Plaintiff served a revised notice calling for the deposition

of Anthony Correra to start at 8:30 a.m. on Wednesday, February 24.  A copy of the revised

notice is attached as Exhibit C.

      9.      On Monday, February 22, counsel for Anthony Correra left a voice mail message

for Plaintiff's counsel saying that his client would not appear for the deposition, because he

would be "covered by the bankruptcy stay" that would enter when Marc Correra filed a

bankruptcy petition.

10.     Plaintiff's counsel sent an e-mail to counsel for Anthony Correra saying that, if

Marc Correra filed for bankruptcy, the automatic stay would enter as to the debtor alone and

stating that, if Anthony Correra did not appear at his noticed deposition, Plaintiff would file a

motion under Rule 1-037 NMRA.

11.     Shortly thereafter, Anthony Correra filed a notice of nonappearance, a copy of

which is attached here to Exhibit D.

12.     It is axiomatic that the automatic stay under 11 U.S.C. § 362 does not extend to

non-debtors.   State ex rel. Udall v. Wimberly, 1994-NMCA-121,  ¶ 13 ("[t]he automatic stay

statute does not control actions brought against non-debtor entities, even where there is a close

nexus between those non-debtors and their bankruptcy affiliate" (citation omitted)).   There is no

exception to the automatic stay rule that stays this action as to the defendant Anthony Correra

and his counsel has failed to articulate one.

13.     Rule 1-037(D)(3) NMRA provides that, if a party fails to appear at his duly

noticed deposition, the court "may make such orders in regard to the failure as are just," and, in

addition to any other orders, "shall require the party failing to [appear] or the attorney advising

that party or both to pay the reasonable expenses, including attorneys' fees, caused by the failure.

WHEREFORE, Plaintiff respectfully moves this Court for an order requiring defendant

Anthony Correra to appear at a deposition and answer questions under oath, and to require the

defendant, his attorney or both to pay the reasonable expenses, including attorneys' fees, caused

by Anthony Correra's failure to appear at his deposition.


Dated: February 25, 2016                    Respectfully submitted,

                                            STATE OF NEW MEXICO


                                              /s/ Bruce A. Brown
                                            Bruce A. Brown
                                            Deputy General Counsel
                                            New Mexico State Investment Council
                                            Special Assistant Attorney General
                                            41 Plaza La Prensa
                                            Santa Fe, New Mexico 87507
                                            (505) 476-9517

                                            and

                                            Kenneth W. Ritt
                                            Special Assistant Attorney General
                                            Day Pitney LLP
                                            One Canterbury Green
                                            Stamford, Connecticut 06901
                                            (203) 977-7318

                                            John B. Nolan
                                            Special Assistant Attorney General
                                            Day Pitney LLP
                                            242 Trumbull Street
                                            Hartford, Connecticut 06103
                                            (860) 275-0289

                                            *Attorneys for Plaintiff*

# EXHIBIT A

FILED IN MY OFFICE
DISTRICT COURT CLERK
12/10/2015 1:26:49 PM
STEPHEN T. PACHECO
Veronica Rivera

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

THE NEW MEXICO STATE INVESTMENT COUNCIL,
as Trustee, Administrator and Custodian of the LAND
GRANT PERMANENT FUND and the SEVERANCE
TAX PERMANENT FUND,

                     Plaintiff,              Case No. D-101-CV-2011-01534

vs.

GARY BLAND, *et al.*,

                     Defendants.

## <u>NOTICE OF DEPOSITION OF ANTHONY CORRERA</u>

Please take notice that commencing at 10:00 a.m. on Tuesday, February 23, 2016, and

continuing on Wednesday, February 24, 2016, the plaintiff, the New Mexico State Investment

Council ("NMSIC"), will take the deposition upon oral examination of defendant Anthony

Correra by stenographic means before a person authorized to administer oaths by the State of

New York at the offices of Day Pitney LLP, 7 Times Square, 20th Floor, New York, New York.

Dated: December 10, 2015

Respectfully submitted,

STATE OF NEW MEXICO


   /s/ Bruce A. Brown
Bruce A. Brown
Deputy General Counsel
New Mexico State Investment Council
Special Assistant Attorney General
41 Plaza La Prensa
Santa Fe, New Mexico 87507
(505) 476-9517

and

Kenneth W. Ritt
Special Assistant Attorney General
Day Pitney LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 977-7318

John B. Nolan
Special Assistant Attorney General
Day Pitney LLP
242 Trumbull Street
Hartford, Connecticut 06103
(860) 275-0289

*Attorneys for Plaintiff*

I hereby certify that, on December 10, 2015, a true and correct copy of the foregoing was served

on counsel of record via the Odyssey File and Serve system.

/s/ Bruce A. Brown
Bruce A. Brown
Deputy General Counsel
New Mexico State Investment Council
41 Plaza La Prensa
Santa Fe, New Mexico 87507
(505) 476-9517

# EXHIBIT B

**Ritt, Kenneth W.**

| | |
|---|---|
| **From:** | Melinda Zamora <melinda@bowles-lawfirm.com> |
| **Sent:** | Monday, February 22, 2016 4:16 PM |
| **To:** | Ritt, Kenneth W.; Jason Bowles |
| **Cc:** | Nolan, John B.; GSK@kesslercollins.com; ltulk@kesslercollins.com |
| **Subject:** | RE: NMSIC v. Bland/Anthony Correra Deposition |
| **Attachments:** | Correra - Notice of Non Appearance.pdf |

Mr. Ritt,
Attached is the notice we submitted to the Court for filing.

Thank you.

**From:** Ritt, Kenneth W. [mailto:kwritt@daypitney.com]
**Sent:** Monday, February 22, 2016 2:02 PM
**To:** Jason Bowles <jason@bowles-lawfirm.com>
**Cc:** Nolan, John B. <jbnolan@daypitney.com>; GSK@kesslercollins.com; ltulk@kesslercollins.com; Melinda Zamora
<melinda@bowles-lawfirm.com>
**Subject:** RE: NMSIC v. Bland/Anthony Correra Deposition

Jason –

I called but got your voicemail.

I am interested in hearing the basis for your position that the automatic stay would apply to your client.

Please call me back.

Ken

> **From:** Jason Bowles [mailto:jason@bowles-lawfirm.com]
> **Sent:** Monday, February 22, 2016 3:39 PM
> **To:** Ritt, Kenneth W.
> **Cc:** Nolan, John B.; GSK@kesslercollins.com; ltulk@kesslercollins.com; Melinda Zamora
> **Subject:** Re: NMSIC v. Bland/Anthony Correra Deposition
>
> Ken - I did receive your voicemail and left you a voicemail and return. Anthony will not appear at his deposition
> on Wednesday and we are filing today a notice of nonappearance. We disagree with your interpretation of the
> automatic stay under bankruptcy law. Please call if you want to discuss. Thank you
>
> Sent from my iPhone
>
> On Feb 22, 2016, at 1:27 PM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>
>> Jason –
>>
>> This will confirm the voice mail message I just left you that we will be proceeding with Anthony
>> Correra's deposition on Wednesday morning.

I am not canceling the court reporter or the conference room.  I will be there and will create a record.

If Marc Correra files for bankruptcy protection today or tomorrow, an automatic stay will enter as to him and him alone.

There is no automatic stay as to any other party, including Anthony.

If Anthony does not appear at his noticed deposition, we will promptly file a motion for sanctions under Rule 1-037 NMRA.

Please acknowledge receipt of this e-mail and call me if you would like to discuss this further.

Best regards,

Ken

Kenneth W. Ritt | Attorney at Law | Attorney Bio

<image001.jpg>

One Canterbury Green | Stamford CT 06901-2047
t (203) 977 7318 | f (203) 399 5897
kwritt@daypitney.com | www.daypitney.com
BOSTON | CONNECTICUT | FLORIDA | NEW JERSEY | NEW YORK | WASHINGTON, DC   <image002.jpg> <image003.png> <image004.jpg>

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for the use of the addressee(s) named above. Any disclosure, distribution, copying or use of the information by others is strictly prohibited. If you have received this message in error, please notify the sender by immediate reply and delete the original message. Thank you.

*********************************************************************************

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for the use of the addressee(s) named above. Any disclosure, distribution, copying or use of the information by others is strictly prohibited. If you have received this message in error, please notify the sender by immediate reply and delete the original message. Thank you.

*********************************************************************************

**Ritt, Kenneth W.**

| | |
|---|---|
| **From:** | Ritt, Kenneth W. |
| **Sent:** | Thursday, February 18, 2016 12:10 PM |
| **To:** | 'Jason Bowles' |
| **Cc:** | Nolan, John B.; Munn, Kevin W.; Lisa Tulk; Gary Kessler (GSK@kesslercollins.com) |
| **Subject:** | RE: Anthony depo |

Jason -

We have advised our client of your proposal and we are ready to proceed as you suggest subject to final confirmation from Gary Kessler that he is on board with the plan and will give us the same assurance you are giving: that, however it would be accomplished, we would have 14 hours of testimony from the deponent at some point.

We are hoping to receive that confirmation today so that we can make new arrangements with the court reporter, etc.

Best regards,

Ken

-----Original Message-----
From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
Sent: Wednesday, February 17, 2016 5:19 PM
To: Ritt, Kenneth W.
Cc: Nolan, John B.
Subject: Re: Anthony depo

Will do, thanks.

Sent from my iPhone

> On Feb 17, 2016, at 3:14 PM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>
> Thanks, Jason.
>
> We will talk to the client and let you know.
>
> Meanwhile, let me know if you hear from Gary Kessler.
>
> -----Original Message-----
> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
> Sent: Wednesday, February 17, 2016 4:43 PM
> To: Ritt, Kenneth W.
> Cc: Nolan, John B.
> Subject: Re: Anthony depo
>
> Ken and Jay -
>
> Is the following acceptable to you both. Anthony would start on Wednesday at 830 and go to 12 and then 1-530 and then continue Thursday morning at 830 to 12. That would be 11.5 hours. If you needed more time with Anthony we

1

could agree that, however it was accomplished, there were 2.5 more hours on our original agreement - for a total of 14 hours. Any time you didn't need with Anthony we could start Marc's earlier but otherwise Marc would then begin 1-5 on Thursday and all day Friday. I have talked to Lisa Tulk but not Gary Kessler and Lisa said she thought that would be fine.

>
> Sent from my iPhone
>
>> On Feb 17, 2016, at 12:36 PM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>>
>> We are on. Can you join us.
>>
>> Dial-in: 800-993-4149
>> Participant code: 203 977 7318
>>
>>
>> -----Original Message-----
>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
>> Sent: Wednesday, February 17, 2016 12:35 PM
>> To: Ritt, Kenneth W.
>> Cc: Nolan, John B.
>> Subject: Re: Anthony depo
>>
>> Ok sounds Good. 1230 my Time?
>>
>> Sent from my iPhone
>>
>>> On Feb 17, 2016, at 10:29 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>>>
>>> I have to go to a meeting in three minutes. I should be free by noon your time and can talk thereafter.
>>>
>>> I would like to have my colleague Jay Nolan join us.
>>>
>>> What time works for you?
>>>
>>> -----Original Message-----
>>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
>>> Sent: Wednesday, February 17, 2016 12:16 PM
>>> To: Ritt, Kenneth W.
>>> Subject: Re: Anthony depo
>>>
>>> Ken can you talk in about 30 minutes or so?
>>>
>>> Sent from my iPhone
>>>
>>>> On Feb 17, 2016, at 9:46 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>>>>
>>>> Jason -
>>>>
>>>> As you know, we scheduled two days for Anthony followed by two days for Marc.
>>>>
>>>> What time could you start on Tuesday? There is a JetBlue flight from Albuquerque on Monday evening that gets in early Tuesday morning.
>>>>

>>>> Ken
>>>>
>>>> -----Original Message-----
>>>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
>>>> Sent: Wednesday, February 17, 2016 11:39 AM
>>>> To: Ritt, Kenneth W.
>>>> Subject: Re: Anthony depo
>>>>
>>>> Ken - in that case can we start Wednesday? I cannot get there Tuesday morning.
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On Feb 17, 2016, at 9:32 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>>>>>
>>>>> Jason -
>>>>>
>>>>> I am so sorry to hear that Tina broke her hip. I wish her a speedy recovery.
>>>>>
>>>>> We cannot, however, reset the deposition.
>>>>>
>>>>> I am glad you can figure out how to make it work.
>>>>>
>>>>> Please note that Anthony's deposition starts on Tuesday and continues on Wednesday.
>>>>>
>>>>> Ken
>>>>>
>>>>> -----Original Message-----
>>>>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
>>>>> Sent: Tuesday, February 16, 2016 11:02 PM
>>>>> To: Ritt, Kenneth W.
>>>>> Subject: Anthony depo
>>>>>
>>>>> If not we will figure out how to make it work on Wednesday
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>>
>>>>>
**********************************************************************************
********
>>>>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>>>>> the use of the addressee(s) named above. Any disclosure, distribution, copying or use of the
>>>>> information by others is strictly prohibited. If you have received this message in error, please
>>>>> notify the sender by immediate reply and delete the original message. Thank you.
>>>>>
**********************************************************************************
********
>>>>
>>>>
>>>>
**********************************************************************************
********

>>>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>>>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>>>> information by others is strictly prohibited.  If you have received this message in error, please
>>>> notify the sender by immediate reply and delete the original message.  Thank you.
>>>>
******************************************************************************************
********

>>>
>>>
>>>
******************************************************************************************
********

>>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>>> information by others is strictly prohibited.  If you have received this message in error, please
>>> notify the sender by immediate reply and delete the original message.  Thank you.
>>>
******************************************************************************************
********

>>
>>
>>
******************************************************************************************
********

>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>> information by others is strictly prohibited.  If you have received this message in error, please
>> notify the sender by immediate reply and delete the original message.  Thank you.
>>
******************************************************************************************
********

>
>
>
******************************************************************************************
********

> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
> information by others is strictly prohibited.  If you have received this message in error, please
> notify the sender by immediate reply and delete the original message.  Thank you.
>
******************************************************************************************
********

>

**Ritt, Kenneth W.**

| | |
|---|---|
| **From:** | Ritt, Kenneth W. |
| **Sent:** | Wednesday, February 17, 2016 5:15 PM |
| **To:** | 'Jason Bowles' |
| **Cc:** | Nolan, John B. |
| **Subject:** | RE: Anthony depo |

Thanks, Jason.

We will talk to the client and let you know.

Meanwhile, let me know if you hear from Gary Kessler.

-----Original Message-----
From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
Sent: Wednesday, February 17, 2016 4:43 PM
To: Ritt, Kenneth W.
Cc: Nolan, John B.
Subject: Re: Anthony depo

Ken and Jay -

Is the following acceptable to you both. Anthony would start on Wednesday at 830 and go to 12 and then 1-530 and then continue Thursday morning at 830 to 12. That would be 11.5 hours. If you needed more time with Anthony we could agree that, however it was accomplished, there were 2.5 more hours on our original agreement - for a total of 14 hours. Any time you didn't need with Anthony we could start Marc's earlier but otherwise Marc would then begin 1-5 on Thursday and all day Friday. I have talked to Lisa Tulk but not Gary Kessler and Lisa said she thought that would be fine.

Sent from my iPhone

> On Feb 17, 2016, at 12:36 PM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:
>
> We are on.  Can you join us.
>
> Dial-in: 800-993-4149
> Participant code: 203 977 7318
>
>
> -----Original Message-----
> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
> Sent: Wednesday, February 17, 2016 12:35 PM
> To: Ritt, Kenneth W.
> Cc: Nolan, John B.
> Subject: Re: Anthony depo
>
> Ok sounds Good.  1230 my Time?
>
> Sent from my iPhone
>

1

>> On Feb 17, 2016, at 10:29 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:

>>

>> I have to go to a meeting in three minutes.  I should be free by noon your time and can talk thereafter.

