Mark A. Weisbart
Texas Bar No. 21102650
James S. Brouner
Texas Bar No. 03087285
THE LAW OFFICE OF MARK A. WEISBART
12770 Coit Road, Suite 541
Dallas, Texas 75251
(972) 628-4903 Phone
mark@weisbartlaw.net
jbrouner@weisbartlaw.net

COUNSEL FOR MARC ANTHONY CORRERA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| IN RE: | |
| | Case No. 16-30728 |
| MARC ANTHONY CORRERA | Chapter 7 |
| Debtor | |

## OBJECTION OF MARC A. CORRERA TO MOTION PURSUANT TO BANKRUPTCY RULE 2004 AND 11 U.S.C. § 105(a) TO COMPEL PERFORMANCE UNDER ORDER GRANTING MOTION OF NEW MEXICO STATE INVESTMENT COUNCIL PURSUANT TO BANKRUPTCY RULE 2004 FOR RULE 2004 EXAMINATION OF ANITA GIANARDI AND PRODUCTION OF DOCUMENTS

Marc Anthony Correra, ("Debtor"), the debtor herein, individually and in his capacity as the Custodian for certain Minor Accounts, files this Objection to Motion Pursuant to Bankruptcy Rule 2004 and 11 U.S.C. § 105(a) to Compel Performance Under Order Granting Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 for Rule 2004 Examination of Anita Gianardi and Production of Documents.  In opposition to the relief requested, Debtor would respectfully state as follows:

### I. SUMMARY OF ARGUMENT

1.      The Motion of the New Mexico State Investment Council ("NMSIC") does not seek to compel Anita Giarnardi ("Gianardi") to comply with a prior order authorizing her Rule 2004 examination and NMSIC's request for her to produce documents, but rather seeks completely a

new form of relief – imagining her computer's hard drive. The assertion that any information that might be retrieved by such process is within the parameters of the order and NMSIC's specific "Document Requests" is meritless. Since the Motion is a new request for discovery it should be denied.

2.      The request should further be denied as it seeks a form of relief that is a drastic remedy which is rare and only warranted in extraordinary circumstances. Given its intrusiveness to matters subject to confidentiality and privacy, it is not one afforded based on a party's desire to search for additional documents or skepticism, speculation or conjecture that all relevant information has not been produced. As more fully explained below, there is no basis to provide the relief and NMSIC's allegations demonstrate that its request is based purely on skepticism, speculation and conjecture and sought for NMSIC's desire for all documents relating to the Debtor regardless of whether they are responsive to the "Documents Requests."

3.      Even assuming, that this type of relief is available and appropriate in this instance, courts do not permit the requesting party the right to conduct the actual search of the records or for its forensic expert unfettered access to sort through the information, but rather have put specific protocols in place on the process to protect confidential and private information and to limit the production of only that information that is relevant to the discovery requests. Here, the proposed protocol which provides NMISC unfettered access and review of all retrieved documents without affording Gianardi the right to review and produce only those responsive to the Discovery Requests goes well beyond what is permissible.

4.      Since the relief sought is meritless, its foundation baseless, seeks to expand the parameters of the discovery previously sought and approved by the Court and the mechanics proposed exceed well recognized procedures, the relief should be denied.

## II. Procedural Background

5.      On February 22, 2016 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") commencing this bankruptcy case.

6.      James Cunningham is the duly appointed and acting chapter 7 trustee (the "Trustee").

7.      As stated in papers previously filed in this case, since 2009 the Debtor has been embroiled in numerous legal matters and has incurred significant legal expenses associated with them.[1]

8.      During this case, NMSIC[2] has filed four requests, pursuant to Fed.R.Bankr.P. 2004, seeking authority to take the Rule 2004 examinations of the Debtor, Gianardi, his former executive assistant, Michelle Rosenberg ("Rosenberg"), his accountant, and his father, Anthony Correra (collectively, the "Examinees"), and to request the production of documents from each Examinee for purposes of their examinations (collectively, the "2004 Motions").[3]   Through these motions NMISIC sought authority to examine each respective examine on certain topics as identified on

---

[1]  See, Amended Statement of Financial Affairs, no. 9 [Doc. No. 58]; Debtor's Objection to NMSIC Motion for Relief From Automatic Stay [Doc. No. 50]; Affidavit of Gary Kessler in Support of Objection to NMSIC Motion for Relief From Automatic Stay [Doc. No. 64]; Affidavit of Marc A. Correra in Support of Objection to NMSIC Motion for Relief From Automatic Stay [Doc. No. 65].

[2]  NMSIC asserts a claim in this case, based on a certain action filed in May 2011, styled *The New Mexico State Investment Council v. Gary Bland et al.*, Case No. D-101-CV-201101534, in the First Judicial Court, State of New Mexico (the "NMSIC Action").   By order entered on May 27, 2016, the Court modified the automatic stay to allow the NMSIC Action to proceed to trial.   Trial in this matter is currently scheduled for November 2017.

[3]  See, Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 For Rule 2004 Examination of the Debtor and Production of Documents [Doc. No. 107] (the "Debtor Motion"), Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 For Rule 2004 Examination of Michelle Rosenberg and Production of Documents by Michelle Rosenberg and Garber & Sandler, LLP [Doc. No. 108] (the "CPA Motion"), Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 For Rule 2004 Examination of Anita Gianardi and Production of Documents [Doc. No. 109] (the "Gianardi Motion"), and Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 For Rule 2004 Examination of Anthony Correra and Production of Documents [Doc. No. 151] (the "Anthony Motion").   All but the motion relating to Anthony were filed in July 2004.  The Anthony Motion was filed in September 2004.