>>

>> I would like to have my colleague Jay Nolan join us.

>>

>> What time works for you?

>>

>> -----Original Message-----

>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]

>> Sent: Wednesday, February 17, 2016 12:16 PM

>> To: Ritt, Kenneth W.

>> Subject: Re: Anthony depo

>>

>> Ken can you talk in about 30 minutes or so?

>>

>> Sent from my iPhone

>>

>>> On Feb 17, 2016, at 9:46 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:

>>>

>>> Jason -

>>>

>>> As you know, we scheduled two days for Anthony followed by two days for Marc.

>>>

>>> What time could you start on Tuesday?  There is a JetBlue flight from Albuquerque on Monday evening that gets in early Tuesday morning.

>>>

>>> Ken

>>>

>>> -----Original Message-----

>>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]

>>> Sent: Wednesday, February 17, 2016 11:39 AM

>>> To: Ritt, Kenneth W.

>>> Subject: Re: Anthony depo

>>>

>>> Ken - in that case can we start Wednesday? I cannot get there Tuesday morning.

>>>

>>> Sent from my iPhone

>>>

>>>> On Feb 17, 2016, at 9:32 AM, Ritt, Kenneth W. <kwritt@daypitney.com> wrote:

>>>>

>>>> Jason -

>>>>

>>>> I am so sorry to hear that Tina broke her hip.  I wish her a speedy recovery.

>>>>

>>>> We cannot, however, reset the deposition.

>>>>

>>>> I am glad you can figure out how to make it work.

>>>>

>>>> Please note that Anthony's deposition starts on Tuesday and continues on Wednesday.

>>>>

>>>> Ken

>>>>
>>>> -----Original Message-----
>>>> From: Jason Bowles [mailto:jason@bowles-lawfirm.com]
>>>> Sent: Tuesday, February 16, 2016 11:02 PM
>>>> To: Ritt, Kenneth W.
>>>> Subject: Anthony depo
>>>>
>>>> If not we will figure out how to make it work on Wednesday
>>>>
>>>> Sent from my iPhone
>>>>
>>>>
>>>>
*************************************************************************************
********
>>>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>>>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>>>> information by others is strictly prohibited.  If you have received this message in error, please
>>>> notify the sender by immediate reply and delete the original message.  Thank you.
>>>>
*************************************************************************************
********
>>>
>>>
>>>
*************************************************************************************
********
>>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>>> information by others is strictly prohibited.  If you have received this message in error, please
>>> notify the sender by immediate reply and delete the original message.  Thank you.
>>>
*************************************************************************************
********
>>
>>
>>
*************************************************************************************
********
>> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for
>> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
>> information by others is strictly prohibited.  If you have received this message in error, please
>> notify the sender by immediate reply and delete the original message.  Thank you.
>>
*************************************************************************************
********
>
>
>
*************************************************************************************
********
> This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for

3

> the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the
> information by others is strictly prohibited.  If you have received this message in error, please
> notify the sender by immediate reply and delete the original message.  Thank you.
>
> *********************************************************************************************
> ********
>

**Ritt, Kenneth W.**

| | |
|---|---|
| **From:** | Jason Bowles <jason@bowles-lawfirm.com> |
| **Sent:** | Tuesday, February 16, 2016 11:02 PM |
| **To:** | Ritt, Kenneth W. |
| **Subject:** | Anthony depo |

If not we will figure out how to make it work on Wednesday

Sent from my iPhone

**Ritt, Kenneth W.**

| | |
|---|---|
| **From:** | Jason Bowles <jason@bowles-lawfirm.com> |
| **Sent:** | Tuesday, February 16, 2016 11:00 PM |
| **To:** | Ritt, Kenneth W. |
| **Subject:** | Anthony depo |

Ken - I talked to Anthony today and Tina, his wife, broke her hip. She is 7 years older than Anthony. He is taking care of her. Is there any way to reset Anthony's depo on a date in March, near or around others you have set?

Sent from my iPhone

# EXHIBIT C

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

THE NEW MEXICO STATE INVESTMENT COUNCIL,
as Trustee, Administrator and Custodian of the LAND
GRANT PERMANENT FUND and the SEVERANCE
TAX PERMANENT FUND,

                        Plaintiff,                Case No. D-101-CV-2011-01534

vs.

GARY BLAND, *et al.*,

                        Defendants.

## NOTICE OF DEPOSITION OF ANTHONY CORRERA

Please take notice that commencing at 8:30 a.m. on Wednesday, February 24, 2016, and

continuing on Thursday, February 25, 2016, the plaintiff, the New Mexico State Investment

Council ("NMSIC"), will take the deposition upon oral examination of defendant Anthony

Correra by stenographic means before a person authorized to administer oaths by the State of

New York at the offices of Day Pitney LLP, 7 Times Square, 20th Floor, New York, New York.

Dated: February 19, 2016                    Respectfully submitted,

                                            STATE OF NEW MEXICO


                                             /s/ Bruce A. Brown
                                            Bruce A. Brown
                                            Deputy General Counsel
                                            New Mexico State Investment Council
                                            Special Assistant Attorney General
                                            41 Plaza La Prensa
                                            Santa Fe, New Mexico 87507
                                            (505) 476-9517

                                            and

                                            Kenneth W. Ritt
                                            Special Assistant Attorney General
                                            Day Pitney LLP
                                            One Canterbury Green
                                            Stamford, Connecticut 06901
                                            (203) 977-7318

                                            John B. Nolan
                                            Special Assistant Attorney General
                                            Day Pitney LLP
                                            242 Trumbull Street
                                            Hartford, Connecticut 06103
                                            (860) 275-0289

                                            *Attorneys for Plaintiff*

# EXHIBIT D

FILED IN MY OFFICE
DISTRICT COURT CLERK
2/22/2016 2:14:59 PM
STEPHEN T. PACHECO
Jorge Montes

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

-------------------------------------------------------------------- x

THE NEW MEXICO STATE INVESTMENT
COUNCIL, as Trustee, Administrator, and Custodian
of the LAND GRANT PERMANENT FUND and the
SEVERANCE TAX PERMANENT FUND,

                 Plaintiff,

       -against-

GARY BLAND, GUY RIORDAN, SAUL MEYER,
RENAISSANCE PRIVATE EQUITY PARTNERS,
LP d/b/a ALDUS EQUITY PARTNERS, LP, MARC
CORRERA, ANTHONY CORRERA, ALFRED
JACKSON, DANIEL WEINSTEIN, VICKY L.
SCHIFF, JULIO RAMIREZ, BARRETT WISSMAN,
WILLIAM HOWELL, MARVIN ROSEN, DANIEL
HEVESI, ELLIOTT BROIDY, MILTON ROBERT
CARR, and HENRY MORRIS,

                Defendants.

-------------------------------------------------------------------- x

Case No. D-101-CV-201101534

## NOTICE OF NON APPEARANCE AT DEPOSITION

     Anthony Correra, by and through his counsel of record, Jason Bowles from

Bowles Law Firm, hereby gives notice that Anthony Correra will not appear for his

deposition, currently scheduled for February 24, 2016.  As grounds, Marc Correra will

file for bankruptcy on February 22 or February 23, 2016, and the automatic stay applies

to Anthony Correra in this case.

Respectfully submitted,

/s/ Jason Bowles
Jason Bowles
Bowles Law Firm
Post Office Box 25186
Albuquerque, NM  87125-0186
Telephone: (505) 217-2680
Jason@Bowles-Lawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was sent through the ESF system, which caused the following parties to be served by electronic means, as reflected on the Notice of Electronic Filing this 22nd day of February, 2016 to all Counsel listed through this Court's Electronic Filing System.

/s/ Jason Bowles
Jason Bowles
Bowles Law Firm

I hereby certify that, on February 25, 2016, a true and correct copy of the foregoing was served

on counsel of record via the Odyssey File and Serve system.

 /s/ Bruce A. Brown_____
Bruce A. Brown
Deputy General Counsel
New Mexico State Investment Council
41 Plaza La Prensa
Santa Fe, New Mexico 87507
(505) 476-9517

# EXHIBIT "C"

Page 1

IN RE:  Marc Anthony Correra, Case Number 16-30728-SGJ7

TRANSCRIPTION OF 341 MEETING OF CREDITORS, recorded in the above-mentioned case, transcribed from CD by Sherry Patterson, CSR in and for the State of Texas, as follows:

Page 2

1                    (Begin recording.)

2                    THE COURT:  All right.  We're going back on the

3    record.  The next case we're taking on the 9:50 docket is Marc

4    Anthony Correra Case Number 16-30728-SGJ7.  The Debtor is

5    present with his attorney.  We have a number of folks present.

6    Mr. Correra's presented his driver's license, Social Security

7    card, and verification ID, I have a copy here.  And my name is

8    Jim Cunningham.  I'm the Chapter Seven Trustee.  First of all,

9    Mr. Correra, let me swear you in, and then we'll get

10   appearances.  Would you raise your right hand.

11                   (The oath was administered.)

12                   THE COURT:  All right.  Then let's go around the

13   room, everybody say who they are, and then we'll start.

14                   MR. WEISBART:  I'm Mark Weisbart, the attorney

15   for Mr. Correra.

16                   MR. BAKER:  I'm Gregory Baker representing

17   creditors Gregory Baker and Laurie Baker.

18                   THE COURT:  Okay.

19                   MR. NOLAN:  I'm John Nolan.  I represent the New

20   Mexico State Investment Council.

21                   MR. YATES:  Jarom Yates from Haynes & Boone,

22   also representing the New Mexico State Investment Council.

23                   THE COURT:  All right.

24                   MR. YAQUINTO [Phonetic]:  I'm Rob Yaquinto.  I

25   represent Jimmy Cunningham, the Trustee.

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 3

1            THE COURT:  Okay.  Anybody else going to do any

2    talking in this meeting?  All right, go ahead.

3            MR WEISBART:  Okay.  You want me to begin?

4            THE COURT:  Yeah.

5            MR. WEISBART:  Mark Weisbart, bankruptcy counsel

6    for Mr. Correra.

7                            EXAMINATION

8    BY MR. WEISBART:

9       Q.   Mr. Correra, let's just discuss briefly what caused

10   you to have to file bankruptcy.  We'll go through your

11   schedules and then --

12      A.   Okay.

13      Q.   -- cover a couple of other items.  And then you can

14   answer questions as they're asked.

15      A.   Sure.

16      Q.   There were a confluence of events that caused you to

17   have to file bankruptcy; is that correct?

18      A.   That's correct.

19      Q.   First you went through a divorce?

20      A.   Correct.

21      Q.   And when -- was it a bitter, contested divorce?

22      A.   To say the least.

23      Q.   Okay.  And over what period of time did that divorce

24   occur?

25      A.   I think the divorce was started, first filed in 2010

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 4

1    and finalized sometime in 2014.

2        Q.   Okay.  And you've -- so that's number one.  Number

3    two, you've been involved in some extensive litigation; is that

4    correct?

5        A.   That is correct.

6        Q.   And has that been expensive?

7        A.   Very much so.

8        Q.   And has the litigation -- I'm not going to ask you to

9    go through each specific lawsuit.  But from a broad brush

10   standpoint, a lot of it involves securities-related claims?

11       A.   Most of them do.

12       Q.   And you've been named in connection with those claims

13   largely in New Mexico; is that correct?

14       A.   Correct.

15       Q.   And you've been named as someone who's aided and

16   abetted certain parties who have been alleged to have committed

17   securities-related offenses?

18       A.   That's the allegation.

19       Q.   Okay.  And also there's a lawsuit, Mr. Baker is here,

20   involving a sale of a house --

21       A.   Correct.

22       Q.   -- that occurred in New Mexico, and he's filed a

23   lawsuit related to that; is that right?

24       A.   Correct.

25       Q.   All right.  And what was your profession?

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 5

1       A.   I was an investment advisor.

2       Q.   Okay.  And when's the last time you've had

3  employment?

4       A.   The last time I've had income has been almost seven

5  years at this point.

6       Q.   Okay.  And your loss of employment or income is

7  related to --

8       A.   Directly to the lawsuit.

9       Q.   -- the lawsuits, right?

10      A.   Yes.

11      Q.   All right.  Is there any other reasons you can think

12  of off the top of your head for having to file this case?

13      A.   Those are -- those are the substantial reasons why.

14      Q.   Okay, all right.  Let's just flip through your

15  schedules here.

16      A.   Sure.

17      Q.   And let me know --

18           MR. WEISBART:  For the Trustee's benefit, we

19  filed an amended schedule, amended petition late yesterday or

20  yesterday, and they were mainly to correct and add some

21  relatively minor things.  The petition was amended to correct a

22  typo and an address.

23           The schedules were amended to correctly identify

24  Mr. Correra's father as a creditor and then, too, the statement

25  of financial affairs were identified to reflect the -- the

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 6

1    addition of Trustmark Bank as being an account that was closed

2    under that particular question and list another entity that

3    Mr. Correra had affiliation with called SDN Advisors.

4              THE COURT.  Okay.

5              MR. WEISBART:  And there was one other

6    correction that just -- I noticed it today that didn't get made

7    that should have been made, and that is Schedule I indicates

8    that Mr. Correra has rental income.

9         Q.   That is not the case; is that correct?

10        A.   That's correct.

11        Q.   All right.

12             MR. BAKER:  Excuse me, I didn't hear.

13             MR. WEISBART:  Mr. Correra does not have rental

14   income.

15        Q.   All right.  And you reside in -- in Dallas County; is

16   that correct?

17        A.   I do.

18        Q.   Okay.  And you also maintain a place in France; is

19   that right?

20        A.   I have a place there where my children are.

21        Q.   Okay.  But -- and again, this is a glitch in the new

22   software.  But your mailing address is Dallas, right?

23        A.   It's Dallas, yes.

24        Q.   Okay.  And that's -- in the petition it triggered the

25   French address.

Page 7

1              All right.  And those addresses are reflected under

2    Schedule A; is that right, interest in property?

3        A.   Yes, that is correct.

4        Q.   Okay, all right.  I'm going to touch on the high

5    points here.  You've identified certain bank accounts that you

6    maintained.  Are these a list of your accounts at the time of

7    filing?

8        A.   Yes, they are.

9        Q.   And as best you can tell, they're accurate balances?

10       A.   Yes, that is correct.

11       Q.   Okay.  You also listed two IRA accounts; is that

12   correct?

13       A.   That is correct.

14       Q.   And can you tell us when those IRAs were created?

15       A.   I think the IRA was originally created probably 1985,

16   1986.

17       Q.   So a long time?

18       A.   A long time, when I first started working.

19       Q.   And have you funded the IRA at all in the past five,

20   six years or so?

21       A.   No, I have not.

22       Q.   Okay.  You've identified some rental deposits in

23   connection with the leases of real estate or your apartments?

24       A.   That is correct.

25       Q.   The Barclays one is pretty high.  Can you -- why is

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 8

1    it so high, do you know?

2        A.    At the time I was living in France when the apartment

3    was rented.  Since I was not working and not a French citizen

4    they required a substantial deposit against the rental of the

5    apartment.

6        Q.    Okay.  And that's with Barclays Bank; is that

7    correct?

8        A.    That is correct.

9        Q.    All right.  You've also identified various custodial

10   educational accounts for your children.  How many children do

11   you have?

12       A.    I have two children, two boys.

13       Q.    And roughly when were those accounts commenced?

14       A.    The children were born in 2002, and they were funded

15   shortly after that up until probably 2009 with the last

16   contribution to those.

17       Q.    Okay.  And you listed a family trust; is that

18   correct?