Exhibit B to each of those motion entitled "Examination Topics," and to require each to produce documents[4] relating to these matters as identified and described in Exhibit A to the respective motion entitled "Document Requests." The scope of the examinations and requests primarily pertained to the Debtor's and his entities' assets, liabilities and financial transactions over the six years prior to the Petition Date, with certain enumerated exceptions.[5]

9.　　The Court approved each of the 2004 Motions, and as to Gianardi an order was entered on August 29, 2016 (the "Order") [Doc. No. 143]. The Order required Gianardi to produce all documents responsive to the Document Requests that were in her possession, custody and control,[6] [Order, ¶ 8], "relating to the six year period preceding the Petition Date," [Order, ¶ 6], "in a manner reasonably similar to the way in which the documents were kept in the ordinary course of business or in a manner similar to the manner in which the documents were received by Ms. Gianardi," [Order, ¶ 4].

---

[4]　The term "Documents," is defined in the Definitions to Exhibit A to mean "all non-identical pieces of written, printed, or electronic matter that provide information. . ." This definition does not specifically request "electronically stored information" on computers or other electronic devices.

[5]　See, Gianardi 2004 Motion, Doc. No. 109, ¶ 30 ("NMSIC requests entry of an order pursuant to Bankruptcy Rule 2004 (i) ordering Ms. Gianardi to produce the documents identified in **Exhibit A** (the "Document Requests") and (ii) ordering the examination of Ms. Gianardi by NMSIC regarding the topics identified in **Exhibit B**."). In the pending Motion, NMSIC contends that Gianardi was "required to produce all documents and information in her possession relating to the finances, assets, liabilities, and transactions of the Debtor and his entities." See Motion, ¶ 17. This contention is false. Per the Order, Gianardi was required to produce only those documents responsive to the Discovery Requests. See also, Doc. 109, ¶ 33 ("NMSIC seeks to conduct an examination of Ms. Gianardi regarding, among other things (and as more fully described on Exhibit B), her knowledge of the Debtor's current assets, the Debtor's assets during the six years prior to the Petition Date, the Debtor's business ventures, including without limitation SDN Advisors, LLC, the Debtor's hedge fund investments, the division of property by the Debtor and Ms. Da Costa in connection with the Divorce Decree, the loan agreements between the Debtor and his father, the transfers between the Debtor and his parents, Ms. Da Costa, and the Debtor's minor children, the Debtor's various bank accounts, the Debtor's tax returns, and any other matter relating to the Debtor's assets, liabilities, and financial affairs during the six years prior to the Petition Date. NMSIC proposes to conduct the examination of Ms. Gianardi (the "Rule 2004 Examination"))."

[6]　The phrase "Possession, custody, or control" was defined by NMSIC as "of any item means that the person either has physical possession of the item or has a right to possession that is equal or superior to the person who has physical possession of the item. Each of the requests contained herein are directed to documents in your possession, custody or control.

10.     Gianardi appeared for her examination on October 14, 2016, at the offices of Haynes and Boone, in Denver, Colorado (the "Examination").[7] She did not produce documents as she had deleted files from her "Computer" (as identified below) several years earlier that may have related to the Debtor following the end of her employment in or around January 2014. She has continued to possess the Computer and has used it as her personal computer over the last three years since then.

11.     Prior to her examination, Gianardi spoke to the Debtor twice since being served with her 2004 motion. The first conversation was initiated by her after her receipt of the motion. She made the call was made to make the Debtor aware that she had received the 2004 Motion. [Gianardi TR, p. 10, lines 4-25; p. 11, lines 1-24]. During that call Gianardi did not receive any instructions from the Debtor. [Gianardi TR, p. 10, lines 23-25]. In response to her receipt of the motion, Debtor said: "It was unfortunate. I tried to keep you out of it." [Gianardi TR, p. 11, lines 8-10]. The second conversation, lasting two minutes, initiated by the Debtor the morning of her examination, in which the Debtor simply advised her to "answer the questions" and "to not worry." [Gianardi TR, p. 9, lines 9-22].

12.     Gianardi is an individual who currently resides outside of Denver, Colorado. For several years, beginning in October 2007 through in or around January 2014, Gianardi worked as an executive assistant to the Debtor and one of his entities, SDN Advisors, LLC ("SDN"). At first, Gianardi worked in SDN's office in Santa Fe, New Mexico, and when the office was closed in or around late 2012, from her home. In connection with her work Gianardi was provided the use of a desktop computer (the "Computer"). When the office closed, she moved the Computer to her home office and continued to provide occasional services to the Debtor until her employment

---

[7] NMSIC did not serve Gianardi with a subpoena for purposes of compelling her appearance or production of documents at the Examination. See. Fed.R.Bankr.P. 2004(c).

ended.

13.     As an executive assistant Gianardi performed office related services.  One of her assignments at the beginning of her employment was to transition the office's paper files to digital files, which involved scanning and storing the files and shredding the paper files.  [Gianardi TR, p. 21, lines 8-24].  This included personal and business files of the Debtor and his businesses and of his family (the "Files").  The digital files were stored on the Debtor's hard drive.  [Gianardi TR, p. 21, lines 25; p. 22, lines 1-3, 13-15].   During this period the Debtor had his own computers that he used.  [Gianardi TR, p. 10, lines 4-25; Debtor TR 1, pgs. 20-23].  During her employment Gianardi and the Debtor did not share email addresses.  Gianardi's business email address was ag@l2capital.com, while the Debtor's email address was mc@l2capital.com.  [Gianardi TR, p. 26, lines 16-17; p. 16-19].

14.     Gianardi's recollection was that her employment ended in or around January 2014. The Debtor did not ask for the Computer's return.  The office and businesses had closed, Debtor had sold his home in New Mexico and moved out of the state, and she was never asked to return it.  Debtor had no reason to seek its return as it had *de minimus* value and all the data and files had been saved on a cloud based storage system.  [Debtor TR 1, pgs. 24-26].

15.     Since the end of her employment, Gianardi has considered, and used, the Computer regularly as her personal Computer on which she has stored personal documents and files (the "Personal Files").  Many of these Personal Files and information are private and confidential.