19       A.    That is correct.

20       Q.    Do you -- when was that trust document prepared?

21       A.    Probably around the time my children were born.

22       Q.    Okay.  Was it --

23       A.    2002.

24       Q.    Was it ever activated?  Was it ever funded with

25   anything?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 9

1       A.    No.  There are no assets in it.

2       Q.    Have there ever been any assets in it?

3       A.    There never have been.

4       Q.    All right.  We've listed some potential claims

5    against third parties for commissions.  And could you just

6    generally describe what those are?

7       A.    They are commissions that were owed to me at the time

8    while I was working.  They -- when the litigation started in

9    2009, many of my clients stopped paying me even though they

10   owed me money at that point.

11      Q.    Okay.  And do you have any information related to

12   those claims if the Trustee wants to see that information?

13      A.    Yes.  Most of those agreements were done through my

14   broker dealer at the time, but yes, I can provide anything you

15   need on that.

16      Q.    Okay.  Now, most of the creditors that you've listed

17   relate to claims or potential claims involving the litigation;

18   is that right?

19      A.    That is correct.

20      Q.    By way of receiving money or -- how are you getting

21   by currently?

22      A.    My family is lending me money at this time.

23      Q.    Okay.  And is that your sole source of --

24      A.    It is.

25      Q.    -- of funds.  All right, okay.  Let's touch base with

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 10

1    your statement of financial affairs.  And the custodial

2    accounts, we've -- you have no interest in those, correct?

3        A.   I do not.

4        Q.   Okay.  We've listed those for disclosure purposes,

5    correct?

6        A.   Correct.

7        Q.   We've listed the various lawsuits.  If the Trustee

8    has questions on those I'll let him ask them.  And let's see,

9    we listed for disclosure purposes transfers to your father, on

10   Question 18.

11       A.   Yes.

12       Q.   Okay.  And within two years of the bankruptcy filing

13   you paid your father this amount of money; is that correct?

14       A.   That is correct.

15       Q.   3,735,000?

16       A.   Correct.

17       Q.   Okay.  Were those repayments of loans?

18       A.   Yes, they were.

19       Q.   Were any made within the year prior to the

20   bankruptcy?

21       A.   No, they have not.

22       Q.   Okay.  And where did you get the money to make those

23   payments?

24       A.   My money -- my assets were frozen for the -- during

25   the divorce, the period of time, so I had no access to any of

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 11

1    my funds for almost five years.  Finally when the divorce was

2    settled the funds were released, and then at that point I was

3    able to repay the loans.

4         Q.   Okay.  And so the loans were in payment of moneys

5    that were lent to you to --

6         A.   Oh, yes.

7         Q.   -- to survive while your funds were frozen; is that

8    right?

9         A.   Yes, yes.

10        Q.   Are you expecting any tax refunds?

11        A.   I am not.

12        Q.   Okay.  And you're working on your 2014 tax return?

13        A.   I am.  They're at the accountants now.

14        Q.   Is it likely that anyone's going to pass away in the

15   next six months and leave you an inheritance?

16        A.   No.

17        Q.   If that happens will you agree to let me know and let

18   the Trustee know, because those rights may belong to the

19   bankruptcy estate.

20        A.   Absolutely.

21             MR. WEISBART:  Okay.  I have no questions at

22   this time -- no further questions.

23             THE COURT:  All right.  We'll just go around in

24   this order.  Mr. Baker, go ahead.

25                              EXAMINATION

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 12

1   BY MR. BAKER:

2        Q.   Mr. Correra, on your official Form 107 Statement of

3   Financial Affairs for Individuals Filing for Bankruptcy on Page

4   6 there's a line towards the bottom that says Claudia Correra,

5   ex-wife, division of property in divorce April 2014.  You're

6   supposed to list the address, and I don't see it there.  What

7   is her current address?

8        A.   I don't have that in front of me, but I can probably

9   provide that for you.

10       Q.   You were also supposed to state the value of the

11   property transferred, and I don't see it there.  What was the

12   value of the property transferred?

13       A.   In the divorce settlement?

14       Q.   Yes.

15       A.   I believe it was about $4.5 million.

16       Q.   Do you have documentation of that?

17       A.   I do.

18       Q.   Do you have a divorce decree?

19       A.   Yes, I do.

20       Q.   And from which jurisdiction is that?

21       A.   The divorce decree is from France.

22       Q.   And do you have property transfer documentation?

23       A.   Yes.

24       Q.   What -- by what name does your former wife now go?

25       A.   I believe she goes by several names.  I think she --

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 13

1    sometimes I've seen her use her maiden name.

2        Q.   What name is that?

3        A.   DeCosta.

4        Q.   One word or two?

5        A.   I've seen it spelled both ways.

6        Q.   What other names does she use?

7        A.   Only ones I know.

8        Q.   Does she live in the United States?

9        A.   I don't know where she maintains her full-time

10   residence.

11       Q.   Do you know if she has a property in the United

12   States where she sometimes lives?

13       A.   I do not know.

14       Q.   Do you know if she sometimes lives in France?

15       A.   She does sometimes live in France.

16       Q.   And what is the address there?

17       A.   69 Avenue Victor Hugo.

18       Q.   Is that your address?

19       A.   It's the address of the apartment that's rented in

20   Paris.

21       Q.   So your ex-wife is living at your apartment in Paris;

22   is that right?

23       A.   Well, what we have is we have the children live in

24   that apartment, so the children are living in that apartment

25   full-time.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 14

1       Q.   And sometimes your ex-wife lives there?

2       A.   And then sometimes I'm in there also when I go back.

3       Q.   What other locations does your wife live at?

4       A.   That's the only one I know of for sure right now.

5    She doesn't keep a permanent residence there.  I don't know

6    where she goes when I go to that apartment.

7       Q.   On the official Form 106 J, your expenses on Page 1,

8    it lists two 13-year-old sons.

9            MR. WEISBART:  Hang on a second so we can find

10   the form.  Which form is it?

11           MR. BAKER:  Your expenses, Page 1 --

12           MR. WEISBART:  I just want to show it to him.  I

13   don't have it here.  Thank you.

14           THE COURT:  Are we looking at the amendment, or

15   are we looking at Document 15?  Pleading 15?

16           MR. WEISBART:  I think he's looking at Schedule

17   J; is that right?

18           THE COURT:  Yeah.

19           MR. BAKER:  Schedule J that was entered on

20   03/14/2016.

21           THE COURT:  Yeah, right.  So it's Page 93 of 94

22   on the PDF Schedule J.

23           MR. WEISBART:  Okay, thank you.

24      Q.   All right.  It lists two 13-year-old sons as being

25   dependents, correct?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 15

1      A.    Where is that?  Yes, correct.

2      Q.    And you see in the column on the right-hand side,

3   does dependent live with you?  And in both instances you've

4   checked no.

5      A.    That's correct.

6      Q.    So this property that you own in Paris --

7      A.    I do not own the property.

8      Q.    Let me correct that.

9           This property on Avenue Victor Hugo in Paris where

10   you sometimes live --

11      A.    Correct.

12      Q.    When you sometimes live there, do your dependents

13   live there as well?

14      A.    My -- the dependents live there full-time.  When I go

15   visit my children, that's where I go.

16      Q.    On official Form 106 H, Schedule H, your CoDebtors,

17   Page 1 of 25, this is Page 66 of 94 on your March 2014 filing.

18   Item two talks about within the last eight years have you lived

19   in a community property state, identifying a series of states,

20   including New Mexico, and you said yes.  And then underneath

21   that, did your spouse, former spouse, or legal equivalent live

22   with you at the time?  You say yes.  Then you say in which

23   community state or territory did you live?  You say none.  Is

24   that a correct answer, sir?

25           MR. WEISBART:  No, that's not a correct answer.

Page 16

1      A.   No.

2           MR. WEISBART:  That's a mistake on our part.

3   And that should be Texas, correct?

4           MR. CORRERA:  At the time with my -- with --

5   when I was married it was New Mexico.

6           MR. WEISBART:  Okay.

7      Q.   And so what is the current address of that person

8   which you were supposed to fill in there?

9      A.   I don't know, as I said in the previous question.

10     Q.   Weren't you supposed to provide complete and accurate

11  information in your submissions?

12     A.   To the best of my ability.

13          MR. WEISBART:  We'll check and see if there's an

14  address to add.

15     Q.   On your official Form 106 EF --

16     A.   Excuse me.  Were you asking for the address of when

17  the -- where I lived in New Mexico?

18     Q.   No.  I'm asking for the address now of your former

19  wife.

20     A.   Oh, no, I don't have that, no.

21          MR. WEISBART:  Okay.  That's been asked a couple

22  of times now.

23     Q.   On Page 106 EF, creditors who have unsecured claims.

24     A.   What page are we on now?

25     Q.   We're on Page 22 of 51.  If you look towards the top

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 17

1     of Page 22 of 51 of your amended filing on March 29th of this

2     year you'll see a reference to Hands Engineering as being a

3     nonparty creditor, and you identify them as contingent,

4     unliquidated, and disputed claims.  Why did you check all those

5     boxes, sir?

6          A.   Could you tell me where this is?

7          Q.   Yes.  It's Page 22 of 51, on your amended filing from

8     March 29th.

9          A.   Okay.  I'm sorry, could you repeat the question?

10         Q.   Yes.  You have checked there claims, check all that

11    apply, contingent, unliquidated, and disputed.  Why do you have

12    that there?

13         A.   There is an outstanding lawsuit on this issue, and I

14    believe that Hand Engineering is one of the defendants in that

15    case.

16         Q.   Do you have claims against Hands Engineering?

17         A.   I do not believe so.

18         Q.   Does Hands Engineering have claims against you?

19         A.   I do not believe so.

20         Q.   Then again, can you tell me why those are checked?

21         A.   I provided all of the outstanding litigation that was

22    there to counsel, and based on --

23              MR. WEISBART:  You provided names of not only

24    people who you know are asserting claims against you, correct,

25    but also names of creditors who might arguably have claims

Page 18

1    whether you know of them or not, correct?

2                    MR. CORRERA:  That's correct.

3                    MR. WEISBART:  Know of a specific claim or not;

4    is that correct?

5                    MR. CORRERA:  That's correct.

6                    MR. BAKER:  In the interest of time, I'll defer

7    my remaining questions and pass the witness to Mr. Nolan.

8                    THE COURT:  All right.  Go ahead.

9                            EXAMINATION

10   BY MR. NOLAN:

11        Q.   Mr. Correra, do you have a Texas driver's license?

12        A.   Yes, I do.

13        Q.   When was it issued?

14                   MR. WEISBART:  Who's -- I'm sorry.  Your name,

15   sir?

16                   MR. NOLAN:  John Nolan, N-o-l-a-n.

17                   MR. WEISBART:  Okay.  Thank you.

18                   MR. NOLAN:  I represent the state of New Mexico.

19                   MR. WEISBART:  Thank you.

20        A.   The date on this driver's license when it was issued

21   looks like November 8th, 2013.

22        Q.   Is that the first Texas driver's license you ever

23   had?

24        A.   No.  I probably owned a Texas driver's license

25   sometime in the past.

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 19

1      Q.   Did you ever live in Texas before -- before 2013?

2      A.   Yes.

3      Q.   When?

4      A.   We had property here, geez, a very long time ago.  I

5  would have to go check on that.

6      Q.   Did you ever file an affidavit with a state court in

7  Texas that said you never lived in Texas?

8      A.   I said we had property here in Texas.

9      Q.   My question was have you ever lived in Texas until

10  recently?

11      A.   Yeah.  I lived in Texas in -- since 20 -- I guess it

12  was 2012 I moved to Texas.

13      Q.   Okay.

14      A.   2013.

15      Q.   Did your -- did your wife start a divorce case

16  against you in Texas?

17      A.   She originally filed in Texas.  We have a

18  jurisdictional dispute over that.

19      Q.   And the basis for the jurisdictional dispute was your

20  claim that you never lived in Texas, right?

21      A.   No.  I believe that the basis of the jurisdictional

22  dispute was that we were living in France.

23      Q.   Did you ever file an affidavit with the state court

24  of Texas in which you said you never lived in Texas or in

25  that --

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 20

1      A.   It is possible, yes.

2      Q.   Okay.  And would that have been a mistake?

3      A.   No.  I believe the -- no.  If I said I moved -- what

4  is the date of the affidavit?

5           MR. WEISBART:  Do you have a copy of the

6  affidavit?

7      A.   Do you have a copy of the affidavit?

8           MR. NOLAN:  I do.  I'll move on.

9           MR. WEISBART:  All right.

10     A.   Because I moved -- I moved -- my children were in

11  school in Texas in -- I'm going to say 2013.

12     Q.   Your children were in school in Texas where?

13     A.   Katy.

14     Q.   They lived in Katy?

15     A.   Yeah.

16     Q.   In what -- with whom were they living?

17     A.   At the time they were living with myself and my

18  ex-wife.

19     Q.   In 2013?

20     A.   2013, correct.

21     Q.   And you moved -- you and your wife and your children

22  moved from Paris to Katy, Texas, in 2013?

23     A.   Let me just think of the date, but I believe that is

24  correct.

25     Q.   And your divorce decree became final in 2014?

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 21

1    A.   I believe that's correct.

2    Q.   And that was in Paris?

3    A.   It was split -- the children's jurisdiction was in

4  Texas, and the divorce was in Paris.

5    Q.   My question is solely related to the divorce.  You

6  were divorced in the Texas -- in Paris, correct?

7    A.   Correct.

8    Q.   And was that by agreement ultimately?

9    A.   I don't understand the question.

10   Q.   Was there an agreement, or did a Judge decide who got

11  what?

12   A.   It was an agreement.

13   Q.   And what was -- what were the terms of the agreement

14  in 2014?

15   A.   It was rather lengthy; but I got to keep some money,

16  she got to keep some money.

17   Q.   And the total amount of the money was in excess of

18  $10 million?

19   A.   Approximately.

20   Q.   It was more than $10 million, correct?

21   A.   I would believe so.

22   Q.   How much more than $10 million?

23   A.   I'd have to go check.

24   Q.   What would you have to go check?

25   A.   Because expenses were -- see, at the time also I

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 22

1  don't know if you're asking the question about liabilities,

2  because I had no access to this money.  So at the time I had to

3  borrow money to live on and pay attorneys.

4       Q.   And that was because you couldn't work?

5       A.   It was also -- no.  The bank accounts were frozen.

6       Q.   You could have gone to work?

7       A.   No, I could not work.  I was -- I still have not been

8  able to find a job.

9       Q.   Have you been looking for a job?

10      A.   I have.

11      Q.   So were you living at Avenue Victor Hugo at that

12  point?

13      A.   At which point?

14      Q.   The time you were divorced.

15      A.   At the time of the final decree of the divorce I was

16  living in Texas.

17      Q.   Okay.  And -- and Avenue Victor Hugo is what -- you

18  live both places, correct?

19      A.   No.

20      Q.   You just live in Texas?

21      A.   I just live in Texas.

22      Q.   What's your address in Texas?

23      A.   My address in Texas is 46 --

24           THE COURT:  We're not supposed to put home

25  addresses on the record.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 23

1           MR. NOLAN:  I'm sorry.

2           THE COURT:  But he can give that afterwards.

3     It's in the pleadings.

4     Q.    When did you move into that apartment?

5     A.    That apartment, after I moved from Katy I moved to

6     Dallas probably end of September of 20 -- of last year, so

7     2015.

8     Q.    Okay.  And in France Avenue -- the apartment on

9     Avenue Victor Hugo is not your first residence in Paris, was

10    it?

11    A.    No.  When I first moved to Paris I was still married

12    at the time.  I lived at a different address.