16.     On February 6, 2017, NMSIC filed its Motion to Compel (the "Motion") seeking to require Gianardi to provide a forensic expert access to the Computer for the purpose of imaging its hard drive and providing NMSIC's counsel unfettered access to any and all files that can be extracted and retrieved regardless of their relevance to any claims or issues that may arise in this case and whether or not they are responsive to NMSIC's specific Document Requests to Gianardi

– requests that have previously been approved by the Court and issued pursuant to the Order.

### III. INACCURATE AND MISLEADING STATEMENTS MADE AS TO THE DEBTOR

17.     To gain traction with its legally impermissible motion, NMSIC identifies certain purported deficiencies, primarily in Debtor's discovery responses, as a pretext for this relief.  These purported deficiencies and NMSIC's narrative of same, however, fail to fully and accurately depict the discovery process to date and erroneously portrays the Computer's hard drive as the only source from which any additional documents can be recovered.

18.     A response to NSMIC's narrative follows.

### Conversations Between Debtor and Gianardi

19.     NMSIC raises the two conversations between the Debtor and Gianard before her examination as purported evidence of collusion between them.  NMSIC complains that when it sought to question the Debtor about these conversations during his examination, Debtor's counsel objected to the line of questioning and the Debtor did not answer the questions.  The innuendo is baseless.  Counsel's objection was legitimate and appropriate, and was based on the scope of the "Examination Topics" proposed by NMSIC and approved by the Court.  These topics expressly limited examination to "the applicable periods preceding the Petition Date."[8]  As these conversations occurred after the Petition Date they did not fall within any of the "Examination Topics."   As a consequence, counsel deemed such questions inappropriate outside the examination's scope.

### Debtor's Production During Discovery Process

20.     Since the commencement of this case, the Debtor has provided approximately18

---

[8]  See Order Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004 For Rule 2004 Examination of the Debtor and Production of Documents [Doc. No. 145, ¶ 11] ("The examination shall be limited to appropriate topics under Rule 2004 and the Examination Topics, including primarily matters relating to § 727 and § 523, transfers of the Debtor's assets, and other matters relating to the Debtor's assets during the applicable periods preceding the Petition Date."

hours of testimony – 5½ hours during his 341 meeting, and 12-13 hours for his 2004 examination conducted on November 3 and 4, 2016.[9] Debtor has further responded to various document and information requests from the Trustee and the Document Requests propounded by NMSIC. NMSIC's approximation of the number of pages produced by the Debtor, 5,000, is woefully low and misleading. To date, the Debtor has delivered in response to the Document Requests 19,102 pages of documents (6,983 pages of paper and 12,119 pages in electronic pdf files)

21. Where NMSIC has identified missing documents or pages of documents, the Debtor has attempted to locate them and, when located, has provided those.

**IRA Documents**

22. NMSIC alleges that the Debtor has refused to turnover documents relating to the IRA Accounts prior to 2001, and that Debtor was instructed not to answer questions with regard to them at his examination. First, it is Debtor's position that these documents are outside the scope of the Document Requests and the Examination Topics did not pertain to this time period.

23. In support NNSIC references Document Request 77. The dispute with regard to this request arises from two definitions given by NMSIC for use by the Debtor in responding to the Document Requests and the Examination Topics at the time of examination.[10] Paragraph 13 of the Definitions defines "IRA Accounts" to mean "the individual retirement accounts identified in the Debtor's Schedules and SOFA along with any predecessor retirement accounts." (emphasis added). Thus, the term "IRA Accounts" subsumes "predecessor retirement accounts." Paragraph 31 of the Definitions states: "Unless otherwise specified herein or in any applicable order of the bankruptcy court, the relevant time period of these requests is from February 22, 2010 to the

---

[9] Although the Court afforded NMSIC, the Trustee and the Bakers up to 14 hours to examine the Debtor, the examination was concluded short of that period.

[10] See Examination Topics, footnote 1 "The definitions in Exhibit A shall apply to the Examination Topics."

present." (emphasis added).

24. Document Request 76, sought: "All documents relating to the investments in the Debtor's IRA Accounts beginning in 2001." Debtor provided those documents responsive to this request that were in his possession, custody and control.

25. Document Request 77, sought: "All documents relating to any predecessor accounts to the Debtor's IRA Accounts." Given the aforementioned definitions, this request raises two issues; (1) the term "IRA Accounts" includes "predecessor retirement accounts," and (2) since there is no specific time period associated with this request the applicable time frame is expressly limited by paragraph 31 of the Definitions (from February 22, 2010 to the present).

26. Further, the Order approving these requests states: "With respect to any asset claimed by the Debtor in his schedules as exempt under 11 U.S.C. § 522 (or other applicable law), the Debtor shall be required to produce any documents requested by the Document Requests relating to those assets for the period requested in the Document Requests (including assets in, or contributions to, any predecessor accounts). [Doc. No. 145, ¶ 6].[11] Moreover, at the hearing on the 2004 Motions, the Court stated it was not expanding the time frame provided in the requests.

27. Based on the foregoing, it was believed that the Document Requests, as interpreted by the undersigned, did not require production of these documents nor did the Examination Topics include such matters as proper subjects for examination.[12]

28. Second, it is erroneous to suggest that Debtor or counsel has refused to produce these documents. To resolve this dispute concerning the pre-2001 IRA related documents, in

---

[11] In contrast to the time frame associated with exempt assets, the Court put no time restraint on documents relating to the loans from the Debtor's parents. [Doc. No. 145, ¶ 6 ("regardless of the time period to which those documents relate.")].

[12] NSMIC could have pursued several remedies in relation to this issue. It could have suspended the Debtor's 2004 examination and sought a ruling from the Court on this issue, but did not. It further could have sought to compel the Debtor's production of these documents in this Court, but has not in the past four (4) months since the examination.

January 2017, the undersigned offered to produce the documents to NMSIC's counsel in exchange for an agreement to abate further discovery and all potential claims and issues in this case until after trial of the NMSIC Action in November. No response was ever received to this offer.