13    Q.    That was Rue de Galilee?

14    A.    That is correct.

15    Q.    Was that an apartment as well?

16    A.    Yes, it was.

17    Q.    What's the rent on the Avenue Victor Hugo apartment

18    at the present time, sir?

19    A.    Present time -- I'll give it to you in Euros so I

20    don't have to convert.  I believe it's about 3600 Euros a

21    month.

22    Q.    3600.  It's not $11,000 a month?

23    A.    No.

24    Q.    Is that your share, or is that the total?

25    A.    That's my share.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 24

```
 1        Q.    And what's your wife's share?

 2        A.    She has no share in that.

 3        Q.    So you pay all the rent in Paris?

 4        A.    That's correct.

 5        Q.    And your sons go to school in Paris at the present

 6   time?

 7        A.    Yes, they do.

 8        Q.    Who pays for that?

 9        A.    I do.

10        Q.    Where do you get that money?

11        A.    I borrowed that from my family also.

12        Q.    What school do your children go to?

13              MR. WEISBART:  Is that important?

14        A.    Is that necessary?

15        Q.    Yes.

16        A.    Because we've been harassed quite a bit from the

17   press.

18              MR. WEISBART:  What is the necessity of what

19   school his children go to?

20              MR. NOLAN:  I'll ask the question another way.

21        Q.    Is it a public school or a private school, sir?

22        A.    It's a private school.

23        Q.    How much do you pay for tuition?

24        A.    I haven't paid anything for this.  My family's paying

25   for it.
```

Page 25

1      Q.   Who in your family?

2      A.   My parents.

3      Q.   Your father and your mother?

4      A.   Correct.

5      Q.   Okay.  Does your mother have a job?

6      A.   No.

7      Q.   Is your father retired as well?

8      A.   Yes, sir.

9      Q.   How much is the payment for your children's education

10   by your parents?

11     A.   Almost 45,000 Euros each.

12     Q.   So that's close to $60,000?

13     A.   Possibly, yeah.

14          THE COURT:  Is that per year or --

15          MR. CORRERA:  Correct.

16          THE COURT:  -- semester?

17     Q.   Okay.  In addition to the tuition, who pays the

18   expenses for your children to eat and be clothed and live?

19     A.   Those are shared.  When they're with her, she pays

20   them.  And when they're with me, I pay them.

21     Q.   Does your wife have a job?

22     A.   I do not know.

23     Q.   When's the last time you talked to your wife?

24     A.   Probably we -- several days ago.

25     Q.   You keep track -- do you know how to get ahold of her

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 26

1    if you have to?

2         A.    I have a phone number.

3         Q.    But you don't know where she lives?

4         A.    Not when she's not there, no.

5         Q.    And you don't know whether she has a job or not?

6         A.    I do not.

7         Q.    Do you know whether she has any money?

8         A.    I do not.

9         Q.    How long have you maintained a residence in France?

10        A.    We -- that apartment I believe was first rented in

11   February of 2012.

12        Q.    That's Victor Hugo?

13        A.    Correct.

14        Q.    And when was Rue de Galilee?

15        A.    2010.

16        Q.    Who pays the --

17               MR. WEISBART:  Are you sure of that, or are you

18   guessing?

19        A.    I'm not.  Some of these dates I'm --

20        Q.    2009, wasn't it?  Isn't that right, sir?

21        A.    It could be.  It could be.

22        Q.    You left New Mexico in 2009?

23        A.    I believe so.

24               MR. WEISBART:  If you're not sure don't --

25        A.    Yeah.  I'm -- some of these dates I will have to go

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 27

1    check.

2                   MR. WEISBART:   And we can check and get the

3    information to you.

4         A.   We can get back to you on all this stuff.

5                   MR. NOLAN:   Appreciate it.

6         A.   But off the top of my head, these are all from a long

7    time ago.

8         Q.   Do you own any assets in Texas?

9         A.   Sure.

10        Q.   What?

11        A.   Car, furniture, television.

12        Q.   What car do you own?

13        A.   2004 Ford Explorer.

14        Q.   When did you obtain that?

15        A.   Last week.

16        Q.   Where did you get the money for it?

17        A.   Again, from my family.   They're supporting me.

18        Q.   Are you on some kind of a regular payment schedule

19   with your family?

20        A.   I'm not at this point since I have no income.

21        Q.   And they just send you money when you ask for it, or

22   they send it to you on a regular basis, or do you have access

23   to a bank account?

24        A.   A little of both.   A little of both.

25        Q.   Do you have access to a bank account in your parents'

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 28

1    names?

2        A.   No, I do not.

3        Q.   Do you have any credit cards?

4        A.   Yes, I do.

5        Q.   What credit cards do you have?

6        A.   I have an American Express card.

7        Q.   How long have you had that card?

8        A.   1985.  It's probably printed if you want to know.

9        Q.   Who pays the bills?

10       A.   It comes out of the money -- from the money I borrow

11   from my parents.

12       Q.   How much have you borrowed from your parents in 2015,

13   taking into account what's been borrowed for your children?

14       A.   I'd have to go check.  I don't know offhand.

15       Q.   How much in excess of $100,000 would you say it is?

16       A.   I would have to check.  I don't know.

17       Q.   What do you have to check?

18       A.   Well, there's a lot of expenses.  I mean, my legal

19   expenses, too.  I'd have to check attorney fees and things like

20   that.

21       Q.   How many attorneys do you have working for you at the

22   present time?

23       A.   Too many.  But probably --

24       Q.   That's a typical lament.

25       A.   Probably I guess two firms.

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 29

1        Q.   What firms?

2        A.   Mark's firm and a firm that's representing me,

3   Kessler Collins.

4        Q.   Are you a citizen of another country besides the

5   United States?

6        A.   I am.

7        Q.   What country is that?

8        A.   Italy.

9        Q.   Do you have an Italian passport?

10        A.   I do not have a current Italian passport at this

11   time.

12        Q.   When's the last time you were out of the United

13   States?

14        A.   Ten days ago.

15        Q.   Where were you?

16        A.   Paris.

17        Q.   And how long had you been in Paris?

18        A.   Prior to that I had been in Paris for about three

19   weeks.

20        Q.   What were you doing in Paris?

21        A.   Visiting my children.

22        Q.   Who paid for your fare?

23             MR. WEISBART:  I don't understand why this is

24   important.  And so if you can explain to me what it has to do

25   with his financial condition or the schedules and statement of

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 30

1    financial affairs, then --

2                    MR. NOLAN:  I'm trying to test the accuracy of

3    some of his statements and --

4                    MR. WEISBART:  Which statements are you trying

5    to test the accuracy of in his --

6                    MR. NOLAN:  That he has no income.

7                    MR. WEISBART:  Okay.  So --

8                    THE COURT:  Let me just --

9                    MR. WEISBART:  I'm not going to --

10                   THE COURT:  In the interest of time, I think

11   it's established he's getting money from his folks.

12                   MR. NOLAN:  Okay.

13                   THE COURT:  And so --

14   Q.    When do you pay -- do you ever pay the money back?

15   A.    I have no ability to do it at this point.

16   Q.    You paid the -- paid your father three and a half

17   million dollars?

18   A.    Correct.

19   Q.    And that was when?

20   A.    Over various periods of time.  In the last -- over

21   various periods of time.

22   Q.    What form did those payments take?  Checks?  Wire

23   transfers?  Cash?

24   A.    Checks, probably wire transfers.

25   Q.    What bank account?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 31

1    A.   I would have to go look at that.  I've had several

2  bank accounts.

3    Q.   Whose account was the bank account's name -- what was

4  the name on the account?  Was it yours?

5    A.   Where it was coming from or --

6    Q.   Yes.

7    A.   What's the question?

8    Q.   Where it was coming from, yes, sir.

9    A.   It would be my account.

10   Q.   And where did you maintain that account?

11   A.   There were various accounts.

12   Q.   Do you remember the names of any of the banks?

13   A.   Yeah.  They're listed.  I believe that they were in

14  Texas.  There was -- I mean, I'd have to go look.  I've had

15  several bank accounts closed on me because of the outstanding

16  litigation.  It's difficult for me to even keep a bank account

17  open at this point.

18   Q.   Do you not have a bank account at the present time?

19   A.   I do.  I do.  But it's --

20   Q.   Where is that?  Where are they, excuse me?

21   A.   It's a credit union in Katy.

22   Q.   Any other bank accounts?

23        MR. WEISBART:  You've listed several accounts.

24   A.   I've listed -- besides I used -- what's been listed

25  there -- everything is listed there.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 32

1      Q.    Do you have any bank accounts in France?

2      A.    Whatever is listed there on my bank accounts.

3      Q.    Do you have any safe deposit boxes anywhere in the

4    world?

5      A.    No.

6      Q.    Have you ever had safe deposit boxes anywhere in the

7    world?

8      A.    Maybe a joint one years ago with -- when we first got

9    married or something.  I mean, I can't say no to that.  But

10   let's say I haven't had a bank account -- a safe deposit

11   account in ten years.

12     Q.    Are you familiar with a property known as 9 Bank

13   Street, Apartment 3, in New York City?

14     A.    I am.

15     Q.    Who owns that apartment?

16     A.    I do not know.

17     Q.    Do you rent it?

18     A.    I do not.

19     Q.    Have you ever rented it?

20     A.    I have.

21     Q.    When?

22     A.    I terminated the lease in -- last year.  When I first

23   rented that apartment, I'd have to go check.  More or less

24   about three years.

25     Q.    And you lived in it?

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 33

1      A.   I lived in it part-time.

2      Q.   Where else were you living when you lived on Bank

3   Street?

4      A.   Katy, Texas.  Texas.

5      Q.   Texas.  And in France?

6      A.   No.  I don't believe I was in France at that time.

7      Q.   You were subleasing that apartment?

8      A.   Yes, I subleased that apartment.

9      Q.   When was the last time you subleased it?

10     A.   June of last year possibly.

11          MR. WEISBART:  Do you know for sure?

12     A.   No, I would have to check.  It was sometime last

13   year.

14     Q.   Who owns it?

15     A.   I do not know.

16     Q.   Did you list that as an -- your interest in that

17   apartment as an asset in this filing?

18     A.   No.  I don't have an interest in it.

19     Q.   Did the lease expire, or was it terminated?

20     A.   It was terminated.

21     Q.   By whom?

22     A.   We filed -- it was -- they tried to evict me.

23     Q.   For what reason?

24     A.   For subletting the apartment.

25     Q.   Did you just walk away or reach a settlement?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 34

1    A.   We reached a settlement.

2    Q.   When was that?

3    A.   Last year.

4    Q.   What were the terms of the settlement?

5    A.   I'd have to go look.  They -- they kept some of my

6    security deposit or something, and I'd have to go look.

7    Q.   What was the rent on that apartment?

8    A.   It raised several times.  By the end it was

9    probably -- I don't know offhand.  I'd have to -- they raised

10   it several times over that period, so I don't know the exact

11   amount.

12   Q.   In excess of $10,000 a month?

13   A.   No.

14   Q.   $5,000 a month?

15   A.   Around five.

16   Q.   Okay.  Where were you getting the $5,000 a month?

17   A.   Again, I was getting money from my parents.

18   Q.   How much do you owe your parents at the present time?

19   A.   I still owe them in excess of a million dollars.

20   Q.   And they keep lending you money whenever you ask for

21   it; is that right?  Is that your testimony?

22   A.   For the moment.

23   Q.   Do you have siblings?

24   A.   I do not.

25   Q.   Does Jason Bowles represent you?

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 35

1        A.    I don't believe so.

2        Q.    Since when?

3        A.    I don't -- I'd have to go check.  I have a lot of

4    attorneys.  I really don't know if Jason -- he could be local

5    counsel for me and I don't -- I'd have to go check.

6        Q.    You are aware that the New Mexico State Investment

7    Council has sued you, correct?

8        A.    I am.

9        Q.    And you list that in your schedule as on appeal.

10             MR. WEISBART:  Can you point precisely where

11    that's listed?

12             MR. NOLAN:  Sure.

13             MR. WEISBART:  Okay.

14             MR. NOLAN:  Question 4 I think it is.  It's the

15    new one.  It's Page 4 -- Page 3, New Mexico State Investment

16    Council, Part 4.

17             MR. WEISBART:  Question 9?  On appeal, New

18    Mexico Investment Counsel versus Marc Correra, okay.  So it's

19    this one?

20             MR. NOLAN:  Yes.

21             MR. WEISBART:  Okay.  Okay, I'm sorry.  Go

22    ahead.  What was your question?

23        Q.    Do you know why the on appeal box is checked?

24        A.    I believe that is the current status of the case.

25        Q.    The case hasn't been tried yet.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 36

1              MR. WEISBART:  Is that a mistake we made?

2        A.   It is possible.

3        Q.   You are aware -- you are aware that there's a trial

4    scheduled in the fall of this year in that case; are you not,

5    sir?

6        A.   Yes, that is correct.

7              MR. WEISBART:  Let me make -- that's probably a

8    mistake.

9              MR. NOLAN:  Not a problem.

10       Q.   And are you aware that just before you filed the

11   petition in this case your lawyer made an agreement to have

12   your deposition taken and your father's deposition taken in

13   that case?

14       A.   I am not aware of that.

15       Q.   You did not know that your lawyer agreed you would

16   appear for a deposition in New York?

17       A.   No.  I would have to go check that.

18       Q.   What would you have to go check, sir?

19       A.   I'd have to go check with my attorney.

20       Q.   But you don't have any recollection of Mr. Bowles --

21   who is his partner?  Lisa?

22       A.   I don't know.

23       Q.   You don't know Lisa Tolk [phonetic]?

24       A.   No, I do know -- she doesn't work for that law firm.

25       Q.   You're not aware of any -- anyone on your behalf

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 37

1    reaching an agreement to have your deposition taken back in

2    February?

3        A.   I do not -- no.  There's been a lot of motion in the

4    case.  I don't know exactly what the status was, so I'm not --

5    I don't know at this point.

6        Q.   Was one of the purposes that you had in mind in

7    filing this case to avoid testifying at that trial?

8        A.   No.

9        Q.   You're perfectly happy to testify?

10       A.   I've testified --

11            MR. WEISBART:  He's going to -- whatever --

12   Counsel, whatever questions relate to current pending

13   litigation are not going to be answered in this -- in this

14   2004 -- or excuse me, in this 341 meeting.

15            MR. NOLAN:  I understand.

16            MR. WEISBART:  If you want to consult with his

17   attorney directly, feel free to do so.  Okay?

18            MR. NOLAN:  You are his attorney.

19            MR. WEISBART:  I'm -- so I'm instructing him,

20   Counsel -- or I'm instructing you not to answer questions

21   related to pending litigation.  You're certainly free to ask

22   questions about his bankruptcy, financial affairs and so forth.

23            MR. NOLAN:  Okay.

24                           EXAMINATION

25   BY MR. YATES:

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 38

1      Q.   Okay.  So it's been mentioned --

2               MR. WEISBART:  I'm sorry.  Who are you?

3               MR. YATES:  Jarom Yates from Haynes & Boone on

4      behalf of New Mexico State Investment Council.

5               MR. WEISBART:  Okay.  Same firm?

6               MR. YATES:  Different firms.

7               MR. WEISBART:  Okay.

8               MR. YATES:  Same client.

9               MR. WEISBART:  I'm sorry, go ahead.

10     Q.   So in your -- in your schedules you have listed two

11     accounts that are identified as IRA accounts; is that correct?

12     A.   That is correct.

13     Q.   And I believe your prior testimony was that at least

14     one of those accounts was opened sometime in 1985; is that

15     correct?

16     A.   The original IRA was opened in 1985.

17     Q.   And what about the -- and which -- which account

18     specifically was opened in 1985?