**Examination Relating to Hedge Fund Operations and Documents**
**Relating to the IRA Investment.**

29.     NMSIC complains that Debtor's counsel hampered questions concerning the IRA Account's investments in a certain hedge fund in which the Debtor was involved. Debtor's counsel objected to these questions on the basis that they were outside the scope of the Examination Topics.

30.     The questions at issue pertained to the operations of L2 Capital Partners, L.P., an entity in which the Debtor held an interest, not the investments made by the IRA Account. The most direct and applicable examination topic relating to any questions to this entity is Examination Topic No. 39, which provides:

> Any non-publicly traded entities owned in whole or in part, directly or indirectly, by the Debtor during the six years prior to the Petition Date, including the transactions entered into by any such entity, the bank accounts in the name of any such entity, the Debtor's investments in any such entity, the operations of any such entity, and the formation, dissolution, and winding-up of any such entity. (emphasis added)

31.     This topic specifically speaks to the operations of the any entity in which the Debtor had an ownership interest and limits the scope of examination for such entities to the six years prior to the Petition Date. The questions posed at the examination sought information relating to L2 Capital Partners, L.P. in 2003, thirteen years prior to the Petition Date. By the express terms of the Examination Topics and the order approving the examination such questions were clearly beyond the parameters of the examination.

32.     NMSIC further contends that the Debtor has failed to produce documents in connection with this investment. This assertion is unfounded. The IRA Account statements reflecting this investment were produced. To the extent NMSIC seeks additional documents, it

fails to identify what other documents would exist and under which Document Request they would fall. The only applicable request concerning IRA Account documents is Document Request 76: "All documents relating to the investments in the Debtor's IRA Accounts beginning in 2001." If the IRA Account held shares in Apple, certainly documents relating to or generated by Apple, the underlying investment, would not be subject to such request.

### Investment in Restricted Securities

33.　　NMSIC contends that the Debtor produced incomplete copies of documents relating to certain "restricted securities" in which the IRA Accounts invested, and that these documents are needed to evaluate whether these investments constitute prohibited transactions given the involvement of Richard Cardinale in those investments. This assertion is groundless. First, complete copies of most of the documents in question were produced that would enable NMSIC to evaluate the issue raised. Further, NMSIC states that the documents produced "demonstrate that Cardinale is the manager of certain of the entities in which the Phoenix IRA Accounts invested. Therefore, to the extent that Cardinale is indeed a fiduciary, the purchases of securities by the Debtor's IRA Account in an entity controlled by Cardinale may be prohibited transactions." NMSIC fails to explain what additional documents it believes the Debtor would have that are relevant to the question of Mr. Cardinale's capacity in those entities, and how the Debtor would be privy to those documents. Second, to the extent any additional documents existed on the Computer those documents would have been stored on the cloud. That additional documents were not produced means that no additional documents exist.

### Net Worth Accreditation

34.　　NMSIC contends that additional documents in these investments are relevant since they contain statements about the Debtor's ownership of securities that are inconsistent with other documents produced by the Debtor. NMSIC references a document that contains a statement that

Debtor held investments totaling $10 million.  It theorizes that the Computer may have information concerning these investments, including instructions for making this representation, on the basis that the Debtor suggested that Gianardi may have filled out the subscription statement.  The flaw in this argument is that the testimony NMSIC references pertained not to the subscription agreements relating to the IRA Account's investments, but the investments made on behalf of the custodial UMTA accounts.  [Debtor TR 2, pgs. 492-494].[13]  Further, the Debtor testified that he was not sure whether Gianardi completed these forms and that it could have been someone at his investment advisor, which had on occasion completed the paperwork.  [Debtor TR 2, pg. 494].

### Investment in Mogo Industries

35.    NMSIC contends that access to the Computer's hard drive is necessary to obtain the subscription agreement for the IRA Account's investment in Mogo Industries in order to understand the circumstances surrounding an event in 2016, less than three weeks prior to the filing of the bankruptcy.  NMSIC argues that this is important to determine whether the Debtor received distributions on account of "his" ownership in Mogo speculating that any distribution on the investment would not have appeared on the IRA Account during the period in question.  This theory is baseless.  First, it is pure speculation that a distribution occurred during this period.  NMSIC could have, but did not, question the Debtor concerning this transaction although the IRA

---

[13] Page 492, line 21:  Q.  And if we turn the next page. Well — well, before we do that, so this appears to be the signature page of a subscription agreement, and the name — It appears that this was a purchase made by you as custodian for one of your sons. Do you see that?

Page 493, lines 2-11:

Q. And if we turn the page to Item B, Lobo Securities LLC, do you see where it says Name of Subscriber?
A. Correct.
Q. Is that one of your sons?
A. It is.
Q. And then it's got some other information. And did you ever purchase Lobo Securities on behalf of one of your sons?
A. Yes.

Account statements had been produced to the Trustee in May 2016 and subsequently given to NMSIC's counsel. Second, there is no possible nexus between an event occurring in 2016 and the documents that may have been stored on the Computer more than two years after Gianardi left Debtor's employment and her deletion of the Files. Third, even assuming a distribution occurred any such distribution would have been payable to the IRA Account, not the Debtor. It would be illogical to have done so. Fourth, there is no allegation that the Debtor has not produced documents relating to accounts in 2016 or any such distributions were made to or received by the Debtor.

### Documents Relating to Loans With Parents

36.     NMSIC alleges that the Debtor has not produced all documents relating to the loans and repayments with his parents. Specifically, NMISC complains that neither the Debtor nor Anthony Correra have produced communications between them in relating to these items, asserting that the absence of email communications is "suspicious," and suggesting that the Debtor failed to undertake a proper search for these communications.[14] Based on these failures, NMSIC contends that the Computer "is likely to contain" relevant information relating to the loans.