19     A.   Well, I think the original -- I was answering the

20     question of when was the IRA originally established.  It might

21     have been moved from place to place.  But the original IRA I

22     believe was -- that's the way I'd answered that question.  I

23     thought that's what I was being asked.

24     Q.   Well, there are two accounts.  So my question was

25     with respect to -- so you're saying one account was originally

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 39

1    established --

2         A.   No.  I believe -- I believe that both of these

3    accounts were probably established after that, but they were

4    originally started in 1985.  That's the way I guess I was

5    answering that question.  No, the dates of these two are more

6    recent than that, but there was -- I can get you the dates for

7    those when they were opened.

8         Q.   Okay.  And so in 1985 was one account opened?  Two

9    accounts opened?

10        A.   No.  I don't believe that either one of these

11   accounts was the original account.

12        Q.   But the account -- the account that was opened in

13   1985, was there a single retirement or 401K or some sort of an

14   account that was opened in 1985?  My question is how many

15   accounts in 1985 were opened?

16        A.   My best guess would be one.  It's a long time ago.

17             MR. WEISBART:  I don't want you to guess.  If

18   you know, you know.

19        A.   I don't know.  I'm sorry, I don't know.

20        Q.   And --

21             MR. WEISBART:  I'm happy to try and find out

22   that information.

23        A.   Yeah.  I can find that out, but it's a long time ago.

24             MR. WEISBART:  What is the question?  How many

25   accounts opened in '85?

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 40

1                MR. YATES:  Right.

2                MR. WEISBART:  All right.

3        Q.   Well, and maybe it would work best to trace back

4    then.  So these two accounts that are listed, let's take the

5    first account, the account -- the account -- I'm looking at

6    your exemptions.  I'm looking at official Form 106 C, Schedule

7    C, exemptions.  So the account that I -- is identified as

8    having $936,677, what is the origin of that account?

9        A.   A previous IRA.

10       Q.   So an --

11       A.   If that's the question.

12       Q.   Could you explain each previous iteration of that

13   account?  Is there just one previous IRA account?  Have there

14   been multiple rollovers?

15       A.   No.  There's probably been -- there's probably been a

16   previous account to each one of these.

17       Q.   Okay.  What -- so this -- this account with $936,000,

18   when was that -- when was the initial precursor to that account

19   first established?

20       A.   If I understand your question, I believe that you're

21   asking me when was the account before this one established?  I

22   would have to check.  I don't know.

23       Q.   What sort of IRA account is it?

24       A.   These are SEP IRAs.

25       Q.   SEP?

Page 41

```
 1      A.   Yes.

 2      Q.   And were they in -- when the original account was

 3   established was it a SEP IRA?

 4      A.   Yes.

 5      Q.   And who was your employer at the time?

 6      A.   It was a firm called First Boston Corporation.

 7      Q.   When did you work with First Boston Corporation?

 8      A.   Approximately 30 years ago.  I'd have to check the

 9   dates.

10      Q.   How long were you employed there?

11      A.   I would have to go check the dates.  It was a very

12   long time ago.

13      Q.   Were you employed there for more than a year?

14      A.   Yes.

15      Q.   More than five years?

16      A.   I'd have to go check.  Probably less.

17      Q.   Do you know how much was contributed to that IRA

18   while you worked at First Boston Corp.?

19      A.   No.

20      Q.   Would you be able to provide that information?

21      A.   I don't believe I could.

22      Q.   So after the SEP IRA was established with First

23   Boston Corp., what happened to the account?

24      A.   It's been -- it's been at different -- since I'm an

25   investment professional, sometimes I've been forced to move it
```

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 42

1    to firms that I've worked at for compliance reasons.

2         Q.   And so what are all the different firms with which

3    you've had --

4         A.   I'd have to try and find that.  I don't know offhand.

5         Q.   And can you provide that information, or can your

6    counsel provide that information?

7              MR. WEISBART:  We'll take your request under

8    advisement.

9         Q.   So can you -- so you don't remember how many

10   employers you've had in the last 30 years?

11        A.   No.  Because -- no, I do not.

12        Q.   Do you remember any of the employers that you've had

13   in the last 30 years?

14        A.   Well, I've been self-employed for most of that

15   period.

16        Q.   Okay.  So during that period were you the person who

17   decided how much to put in this IRA?

18             MR. WEISBART:  What period are you talking

19   about?

20             MR. YATES:  During any of these -- while he was

21   self-employed.

22        A.   I would have to go check.

23        Q.   Okay.  And are you aware of the contribution limits

24   for SEP IRAs?

25        A.   At this moment, no.  I do not know what the

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 43

1    current -- no.

2        Q.    While you were self-employed were you the person with

3    responsibility for administering the SEP IRA?

4        A.    I'm not sure if I understand the question.

5        Q.    So with the SEP IRA, as I understand it, if you are

6    self-employed you can contribute funds.  Are you the one that

7    decided how much to contribute into the SEP IRA?

8        A.    I would have to check.  I don't know.

9        Q.    Okay.  Do you know whether or not you followed the --

10   you complied with the contribution limits?

11       A.    Oh, I believe I did, yes.

12       Q.    Okay.  Was there any period during that time where

13   this money was not in an IRA?

14       A.    The -- because I -- there was a withdrawal from the

15   IRA.  Does that answer the question or --

16       Q.    At any time was the IRA converted into something

17   other than an IRA?

18       A.    No.  I did make a withdrawal, though.

19              MR. WEISBART:  You withdrew --

20              MR. CORRERA:  I withdrew --

21              MR. WEISBART:  -- money from the IRA?

22              MR. CORRERA:  Yeah.

23              MR. WEISBART:  Correct.  And I think that's

24   listed on this.

25       Q.    Yeah.  I believe there's maybe a $45,000 withdrawal.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 44

1    Is that the only withdrawal you've ever made from the IRA?

2         A.   There was a withdrawal that was then re --

3    redeposited.  I believe there's a specific time period you're

4    allowed to do that, so that was done.

5         Q.   And when did that occur?

6         A.   Approximately at the same time.

7         Q.   Same time as what?

8         A.   The withdrawal.

9         Q.   The withdrawal that's listed in your schedules?

10        A.   Correct.

11        Q.   What was the amount of that withdrawal?

12        A.   I would have to go check.

13        Q.   Was it over $100,000?

14        A.   Probably.

15        Q.   Was it over a million dollars?

16        A.   It was not.

17        Q.   Was it over $500,000?

18        A.   Probably.

19             MR. WEISBART:  Whoa, whoa.  Are you talking --

20             MR. YATES:  Concurrent with the --

21             MR. WEISBART:  Okay.  I'm just confused on what

22   you're --

23             THE COURT:  Let me -- let me take a quick break.

24   I need to step in the other room.  I'm supposed to

25   telephonically appear in another court.  And so I'm going to

Page 45

1   let Rob sit here for about ten minutes, and then hopefully I'll

2   be back.

3                    MR. YAQUINTO:  Are you trying to do the Seattle

4   thing?

5                    THE COURT:  Yes.

6                    MR. YAQUINTO:  They called and said they needed

7   30 minutes.

8                    THE COURT:  Okay, great.

9                    MR. WEISBART:  I guess my question, are you

10  asking about this 45 -- $47,000 withdrawal on the --

11                    MR. YATES:  Well, I'd asked if there ever were

12  any withdrawals.  He said that there was a withdrawal.  I asked

13  if there were other withdrawals --

14                    MR. WEISBART:  Other withdrawals --

15                    MR. YATES:  -- other than that.

16                    MR. WEISBART:  -- than that one, okay.

17                    MR. YATES:  And he said that there was another

18  withdrawal --

19                    MR. WEISBART:  Okay.

20                    MR. YATES:  -- made at the same time.

21                    MR. WEISBART:  Okay.  I was just confused.  Made

22  at the same time?

23                    MR. CORRERA:  Well, I don't understand.  What

24  is -- what is the question I'm being asked?

25                    MR. WEISBART:  He's asking you -- if I

Page 46

1    understand the question, were there other withdrawals besides

2    this $47,500 withdrawal that's listed on your statement of

3    financial affairs which we identified occurring in 2014; is

4    that correct?  Other withdrawals from the IRA?

5         A.   If you can -- I don't know the question.  If you

6    withdraw and then redeposit the money in the time frame, is

7    that --

8         Q.   Yes, that's a withdrawal.

9         A.   -- considered a withdrawal?  Then yes, there was.

10        Q.   And was that withdrawal that we're referring to

11   that's not listed, was that made at the same time as this

12   withdrawal?

13             MR. WEISBART:  At the same time, so you're

14   saying --

15        Q.   Or -- or if not at the same time, when was it made?

16             MR. WEISBART:  Okay.  I'm just trying --

17             MR. YATES:  Right.

18             (Inaudible due to multiple speakers.)

19        A.   Yeah, I would have to go get the dates for you on

20   that.  I'd have to go get the dates for you, but --

21        Q.   And what did you do with those funds?

22        A.   Paid bills.

23        Q.   Okay.  And what was the source of funds that you used

24   to redeposit into the account?

25        A.   It was actually some of the same money went right

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 47

1    back in again.  I was -- because I had all my -- so some of the

2    money was actually -- it was the same money that went back.

3        Q.   Well, if you withdrew -- so you withdrew funds, you

4    paid bills.

5        A.   What happened was -- no.  The same -- I believe most

6    of the same money went back in, yeah.

7        Q.   So why -- so you withdrew the money.  What bills did

8    you pay with the money that you withdrew?

9        A.   I'd have to go check.

10       Q.   But you did pay bills with some of the money?

11       A.   Possibly, yes.

12       Q.   And when you redeposited, did you redeposit the same

13   amount that you had withdrawn, or was it a different amount?

14       A.   I believe it was less.  And I believe that -- if I

15   understand this correctly, I believe that the amount that was

16   redeposited was the $46,000.

17       Q.   Okay.

18       A.   Okay.  That's my understanding of it.

19       Q.   So you're saying there was only one withdrawal?

20       A.   No.  It may have come on -- it may have been on

21   separate days.  I would have to go look at that.  I don't know

22   that offhand.

23       Q.   Okay.

24            MR. YAQUINTO:  Let me sum up your question.  In

25   2014 what's the total amount you think you took out of your

Page 48

1    IRAs approximately, give or take $20,000?

2                    MR. CORRERA:  In 2014, let me -- I just want to

3    confer on the year.  That's only -- so then the total amount

4    that I took out I'm going to say is this amount, the -- sorry,

5    where is it here --

6                    MR. YAQUINTO:  The 47,000?

7                    MR. CORRERA:  -- the 47,000.

8                    MR. WEISBART:  And we'll double check it.

9                    MR. YAQUINTO:  Then you've answered his question

10   incorrectly, because you said you put something back in.  If

11   you took out 47 and you --

12                   MR. CORRERA:  Oh, I'm sorry.  The total amount

13   of withdrawal --

14                   MR. YAQUINTO:  The total amount --

15                   MR. CORRERA:  -- of the withdrawal?  I would

16   have to check on that amount.

17                   MR. YAQUINTO:  Are we talking 500,000 --

18                   MR. CORRERA:  Probably about -- no, I'm sorry.

19   Probably about 250,000.

20                   MR. YAQUINTO:  Okay.  And so you put in -- back

21   in about 230,000?

22                   MR. CORRERA:  Exactly.

23                   MR. YAQUINTO:  Did you put all that back in at

24   once?

25                   MR. CORRERA:  I believe I did.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 49

1          MR. YAQUINTO:  Okay.  And -- all right.

2      Q.   Did you use -- well, okay.  So that was in 2014.  In

3  any years prior did you ever withdraw from either IRA account?

4      A.   No, I did not.

5      Q.   So your testimony is that you have made one single

6  withdrawal?

7      A.   No.  My testimony is I have to get you dates of when

8  the withdrawals were.

9      Q.   So your testimony is that in 2014 that's the only

10  year in which you made any withdrawals from either of these

11  accounts?

12          MR. WEISBART:  Do you want to double check it?

13      A.   I want to double check that.

14          MR. WEISBART:  Okay.  Is that okay, Counsel?

15          MR. YATES:  I mean, I'd prefer an answer, but

16  yeah.

17      Q.   So with respect to -- now, could we go through a

18  similar exercise with respect to the other IRA account that has

19  $1.9 million?

20          MR. WEISBART:  I that thought that's what you

21  were talking about.

22          MR. YATES:  Well --

23          MR. WEISBART:  You said IRAs.  I assumed you --

24      A.   Yeah, this is -- I don't -- exactly.

25      Q.   So at what point did you establish -- so you started

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 50

1    out you think with one SEP IRA with Boston --

2        A.   Yeah.  Well, it's -- yes, correct.

3        Q.   At what point did you create the second account?  Or

4    at what point did you have two IRAs instead of one IRA?

5        A.   I would have to check the dates of when these

6    accounts were opened.  I don't know that information.

7        Q.   Do you know whether it was in the last five years?

8        A.   Yes, within the last five years.

9        Q.   Was it in the last two years?

10       A.   I do not believe so, no.

11       Q.   So when do you think it was?

12       A.   I would have to go check.  I don't know.

13       Q.   So you think it was sometime between two years ago

14   and five years ago?

15       A.   Yes.  But I would have to check.

16       Q.   And what was the reason for establishing the second

17   account?

18       A.   Different business, different firms as it moved from

19   firm to firm.  I've moved them several times.

20       Q.   I recall your testimony was that you haven't been

21   employed for six or seven years.

22       A.   Correct.

23       Q.   So if you made --

24       A.   But there was -- there were investments and things I

25   wanted to do with that particular firm, and so I opened an IRA

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 51

1   over there and transferred funds into it.

2        Q.   Over where?

3             MR. WEISBART:  What account are you -- which one

4   are you talking about?

5             MR. YATES:  Well --

6             MR. WEISBART:  Does it have a name to it?

7        Q.   Which -- well, so we've got the Phoenix Financial

8   account.  Let's talk about that account.

9             MR. WEISBART:  Is that the one with the 1.9

10  million?

11            MR. YATES:  That's the one with the 1.9 million.

12            MR. WEISBART:  Okay.  Let's refer to that as

13  Phoenix.

14            MR. YATES:  Okay.  And the other account -- I

15  don't recall the name of that account.

16            MR. YAQUINTO:  Interactive brokerage.

17            MR. YATES:  Okay.  There it is right there,

18  okay.

19       Q.   So which account was established during that period

20  that you don't recall sometime within two and five years ago?

21       A.   Both of them.

22       Q.   So both of them -- and prior to that time did you

23  have only one IRA account?

24       A.   That is my belief.

25       Q.   Okay.  So sometime between two years ago and five

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 52

1   years ago you converted a single account into two separate

2   accounts?

3        A.   Yes.

4        Q.   What was the source of -- and at that time how much

5   money was in each account?

6        A.   I would have to go look.  I don't know.

7        Q.   Are the amounts that are in there currently, are

8   those generally the same amounts, or have the amounts changed

9   materially?

10       A.   The amounts have appreciated over the years.

11       Q.   Within the last two to five years?

12       A.   Yes.

13       Q.   And how much would you say they've appreciated?

14       A.   I would have to go check.  I don't know.

15       Q.   Okay.  Do you manage the investments for these

16   different accounts?

17       A.   I do.

18       Q.   How long have you managed those investments?

19       A.   Since I've established them.

20       Q.   So you -- has anybody else ever managed the

21   investments in these accounts?

22       A.   I don't believe so.

23       Q.   Okay.  Let's talk -- are both of the accounts SEP

24   accounts?