37.     The suggestion that any such documents, if they exist, are likely contained on the Computer is completely unsubstantiated and unfounded in light of the testimony to date. In her examination Gianardi was shown each loan agreement and questioned about her knowledge as to each. Her testimony was unequivocal that she had never seen the documents before and she had no idea that the Debtor had received loans from his father, let alone from any source. [Giarnardi TR, pgs. 101- 116 EXs 10- 14]. Gianardi scanned and digitized all the paper documents in the office and saved and stored them. If she had digitized any documents relating to the loans she

---

[14] To be clear, NMSIC does not allege that documentation of the loans and repayment has not been provided by the Debtor.

certainly would have either seen them before or known of the loans' existence.  Her testimony was clear on both points.  It is reasonable to assume that upon scanning any such documents she would have saved them to a file she would have named.  Had she done so she would certainly have had seen the documents and been aware of the loans.

38.      Further, the Debtor and Gianardi maintained separate email accounts and the Debtor used his own laptops.  There is no allegation or evidence that Gianardi had insight into the Debtor's email account or that the Debtor used the Computer for any purpose.  That NMSIC finds it implausible that the Debtor and his father did not communicate via email, such belief does not constitute evidence that any such emails existed or that the Computer was used to send and receive them.  Debtor testified that he used several laptops over the years.  It is certainly more likely that any such emails, if they existed, would have originated and been received on one of those devices rather than the Computer.    To the extent NMSIC is dissatisfied with the Debtor's production and his response that his communications with his father were not made via email, but rather the old fashion way – telephonic and in person – it could seek appropriate relief as to him.  This NMSIC hasn't done.  Lastly, NMSIC has yet to take Anthony Correra's 2004 examination.  Thus, the contention that the Computer is the sole place relevant documents may exist is unsubstantiated and pure speculation

### Production of Account Statements and Wire Transfer Information

39.      NMSIC alleges that the Debtor failed to produce all bank account statements for all bank accounts, referencing the lack of complete statements for a certain Wells Fargo account that Gianardi had opened for the Debtor.  This argument is weak given the alternative sources to obtain any missing statements for this account.  There is no suggestion that NMSIC has sought to compel production of the Wells Fargo account records from the Debtor or from another less intrusive and less costly source, i.e. Wells Fargo.  Further, NMSIC fails to identify specific "other accounts" for

which documents have not been produced, nor has it identified any evidence that any other accounts exist. The assertion that other accounts exist is unfounded and is pure speculation.

40. NMSIC further alleges that the Debtor's production was incomplete referencing certain wire confirmations relating to transfers to his parents which contain the Debtor's home address in Katy, Texas, and noting that Anthony Correra has not produced any bank statements. This argument fails as there is simply no nexus shown between these wire confirmations and the Computer. The transfers in question (Exhibit E to the Motion) were made in May and August 2014, 4 and 6 months, respectively, after Gianardi ceased working for the Debtor and/or his entities. Moreover, NMSIC has yet to take Anthony Correra's 2004 examination to inquire about these transactions, and without such inquiry cannot claim that the Computer is the only source for obtaining these documents. NMSIC had an opportunity to examine both Gianardi and the Debtor concerning any other accounts or any that it believed existed for which no documents had been produced, yet did not. Lastly, the notion that the Computer would contain documents of any accounts opened by the Debtor in the last six years is false since Gianardi ceased working for the Debtor in or around January 2014. The Computer certainly would not contain documents relating to any accounts opened by the Debtor subsequent to that date.

### Debtor's Prior Testimony

41. NMSIC alleges that certain of the Debtor's prior testimony was misleading. They claim that the Debtor testified that his assets were frozen during the divorce and that he had no access to any of his funds for five years. This assertion is unfounded and baseless. First, there is no nexus between these allegations and its request to gain unfettered access to the Computer. Second, NMSIC has taken the Debtor's testimony out of context. In doing so, it fails to acknowledge its full understanding of that testimony. The exchange NMSIC references pertained to the Debtor's loan repayment to his father. The entire exchange is as follows:

Q. Okay. And within two years of the bankruptcy filing you paid your father this amount of money; is that correct?
A. That is correct.
Q. 3,735,000?
A. Correct.
Q. Okay. Were those repayments of loans?
A. Yes, they were.
Q. Were any made within the year prior to the bankruptcy?
A. No, they have not.
Q. Okay. And where did you get the money to make those payments?
A. My money -- my assets were frozen for the – during the divorce, the period of time, so I had no access to any of my funds for almost five years. Finally when the divorce was settled the funds were released, and then at that point I was able to repay the loans.[15]

Transcript 341 Meeting, pg. 10.

42.     NMSIC also references the Debtor's testimony from the continued meeting of creditors asserting that the Debtor modified his earlier testimony concerning the frozen funds.  But, the transcript of the second meeting clearly demonstrates that NMSIC fully understood the meaning of the Debtor's prior testimony.  The exchange is as follows:

Q. And you had mentioned at the prior meting that certain of your bank accounts had been frozen during the pendency of the divorce; is that accurate?
A. Yes.
Q. Were there any accounts that you had that had not been frozen during that period?
A. Only my IRA.

. . .

Q. Were there any accounts that you had that were not frozen, other than your IRA?
A. Other than my IRA, no. There might have been other accounts. There might have been a checking account or something small like that. There was nothing --

---

[15]  Later in the meeting, the Debtor further explained what funds had been frozen:

Q. It was more than $10 million, correct?
A. I would believe so.
Q. How much more than $10 million?
A. I'd have to go check.
Q. What would you have to go check?
A. Because expenses were -- see, at the time also I don't know if you're asking the question about liabilities, because I had no access to this money.  So at the time I had to borrow money to live on and pay attorneys.

341 Meeting Transcript, pg. 21.

let's say nothing substantial.

Transcript Continued Meeting, pgs. 68; 70.

43.     Further, NMSIC suggests that this testimony and funds transferred to SDN contradicts the Debtor's statement contained in his affidavit submitted in relation to the hearing on its request for relief from.  NMSIC does not attempt to identify the source of the funds placed into SDN.  However, these deposits are consistent with the Debtor's prior testimony at the 341 meeting and his affidavit, that he obtained loans from his family to cover the costs of litigation and his divorce (which had exceeded $2 Million) and to pay his personal expenses.