25       A.   Yes, they are.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 53

1      Q.   What's your basis for saying that both accounts are

2   SEP accounts?

3      A.   I believe that that's what they are.

4      Q.   Who -- who told you that that's what they are?

5      A.   I believe -- that's what they've always been.

6      Q.   But what -- at what point did you realize that they

7   were SEP accounts?

8      A.   To the best of my knowledge that's what they are.  I

9   will have to -- I can go check.  I can provide you -- but to

10  the best of my knowledge.

11     Q.   Okay.  So let's talk for a moment about -- there are

12  four other accounts identified in your exemptions.  Well,

13  these -- these are accounts -- there are four other accounts

14  for which you have stated you are the custodian; is that

15  accurate?

16     A.   Yes.

17     Q.   And who established each of those four accounts?

18               MR. WEISBART:  Which accounts are you referring

19  to, Counsel?

20               MR. YATES:  Well, these are the accounts -- the

21  education accounts.

22               MR. WEISBART:  Oh, okay.

23               MR. YAQUINTO:  Schedule B, Item 35.

24               MR. WEISBART:  Okay thank you.

25     Q.   So there are two Phoenix Financial Services accounts

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 54

1    and two Fidelity -- Fidelity accounts.  Are you the one that

2    established each of those accounts?

3         A.   Yes, I am.

4         Q.   And when was each of these accounts established?

5         A.   Between two and five years ago.

6         Q.   And what was the source of funds for those accounts?

7    And let's take them account by account.  So there are two

8    Phoenix Financials, two Fidelitys.  So Phoenix Financial

9    Services account ending in 707, what was the source of the

10   funds placed in that account?

11        A.   A prior -- 707, a prior account that was probably

12   titled very similar to that at another firm.

13        Q.   Okay.  And what was the origin of that account?  Did

14   you -- well, did you establish that prior account?

15        A.   Yes.

16        Q.   And what was the date that that account was

17   established?

18        A.   I would have to go check.

19        Q.   Were there any other prior custodial accounts?

20        A.   Possibly.

21        Q.   So -- so these funds, we know that they came from a

22   prior account.  You're saying that there may have been an

23   account prior to that from which those funds --

24        A.   Correct.

25        Q.   Who would know that?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 55

1      A.   I would.

2      Q.   You're the custodian, correct?

3      A.   Correct.

4      Q.   Have you always been the custodian?

5      A.   No.

6      Q.   Who was the prior custodian?

7      A.   There was a custodian appointed at one point during

8    the divorce I believe.  There was a custodian or someone else

9    that was a custodian for the account.

10      Q.   And prior to that appointment, you were the -- you

11   were the custodian?

12      A.   It is possible that there was another custodian along

13   the way.

14      Q.   So when -- when the original custodial account was

15   established, who was the custodian?

16      A.   Probably me.

17      Q.   Okay.  And what was your reason for establishing the

18   accounts?

19      A.   For estate planning for my children.

20      Q.   And how much was originally funded into -- talking

21   about the Phoenix Financial Services accounts, those two

22   accounts have currently 547,000.  What was the original amount

23   deposited in whatever the original custodial account was?

24      A.   Whatever the limits were in that year, which I

25   believe they change over time or they have changed is my

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 56

1   belief.

2        Q.   Okay.  And have you -- how many deposits have you

3   made into these accounts?

4        A.   I've made deposits every year as far as I know, so I

5   don't know how many, but several.

6        Q.   Okay.  And have you ever -- has money ever been

7   transferred out of either of these accounts or any of their --

8   the previous custodial accounts?

9        A.   What do you mean by "transferred out"?

10       Q.   Has any -- has any money ever been transferred out of

11  those accounts for any other purpose other than to fund a

12  subsequent custodial account?

13       A.   Yes.  Money was paid.  There were tax obligations due

14  for the children, and so the tax on the children came from

15  those accounts.  And I believe there was one small withdrawal

16  for about 41,000 for -- I think it was a piano or something for

17  one of the children.

18       Q.   Have -- other than transfers for taxes and the one

19  transfer that you mentioned, have any other transfers out of

20  these accounts ever occurred?

21       A.   No.

22       Q.   Has your wife or your ex -- sorry.  Is your ex-wife a

23  custodian on any of these accounts?

24       A.   No.

25       Q.   Has she ever been a custodian on any of these

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 57

1    accounts?

2         A.   I don't believe so.

3         Q.   So you'd mentioned that there were other custodians

4    appointed, including one during your divorce.

5         A.   Correct.

6         Q.   What was the reason for the appointment of that

7    custodian?

8         A.   It was a very, very contentious divorce, and she

9    challenged the fact of me being custodian for the accounts.

10        Q.   And who -- who decided whether to replace you as

11   custodian?

12        A.   I believe it was mutually agreed upon.  I think we

13   were -- I believe it was just something we mutually agreed

14   upon.  She objected to it, and we didn't see a problem with

15   that.

16        Q.   Okay.  So it was by agreement?

17        A.   Yes.

18        Q.   You're certain of that?

19        A.   I would have to check, but that is my belief.

20        Q.   So is it possible that a Court ordered that you be

21   removed as the custodian?

22        A.   I don't recall that.

23        Q.   Okay.  Have you ever borrowed money against either of

24   these accounts?

25        A.   No.

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 58

1        Q.   Has anyone ever used either of these accounts as

2   collateral for any loan?

3        A.   Not that I know of.

4        Q.   Okay.  So I want to talk a little bit about the money

5   that you have received from your father, your parents, and the

6   money you've transferred to your parents.  You have

7   mentioned -- in your schedules you mention that you have paid

8   your father approximately three and a half million dollars --

9        A.   Correct.

10        Q.   -- in 2014 and 2015; is that correct?

11        A.   Correct.

12        Q.   What was your reason for paying those amounts?

13        A.   Repayment of outstanding loans.

14        Q.   What was -- and those outstanding loans, was there

15   any documentation associated with those loans?

16        A.   Yes, there is.

17        Q.   What sort of documentation?

18        A.   Signed loan agreements.

19        Q.   And were you represented by counsel in connection

20   with those loan agreements?

21        A.   I don't remember.

22        Q.   Do you often enter into loan agreements without the

23   aid of counsel?

24        A.   Sometimes.

25        Q.   And under what -- and under what circumstances do you

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 59

1    enter into loan agreements without the aid of counsel?

2         A.   They vary.

3         Q.   And with whom have you entered into loan agreements

4    without the aid of counsel?

5         A.   I would have to check.

6         Q.   Are there any individuals other than family members

7    with whom you've entered into a loan agreement without the aid

8    of counsel?

9         A.   Possibly.

10        Q.   And who would those --

11        A.   I would have to check.  I don't know offhand.

12        Q.   Okay.  And the documentation for these loan

13   agreements, do you have access to that, to the loan agreements?

14        A.   I do.

15        Q.   How many loan agreements are there?

16        A.   I would have to go check.

17        Q.   You -- how often would you enter into loan

18   agreements?

19        A.   Varies, there's no timetable for that.  Depends upon

20   need.

21        Q.   So this three and a half million dollars that you

22   allege that you've repaid your father, how many loan agreements

23   was that three and a half million dollars loaned under?

24        A.   Four or five, something like that.

25        Q.   Okay.  And when were those loan agreements entered

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 60

1    into?

2         A.    Various dates.

3         Q.    Ballpark.

4         A.    2002 to 2000 -- I don't -- I don't know.  The first

5    one was probably 2002.

6         Q.    Okay.  And that first loan in 2002, what was the

7    amount of that loan?

8         A.    I would have to go check.

9         Q.    Do you have --

10        A.    But it was probably over a million dollars.

11        Q.    Okay.  And what were the terms of the loan agreement?

12        A.    I would definitely have to go check.

13        Q.    Was there an interest rate?

14        A.    Yes.

15        Q.    Do you recall what the interest rate was?

16        A.    No, I don't.

17        Q.    Was there a maturity date?

18        A.    I have no -- I would have to look at the documents

19   for all the details for the loans.

20        Q.    In any of the loans was there a maturity date?

21        A.    As I said before, I would have to check all the

22   documents.

23        Q.    So you don't recall off the top of your head whether

24   these loans had maturity dates?

25        A.    I do not.

Page 61

1       Q.   Did each of the loans have interest payments?

2       A.   I believe -- each of the loans, does that mean do all

3   of the loans?

4       Q.   Do any of the loans not have an interest rate?

5       A.   I would have -- as I said before, I would have to

6   check the details of the loans to see what the details are.

7       Q.   Okay.

8       A.   I don't know.  It was from a long time ago.

9            MR. WEISBART:  We'd be happy to provide the

10   Trustee with the documentation.

11       A.   I mean, I can provide that, but I don't know them off

12   the top of my head.

13       Q.   Did you sign promissory notes in connection with any

14   of the loans?

15       A.   I'm not sure I know the difference between a

16   promissory note and a loan.

17       Q.   Well, a loan agreement typically would govern the

18   terms of the loan, but the promissory note would be a separate

19   document.

20       A.   Again, I would have to refer back to those documents.

21   I don't know.

22       Q.   Okay.  Did you provide any security in connection

23   with -- or other collateral in connection with any of the

24   loans?

25       A.   I don't believe so.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 62

1      Q.   Okay.  Now, you also mentioned that you have received

2   repayments from your father.  Well, I -- well, I -- have you

3   ever loaned your father money?

4      A.   Possibly.  I believe there was a small amount many

5   years ago.

6      Q.   Before 2000?

7      A.   Probably after 2000.

8      Q.   And what was the reason for that loan?

9      A.   I believe at the time he needed some money for

10  business -- for a business or something that he didn't have --

11  he needed some money.  I believe it was maybe about -- I'd have

12  to check, about $50,000 or so.

13     Q.   And was that loan documented?

14     A.   Probably not.

15     Q.   Okay.

16     A.   It was a very short-term loan.

17     Q.   And other than that, you've never loaned your father

18  any money?

19     A.   I don't believe so, but I want to refer to -- to

20  double check.

21          MR. WEISBART:  If you don't know, you don't

22  know.  If you don't remember, you don't remember.

23     A.   Yeah, I don't know.

24     Q.   Now, as I recall, your -- your SOFA listed income

25  from loans to family members.  Is that accurate?  Do you

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 63

1    receive income from family members on loans that you've

2    provided to them?

3                    MR. WEISBART:  Do you want to look at that and

4    point to where it says that?

5                    MR. YATES:  I believe it's on the income

6    statement.

7                    MR. WEISBART:  You mean Schedule I?

8                    MR. CORRERA:  What page am I looking for here?

9    Where are we looking on this?

10                   MR. WEISBART:  We're looking for Schedule I.

11                   MR. YAQUINTO:  Page 92 of 94 on the Pleading 15.

12                   MR. WEISBART:  Let me see this real quick.

13                   MR. CORRERA:  Sure.

14                   MR. YAQUINTO:  Or the next page thereafter,

15    Number 11.

16                   MR. WEISBART:  Okay.  Number 11, state all other

17    regular contributions that you receive.

18        A.   Well, this is the -- this is the loans that I'm

19    current -- this is the money -- this is my monthly money that

20    I'm borrowing.

21                   MR. WEISBART:  Okay.

22        Q.   Okay.  So what you're saying is this -- this

23    income --

24                   MR. WEISBART:  Well, you describe it as

25    income --

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 64

1      Q.   Okay.  This is not -- these are not repayments on

2   loans.  These are loans that you continue to enter into?

3      A.   Correct.

4      Q.   Okay.  So you are not receiving any -- any loan

5   payments from any family members to you?

6           MR. WEISBART:  I don't understand.

7      Q.   In other words, have you -- in other words, this

8   $12,000 is not a loan repayment to you from a loan you've made

9   to another family member.  This money is a loan to you from a

10  family member?

11     A.   Correct.

12     Q.   That you will have to repay?

13     A.   Correct.

14     Q.   Okay.  Now, have -- have -- has your father ever

15  forgiven a loan that he has made to you?

16     A.   No.

17     Q.   Okay.  How much do you currently -- so is the

18  $1.5 million listed as being owed to your father, is that the

19  entire amount that you're currently owed -- that you currently

20  owe your father?

21     A.   Approximately -- well, no.  Well, I guess as an --

22          MR. WEISBART:  As of the petition date.

23     A.   As of the petition date.

24     Q.   Okay.  So as of the petition date you owe your father

25  approximately $1.5 million?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 65

1      A.    Approximately.

2      Q.    And you have repaid your father approximately 3.5,

3  $3.7 million?

4      A.    Approximately.

5      Q.    So is it accurate to say then that the total amount

6  up to the petition date that you had received in loans from

7  your father or mother is the sum of those two numbers, the

8  amounts that you repaid in 2014 and '15 and the current

9  outstanding approximately $1.5 million?

10      A.    Approximately.

11      Q.    Okay.  Are there any other -- any other loans you've

12  entered into with your father that are not reflected in

13  those -- in those numbers that are currently outstanding?

14          MR. WEISBART:  Well, the numbers you mentioned

15  -- you're talking about the time periods that are identified on

16  the schedules; is that correct?

17          MR. YATES:  Well, that's part of my question.

18  Are there other --

19          MR. WEISBART:  Well, your question's so -- not

20  real clear.

21      Q.    So well -- Okay.  Let me -- let me put it this way:

22  So in 2014, 2015 --

23          MR. WEISBART:  Okay.  There you go.

24          MR. YATES:  He paid about three and a half

25  million back.

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 66

1        Q.    You paid about three and a half million back to your

2    father?

3        A.    Approximately.

4        Q.    In the years prior to that have you repaid any other

5    amounts to your father?

6        A.    In the years prior -- in the immediate prior years,

7    no.

8        Q.    In the lifetime of your lending activity with your

9    father, what's the total amount that you have borrowed from

10   him?

11       A.    I would have no idea.

12       Q.    Is it -- but it would be over this -- it would be

13   over $5 million, though?

14       A.    Yes.

15       Q.    Would it be over $10 million?

16       A.    I do not believe so.

17       Q.    Okay.  Are there -- and -- and so the repayment of

18   that three and a half million dollars -- I may have already

19   asked this.  But were each of the loans under which those

20   repayments were made, were each of those loans documented?

21       A.    I believe you asked that before.  Yes.

22       Q.    Okay.  Have you made any repayments to your father on

23   a loan for which there's no loan documentation?

24                  MR. WEISBART:  Ever?  What time period, Counsel?

25       Q.    Well, let's start with the four years prior to the

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 67

1    bankruptcy.

2         A.   And what's the question again?

3         Q.   Are there any loans that you have repaid to your

4    father -- sorry.

5              Are there any amounts that you have paid to your

6    father within the four years prior to the bankruptcy on loans

7    that were not documented with a loan agreement?

8         A.   Four years prior to the bankruptcy, nondocumented

9    loans?

10        Q.   That you --

11        A.   That I have --

12        Q.   Or amounts that you paid on any nondocumented loans.

13        A.   I don't believe so.

14        Q.   Okay.  But you did say that you'd be able to provide

15   all the loan documents for each of the loans that you have

16   entered into with your father?

17        A.   Correct.

18        Q.   Were each of the loan documents entered into

19   concurrently with the issuing of the money?

20        A.   I don't understand the question.

21        Q.   So were -- at any time did you receive --

22             MR. WEISBART:  Did you sign the notes at the

23   time you got the money?  That's the question.

24        A.   Yeah.

25        Q.   Did you ever receive money and at some period in the

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 68

1    future draft up loan documents in connection with the prior

2    transfer?

3         A.    No.

4         Q.    No, okay.  And to clarify, were you represented by

5    counsel in connection with -- have you ever been represented by

6    counsel in connection with any loan with your father?

7         A.    I would have to go check on that.

8         Q.    Okay.

9              THE COURT:  I'm going to let Rob sit in here,

10   and he'll do his questions from here.  These are good

11   questions.  We'll go a little bit longer, but not too much

12   longer.  Maybe 15, 20 minutes.  Here's my reset dates right

13   here.  Or we could reset it to 1:00 on any of those days.