### Statements as to Corporate Entities

44.     NMSIC suggests that the Debtor's testimony concerning his businesses and their operations was inaccurate based on certain financial statements.  There is no evidence that these statements were final statements.  At least one statement evidences that they were merely drafts. The veracity of the Debtor's statements will be judged at another time but are irrelevant to the instant request.  The Debtor's conduct has no bearing on Gianardi's responsiveness to the Document Requests or the justification for NMSIC to gain unfettered access to the Computer. NMSIC seeks to hold Gianardi accountable for the alleged production deficiencies and discrepancies of the Debtor without a determination by this Court that such deficiencies exist or discrepancies have occurred.

### IV. OBJECTION TO RELIEF REQUESTED

45.     Debtor objects to the relief NMSIC requests for several reasons.  First, the request to inspect the Computer and its hard drive is beyond the relief requested in the 2004 Motion. Second, NMSIC has not demonstrated based on the facts alleged that it is entitled to the drastic remedy of obtaining an image of the Computer's hard drive.  Third, to the extent an image is warranted there is no basis to afford NMSIC's counsel unfettered access to any and all documents

and information that may be extracted. Fourth, the request violates the Debtor's and Gianardi's privacy rights as the proposed process involves the extraction of documents and information that are clearly outside the scope of Rule 2004, not responsive to the Document Requests and not relevant to any issue that might be raised in this case. Lastly, NMSIC has not, nor can its show, that there are not alternative sources from whom such documents can be obtained through a less intrusive and less costly process.

## A. **The Motion Seeks Relief Outside the Scope of Rule 2004 and NMSIC's Request**

46.     Rule 2004(c) authorizes the Court to require the "production of documents" in conjunction with an entity's Rule 2004 examination. Further, the Document Requests, as approved by the Order, only sought and required the production of documents responsive to the Document Requests that were in Gianardi's possession, custody and control, relating to the six-year period preceding the Petition Date, in a manner reasonably similar to the way in which the documents were kept in the ordinary course of business or in a manner similar to the manner in which the documents were received by Gianardi. The Document Requests did not seek production of "electronically stored information" on computers or other electronic devices.

47.     Unfortunately, more than two years before the filing of this case Gianardi deleted from the Computer all files relating to the Debtor and his businesses.

48.     Rule 2004 does not contemplate inspection of tangible objects, i.e. a computer, or inspection of same. However, even assuming, that Rule 2004 is so broad, NMSIC did not through the 2004 Motion request that Gianardi produce electronically stored information contained on the Computer or seek production of the hard drives or permission to inspect, test or sample its files.[16] As a consequence, the Motion does not seek to compel Giarnardi's obligations under the Order

---

[16] See National Form B254 (Form 254 – Subpoena for Rule 2004 Examination), which provides for commanding "Production: of documents, electronically stored information, or objects, and inspection, copying, testing, or sampling of the material.

and Document Requests, but rather seeks to expand and impose even greater and more burdensome obligations on her well beyond those contained in the Order and Document Requests.

49.     At no time prior to the Motion's filing, has NMSIC sought further relief under Rule 2004 or issued a subpoena to require Gianardi to produce such additional objects and items or to provide access to the Computer.  As the relief now requested is beyond the scope of the 2004 Motion and Order, the Motion should be denied.

**B.  The Relief Requested is Intrusive and Violates Privacy, Privilege and Confidentiality Concerns.**

50.     Assuming that the Court determines that further production is required of Gianardi, the relief requested and "inspection protocol" proposed is overly broad and exceeds the bounds of permissible discovery even for purposes of Rule 2004.  Here, NMSIC seeks to impose an onerous discovery burden on Gianardi, a non-party, who has done nothing to intentionally thwart NMSIC's investigation into the Debtor's affairs, and to pry into her personal private, privileged and confidential documents and information based on a variety of false premises.

51.     The question of a party gaining unfettered access to image a computer hard drive has not addressed under Rule 2004.  Yet, the issue has received substantial attention by federal courts in construing and applying the civil discovery rules.  Under Fed. R. Civ. P. Fed. R. Civ. P. 34(a)(1)(A), a party may serve a request seeking 'to inspect, copy, test, or sample' 'electronically stored information'" in a [party's] control." *Cory v. George Carden Int'l Circus, Inc.*, 4:13-CV-760, 2016 WL 3460781, at *1 (E.D. Tex. Feb. 5, 2016).  Any such document request "must describe with reasonable particularity each item or category of items to be inspected" or produced.

52.     Direct inspection of an opponent's hard drive is not routine and may be justified only in certain circumstances.  The advisory committee notes to the 2006 amendment to *Federal Rule of Civil Procedure 34(a)* provides, in pertinent part:

> The addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances. Courts should guard against undue intrusiveness resulting from inspecting or testing such systems.

Fed. R. Civ. P. 34(a) advisory committee notes to 2006 amendment.

53.     "Courts have acknowledged that inspection or testing of certain types of electronically stored information may raise issues of confidentiality or privacy." *Tucker v. Am. Int'l Group, Inc.*, 281 F.R.D. 85 (D.Conn. 2012) (citations omitted).  Thus, courts are very cautious about ordering mirror imaging of computers. *Lanelogic, Inc. v. Great Am. Spirit Ins. Co.*, 2010 WL 1839294, at *7 (N.D. Tex. May 6, 2010); *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 900–01 (S.D. Tex. 2015) (citing *See, e.g., Han v. Futurewei Technologies, Inc.*, 2011 WL 4344301 (S.D.Cal. Sept. 15, 2011).  "To the extent possible, courts should be mindful of protecting sensitive information and should choose the least intrusive means of retrieval." *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 316 (Tex. 2009).