14              MR. YATES:  That's all my questions for now.

15              MR. YAQUINTO:  Okay.  I don't have a whole lot

16   of questions.

17                        EXAMINATION

18   BY MR. YAQUINTO:

19        Q.    Where do your parents live?

20        A.    Now they live in New York.

21        Q.    Okay.  And how long have they lived there?

22        A.    I would -- I'd have to check, because they've lived

23   in New Mexico and they had both residences at the same time, so

24   I don't know when they moved from one to the other.

25        Q.    Are they originally from New Mexico?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 69

1      A.   No.  They're originally from New York.

2      Q.   So they -- when did they -- when did they live in New

3  Mexico?

4      A.   I think they first bought a property there in the mid

5  '70s.

6      Q.   And did they move there full-time, or is that just a

7  second house?

8      A.   At various points it changed.

9      Q.   You kept talking about the apartment in Paris being

10  for your children.  Who lives with your children?

11      A.   When I'm not there they live with their mother.

12      Q.   Okay.  So one of the parents is there all the time?

13      A.   Correct.

14      Q.   Do you have -- do you have a nanny or any kind of

15  help?

16      A.   I don't know what she does.

17      Q.   Okay.  But you're not paying for anything like that?

18      A.   No.

19      Q.   Okay.  You said something about withdrawals from the

20  education funds would have been reflected in your children's

21  tax returns?

22      A.   Correct.  I want to clarify something you said,

23  though.  You said from the education funds.  I believe that one

24  of them -- two are education funds, and two are custodial

25  funds.  So I just want to make sure we're talking about the

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 70

1    correct accounts when you ask these questions.

2         Q.   Okay.  Well, do your children have tax refund -- tax

3    returns?

4         A.   They do.  They file their own.

5         Q.   Okay.  And who files them for them?

6         A.   The accountant.

7         Q.   And who is your accountant -- who is the accountant?

8         A.   It's listed on there.

9         Q.   The same accountant who --

10        A.   Yeah.  It's the same one.  It's the same one.  She

11   does all the stuff.

12        Q.   Okay.

13             MR. YAQUINTO:  Mark, the rental income on

14   Schedule I is not correct?

15             MR. WEISBART:  That is -- that is correct.  It

16   is correct that it is not correct.  There is no rental income.

17        A.   That's correct, because I no longer have that

18   apartment.

19        Q.   Okay.

20             MR. WEISBART:  We were looking -- the Schedule I

21   was somewhat an average over the past six months.

22             MR. YAQUINTO:  Okay.

23             MR. WEISBART:  And that got left in there as of

24   the time of the petition filing.  There was no rental.

25        Q.   And do you still have an American Express card?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 71

1       A.   I do.

2       Q.   And they're not listed on the matrix.  Did you notify

3   them of the bankruptcy?

4       A.   I'm not sure of that.

5       Q.   Are you still using the VMX card?

6       A.   I am.

7       Q.   All right.  And there aren't any assets in this

8   family trust that you created?

9       A.   That is correct.

10      Q.   Never have been?

11      A.   Never have been.

12      Q.   The claims for commissions, how old are they?  You

13   said 2009, is that what I --

14      A.   Yeah.  But it's -- the actual agreements that the

15   commissions are based on could have been from prior years from

16   even before 2009.

17      Q.   Ballpark, how much are you talking about?

18      A.   I would have no idea, to be honest with you.

19      Q.   Do you have -- and you've said you've got the

20   documents to support those claims, right?

21      A.   Yes.

22      Q.   The -- the divorce decree, is it in English or is it

23   in French?

24      A.   It's in French.

25      Q.   Has it been translated?

Page 72

1        A.   Not that -- no.

2        Q.   Is your wife French?

3        A.   No, she's not.

4        Q.   So why do you-all have an apartment in France if

5   she's not French and you live in Texas?

6        A.   We had lived there at one point in time.  We would

7   always travel there.  We've always spent a lot of time in

8   Europe.  She has lived in France for many years.

9        Q.   You're not concerned about safety over there?

10        A.   Now, yes, a little bit, but --

11             MR. YAQUINTO:  Okay.  I'm going to go around one

12   more time and see if anybody -- is there anybody else on this

13   case that has any questions that hasn't had the opportunity to

14   ask?

15             All right.  Mr. Baker, I'll give you one more shot.

16                         EXAMINATION

17   BY MR. BAKER:

18        Q.   On your Voluntary Petition for Individuals Filing for

19   Bankruptcy, the one that was amended March 29th, 2016, Line 20

20   asked you to estimate your liabilities, how much do you think

21   they would be; and you checked a box that says 100 to

22   $500 million.  Where does that number come from?

23        A.   It was my -- it was an estimate about what the

24   potential claims I guess could be against me in some of these

25   cases.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 73

1        Q.   Who gave you the estimate?

2        A.   I think it was just in discussions with various

3    attorneys.

4        Q.   It's a rather large, number, sir.  Do you have any

5    substantiation for that large number?

6        A.   Given the numbers that have been around in those

7    cases, I would say that that is possibly a reasonable number.

8        Q.   Do you have any substantiation for it, any

9    documentation?

10        A.   I'm not sure what would be substantiation.

11             MR. WEISBART:  Well, the copies of the lawsuits

12    I guess would be --

13        A.   Well, the copies of the lawsuits are all public.  I

14    mean, those are all there.

15        Q.   Do you have any damage expert opinions or anything

16    like that that would suggest to you a number in this range?

17        A.   I have not had a damage expert, no.  I've not hired

18    anybody to do that.

19        Q.   Have you seen any damage expert submissions by anyone

20    else that would suggest to you that your liabilities are in

21    that range?

22        A.   No.  I have not, no.

23                            EXAMINATION

24    BY MR. NOLAN:

25        Q.   Those cases are all related, with the exception of

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 74

1    Mr. Baker's case, to pay for play?

2        A.    They're New Mexico -- most of them are based in New

3    Mexico, correct.

4        Q.    Any other states involving pay for play?

5        A.    Nope.

6        Q.    Did you sell investments to public funds in states

7    other than New Mexico?

8        A.    I'd have to go check.

9        Q.    South Carolina?

10       A.    Possibly.

11       Q.    North Carolina?

12       A.    No.

13       Q.    Connecticut?

14       A.    No.  But I would have to go check.

15       Q.    New York?

16       A.    It depends on the way the question is because of

17   where the firms are located and the broker dealers and the way

18   the contracts were drawn up.  I would have to --

19       Q.    Did you ever sell any investments to the treasurer of

20   the state of New York in his official capacity?

21       A.    No.

22       Q.    Do you speak French?

23       A.    Reasonably well.

24       Q.    Do you read French?

25       A.    Okay.

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 75

| 1 | Q. | Do you know Gary Bland? |
| 2 | A. | I do. |
| 3 | Q. | Did you ever loan him any money? |
| 4 | A. | No. |
| 5 | Q. | Did he loan you any money? |
| 6 | A. | No. |
| 7 | Q. | Did you ever buy anything for him? |
| 8 | A. | No. |
| 9 | Q. | Nothing? |
| 10 | A. | I mean, maybe a beer or something once, I mean -- |
| 11 | Q. | He doesn't drink, does he? |
| 12 | A. | No.  Actually I've never seen the man drink. |
| 13 | Q. | What kind of American Express card do you have? |
| 14 | A. | Silver one. |
| 15 | Q. | Platinum? |
| 16 | A. | Yeah. |
| 17 | Q. | Okay.  And how many cards do you have? |
| 18 | A. | That's the only card I have. |
| 19 | Q. | And is there anyone else on the account besides you? |
| 20 | A. | Nope. |
| 21 | Q. | Where do the bills come? |
| 22 | A. | They go to me. |
| 23 | Q. | In Texas? |
| 24 | A. | Yes. |
| 25 | Q. | And you pay them out of Texas? |

Page 76

1        A.    Yes.

2        Q.    You said -- this is my last area.  You said at the

3   beginning that you're working on your 2014 income tax return?

4        A.    Correct.

5        Q.    Why haven't you filed your 2014 return?

6        A.    There was some papers that they needed, and we

7   finally got everything in.  I've got everything to the

8   accountant now.

9        Q.    You didn't have any income, though, did you in 2014?

10       A.    No.

11       Q.    Did you have a complicated return?

12       A.    There's still -- there was some items that they

13   wanted.  I believe there was some issues for the children also.

14   They were asking for some paperwork.

15       Q.    Who is "they," your accountants?

16       A.    The accountants, yes.

17       Q.    Did you file your 2013 return?

18       A.    I did.

19       Q.    Did you have any income?

20       A.    I'd have to go look and see.  There might be some --

21   there might be -- yes, because there was probably some rental

22   income from the apartments or something.

23       Q.    Did you pay any tax?

24       A.    Probably, yes.

25       Q.    You have all your tax returns going back how far?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 77

1      A.   I probably have the last five years.

2      Q.   And several times this morning -- I guess it's not

3   still this morning -- you've said you have to go back and check

4   records.  What records do you have to check?

5      A.   Whatever I have -- whatever I asked at that time.

6   You asked me questions about loans and some details I think --

7   some of this stuff is from many years ago.

8      Q.   Exactly.  And my point is what -- what financial

9   records do you have dating back, say, 10 or 15 years in some

10  cases to answer these questions?

11     A.   I'd -- what financial records do I have from ten

12  years ago?  If they're still pertinent, I would keep them.  If

13  they're not, I don't.

14     Q.   But you've said repeatedly I have to go back and

15  check my records or I have to go talk to someone.  Leaving who

16  you have to talk to aside.  Do you now know what records you

17  have that you can consult in order to obtain the answers?

18     A.   Do I now know what records I have to consult?

19     Q.   What records are available to you to consult in order

20  to answer these questions?

21     A.   I believe they were referring to loan documents, and

22  so I still have loan documents.  I have some tax returns.  I'm

23  not sure what your question is.

24     Q.   How long have you had -- how long have you had the

25  same accountant for your taxes?

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 78

```
 1        A.   Many years.

 2        Q.   Ten?

 3        A.   Yes, at least.

 4        Q.   Where is the accountant located?

 5        A.   New York.

 6        Q.   Is that the same accountant that your father and

 7   mother use?

 8        A.   I do not know.

 9        Q.   Pardon?

10        A.   I don't know.

11        Q.   Is that Michelle Rosenberg?

12        A.   Correct.

13        Q.   Does she have a firm, or is she by herself?

14        A.   She has a firm.

15             MR. NOLAN:  That's all I have.

16             MR. YAQUINTO:  Mr. Yates, do you have anything

17   else?

18             MR. YATES:  Nothing further.

19             MR. YAQUINTO:  Why don't we pick a reset date.

20   We're going to need a lot of documents I think.

21             THE COURT:  Yeah.  Let's coordinate a date.  And

22   then I have one question, unless you answered this one while I

23   was gone.  So I have available -- and we would do this at 1:00

24   on any of these dates:  April 12, April 26, May 4th.  We're

25   going to probably have a document request.
```

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 79

1          MR. WEISBART:  Well, I guess my question is -- I

2    mean, we've been going, what, two hours here?

3          THE COURT:  Yeah, an hour and 30.

4          MR. WEISBART:  If you want to give us the

5    documents and we're happy to just deal with you directly.  I

6    don't --

7          THE COURT:  Well --

8          MR. WEISBART:  I mean, how long do you

9    anticipate turning the --

10          THE COURT:  It depends on when he says he's got

11    the records.  I mean, he might can just provide a historical

12    record of all his IRA contributions and I just go check, check,

13    check, check, check.

14          MR. WEISBART:  Okay.

15          THE COURT:  Or he might not and I spend 15

16    minutes on each --

17          MR. WEISBART:  I guess my question is can we

18    just provide this to you directly?  Do we have to have a reset

19    date?

20          THE COURT:  I'd rather have a reset date.  Let's

21    set it on May 4th.  That gives us a while out.  May 4th at

22    1:00.

23          MR. WEISBART:  Let me double check that, because

24    I won't be in town.

25          THE COURT:  Oh, okay.

Page 80

1          MR. WEISBART:  But I'll check to see if

2   Mr. Brown or someone else can cover it.

3          THE COURT:  Okay.  Well, would April 20 --

4   April 26th work better for you?

5          MR. WEISBART:  You know, I hate to sound like --

6   I don't have my calendar right here, but I don't know if that

7   will be any better.  What's the other one, April 12?

8          THE COURT:  April 12th.

9          MR. WEISBART:  I -- let me just double check.

10          THE COURT:  I think it'll take longer than

11   April 12.

12          MR. WEISBART:  I'll get back to you by this

13   afternoon or tomorrow, if that's all right, so you can know.

14          THE COURT:  All right.  Do any of y'all have

15   conflicts on the 26th or the 4th?

16          MR. BAKER:  Not that I know of.

17          MR. YATES:  You talking about 1:00?

18          THE COURT:  At 1:00.

19          So Mr. Correra, when you do your money back and

20   forth with your father, physically what happens?  You call him

21   up and say hey, I need 5,000 bucks, and he sends it, and you

22   deposit it; and where do you deposit it, and where does it come

23   out, etcetera?

24          MR. CORRERA:  Are we talking recently, like this

25   month or --

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 81

1                    THE COURT:  Yeah, recently in the last --

2     last --

3                    MR. CORRERA:  Yeah.  It goes into my -- my bank

4     account here in Texas.

5                    THE COURT:  Okay.  You use the -- let me get

6     back over to your list of accounts.  You had four accounts

7     listed.  There's one that's TDE Credit Union.

8                    MR. CORRERA:  Yes.

9                    THE COURT:  What does TDE stand for?

10                   MR. CORRERA:  Texas Dow Employees Credit Union.

11                   THE COURT:  Okay.  So that's the main one you

12    operate out of?

13                   MR. CORRERA:  That's the main one, yeah.

14                   THE COURT:  And then you pay your bills out of

15    that account?

16                   MR. CORRERA:  Correct.

17                   THE COURT:  And then I guess it sounds like

18    since you made the $3.5 million payment you've not repaid your

19    dad since then; is that correct?

20                   MR. CORRERA:  Correct.

21                   THE COURT:  Okay.  So -- so since that point

22    it's all been money coming to you, no money going out other

23    than to pay bills?

24                   MR. CORRERA:  Correct.

25                   THE COURT:  Okay.  And when you pay bills in

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 82

1    France, are you running it out of this account?  Or do you have

2    an account there that things get converted?

3                    MR. CORRERA:  I have a -- yes.  I have an

4    account there that things get converted to.

5                    THE COURT:  And is that the Barclay account?

6                    MR. CORRERA:  No.  It's the HSBC account.

7                    THE COURT:  HSBC account?

8                    MR. CORRERA:  Correct.

9                    THE COURT:  Okay.  And -- and when you filed

10   this case, those accounts were down with pretty small balances;

11   so did you then say in the week after or two weeks after call

12   up and say hey, Dad, I need to pay next month's rent bills, and

13   he sent you more money?  Or how did that work?

14                    MR. CORRERA:  Yeah.  Typically I have to pay my

15   monthly rents, so I get a -- I get a check or wire transfer.

16                    THE COURT:  Is that how it usually is, wire

17   transfer?

18                    MR. CORRERA:  Or check.  It depends.

19                    THE COURT:  Okay, okay.  And -- and is it --

20   when you're talking about your loan documentation then, does he

21   have an open-ended loan with you that he then adds to the

22   balance?

23                    MR. CORRERA:  These loans -- yes.  These

24   loans -- so the loans that are coming out from -- you know, for

25   my monthly expenses are coming from him from that, yes.