54.     Granting a party access to another's electronic storage device is highly intrusive and the rules were not meant to create a "routine right of direct access" and courts "should guard against undue intrusiveness." *A.M. Castle & Co.*, 123 F. Supp. 3d at 900–01; *see also In re Weekley Homes, LP*, 295 S.W.3d 309, 317 (Tex.2009) (opining that under federal case law, direct access to a party's electronic device requires a showing by the requesting party that the responding party has "defaulted in its obligation to search its records and produce the requested data."); *Balfour Beatty Rail, Inc. v. Vaccarello*, Case No. 3:06–cv–551–J–20MCR, 2007 WL 169628, at *3 (M.D. Fla. Jan. 18, 2007) (denying access to responding party's computer hard drives when requesting party did not show what it was seeking to discover from them or to establish that the responding party failed to comply with discovery obligations); *Cf. Balboa Threadworks, Inc. v. *901 Stucky,* 2006 WL 763668, at *3 (D.Kan. 2006) ("Courts have been cautious in requiring the

mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit are unduly vague or unsubstantiated in nature."); *McCurdy Group v. American Biomedical Group, Inc.,* 9 Fed.Appx. 822, 831 (10th Cir. 2001) (affirming the district court's denial of a request to compel production of the opponent's computer hard drives as a "drastic discovery measure" in light of the movant's failure to explain why it should be allowed to inspect them and its only assertion was that it was skeptical that the opponent had produced copies of all relevant and nonprivileged documents from the hard drives).

55.     "[A] party may not inspect the physical hard drives of a computer merely because the party wants to search for additional documents responsive to the party's document requests." *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 900–01 (S.D. Tex. 2015). "As a threshold matter, the requesting party must show that the responding party has somehow defaulted in its obligation to search its records and produce the requested data." *Lanelogic, Inc.*, 3-08-CV-1164-BD, 2010 WL 1839294, at *7 (quoting *In re Weekley Holmes, L.P.,* 295 S.W.3d 309, 317 (Tex. 2009) (citing cases)). "The requesting party should also show that the responding party's production 'has been inadequate and that a search of the opponent's [electronic storage device] could recover deleted relevant materials.'" *Id.*

56.     Nor is skepticism, without anything else to support its request for an intrusive fishing expedition in a party's electronic devices sufficient to support such a drastic discovery request. *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) ("mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures."); *McCurdy Group, LLC v. Am. Biomedical Group, Inc.*, 9 F. App'x 822, 831 (10th Cir. 2001) (same). "Courts have been reluctant to rely on mere skepticism or bare allegations that the responding party has failed to comply with its discovery duties." *In re Weekley Holmes, L.P.,* 295 S.W.3d at 317-318; *Vailes v. Rapides Parish Sch. Bd.*, 2016 U.S. Dist. LEXIS 22340 at

*18 (W.D. La., Feb. 22, 2016) (denying request for forensic expert's direct access to party's computer based on mere skepticism and bare allegations that party failed to comply with discovery rules); *Coast to Coast Eng'g Servs. v. Roop*, 2016 U.S. Dist. LEXIS 154758 at *2 (D.Me., Nov. 8, 2016) ("A court should not allow a forensic examination of a party's computers in order to help the party seeking the examination to confirm a 'highly speculative conjecture' that materials responsive to duly served requests for production have not been produced and are present on those computers.").

57.     Further, "even if this threshold showing is made, only a qualified expert should be given access to an opponent's electronic storage device." *Lanelogic,* 2010 WL 1839294, at *7 (citing *Weekley Homes,* 295 S.W.3d at 318 (citing cases)); *In re Ford Motor Co*., 345 F.3d 1315, 1316-17 (11th Cir. 2003) (Rule 34(a) does not give the requesting party the right to search through all of the responding party's records— *i.e.*, "does not give the requesting party the right to conduct the actual search").

58.     And where access is granted to a party's expert a court may not "give the expert carte blanche authorization to sort through the responding party's electronic storage device." *In re Weekley Homes, L.P.*, 295 S.W.3d at 318. "[C]ourts are advised to impose reasonable limits on production." *Id.* (citing *In re CSX Corp., re CSX Corp.,* 124 S.W.3d 149, 152 (Tex. 2003); *Scotts Co .LLC v. Liberty Mut. Ins. Co.,* 2007 U.S. Dist. LEXIS 43005, at *5 (S.D. Ohio, June 12, 2007); *see also Ford,* 345 F.3d at 1317 (noting the importance of establishing protocols for the forensic search of a party's hard drives, such as designating search terms to restrict the search)).

59.     Further, the majority of courts that have allowed inspection of an opponent's hard drive only allow such inspections under specific protocols that preserve claims of attorney-client privilege and protect the confidentiality of personal information located on the hard drives that is not related to the claims and defenses or the subject matter of the lawsuit. *Musket Corp. v. Star*

*Fuel of Okl, L.L.C.*, 2012 U.S. Dist. LEXIS 135374 at * (W.D. Okl., Sept. 21, 2012), citing, *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 2009 U.S. Dist. LEXIS 22068, 2009 WL 722056, at *8 (D. Kan. March 18, 2009) and *In re Honza*, 242 S.W.3d 578, 582 (Tex. App. 2008).

60.     The facts here are similar to those addressed in *Downs v. Va. Health Sys.*, 2014 U.S. Dist. LEXIS 74415 (W.D. Va., June 2, 2014).  In *Downs*, the plaintiff had deleted all material she had sent to her home computers following her termination from employment.  Years later plaintiff sued for employment related claims.  After acknowledging the deletion of her files in response to discovery, defendant sought "to obtain the plaintiff's family computers in order to attempt to recover the work-related material she forwarded utilizing the services of a computer forensics expert," and "conten[ded] that since the normal use of computer equipment may cause information to be overwritten or otherwise lost, the only way to ensure against any further spoliation or destruction of evidence [was] through mirror-imaging." *Id*. at *2-3.  After considering the applicable standards and discovery rules, the court denied the request, making the following findings and conclusions:

> (1) nothing in the record suggests any willful failure, fault or bad faith by the plaintiff on her discovery obligations that would justify the requested computer forensics examination; (2) the "mirror-imaging" of the plaintiff's family computers three years after her termination raises significant issues of confidentiality and privacy; (3) there was no duty on the part of the plaintiff to preserve her family computers as evidence, (4) principles of proportionality direct that the requested discovery is not sufficiently important to warrant the potential burden or expense in this case; and (5) on the current record that the defendants have failed to justify a broad, and frankly drastic, forensic computer examination of the plaintiff's two family computers.