Page 83

```
 1                    THE COURT:  Do you ever pay monthly expenses of

 2   any kind out of any other -- other than these two accounts, the

 3   TD -- for the last -- let's say since you made your repayment

 4   to your dad when the divorce court deal -- the 3.5 million,

 5   since that point forward?

 6                    MR. CORRERA:  Yes, I had a -- I had a -- I'm

 7   sorry.  What was the date we're looking at?

 8                    THE COURT:  That was the end of 2014; wasn't it,

 9   when you paid your dad back?

10                    MR. CORRERA:  Yeah.  But so you're -- I'm sorry.

11   So what are the -- there have been -- there was another bank

12   account that I was using, and I think I've listed it on there

13   on the amendment.

14                    THE COURT:  We had Barclays and Interactive.

15                    MR. WEISBART:  Landmark?

16                    MR. CORRERA:  Trustmark.

17                    MR. WEISBART:  Trustmark.

18                    MR. CORRERA:  Trustmark --

19                    THE COURT:  Okay.

20                    MR. CORRERA:  -- was another Texas bank, but

21   that account was closed.

22                    THE COURT:  So all of your financial dealings

23   since the end of 2014 have gone through those three accounts,

24   either TDECU, HSBC or the Trust -- Landmark or Trustmark,

25   whatever it was?
```

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 84

```
 1                    MR. CORRERA:  Yes, I believe that's correct.

 2                    THE COURT:  And does your dad ever send you cash

 3     and you hold cash in your wallet and pay bills by cash?

 4                    MR. CORRERA:  No.

 5                    THE COURT:  Or debit cards?

 6                    MR. CORRERA:  No.

 7                    THE COURT:  All right.  So I will -- we'll

 8     confer later on, and then I'll post it on the docket sheet

 9     whether it's either April 26 or May 4th.

10                    MR. WEISBART:  Okay.

11                    THE COURT:  And if y'all -- my e-mail address is

12     jctrustee@aol.com.  If y'all send me your contact information

13     I'll -- I'll get one of those dates to you.  And then we'll do

14     a document production letter for Mr. Weisbart and try to get a

15     batch of documents.

16                    MR. WEISBART:  Okay.  You'll send me a letter?

17                    THE COURT:  Yeah.

18                    MR. WEISBART:  Okay.  And I -- anything --

19                    THE COURT:  And then, let me think, one other

20     thing.  Are any of these documents you talked about in response

21     to these last few questions I heard, any of these documents

22     that you need to refer to not in this country?  Are you going

23     to have a hard time getting documents when we ask these

24     questions?

25                    MR. CORRERA:  No.  I believe I should be able to
```

Page 85

1   provide most of these documents.

2                   THE COURT:  Okay.

3                   MR. YATES:  Do you have a translation in the

4   divorce decree?

5                   MR. CORRERA:  I do not.

6                   THE COURT:  Is there one that was produced

7   anywhere?

8                   MR. CORRERA:  Not that I know of.

9                   MR. YAQUINTO:  Are you fluent in French?

10                  MR. CORRERA:  I am not.

11                  MR. YAQUINTO:  Who did you depend on to do that

12   stuff in France?

13                  MR. CORRERA:  French counsel.

14                  MR. YAQUINTO:  And what was that person's name?

15                  MR. CORRERA:  Charlotte -- she has a long French

16   last name.  I can provide you that information.

17                  MR. YATES:  Does she speak English?

18                  MR. CORRERA:  Yes, she does.

19                  THE COURT:  Is she on your creditor list?  Do

20   you owe her money?

21                  MR. WEISBART:  You need to answer the question.

22                  MR. CORRERA:  Sorry.  No.  I'm sorry.  I was

23   shaking my head.  No, I don't.

24                  THE COURT:  Okay.  Charlotte something.

25                  MR. CORRERA:  She has --

**MARC ANTHONY CORRERA - TRANSCRIPTION**

Page 86

1              THE COURT:  Okay, all right.  So there's some

2   standard stuff.  May 31st is the last day creditors can object

3   to discharge, or it's the deadline for filing an objection to

4   discharge.  We're going to continue to either this April 26th

5   or May 4th date.  And I think we've covered everything else.

6              MR. WEISBART:  And I have a few clarification

7   questions, but I'll just cover it at the next meeting, if

8   that's all right with you.

9              THE COURT:  Okay, all right.  That sounds good.

10   All right.  Thank you, everybody.  We will continue the meeting

11   to one of those two dates and then go back on the record.

12              (End of recording.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MARC ANTHONY CORRERA - TRANSCRIPTION

Page 87

1   STATE OF TEXAS          )

2   COUNTY OF DALLAS        )

3

4       I, Sherry Patterson, Certified Shorthand Reporter, in and

5   for the State of Texas, certify that the foregoing recorded

6   proceedings were reported stenographically by me, to the best

7   of my ability, as indicated above, and that I was not present

8   at the time of the recording.

9           Given under my hand on this the 8th day of April,

10  2016.

11

12  _____

13  Sherry Patterson, Texas CSR 7607
    Expiration Date:  12/31/16

14  ELITE DEPOSITION TECHNOLOGIES
    Firm Registration No.:  598

15  400 N. St. Paul Street, Suite 1110
    Dallas, Texas  75201

16  Telephone:  214-698-5199

17

18

19

20

21

22

23

24

25

# EXHIBIT "D"

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

-------------------------------------------------------------------- x
                                              :

THE NEW MEXICO STATE INVESTMENT      :
COUNCIL, Trustee, Administrator and Custodian  :
of the GRANT PERMANENT FUND and the     :
SEVERANCE TAX PERMANENT FUND,      :
                                              :

                       Plaintiff,     :
                                              :        Case No.
      - against -                  :        D-101-cv-201101534
                                              :

BLAND, et al.,                       :
                                            :

                    Defendants.     :

**DEFENDANT  MARC CORRERA'S OBJECTIONS AND RESPONSES
TO PLAINTIFF'S REQUEST FOR PRODUCTION**

     Defendant Marc Correra, hereby responds to Plaintiff, the New Mexico State

Investment Council First Production of Documents, served April 24, 2015, as follows:

1.     All federal and state tax returns, including requests for extensions, amendments and

drafts, you filed or had prepared for 2003 through the present.

     <u>Response</u>:  Defendant Marc Correra objects to this request as overly broad and unduly

burdensome in that it requests production of documents wholly unrelated to issues presented by

the Plaintiffs' claims (such as requests for extensions), information which is otherwise

protected by the accountant-client confidentiality rules (drafts of returns) and personal financial

information which grossly exceeds the scope of information relevant to Plaintiffs' causes of

action (the returns themselves, as tax returns do not itemize transactions generating income or

1

limit information to that potentially relevant to Plaintiffs' claims).   Defendant further objects that the request is overly broad in temporal scope as Plaintiff does not contend Defendant received any funds related to state investments after 2009, and thus there can be no legitimate basis related to Plaintiffs claims to seek returns from 2010 through the present.   Subject to the foregoing objections, Defendant Marc Correra responds that he will not produce documents responsive to this request.

2.     All documents comprising, referring or relating to communications with, between or among any of the following:  you, L2 Capital Management, L2 Capital Partners, Crosscore Management, SDN Advisors, Anthony Correra, Sandia Asset Management, Bill Richardson, Diane Denish, David Contarino, Hilary C. Tompkins, James Jimenez, Eric Witt, Richard Guay, Brian Condit, Paul Blanchard, Amanda Cooper, Janis Hartley, Jackie, Brot, Jennifer Yocham Poersch, Andrew Davis, Gary Bland, Deborah Gallegos, Charlie Wollmann, Greg Kulka, Adam Levine, Bob Jacksha, Scott Smith, Arlene Busch, Ajax Investments, Martin Cabrera, Cabrera Capital Markets, Julio Ramirez, Alfred Jackson, Allan Martin, Ben Simonds, Saul Meyer, Richard Ellman, Matt O'Reilly, Marcellus Taylor, Reed Walters, Steve Novick, Michael Humphrey, Clark Hunt, Michael Tari, Barrett Wissman, Gary Fuhrman, David Basner, John Muse, Leo Hindery, Cesar Baez, Paul Cross, Mike Levitt, Jorge Castro, Steve Rattner, Richard Ziman, Don Marron, Mack McLarty, Tom Soto, John Veronis, Brent Martin, David Friedman, William Howell, Marvin Rosen, Daniel Weinstein, Vicky Schiff, Danny Villanueva, Brian Birk, Carl Thoma, Lee Mitchell, Richard Dresdale, Seth Tobias, Seth Platt, Christopher Kirsten, John Rocchio, David Hamamoto, Ed Sheetz, Colin McGrady, Mari Kooi, Andrew Sloves, Pat Livney, Kurt Florian, Stephen Bernhardt and/or Emad Zikry.

2

<u>Response</u>:  Defendant Marc Correra objects that this request is vague and ambiguous in that it seeks production of all documents that "relate to" the identified communications. Subject to the foregoing objections, Defendant Marc Correra responds that he will produce those responsive documents within his possession, custody or control.

3.   All documents concerning investments by the New Mexico State Investment Council, including but not limited to investments in or with the following:

a.   American Value Partners Fund I, LP
b.   Austin Capital Safe Harbor QP Fund Ltd.
c.   Capital Point Partners, L.P.
d.   CIM Fund III, LP
e.   Circle T Explorer Master Limited
f.   Clayton Dublier & Rice Fund VII, L.P.
g.   Clayton Dublier & Rice Fund VIII, L.P.
h.   Fenway Partners Capital Fund III, L.P.
i.   GF Capital Private Equity Fund, L.P.
j.   GSC Partners Recovery Fund III, L.P.
k.   HFV Multi-Strategy Limited
l.   InterMedia Partners VII, L.P.
m.   KH Growth Equity Fund, L.P.
n.   Lehman Brothers Merchant Banking Partners III, L.P.
o.   Lehman Brothers Merchant Banking Partners IV, L.P.
p.   Levine Leichtman Capital Partners IV, L.P.
q.   Levine Leichtman Deep Value Fund, L.P.
r.   Newstone Capital Partners, LLC
s.   Northstar SIC Holding, LLC
t.   Quaker BioVentures II, L.P.
u.   Sector Performance Fund, L.P.
v.   Silver Creek Ventures II, L.P.
w.   Stone Tower Loan Value Recovery Fund LP
x.   TAG Relative Value Offshore Fund Ltd.
y.   Vintage Classic, LLC
z.   Vanderbilt Dunhill
aa.   Vanderbilt Financial Trust
bb.   Vanderbilt Fort Dearborn
cc.   Vanderbilt Lakeside II
dd.   Vanderbilt Monroe Harbor
ee.   Vanderbilt Sky River
ff.   Vanderbilt Streeterville
gg.   Vanderbilt Tudor Place

<u>Response</u>:  Defendant Marc Correra objects that this response is overly broad and unduly burdensome in that it seeks production of "all documents," and ambiguous in that it seeks all documents "concerning" the referenced subject matter.  Subject to the foregoing objections, Defendant Marc Correra will produce those responsive documents within his possession, custody or control.

4.    Documents sufficient to show the nature and amount of all transfers of funds between you and any entity you control and Anthony Correra and any entity he controls from 2003 to the present.

<u>Response</u>:  Defendant objects that this request is overly broad and unduly burdensome in that it (1) exceeds the scope of Plaintiffs' causes of action and necessarily requires production of numerous documents unrelated to any transfer of funds in a material amount; and (2) exceeds the reasonable temporal scope of relevance pertaining to any of Plaintiffs' claims. Subject to the foregoing objections, Marc Correra responds that to the extent responsive documents exist or can be obtained with reasonable effort, he will produce those responsive documents within his possession, custody or control.

5.    Documents sufficient to show the nature and amount of all income received by you in connection with the hiring of investment advisors and managers and the making of investments by the New Mexico State Investment Council.

<u>Response</u>:  Defendant Marc Correra will produce those responsive documents within his possession, custody or control.

4

6.     All documents related to political fundraising on behalf of Bill Richardson, Diane Denish, Moving America Forward, Moving America Forward Foundation and the Democratic Governors' Association.

Response:  Defendant Marc Correra objects that this response is overly broad and unduly burdensome in that it seeks production of "all documents" relating to a very broad subject matter, and is ambiguous and overly broad in that it seeks all documents "related to" fundraising efforts by unidentified individuals on behalf of the entities. Subject to the foregoing objections, and to the extent that he can comprehend the request, Marc Correra responds that he has no documents responsive to this request in his possession, custody or control.

7.     All documents related to legal advice you sought in connection with your acting as an introducer, consultant, solicitor, finder, broker, intermediary, placement agent, third party marketer, sales representative or other kind of agent or representative on behalf of individuals and entities seeking to do business with public pension or sovereign wealth funds, including, but not limited to, the New Mexico State Investment Council.

Response:  Defendant objects that this request seeks, by definition, either documents subject to the attorney-client, attorney work product, or common interest privileges.  Defendant further objects that to the extent this request does not seek privileged information, it seeks information not reasonably calculated to lead to admissible or relevant evidence such as invoices for professional services.  Subject to the foregoing objections, Defendant responds that he will not produce the requested documents

8.      All documents related to your acting as an introducer, consultant, solicitor, finder,

broker, intermediary, placement agent, third party marketer, sales representative or other kind

of agent or representative on behalf of hedge funds seeking to do business with hedge funds-of-

funds.

Response:   Defendant Marc Correra objects that this response is overly broad and

unduly burdensome in that it seeks production of "all documents" related to a very broad

subject matter and concerning funds, entities, and potential investors wholly unrelated to the

Plaintiffs' claims at issue, including but not limited to the hedge fund managed by Mr. Correra

wholly independently of any issue in this suit.  Defendant further objects that this request seeks

production of information unrelated to Plaintiff's investments or claims which is confidential

and proprietary to third parties, and that the request is unduly burdensome in that it is not

limited in temporal scope.   Subject to the foregoing objections, Defendant responds that he

will produce those responsive documents relating to hedge funds or funds of funds in which the

Plaintiff made any investment or was known to be contemplating investment that are within his

possession, custody or control.


9.      All documents you or entities you control produced to the United States Securities and

Exchange Commission, the Department of Justice and any other law enforcement agency in

connection with investigations related to investments by public pension and sovereign wealth

funds, including, but not limited to, the New Mexico State Investment Council.

Response:   Defendant Marc Correra objects that this request is overly broad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence in

this action as the investigations by law enforcement agencies referenced are necessarily not

relevant to Plaintiffs' civil claims as such investigations are criminal in scope and not tailored

to issues relevant to Plaintiffs' claims.   Subject to the foregoing objections, Defendant Marc

Correra responds that he will not produce documents responsive to this request unless

otherwise indicated in response to Requests for Production Nos. 1-8 above.


Dated:  May 26, 2015

                                                    Respectfully submitted:

                                                    THE BOWLES LAW FIRM

                                                    Jason Bowles
                                                    P.O. Box 25186
                                                    Albuquerque, NM 87125-5186
                                                    (505) 217-2680 – Telephone

                                                    And

                                                    KESSLER & COLLINS, P.C.

                                                    By:  /s/ Gary S. Kessler                     

                                                    Gary S. Kessler *(pro hac vice)*
                                                    Lisa C. Tulk *(pro hac vice)*
                                                    2100 Ross Avenue, Suite 750
                                                    Dallas, Texas  75201
                                                    (214) 379-0722 – Telephone
                                                    (214) 373-4714 – Facsimile

                                                    **Attorneys for Defendant Marc Correra**


### CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing was sent to all counsel of record
via the court's e-file and serve system this 26 day of May, 2015.

/s/ Gary S. Kessler                          
Gary S. Kessler
Kessler & Collins, P.C.