61.     As in *Downs*, NMSIC's request must fail.  First, Gianardi complied with the Order and the Document Requests.  Although she did not have documents responsive to those requests as they were framed, she complied with her discovery obligations.  There was no willful failure,

fault or bad faith on her part that would justify a forensic exam of the Computer. Thus, NMSIC cannot establish its threshold burden that she defaulted on her obligations under the Order or Document Requests. That the Debtor or Anthony Correra may have defaulted on theirs is of no consequence, since, if true, NMSIC has remedies as to them. NMSIC cannot, nor should it be permitted, to expand the scope and nature of the Document Requests and circumvent proper discovery methods through this Motion.

62. Second, the imaging of the Computer's hard drive, if successful, will certainly recover a trove of documents and information that are not responsive to the Document Requests nor relevant to the bankruptcy case, including Gianardi's Personal Files and personal files of the Debtor and his family that are private and confidential. These include personal files of the Debtor that existed in 2007 before their digitalization and the Personal Files that Gianardi generated and stored in the Computer for more than three years since the end of her employment. The protocol is woefully inaccurate to preserve the privacy and confidentiality of these documents.

63. Third, Gianardi was under no obligation to preserve the deleted files. NMSIC seeks to portray Gianardi as deliberate in her deletion of the Computer file -- that Gianardi should have known that these files should have been preserved and maintained because she had knowledge of certain litigation pending at the time involving the Debtor and/or SDN – the NMSIC Action, the Debtor's divorce action and litigation involving Claudia Correra. However, the issues in those actions are not potential issues in this bankruptcy case, no has any party in those actions sought discovery of the Computer's files in relation to those actions, nor is it alleged that the documents that NMSIC ostensibly hopes to recover through this process have anything to do with any of those matters. Rather, as NMSIC clearly professes, the documents are necessary to evaluate primarily six issues involved in this bankruptcy case – Debtor's exemption of his IRA Accounts, the nature of the Debtor's custodial accounts, the Debtor's loan repayments to his parents, the location of the

Debtor's assets, the completion of the Debtor's document production and the veracity of the Debtor's prior testimony – all matters and potential claims that did not arise until the filing of this bankruptcy case in February 2012, no less than two years after Gianardi deleted the files from the Computer. Gianardi had no knowledge, or reasonable expectation, that any of these issues could one day arise in the future. Documents relating to these issues had no bearing or relationship on the claims asserted in any of the litigation then pending involving the Debtor.

64. Fourth, the importance of the potential information does not warrant the burden and expense to image and review and evaluate the information, if any, that is retrieved. The hard drive is cumulative of the discovery obtained from or that could be obtained from the Debtor, Anthony Correra or other sources.

65. Fifth, NMSIC has not justified such a broad and drastic forensic examination of the Computer. Its claim that the Computer is the only place that the documents and information may exist rings hollow. It has not sought other less intrusive remedies as to the Debtor, Anthony Correra and other possible sources.

66. In short, the Motion is based on pure speculation, conjecture and skepticism. These beliefs fail to warrant the relief sought.

67. NMSIC cites *Simon Prop. Group, LP v. my Simon, Inc.,* 194 F.R.D. 639, 641 (S.D. Ind.2000) in support of its request. However, Simon is distinguishable in two respects; first, in *Simon* only the plaintiff's expert was allowed to review the mirror image of defendant's computers, and, second, it was the defendant's own "troubling discrepancies" as to its document production that formed the basis of the court's ruling. By contrast, here NMSIC, by and through its counsel, is seeking unfettered access and discretion to review all extracted information. Further, NMSIC seeks to hold Gianardi accountable for the alleged and pure speculative production deficiencies and discrepancies of the Debtor and Anthony Correra without a determination by this Court that

such deficiencies exist or discrepancies even occurred, and if so, they can be remedied through a less intrusive manner. Thus, *Simon* stands in sharp contrast with the facts here.

68. Finally, Debtor adopts by reference any arguments made by Anita Gianardi or any other objecting party against the Motion.

## V. CONCLUSION

69. The Motion seeks an unfettered, unabated and overly broad access to all of the Debtor's files that may be on Computer and Gianardi's Personal Files. Thus, seeking access of documents and/or information that are neither responsive to the Document Requests or relevant to any issue or claims that could possibly arise during this case, contested matter or adversary proceeding.

70. As these files are completely irrelevant to the Debtor, his finances and financial transactions are outside the scope of the Document Requests and the Examination Topics, the request must be denied.

## VI. PRAYER

WHEREFORE, the Debtor respectfully requests that the Court deny the relief requested by NMSIC and that it grant her such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Mark A. Weisbart
Mark A. Weisbart
Texas Bar No. 21102650
James S. Brouner
Texas Bar No. 03087285
THE LAW OFFICE OF MARK A. WEISBART
12770 Coit Road, Suite 541
Dallas, Texas 75251
(972) 628-4903 Phone
mark@weisbartlaw.net
jbrouner@weisbartlaw.net

COUNSEL FOR MARC ANTHONY CORRERA

## <u>CERTIFICATE OF SERVICE</u>

   The undersigned hereby certifies that a true and correct copy of the foregoing instrument was electronically filed and served upon all parties and/or counsel of record receiving ECF notices, on this the 6th day of March 2017.

James W Cunningham
ECF.JCTrustee@att.net

Jarom J. Yates
jarom.yates@haynesboone.com

Kenneth W. Ritt
kwritt@daypitney.com

Office of the U.S. Trustee
1100 Commerce St, Rm 524
Dallas, TX 75242

John B. Nolen
jbnolan@daypitney.com

James C. Jacobsen
jjacobsen@nmag.gov

       /s/ Mark A. Weisbart
       Mark A. Weisbart