

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 21, 2018**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MARC ANTHONY CORRERA, | § | CASE NO. 16-30728-SGJ-7 |
| | § | (Chapter 7) |
| DEBTOR. | § | |

## MEMORANDUM OPINION AND ORDER IN CONTESTED MATTERS[1] INVOLVING CONCEALMENT AND DESTRUCTION OF ELECTRONICALLY STORED FINANCIAL RECORDS OF A CHAPTER 7 DEBTOR

### I.    Introduction.

Before this Texas bankruptcy court are two, related contested matters  (one against an

individual Chapter 7 debtor and one against his former, long-time personal assistant), initiated by

---

[1] This Memorandum Opinion and Order constitutes the bankruptcy court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Proc. 9014 and 7052, in connection with the contested matters initiated by the New Mexico State Investment Council in:  (a) DE # 263 ("Motion Seeking Sanctions Against the Debtor for Spoliation"); and (b) DE ## 264 and 265 ("Motion for Contempt and Sanctions Against Anita Gianardi Regarding Violation of 2004 Order and Destruction of Evidence").  References to "DE # __" in this Memorandum Opinion and Order refer to the docket entries maintained by the Bankruptcy Clerk in Case No. 16-30728.

one of the debtor's alleged creditors, involving: (a) what appears to have been an intentional concealment, then destruction, of electronically stored financial records of the debtor; and (b) a request for various sanctions against each of the two individuals in connection with same. The facts are egregious. The analysis regarding what sanctions may be procedurally and legally appropriate, with regard to each of the two individuals, is somewhat complicated.

The two individuals involved are, again, a chapter 7 debtor ("Mr. Corerra" or the "Debtor") and his former personal assistant, Anita Gianardi ("Ms. Gianardi"). The Debtor describes himself as an unemployed divorced father, with no income whatsoever,[2] raising two sons in a 6,000 Euro-per-month apartment in Paris, France. The Debtor testified that his only form of sustenance, at this point in life, is family loans (mostly from his father).[3] Previously, the Debtor was an investment professional, in some form or fashion—raising money or finding investment opportunities for hedge funds and private equity funds. In recent years, the Debtor had a net worth of several millions of dollars, doing business under the following names: L2 Capital Partners, LLC; L2 Capital Management, LLC; L2 Investment Advisors, LLC; SDN Advisors, LLC; Crosscore Management, LLC; Mergent Securities, LLC; LLMN Investments, LLC; Pitanga, LLC; and Baltimore Casino Investments, LLC. Ms. Gianardi worked closely with the Debtor and at least one of his companies, SDN Advisors, LLC, for several years prepetition (first, in an office he maintained in Santa Fe, New Mexico, and then long distance from her home in Colorado).

The Debtor filed bankruptcy in early 2016. An alleged creditor of the Debtor—the New Mexico State Investment Council (the "NMSIC"), a State of New Mexico governmental

---

[2] *See* DE # 344 (Transcript from 6/14/18 Hearing, at p. 5 (lines 15-21)).

[3] *Id.* at pp. 5-9.

agency—has been very active in the Debtor's bankruptcy case from the very beginning. The NMSIC is highly skeptical of the Debtor's dramatic and sudden reversal of fortune.[4] In fact, the Chapter 7 Trustee in this case—while somewhat active—has often deferred to (or simply joined with) the NMSIC in various investigatory activities, since there are no funds, at this point, in the bankruptcy estate and the NMSIC has been economically motivated to pursue all available bankruptcy tools for recovery against the Debtor.

A.    *Who is the NMSIC?*

The NMSIC is a State of New Mexico governmental agency that is responsible for investing public trust funds for the benefit of its citizens under the New Mexico Constitution.[5] The NMSIC has, since the year 2011, been engaged in certain "pay-to-play" litigation against the Debtor, his father, and others. The "pay-to-play" litigation has yet to go to trial (the bankruptcy court lifted the stay to allow it to proceed to trial many months ago). In the "pay-to-play" litigation, the NMSIC has alleged that the Debtor, through his father Anthony Correra—who was a close friend and political ally of former Governor of New Mexico Bill Richardson—developed business and social relationships with an individual named Gary Bland ("Bland"), who for many years served as the New Mexico State Investment Officer and as a member of the NMSIC. It is alleged that the Debtor exploited his relationship with Bland and others to obtain millions of dollars in fees from investment managers willing to pay for his influence—and his father's—in their pursuit of investments from the NMSIC in their hedge funds, private equity funds, *etc.*[6] The Debtor has allegedly admitted that, during Bland's tenure, he received more than $18

---

[4] The court is reminded of the oft-quoted literary conversation between two characters in Ernest Hemingway's novel *The Sun Also Rises*: "How did you go bankrupt? Two ways. Gradually, then suddenly."

[5] *See* DE # 37.

[6] *Id.* at ¶¶ 4-26.

million in fees, directly or indirectly, from fund managers, investment advisors and other service providers doing business with the NMSIC. Through the "pay-to-play" litigation, the NMSIC is asserting claims against the Debtor for, *inter alia*, aiding and abetting Bland's breach of his fiduciary duties and unjust enrichment in connection with the actions taken by the Debtor.

Early on in this bankruptcy case, the NMSIC sought authority to take a Bankruptcy Rule 2004 examination of the Debtor[7] and his former personal assistant, Ms. Gianardi.[8] The NMSIC also sought production of certain financial records from each of them in connection therewith. The NMSIC had questions regarding, among other things, certain financial accounts of the Debtor; transfers of funds and alleged loans from family members;[9] and the validity of the Debtor's claimed exemptions (in particular, in certain IRAs). The bankruptcy court ordered the requested Bankruptcy Rule 2004 examinations to occur.[10]

B.      *The Computer*.

During a Bankruptcy Rule 2004 examination of Ms. Gianardi on October 14, 2016,[11] Ms. Gianardi unexpectedly testified that she still had possession of a computer (the "Computer") on which she, for many years, had maintained a digital filing system for the Debtor (*i.e.,* she had, for many years, scanned and archived onto the Computer's hard drive financial documents and

---

[7]  *See* DE # 107 (filed 7/15/16).

[8]  *See* DE # 109 (filed 7/15/16).

[9] The Debtor's Statement of Financial Affairs filed in his bankruptcy case states that the Debtor transferred over $3.7 million to his father, in the two years preceding the filing of his bankruptcy case. *See* DE # 58 (SOFA Question 18).  The Debtor has previously testified these transfers were repayments of loans from his parents.  Although the Debtor and his father have both produced copies of certain notes and loan agreements, according to the NMSIC, they have failed to provide virtually any other documentation supporting the validity of the loan agreements.

[10] *See* DE ## 143 & 145 (entered 8/29/16).

[11] *See* Exh. 7.

other information relating to the Debtor's finances—then shredded the original hard copies).[12]
Ms. Gianardi also testified that she had simply kept the Computer after she left the Debtor's
employ (*i.e.,* the Debtor did not really explicitly give it to her, she just kept it) ***and that she
deleted all of the Debtor's files from the Computer when she stopped working for him*** (a
couple of years before he filed bankruptcy) and now simply used it as her own personal
computer.[13] The NMSIC and the Chapter 7 Trustee immediately surmised that the Computer—
even if files had been deleted—could be a Rosetta Stone, of sorts, in understanding the Debtor's
financial maneuverings during the past several years. They wanted a forensic expert to examine
the Computer's hard drive to determine if ***the allegedly deleted files of the Debtor could be
recovered***.

After more than three months of being unable to work out an informal agreement with
Ms. Gianardi to provide access to the Computer (and over objections of the Debtor and Ms.
Gianardi—whose attorney's fees, it was later revealed, were being paid by the income-less
Debtor), the NMSIC filed a motion to compel access to the Computer to facilitate the creation of
a forensic image of it, so as to possibly recover the Debtor's documents from it (the "Motion to
Compel—Computer").[14] The court later granted the Motion to Compel—Computer and also
ordered the appointment of a neutral forensic expert to examine the Computer.[15]

---

[12] *Id.* at p. 21.

[13] *Id.* at pp. 133 & 136. As later explained, the evidence ultimately reflected that there were mass deletions of data from the Computer by Ms. Gianardi going back as early as October 22, 2011 and as late as February 2017—during which time the Debtor was in the midst of litigation with the NMSIC as well as other litigation, including a divorce. *See* Exh. 19.

[14] *See* DE ## 202 & 203.

[15] *See* DE ## 224 & 248.

C.  *Cat Pictures and Movies.*

In these contested matters, the NMSIC now alleges an intentional, bad faith spoliation of evidence that is utterly eye-popping.  As further described herein, the NMSIC alleges that, in December 2016—***shortly after Ms. Gianardi's Bankruptcy Rule 2004 examination, and just after discussions collapsed regarding a consensual production of the Computer***: (a) someone inserted multiple USB drives into the Computer,[16] (b) then someone using Ms. Gianardi's login information downloaded a "wiping" tool from an internet website onto the Computer to fill unallocated space on the Computer's hard drive—filling some of the Computer's unallocated space with cat pictures and strings of numbers (thus, covering up and making irrecoverable some files that would likely have been retrievable); and (c) then someone using Ms. Gianardi's login information copied 101 movie files (which amounted to 420 gigabytes of data) onto the Computer, in a one-week period, covering most of the hard drive space on the Computer, where deleted files might have remained.  ***The latter two actions essentially overrode the court-appointed forensic expert's ability to retrieve data that might have existed on the space***.[17]  The court-appointed forensic expert was nevertheless able to find dozens of documents on the Computer relating to the Debtor and his father that were apparently never deleted by Ms. Gianardi and also were never produced by the Debtor or Ms. Gianardi (although they would have been responsive to the bankruptcy court's Bankruptcy Rule 2004 Orders directed at them).

The court held a hearing on June 5, 14, & 19, 2018 on:  (a) a Motion for Finding of Contempt and Sanctions Against Anita Gianardi for Violation of 2004 Order and Destruction of

---

[16]  It was undeterminable whether the USB drives were used to copy information or import information to the Computer.

[17]  Apparently, when one deletes active files from a computer, those files typically sit on "unallocated" space unless and until new data is copied onto the computer and covers up that space.

Evidence (DE ## 264 & 265) (the "Gianardi Sanctions Motion" or "Contested Matter No. 1—Gianardi");[18] and (b) a Motion Seeking Sanctions Against the Debtor for Spoliation (DE # 263) (the "Debtor Sanctions Motion" or "Contested Matter No. 2—Debtor").[19] The theme of the Gianardi Sanctions Motion is that, while under an obligation to preserve evidence, Ms. Gianardi either allowed documents in her possession on the Computer to be destroyed or actively destroyed them. Similarly, the theme of the Debtor Sanctions Motion is that, while under a duty to preserve evidence, the Debtor either allowed his documents in the possession of his former assistant to be destroyed or aided in their destruction. Specifically, the Debtor failed to take the necessary steps to ensure the information was preserved and, in fact, actively opposed the Trustee's and the NMSIC's efforts to recover the deleted evidence. Because of the Debtor's failure to preserve the Computer and the information it contained, virtually all of the information on the Computer has now been lost and is unrecoverable.

As will be more fully explained below, the court finds that both the Debtor and Ms. Gianardi have concealed and destroyed evidence and concludes that significant sanctions should be awarded.

---

[18] The Gianardi Sanctions Motion cites to Fed. Rs. Civ. Proc. 70(e) and 37(e) as the applicable authority at the beginning, but then argues civil contempt case law, section 105 of the Bankruptcy Code—inherent authority to sanction a party for abuse of process—and case law regarding spoliation generically.

[19] The Debtor Sanctions Motion cites to Fed. R. Civ. Proc. 70(e) as the applicable authority at the beginning, but then argues case law regarding spoliation generically.

II.   **Findings of Fact.**[20]

A.     *The Peripatetic Debtor.*

1.       On February 22, 2016, the Debtor commenced his Chapter 7 Case.  While the Debtor listed a Dallas, Texas rented apartment for his place of residence, the Debtor testified in this contested matter that he has resided in Paris, France[21] (in the so-called Eighth District—on the right bank of the River Seine)[22] since approximately the summer of 2009.  The court is not clear why the Debtor maintained an apartment in Dallas, Texas, or chose the Northern District of Texas for the venue of his bankruptcy case.[23]  In any event, the Debtor testified that he has moved around a lot.  Indeed, there was evidence that the Debtor has, in recent years, owned homes in Santa Fe, New Mexico; Acapulco, Mexico; and Katy, Texas.  He has used an address of an apartment in New York as well.

2.       As earlier alluded to, the Debtor described his former occupation as providing investment-related services for hedge funds and private equity funds.  However, he testified that he is now unemployed with no income and survives off of borrowed funds from family and, specifically, his father.  Among other things, he testified that he has borrowed approximately $800,000 from his father to pay legal fees and expenses in connection with his bankruptcy

---

[20] Statements made in the Part **I. Introduction** section of this Memorandum Opinion and Order, while mainly set forth to establish context and background for this court's ultimate ruling, should also be considered findings of fact, pursuant to Fed. R. Bankr. Proc. 7052 and 9014.  Findings of Fact that should more appropriately be deemed Conclusions of Law should be regarded as such, and *vice versa*.

[21] The court clarifies Paris, ***France***—since there is a Paris, ***Texas*** approximately 100 miles from the Dallas federal courthouse. The court notes, anecdotally, that the two cities bear very few similarities, other than their common name.

[22] *See* DE # 344 (Transcript from 6/14/18 Hearing, at p. 8 (line 5) through p. 10 (line 25)).  The court takes judicial notice that this area of Paris is sometimes referred to as the "VIII arrondissement of Paris" or *huitieme* and is situated around the famous Avenue des Champs Elysees.

[23] No one ever questioned venue in this case.

case.[24] He also testified that his current rent for his Paris apartment (which he shares with his two minor sons) is approximately €6,000 per month, and that the annual tuition he pays for private school for his sons in Paris is €40,000 per child. The Debtor's Schedules list only $4,745 of personal and household items, but $4,040,082.95 in exempt IRA funds and children trust funds.

3.      The Debtor scheduled a very large number of unsecured creditors in his bankruptcy case—most of which showed "unknown" amounts due. However, only a handful of proofs of claim were filed in the case. The NMSIC—a large disputed creditor that has been involved in certain so-called "pay-to-play" litigation with the Debtor in the State of New Mexico for several years—had many questions, early on, regarding the Debtor's assets, liabilities, and transfers that occurred in the months and years before his bankruptcy filing. In fact, it appeared that the Debtor had an unexplained significant decrease in personal net worth in recent years. Among other things, the Debtor allegedly transferred over $4 million to his ex-wife in a consensual divorce settlement two years before bankruptcy (and the Debtor, somewhat incredulously, has claimed not to know the current address or whereabouts of his ex-wife—the mother of his two children over whom he has custody).[25] The Debtor has also transferred large sums of money to his father.

       B.      *The NMSIC Seeks Rule 2004 Examinations.*

4.      The NMSIC sought permission to take Bankruptcy Rule 2004 examinations from the Debtor's father, former accountants, and other professionals in this case. On July 15, 2016, the NMSIC also filed a motion in the bankruptcy court to take a Bankruptcy Rule 2004

---

[24] *See* DE # 344 (Transcript from 6/14/18 Hearing, at p. 10 (line 25) through p. 11 (line 22)).

[25] Debtor 2004 Motion, DE # 107, ¶¶ 16-22.

Examination of Ms. Gianardi (the "Gianardi 2004 Motion")[26] and also one of the Debtor (the "Debtor 2004 Motion").[27]

5. Both the Debtor 2004 Motion and the Gianardi 2004 Motion contained a long list of documents that were desired as part of the examinations. The motions and their accompanying instructions made clear that the "documents" being sought included hard copies as well as electronic documents—specifically, defining "documents" as including, among other things: "written, printed, or electronic matter that provide information, including, without limitation, emails, text messages, chats, instant messages, facsimiles, websites, social media entries, databases, calendar entries, spreadsheets, notes, jottings, diaries, communications, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing." With regard to electronic documents, there were instructions about how they were to be extracted and produced.[28] With regard to "media," it was specified that: "All documents shall be produced via either a secure ftp site, hard drives, CDs, DVDs or other mutually agreeable media."[29]

6. With regard to the Debtor 2004 Motion, after an objection and some controversy and negotiations regarding such things as examination topics and appropriate length of the examination, the bankruptcy court ordered a Rule 2004 examination with regard to the Debtor, including production of essentially all the requested documents (with some limitations), with such examination and production to occur at the Debtor's lawyer's office in Dallas, Texas (the "Debtor 2004 Order").[30]

---

[26] *See* DE # 109.

[27] *See* DE # 107.

[28] *Id.,* Exh. A, p. 5.

[29] *Id*., Exh. A, p. 6.

[30] *See* DE # 145.

7.      With regard to the Gianardi 2004 Motion, the argument presented was that—given her capacity as a long-time personal assistant to the Debtor—not only might she have access to his financial records and knowledge about his assets, but she had also been involved in bizarre litigation involving the Debtor's now-vanished ex-wife who had obtained the $4 million consensual divorce settlement just a couple of years prepetition.  Apparently, both Ms. Gianardi and the ex-wife accused each other of hacking each other's e-mail accounts.[31]  This latter fact might be another reason to seek information from her about the Debtor's assets and affairs.

8.      The NMSIC represented in the Gianardi 2004 Motion (¶ 36) and in the Certificate of Conference thereto that it had spoken with Ms. Gianardi by telephone on July 12, 2016, regarding a mutually agreeable time and place for a Rule 2004 examination, but she had replied that she was not in a position to agree to anything.  ***Ms. Gianardi currently lives in Loveland, Colorado***.  She had previously lived in Santa Fe, New Mexico and began working for the Debtor when he had a residence and office there.  The NMSIC proposed an examination of Ms. Gianardi and the production of documents by her in a Denver, Colorado office of the NMSIC's outside counsel.

9.      On July 18, 2016, a process server personally served Ms. Gianardi in Loveland, Colorado with the Gianardi 2004 Motion and a Notice of Hearing in the bankruptcy court

---

[31] Specifically, on May 9, 2013, the Debtor and his entity SDN Advisors, LLC commenced a lawsuit against the Debtor's ex-wife styled *SDN Advisors, LLC and Marc Correra v. Claudia Correra*, Case No. D-101-CV-201301282 in the New Mexico District Court in Santa Fe.  Two days later on May 11, 2013, Ms. Gianardi commenced a lawsuit against the Debtor's ex-wife styled *Anita Gianardi v. Claudia Correra*, Case No. D-101- CV-201301301 in the New Mexico District Court in Santa Fe. The lawsuits apparently related, in part, to the Debtor's ex-wife's alleged hacking into Ms. Gianardi's email accounts.  *See* DE # 335 (Transcript from 6/5/18 Hearing at p. 240 (line 22) through p. 244 (line 12)).  Meanwhile, the Debtor's ex-wife accused Ms. Gianardi of the same type of hacking in the Correra divorce case.  Exh. 65, ¶¶ 24-25.

regarding same.[32] Ms. Gianardi filed no objection to the Gianardi 2004 Motion or to the bankruptcy court's personal jurisdiction over her. Ms. Gianardi filed nothing at all with the bankruptcy court.

10.     On August 29, 2016, after a hearing in the bankruptcy court on August 9, 2016, at which no one appeared for Ms. Gianardi, the bankruptcy court ordered a Rule 2004 examination with regard to Ms. Gianardi, including production of all the requested documents (the "Gianardi 2004 Order").[33] The Gianardi Rule 2004 Order required production of 35 categories of documents. The document production was ordered to occur in Denver, Colorado at the law offices of the NMSIC's outside counsel on or before September 9, 2016 at 4:00 p.m. "or such other time and place agreed to by the NMSIC and Ms. Gianardi." The examination was ordered to occur on September 23, 2016, at 9:00 a.m. "or on such other date and time as may be agreed by Ms. Gianardi and the NMSIC." Counsel for the NMSIC represented to the bankruptcy court at the hearing (Mr. Jarom Yates) that he had talked on the telephone with Ms. Gianardi and—while she did not think she had any responsive documents (because she said she no longer worked for the Debtor and, when she left his employ, she said she did not take anything with her)—she did not object to the Gianardi 2004 Motion. The NMSIC's counsel represented that Ms. Gianardi said that, if ordered, she would produce documents and appear.[34]

11.     The NMSIC did not serve a subpoena on Ms. Gianardi, but, as earlier noted, it is unrefuted that, on July 18, 2016, it personally served, through a process server, the Gianardi 2004 Motion and Notice of Hearing on her and, on September 6, 2016, it served the Gianardi

---

[32] *See* DE # 116.

[33] *See* DE # 143.

[34] FTR court audio recording from 8/9/16 hearing on Gianardi 2004 Motion at 2:33:51-2:34:57.

2004 Order on her by Federal Express at her place of employment in Loveland, Colorado (the same place it had earlier personally served the Gianardi 2004 Motion and Notice of Hearing on her).[35]

12. On September 7, 2016, after being served with the Gianardi 2004 Order, Ms. Gianardi sent counsel for the NMSIC a letter seemingly acknowledging an obligation and intention to comply with the Gianardi 2004 Order—stating that the "order requires me to turn over any documents that I have in my possession, custody or control," and further stating that she had "not retained nor have any access to any documents pertaining to Mr. Correra." She further added, "I am unable to provide the court with any documents at all. I have no documents in my possession, my custody or my control."[36] *These statements—about having no documents— would prove to be untrue.* In any event, no documents were produced in connection with the Gianardi 2004 Order.

13. On October 14, 2016, Ms. Gianardi, with Colorado legal counsel now representing her—Andrew D. Johnson from the firm Onsager Fletcher Johnson in Denver— appeared for her Rule 2004 examination (the "Gianardi 2004 Examination") in Denver, Colorado at the offices of the private law firm representing the NMSIC.[37] Neither Ms. Gianardi nor her attorney raised any objection to the bankruptcy court's personal jurisdiction over her with regard to issuing the Gianardi 2004 Order or with regard to her appearance that day generally.[38] As

---

[35] *See* DE # 146.

[36] *See* Exh. 5.

[37] *See* Exh. 7 (entire Transcript).

[38] *Id.*

earlier mentioned, ***no separate subpoena was issued or served on Ms. Gianardi***.[39]  However, neither she nor her counsel resisted appearing, nor expressed that a subpoena would be needed to compel her attendance or the production of documents.[40]  They willingly appeared for the Gianardi 2004 Examination without any reservation of rights.

14.     During the Gianardi 2004 Examination, Ms. Gianardi testified that she had spoken with the Debtor by phone on the morning of her examination and "probably" a few times about the Gianardi 2004 Examination.[41]  In the Debtor's Rule 2004 Examination just 20 days later on November 3, 2016, he testified "I don't remember" when asked if he had talked to Ms. Gianardi the morning of the Gianardi 2004 Examination.[42]  In any event, Ms. Gianardi denied that he helped her hire an attorney or paid for her attorney in connection with the Gianardi 2004 Examination.[43]  This is inconsistent with the Debtor's own testimony that he paid for two or three attorneys for Ms. Gianardi.[44]

---

[39] *See* Bankruptcy Rule 2004(c) ("The attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial"; Bankruptcy Rule 9016, in turn, incorporates Fed. R. Civ. Proc. 45, which provides various relevant requirements for subpoenas).

[40] As earlier stated, Ms. Gianardi was served with the Gianardi 2004 Motion and Notice of Hearing (via personal service) and the Gianardi 2004 Order (via Federal Express).

[41] *Id.* at p. 9 (line 9) through p. 11 (line 13).

[42] *See* Exh. 6 (Day 1) at p. 69 (lines 22-24).

[43] *Id.* at p. 11 (line 14) through p. 12 (line 8).

[44] *See* DE # 335 (Transcript from 6/5/18 Hearing).  Debtor's testimony at this hearing was that he paid for 2-3 lawyers for her.  *See also* DE # 344 (Transcript from 6/14/18 Hearing, p. 12 (line 15) through p. 13  (line 12)).

C.     *The Previously Undisclosed Computer.*

15.     Ms. Gianardi then revealed at the Gianardi 2004 Examination that, over the approximately seven years she worked for the Debtor (from October 2007 to January 2014),[45] she saved extensive amounts of financial and business information relating to the Debtor and his entities on a work computer (the "Computer").  Specifically, beginning in 2007 or 2008, Ms. Gianardi converted the Debtor's personal and business files from paper to digital files and began saving them on the hard-drive of the Computer (shredding original hard copies), which she continued doing through at least 2014.[46]  Things suddenly got more interesting after the Computer was mentioned.  It appeared as though the information that had been saved on this Computer might have been highly responsive to the NMSIC's document requests to Ms. Gianardi.

16.     Ms. Gianardi testified that in the year 2009, the Debtor closed his Santa Fe, New Mexico office and she ***took the Computer to her home***, where she continued to do work for the Debtor and his companies for several years.[47]  Ms. Gianardi further testified that, to this day, she still had the Computer at her home in Colorado and used it for her own life—first stating that it was essentially "donated" to her by the Debtor, then later explaining the Debtor simply let her keep it without discussion.[48]  She further testified that ***she deleted all of information of the Debtor's and his companies' shortly after she stopped working for the Debtor in the year***

---

[45] Actually, Ms. Gianardi testified that she worked for the Debtor's investment firm SDN Advisors.  Additionally, her email address is associated with the Debtor's entity L2 Capital.  *See* Exh. 7, pp. 13, 26 (lines 17-25) & 28 (lines 6-14).

[46] *See* Exh. 7, pp. 21-22, 34, 132-133, 138.

[47] *Id.* p. 18 (line 17) through p. 22 (line 15).

[48] *Id.* at p. 132 (line 15) through p. 137 (line 18).

*2014*.[49]  She said that she was not worried about deleting the Debtor's files because she was sure

the Debtor had a copy of everything because she "put it all on discs and gave it to him"—

although she did not know what he had done with the discs.[50]  The Debtor has denied having any

discs[51]—even when confronted with evidence that suggests they exist or existed. [52]

17.     The NMSIC, not surprisingly, wanted to inspect the Computer after hearing this

testimony of Ms. Gianardi.  The NMSIC was concerned that the Debtor himself was not being

forthcoming with document production (for example, the NMSIC did not receive as many

documents as it expected to get from the Debtor's document production).  And the NMSIC

thought that, perhaps, any *deleted* files relevant to the Debtor's financial affairs could be

*retrieved* from the Computer, if an expert was retained to attempt such a task.  The NMSIC's

counsel said to Ms. Gianardi on the record during her Rule 2004 Examination:

> Q:  And we would ask that you not do anything further to that computer –
> A:  Okay.

---

[49] *Id.* at p. 133 (lines 4-19).

[50] *Id.* at p. 137 (lines 1-18).

[51] *See* Exh. 6 (Day 1) at p. 24 (lines 5-12); *See also* DE # 335 (Transcript from 6/5/18 Hearing at p. 228 (lines 2-12)).

[52] *See* DE # 344 (Transcript from 6/14/18 Hearing at p. 28 (lines 2-17).  When the NMSIC's attorney questioned the Debtor about a Skype log, Exh. 59, between the Debtor and Ms. Gianardi, that reflected a discussion between them regarding back-up discs in a storage unit, the questioning went like this:

> Q. From Anita Gianardi. It says, "Do you know she told Rosie that only her things were in there? I would like to let you know that all of your back-up disks are in that unit along with all of your own personal effects. There are two sets of keys, one I will give to Rosie on Saturday and the other your dad has.  Be careful when someone opens it, you can only open from one side. If you open from the other side, all of the furniture will fall. When opening the correct side, you must be careful, as the huge M Scott painting to the right is inside the door."  Did I read that correctly?
> A. Yes.
> Q. Ms. Gianardi says here that "all of your back-up disks are in that unit." Is that correct?
> A. Yes.
> Q. And on direct testimony you testified that she never gave you any back-up disks; is that — is that correct?
> A. Yes.

Q:  --in the event that there is a request to see if there's some ability to recover information.
A:  Okay.
Q:  And so will you agree to not delete anything further from the computer?
A:  Yes.
Q:  Okay.  And will you agree not to intentionally damage the computer?
A:  Yes.
Q:  Will you agree not to give it away or sell it?
A:  Yes.[53]

D.      *Attempts to Gain Access to the Computer.*

18.      The Gianardi 2004 Examination started and ended on October 14, 2016.

Thereafter, apparently multiple informal discussions took place between Ms. Gianardi's counsel

and the NMSIC's counsel regarding inspection/retrieval of the Computer.  These informal

discussions ultimately were not fruitful.  The NMSIC's counsel represented that it conferred with

Ms. Gianardi's counsel in Colorado on multiple occasions to see if it was possible to obtain an

image of the Computer without the need to file a motion, including by email on November 10,

2016, November 11, 2016, November 21, 2016, and by telephone both before and after

November 10, 2016 (offering to pay the entire costs).  However, Ms. Gianardi would not agree to

allow the NMSIC to obtain an image of the Computer and insisted that any analysis be limited to

the work of a third party and any information produced be limited to information recovered by

"key word" searches.   The NMSIC did not think this would be useful, under the circumstances,

since Ms. Gianardi testified that she intentionally deleted numerous documents.

19.      Finally, on February 6, 2017, the NMSIC filed in the bankruptcy court a "Motion

Pursuant to Bankruptcy Rule 2004 and 11 U.S.C. § 105(a) to Compel Performance Under Order

Granting Motion of New Mexico State Investment Council Pursuant to Bankruptcy Rule 2004

and for Rule 2004 Examination of Anita Gianardi and Production of Documents" (the "Motion

---

[53] *Id.* at p. 132 (line 16)-p. 134 (line 90).

to Compel—Computer").[54]  It is unrefuted that the Motion to Compel—Computer, and a Notice

of Hearing regarding same, were served on February 7, 2017, by regular mail to Ms. Gianardi at

her home address in Loveland, Colorado; also to her business address in Loveland, Colorado;

and also to her then-Colorado attorney who had represented her during the Gianardi 2004

Examination (in addition to various other parties-in-interest, including the Debtor and his

counsel).[55]  In the Motion to Compel—Computer, the NMSIC sought an order from the

bankruptcy court ***compelling access to the Computer***, to facilitate the creation of a forensic

image of the hard drive or drives in the Computer, so that the NMSIC might attempt to recover

documents that were deleted from the Computer by Ms. Gianardi.

  20.  The Motion to Compel—Computer cited Bankruptcy Rule 2004 and Bankruptcy

Code section 105(a) as the underlying authority for the relief sought.  Basically, the NMSIC

argued that the newest relief it was seeking was a follow-on request to the Gianardi 2004 Order

and the Debtor 2004 Order.  The Motion to Compel—Computer further explained that Ms.

Gianardi had testified that, for many years, she had scanned and archived onto the Computer's

hard drive financial documents and other information relating to the Debtor's personal finances

and finances of several of his business entities (shredding hard copy originals).[56]  She had further

testified that she deleted records without consulting with the Debtor sometime after she left his

employ (in 2014).  The NMSIC believed that some of the deleted information might be

recoverable from the Computer by creating a bit-by-bit forensic image of the hard drive and

analyzing it using data recovery tools.  Significant to the bankruptcy court, the NMSIC also

---

[54] *See* DE ## 202 & 203.

[55] *See* DE # 205.

[56] *See* Exh. 7, p. 21.

stated: "*Ms. Gianardi's own testimony demonstrates that the Computer, and the Debtor's information contained on it, does not belong to her. The Debtor's testimony also suggests that the Computer did not belong to Ms. Gianardi. During the Debtor's Examination, the Debtor identified the Computer used by Ms. Gianardi as an additional computer that he owned.*"[57]

21.     The NMSIC also further expressed concern that the Debtor was not being forthcoming with providing documents. In fact—despite Ms. Gianardi's testimony that she at one time copied information from the Computer onto discs and gave them to the Debtor[58]—the Debtor testified that he had no recollection of receiving any discs and if he got any, they must have been lost or misplaced.[59] The Debtor also appeared to have been haphazard in his own production of documents.[60] Thus, any information recoverable from the Computer was likely not recoverable from any other source.

22.     On March 8, 2017, Ms. Gianardi, through her newly retained Texas bankruptcy counsel (not to be confused with her Colorado lawyer who sat in on the Gianardi 2004 Examination), filed an objection to the Motion to Compel—Computer (the "Gianardi Objection to Motion to Compel—Computer").[61] While the 15-page objection did make a brief argument, at paragraphs 4-9, that the dispute "should be determined in the bankruptcy court for the district in which Ms. Gianardi was requested to produce *documents*, the District of Colorado" (emphasis added), and further stated that, if the NMSIC had properly served a *subpoena* on Ms. Gianardi,

---

[57] *See* DE # 202 at ¶ 56 (citing Debtor Exh. (Day 1), p. 242).

[58] *See* Exh. 7, pp. 136-137.

[59] *See* Exh. 6 (Day 1), p. 24 (lines 5-12).

[60] *Id.* at pp. 24, 37-50.

[61] *See* DE # 211.

this would be clear, the objection never mentioned "personal jurisdiction" or actually contested the bankruptcy court's personal jurisdiction over Ms. Gianardi.

23.    The Gianardi Objection to Motion to Compel—Computer mostly complained that production of the Computer was intrusive and well beyond the scope of what was contemplated by Bankruptcy Rule 2004.  It also articulated privacy concerns with regard to the NMSIC or any forensic expert examining the Computer—given that Ms. Gianardi allegedly had a significant amount of her own personal data and pictures on it by this point.  Ms. Gianardi sought affirmative relief from the bankruptcy court to protect her personal information on the Computer, in the event the Motion to Compel—Computer was granted.  Ms. Gianardi wanted to put restrictions on how the Computer would be searched (with search terms, and the like).

24.    The Debtor also separately filed an objection to the Motion to Compel—Computer.[62]  The Debtor's objection to the Motion to Compel—Computer argued that the NMSIC's request should be denied for several reasons.  First, the request to inspect the Computer and its hard drive was argued to be beyond the relief requested in the 2004 Motions.  Second, the Debtor argued that the NMSIC had not demonstrated based on the facts alleged that it was entitled to the "drastic remedy" of obtaining an image of the Computer's hard drive.  Third, to the extent an image was warranted, the Debtor argued there was no basis to afford the NMSIC's counsel unfettered access to any and all documents and information that might be extracted.  Fourth, the request allegedly violated the Debtor's and Ms. Gianardi's privacy rights as the proposed process involved the extraction of documents and information that were allegedly outside the scope of Rule 2004, not responsive to the document requests in the 2004 Motions, and not relevant to any issue that might be raised in the bankruptcy case.  Lastly, the

---

[62] *See* DE # 210.

Debtor argued that the NMSIC had not, nor could it show, that there were not alternative sources from whom such documents could be obtained through a less intrusive and less costly process.

25.     On March 13, 2017, the court held a hearing on the Motion to Compel—Computer.  Ms. Gianardi appeared there through her Texas bankruptcy counsel (two lawyers), making a regular appearance—not a special appearance, thus seemingly not preserving any arguments of "lack of personal jurisdiction" that she might have had.[63]  Ms. Gianardi's Texas counsel represented that *the Debtor* had paid them a retainer for representation of Ms. Gianardi.[64]  Ms. Gianardi's counsel represented that "*She did voluntarily appear for that exam in Colorado, where she resides, and she believed that her duty was—strictly with respect to that oral deposition.*"[65]  Her counsel went on to say at first that Ms. Gianardi did not believe she had a duty to produce "an imaged copy of her hard drive."[66]  Her belief was that the Computer belonged to her at this point.[67]  Then her counsel later said, "*Your Honor, she is not opposed to having a forensic copy made. We prefer that. She wants every—she wants to get out of this mess, I mean two parties that don't trust each other. It's what happens after that that I hope we were going to get some kind of consensus today on.*"[68]  Ms. Gianardi's sole message (through her counsel to the bankruptcy court) was that she did not really want to produce the

---

[63] *See* DE # 227 (Transcript of hearing held 3/13/17, p. 3 (lines 6-8)).

[64] *Id.* at p. 27 (lines 1-4) ("Our firm has—our retainer has been paid by the debtor Mr. Correra for representation of Anita at this proceeding, but we are purely acting at her direction in this matter.").

[65] *Id.* at p. 27 (lines 9-12) (emphasis added).

[66] *Id.* at p. 27 (lines 13-14).

[67] *Id.* at p. 27 (lines 15-23).

[68] *Id.* at p. 43 (lines 10-14) (emphasis added).

Computer but, if she had to, she wanted a search term protocol in place and, certainly at a minimum, a protective order to guard private information.

26.    At one point during the hearing on the Motion to Compel—Computer, Ms. Gianardi's counsel suggested the idea of an independent discovery examiner with regard to the examination of the Computer: "***Not to complicate things further, but maybe the Court might want to give some consideration to, and I floated this idea, I didn't get much traction with it, to an independent discovery examiner that both parties could share the cost of. They would report directly to the Court with any issues that arise after the image is copied on what the, you know, search capabilities are, what are the challenges going to be, on getting them the documents that they need while still protecting my client's privacy right.***"[69]  Nothing was said at this hearing about the bankruptcy court's authority (or lack thereof) to issue orders regarding turnover of the Computer—although Ms. Gianardi's counsel did express that this was all extremely inconvenient for her and that she preferred it be litigated in Colorado where Ms. Gianardi resided.[70]

        *E.    The Computer Compel Order.*

27.    The bankruptcy court ultimately approved the Motion to Compel—Computer, but in a slightly modified fashion.  The court ordered Ms. Gianardi to produce the Computer ***to the Chapter 7 Trustee*** at a mutually agreed-upon location, so that a forensic expert approved by the court could create a forensic image of the hard drive or drives on the Computer.[71]  The court further provided that the ***Chapter 7 Trustee*** should file an application to retain a forensic

---

[69] *Id.* at p. 54 (lines 17-25) (emphasis added).

[70] *Id.* p. 55 (lines 1-14).

[71] *Id.* at p. 56 (lines 20-25).

expert—the cost of which would be split three ways among the NMSIC, the Debtor and Ms. Gianardi—and he or she would be *a court-appointed expert as contemplated by Federal Rule of Evidence 706*.[72] Certain protections were woven into the order to address the privacy concerns of Ms. Gianardi.[73] The Computer Compel Order was never appealed or otherwise challenged.

28. The bankruptcy court deviated from the exact relief sought by the NMSIC in its Motion to Compel—Computer, *not only due to the privacy concerns articulated by Ms. Gianardi* (for example by injecting an independent fiduciary—the Chapter 7 trustee—into the middle of the process, and also ordering an independent court expert that would not necessarily be the expert the NMSIC wanted), but also because, despite the wording of the Motion to Compel—Computer, invoking Bankruptcy Rule 2004 and Bankruptcy Code Section 105, the court believed the authority for the relief sought certainly seemed to be within certain self-executing obligations in the Bankruptcy Code—including *section 542*. The court stated orally at the hearing: "I mean this is—this is property of the estate. Granted, she chose to take it [*i.e.,* the Computer], use it, and now she may have personal information on it, but I mean maybe I should just be ordering turn over to the *trustee* [of] the computer" (emphasis added).[74] Indeed, if there was any reason to doubt this was the Debtor's computer, it was dispelled on June 14, 2018, when compelling evidence was produced in the form of a general ledger of one of the Debtor's

---

[72] *Id.* at p. 57 (lines 1-8).

[73] *See* DE # 224, Order Granting Motion to Compel (the "Computer Compel Order"), entered March 22, 2018.

[74] *See* DE # 227 (Transcript of hearing held 3/13/17, p. 11 (lines 3-6)). The court regrets not spelling this out more explicitly to the parties by using Bankruptcy Code section 542(e) in its oral discussion at the hearing.

businesses (SDN Advisors—the one that wrote Ms. Gianardi's paychecks) that showed the purchase of the Computer on June 29, 2011.[75]

29. To further understand the original mindset of the court with regard to the Computer, first, the Bankruptcy Code imposes certain self-executing statutory obligations upon a debtor (without the requirement of a motion or order). A debtor must cooperate with any trustee appointed in a bankruptcy case to enable him or her to perform the trustee's duties (11 U.S.C. § 521(3)), and a debtor must surrender all property of the estate and recorded information (11 U.S.C. § 521(4)). Moreover, "[o]ther provisions of the Bankruptcy Code impose analogous obligations *on a much broader class*. With certain exceptions, any entity in possession, custody or control of property that the trustee can use, sell or lease, must turn that property over to the trustee."[76] Most notably, section 542(e) provides: "Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, *or other person*[77] that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."[78]

30. Accordingly, not only did the court issue the Computer Compel Order, but—as part and parcel to it—on June 7, 2017, the bankruptcy court approved the Chapter 7 Trustee's

---

[75] *See* Exh. 70 & DE # 344 (Transcript 6/14/18 Hearing, at p. 45 (line 1) through p. 49 (line 21)). The Debtor has argued at times that the Computer may not have been the Debtor's or SDN Advisors' or at least has tried to call this into doubt. The court found these arguments to be disingenuous and not at all credible.

[76] *See In re Schick*, 215 B.R. 4, 8 (Bankr. S.D.N.Y. 1997) (emphasis added) (case involving duty of debtor to turn over a laptop computer to a trustee, pursuant to section 542 of the Bankruptcy Code).

[77] *See Sola Commc'ns, L.L.C. v. Def. Dynamics, L.L.C. (In re Sola Commc'ns, L.L.C.)*, Adv. No. 05-5081, 2005 WL 4806063, at * 2 (Bankr. W.D. La. Dec. 21, 2005) (emphasis added) (dealing with an obligation of the former chief operating officer of the debtor to turn over computer disks; the court stated that, while section 542(a)(6) "was intended to prevent attorneys, accountants, and others similarly protected by state law, from asserting a lien on the debtor's property to obtain repayment of their fees," that the language of the statute was nevertheless broad enough to apply to some other person to turn over information).

[78] 11 U.S.C.A. § 542(e) (West, Westlaw through P.L. 115-223 (also includes P.L. 115-225 to 115-229)).

retention of Epiq/DTI as a forensic computer analyst (the "Court-Appointed Forensic Expert") to analyze the Computer and seek to recover data from the Computer (the "Epiq Retention Order"),[79] pursuant to an application filed April 12, 2017.[80]  To be clear, Epiq/DTI was identified and selected by the Chapter 7 Trustee—it had not been the first choice of either the NMSIC or the Debtor (much less Ms. Gianardi).  The Epiq Retention Order provided that payment "shall be divided equally among New Mexico State Investment Council, Anita Gianardi and Debtor, Marc Anthony Correra."[81]  Like the Computer Compel Order, the Epiq Retention Order was never appealed or otherwise challenged.

31.    At a May 18, 2017 hearing on the Epiq Retention, Ms. Gianardi did not appear in person or through counsel.  However, the Debtor's counsel appeared and argued for a procedure whereby documents extracted by the forensic expert would be provided first to Debtor's counsel—prior to anyone else and reviewed for privileged information.  When the court posed the issue of likely waiver of privilege (since any privileged documents of the Debtor had been in the custody and care of Ms. Gianardi for years now on the Computer which the Debtor had essentially abandoned to Ms. Gianardi),[82] ***Debtor's counsel referred to Ms. Gianardi as the Debtor's agent***.[83]

---

[79] *See*  DE # 248.

[80] *See* DE # 235.

[81] *Id.* at ¶ 2.

[82] *See* DE # 287 (Transcript of hearing held 5/18/17), p. 74 (line 7) through p. 78 (line 12).

[83] *Id.* at p. 77 (line 1); p. 86 (lines 11-16); p. 87 (lines 5-16).

F.     *The Epiq Report:  Previously Undisclosed Documents, Wiping Tools, Cat Pictures, and Massive Movie Downloads.*

32.     On February 1, 2018, Epiq circulated the report it prepared at the direction of the court pursuant to the Epiq Retention Order (the "Epiq Report").[84]  A forensic consultant at Epiq, Mr. Ashraf Massoud, would later testify credibly about the Epiq Report on June 5, 2018.  The Epiq Report and Mr. Massoud's testimony revealed several disturbing details.  First, despite the testimony of Ms. Gianardi that she destroyed the Debtor's files when she left his employ in 2014 and her representations at all times that she did not have any information responsive to the NMSIC's document requests, Epiq's examination of the image it made from the Computer revealed that Ms. Gianardi had dozens of "live" documents on her Computer that related to work she performed for the Debtor and his father, Anthony Correra.   Not only were these documents not produced by Ms. Gianardi, but many of these files have never been produced by the Debtor. The following is a non-exclusive list of the types of "live," undeleted documents found on the Computer:[85]

a.     K-1s, account statements, and other documents relating to several of the Debtor's hedge fund investments, including a transfer request dated May 20, 2014 made from Alkeon in connection with the Debtor's divorce settlement;

b.     A list of the Debtor's access codes, passwords, and PINs for several bank accounts, credit cards, and subscription services;[86]

---

[84] *See* DE ## 271 & 277.  *See also* Exhs. 1-2.

[85] *See, e.g.*, Exh. 78 and documents referenced therein, including Exhs. 21-69 & 83-87.  *See also* Exhibits 91 and 93.

[86] *See* Exh. 38.

c.     Bank Statements and wire transfer records relating to several of the Debtor's bank accounts (including accounts with Century, HSB, and Lazard), including for periods during the four years prior to the bankruptcy filing;

d.     Various IRA statements and account transfer records relating to several of the Debtor's IRA Accounts (*e.g.* Merlin, TradeStation, and Anthony Correra's IRA accounts);

e.     An employment contract with the Debtor's bookkeeper;

f.     Email communication in 2014 between Ms. Gianardi and the Debtor relating to litigation between the Debtor's ex-wife and Ms. Gianardi;

g.     Loan documents between certain of the Debtor's entities and/or entities in which he held an interest;

h.     Wire transfer letters between the Debtor's father and the Debtor (including in 2013);

i.     Some of the Debtor's tax returns;

j.     An affidavit prepared in connection with the Debtor's divorce in 2012; and

k.     Logs of Skype chats between the Debtor, Ms. Gianardi and Anthony Correra's wife on behalf of Anthony Correra.

33.     Additionally, the Epiq Report indicated that, on December 8 and 9, 2016—approximately two months after her October 14, 2016 Rule 2004 Examination, and while the attorneys were trying to  make amicable arrangements for the consensual examination of the Computer—a "wiping tool" was used on the Computer while in Ms. Gianardi's possession, custody, and control, to overwrite unallocated space with a pattern of useless data.[87]  The person using the wiping tool visited a website called http_xxx.filldisk.com (*i.e.,* http_196.filldisk.com),

---

[87] *See* Exh. 2, p. 8 (¶ 10).

a site that Epiq concluded has no purpose other than "to fill up the unallocated space with a pattern of data," such as pictures of cats and strings of useless numbers.[88] This process overwrote data in unallocated spaces and destroyed the Court-Appointed Forensic Examiner's ability to recover that data.[89]

34. And there was more. Between December 11, 2016 and December 18, 2016—again, just two months after the October 14, 2016 Gianardi Rule 2004 Examination, and after Ms. Gianardi agreed to leave the Computer undisturbed, and soon after the discussions between Ms. Gianardi and the NMSIC regarding a consensual examination of the Computer broke down, someone using Ms. Gianardi's login account copied a total of 101 movie files (approximately 420 gigabytes of data) onto the Computer hard drive.[90] Notably, the Computer only had a 640 gigabyte hard drive. By filling up more than two-thirds of the Computer's hard drive with data, all of the unallocated space on the hard drive, where deleted files might have remained, was over-written. This process destroyed the Court-Appointed Forensic Examiner's ability to determine what data if any, was deleted prior to the large movies files being copied onto the drive because the new movie files had overwritten any potentially recoverable data that might have existed in that space.[91] After writing all of these files to the Computer, there was only 5.9% of the drive left for the forensic expert to search for the deleted evidence.

35. Finally, the examination of the Computer by the Forensic Examiner also revealed that various USB flash drives were inserted into the Computer on, *inter alia*, the following dates:

---

[88] *Id.*

[89] *Id.*

[90] *Id.* at p. 7 (¶ 9).

[91] *Id.* p. 8 (¶ 9).

March 14, 2016 (20 days after the Petition Date);

October 28, 2016 (two weeks after the Gianardi 2004 Examination);

November 27, 2016 (six weeks after the Gianardi 2004 Examination);

February 8, 2017 (two days after the Motion to Compel—Computer was filed); and

February 9, 2017 (three days after the Motion to Compel—Computer was filed).[92]

In part, because of the mass copying of useless data and 101 movies to the Computer in December 2016, the court's expert could not determine what data was copied, removed or deleted when the USB flash drives were used.  However, the expert was able to conclude that a folder called "Business Stuff" was accessed, along with files named acct.xlsx and CLAUDIA DIVORCE SUIT.pdf.[93]

G.    *Sanctions Motions.*

36.    On February 23, 2018, the NMSIC filed its "Motion of New Mexico State Investment Council for Finding of Contempt and Sanctions against Anita Gianardi for Violation of 2004 Order and Destruction of Evidence" (the "Gianardi Sanctions Motion"),[94] seeking a finding of contempt and imposition of sanctions against Ms. Gianardi for her alleged violation of the Gianardi Rule 2004 Order and for her actions taken with respect to the Computer.  The Gianardi Sanctions Motion recites that Ms. Gianardi violated the Gianardi 2004 Order when she failed to produce the documents on the Computer that were responsive to the Gianardi 2004 Order and intentionally destroyed relevant evidence when she used the wiping tool and copied 420 gigabytes of movie files to the Computer.  Ms. Gianardi is alleged to have performed those

---

[92] *Id.* at p. 5 (¶ 6).

[93] *Id.* at pp. 6-7 (¶ 7).

[94] *See* DE ## 264 & 265.

acts even though she was aware that the NMSIC was seeking to recover the deleted files, had agreed not to take further action to delete files or otherwise compromise the Computer, and knew and understood that parties-in-interest in the Debtor's bankruptcy case were seeking to recover the deleted files. Ms. Gianardi's decision to take steps with the Computer to make it impossible to recover deleted data are alleged to have been willful and ostensibly intended to impede the ability of parties in the Debtor's bankruptcy case from obtaining relevant information. Therefore, it is argued, Ms. Gianardi should be held in contempt and sanctioned, including the payment of the NMSIC's and the Trustee's attorneys' fees.

37.    Also on February 23, 2018, the NMSIC filed a "Motion of New Mexico State Investment Council Seeking Sanctions Against the Debtor for Spoliation" (the "Debtor Sanctions Motion"),[95] seeking a finding of contempt and imposition of sanctions against the **Debtor**, for either allowing his documents to be destroyed or aiding in their destruction by Ms. Gianardi. Specifically, the Debtor Sanctions Motion argued that the court should find that the Debtor spoliated evidence by failing to preserve the Computer. The NMSIC argued that, regardless of who had possession of the Computer, it should be considered still owned by the Debtor. Even if the Computer were not owned by the Debtor, the Debtor had a duty to inform the Trustee and/or the NMSIC of the existence of the Computer and the fact that it was likely to contain information relevant to the bankruptcy case. The NMSIC further argued that the Debtor was fully aware that the Computer contained voluminous amounts of information relating to his personal and business finances, property, assets, and related dealings. He also knew or should have known that the Computer likely held evidence relevant to transfers between the Debtor and his father and other family members, as well as information about his IRA accounts, his hedge

---

[95] *See* DE # 263.

fund, and other matters relevant to pending objections to his exemptions.  The Debtor failed to

take the necessary steps to ensure the information was preserved, and in fact actively opposed the

Trustee's and the NMSIC's efforts to recover the deleted evidence.   Because of the Debtor's

failure to preserve the Computer and the information it contained, virtually all of the information

on the Computer was now lost and is unrecoverable.  Finally, the NMSIC argued that, even if the

Debtor was unaware of the Computer until after the Gianardi 2004 Examination, the Debtor had

an obligation to prevent the overwriting of data and the use of the wiping tool while the NMSIC

was seeking access to the Computer.

38.     On April 2, 2018, the court held a status conference that both Debtor's counsel

and Ms. Gianardi's then-Texas counsel attended.[96]   The court discussed timing for a hearing on

both the Gianardi Sanctions Motion and the Debtor Sanctions Motion.  Ms. Gianardi's counsel

made no objection to the court's personal jurisdiction over her.  Ms. Gianardi's counsel informed

the court that he intended to withdraw and would be replaced by Ms. Gianardi's newest counsel

in Colorado.  Ms. Gianard's then-Texas counsel mentioned certain dates that Ms. Gianardi's new

Colorado counsel had informed him that she would not be available for a hearing in May.  The

court ultimately established a detailed scheduling order on the sanctions proceedings and set

June 5, 2018 as the hearing date to consider the Gianardi Sanctions Motion and the Debtor

Sanctions Motion (the "Combined Sanctions Hearing").

H.      *Ms. Gianardi's New Counsel and Eleventh-Hour Strategy Pertaining to*
        *"Personal Jurisdiction."*

39.     On April 3, 2018, Ms. Gianardi's Texas counsel filed a "Notice of Withdrawal as

Counsel for Anita Gianardi" [DE #282], stating that "further inquiries regarding Ms. Gianardi

---

[96] *See* DE # 284 (Transcript from 4/2/2018 Status Conference).

should be directed to her new counsel as follows: Laura A. Menninger" (with an address and other contact information included). Ms. Menninger is a Denver, Colorado criminal lawyer. Then, on April 20, 2018, Ms. Gianardi's Texas counsel filed an Emergency Motion to Withdraw as Counsel[97]—indicating it was being filed in an abundance of caution, to conform to Local Rules that required a motion and order (rather than a mere Notice)—and an accompanying Unopposed Motion for Emergency Hearing on Motion to Withdraw as Counsel [DE # 290]— indicating that he needed a hearing on the Motion to Withdraw at the court's earliest convenience because the NMSIC was continuing to serve him with discovery requests on behalf of Ms. Gianardi.

40.    Specifically, on April 19, 2018, the NMSIC served Ms. Gianardi with a subpoena duces tecum requesting the production of documents as well as interrogatories relevant to the Combined Sanctions Hearing (the "April 2018 Written Discovery").

41.    On April 23, 2018, the bankruptcy court held a hearing on Ms. Gianardi's Texas' counsel's Motion to Withdraw. The court granted the Motion to Withdraw, expressing at the same time a concern that Ms. Gianardi's supposed new Colorado counsel had not filed an appearance substituting in for prior counsel. ***On the same day, Ms. Gianardi's new Colorado counsel, Laura Menninger (who is not admitted in Texas and acting without local counsel) filed a "Special Entry of Appearance,"[98] stating that she was appearing specially "to contest this Court's jurisdiction to enforce the Rule 2004 Exam Order dated August 29, 2016 (Doc. 143) and any subsequent discovery pertaining to that Order."*** Ms. Gianardi also filed, on April 23, 2018, a "Notice of Objection to Jurisdiction in Northern District of Texas and Request to

---

[97] *See* DE # 289.

[98] *See* DE # 295.

Stay Proceedings Related to Ms. Gianardi's Compliance with Rule 2004 Document Production."[99] She never requested a hearing with regard to this pleading, including the request to stay further proceedings. However, the pleading argues, for the first time ever, that the "Northern District of Texas Lacks Personal Jurisdiction Over Ms. Gianardi."[100]

42. On April 23, 2018, Ms. Gianardi, through her Colorado counsel, commenced a miscellaneous proceeding in the Colorado District Court pursuant to Fed. R. Civ. P. 45 (the "Miscellaneous Proceeding"). In the Miscellaneous Proceeding, Ms. Gianardi, again, asserted that the bankruptcy court lacks personal jurisdiction over her.

43. Meanwhile, on May 4, 2018, Ms. Gianardi, through her new Colorado counsel, responded to the April 19, 2018 Written Discovery by invoking her Fifth Amendment privilege against self-incrimination to *each and every interrogatory and request for production*.[101] Additionally, in May 2018, when counsel for the NMSIC inquired of Ms. Gianardi's counsel whether Ms. Gianardi would assert her Fifth Amendment privilege if subpoenaed to appear for a deposition in connection with the Sanctions Motions, Ms. Gianardi's counsel confirmed that Ms. Gianardi would assert her Fifth Amendment privilege in response to any such questions. In fact, Ms. Gianardi's counsel memorialized Ms. Gianardi's position in a Rule 11 letter agreement.[102]

    *I.*    *The Evidentiary Hearing.*

44. On June 5, 14, and 19, 2018, the court held the Combined Sanctions Hearing. Ms. Gianardi and her counsel did not appear. The court heard testimony from: (a) the Court-

---

[99] *See* DE ## 296 & 297.

[100] *Id.*

[101] *See* Exh. 17.

[102] *See* DE ## 321 & 327, Exh. 9 thereto.

Appointed Forensic Expert (actually two persons from the Epiq Firm who worked on attempting to extract information from the Computer), (b) a forensic expert hired separately by the Debtor, (c) the Debtor, and (d) certain of the outside attorneys for the NMSIC.

45.     At the hearing, Mr. Massoud from Epiq (the Court-Appointed Forensic Expert), with confirmation from the Chapter 7 Trustee, credibly proved up a chain of custody establishing that the Computer (which happened to be an HP Compaq model CQ 5000 computer, serial number 3CR0480YCT) was obtained by the Chapter 7 Trustee from Ms. Gianardi; an image of the Computer was made; and a forensic analysis was conducted.[103]

46.     There was compelling evidence presented, and the court does now find, that the Computer (and certainly data thereon) were property and records, respectively, of the Debtor that should have been treated by the Debtor and Ms. Gianardi as property of the estate.[104]  From the evidence presented, the court can reasonably infer that the Debtor, through his wholly owned entity, SDN Advisors, and through his personal assistant Ms. Gianardi, bought the Computer on or about June 29, 2011, and provided it to Ms. Gianardi to use for the Debtor and his business and personal affairs;[105] that the Computer was first initialized or booted up for service on July 5, 2011;[106] and that, when Ms. Gianardi was complying with the court's order in turning over the Computer, this computer purchased on June 29, 2011 was the computer that she turned over, and was the one that had contained the digital filing system of the Debtor.

---

[103] *See* Exh. 3.  *See also* DE # 335 (Transcript of 6/5/18 Hearing, at p. 48 (line 21)–p. 58 (line 8)).

[104] *See, e.g.,* 11 U.S.C. §§ 541 & 546.

[105] Credible evidence was produced in the form of a general ledger of one of the Debtor's businesses (SDN Advisors—the one that wrote Ms. Gianardi's paychecks) that showed the purchase of the Computer on June 29, 2011.  *See* Exh. 70 & DE # 344 (Transcript 6/14/18 Hearing, at p. 45 (line 1) through p. 49 (line 21)).

[106] *See* DE #335 (Transcript of 6/5/18 Hearing, at p. 149 (lines 16-19) & p. 179 (lines 20-23)).

47.     Next, there was credible evidence and the court now finds that there were mass deletions of Debtor files over time.[107]  The evidence actually indicated that there were mass deletions of data from the Computer by Ms. Gianardi in years 2011, 2012, and 2015[108]—during which years the Debtor was in the midst of litigation with the NMSIC as well as other litigation, including a divorce.[109]

48.     Next, Mr. Massoud of Epiq credibly testified that he examined the Computer for various artifacts, deletion activity, copying activity, USB activity, and things of that nature.[110] Mr. Massoud credibly testified, and the court now finds, that, on December 8 and 9, 2016—less than two months after Ms. Gianardi's 2004 Examination during which (while represented by counsel) Ms. Gianardi agreed not to delete items from or otherwise disturb the Computer, and while counsel for the NMSIC was attempting to reach consensual arrangements for turnover of the Computer—someone using Ms. Gianardi's user profile used the Computer to visit a site on the Internet called "http_196.filldisk.com" that was loaded onto the Computer and had the effect of covering up space on the Computer hard drive.[111]  Mr. Massoud credibly testified, and the court finds it is true, that the sole purpose of this website is to fill up the unallocated space on a computer with a pattern of nonsensical data (such as pictures of cats and numbers).[112]

---

[107] *See* Exh. 7, pp. 133 & 136.

[108] *See* Exh. 19, p. 6.

[109] The Pay-to-Play litigation in New Mexico was filed in 2011.  The Debtor's divorce and custody proceedings in Texas and Paris were filed in 2010 and 2011, respectively.  Various qui tam and related actions identified in the Debtor's Statement of Financial Affairs were filed in 2008, 2009, 2010, 2011, and 2014.  According to the Debtor's separately hired forensic expert, Protegga, the majority of deletions on the Computer occurred December 20, 2015—which the court notes, anecdotally, was less than two months before the Debtor's bankruptcy case was filed.  *See* Exh. 19, p.6.

[110] *Id.* at p. 49 (lines 2-4).

[111] *Id.* at p. 59 (lines 1)-p. 60 (line 7).

[112] *Id.  See also* Exh. 38, pp. 24-25.

49.     Mr. Massoud also credibly testified, and the court hereby finds, that a couple of days later—during the period of December 11, 2016 through December 18, 2016—someone using Ms. Gianardi's login account copied a total of 101 movie files, approximately 420 gigabytes of data, onto the Computer hard drive.  This actually overwrote the unallocated space. Unallocated space is where prior deleted data resides until it is overwritten with new data.  The new movie file data had overwritten any potentially recoverable deleted data that might have existed on the hard drive prior to this overwriting activity.  The 420 gigabytes of movie files that were written to the drive in December 2016 represented approximately 66 percent of the total hard drive space.[113]  To be clear, Mr. Massoud credibly testified, and the court finds, that, had the movie files not been written to the drive in December 2016, Mr. Massoud would have been able to do one of the following: (a) analyze existing active data that already occupied that 420 gigabytes of data; or (b) analyze and recover data that may have been previously deleted but had not yet been overwritten by new data.[114]

50.     Debtor's counsel attempted to attack the credibility of Epiq and implied at the Combined Sanctions Hearing that Epiq was biased toward the NMSIC because Epiq personnel had communications with the Chapter 7 Trustee and counsel for the NMSIC in connection with preparing its report, and that this somehow tainted Epiq's conclusions and his findings. However, the Debtor's own expert corroborated the findings and conclusions of Mr. Massoud: 101 movies were downloaded onto the Computer in December of 2016 and 420 gigabytes of unallocated

---

[113] *Id.* at p. 60 (lines 11-22).

[114] *Id.* at p. 61 (lines 2-7).

space was overwritten as a result. That is not in dispute. The court did not find Epiq to be in any way biased or not credible.[115]

51.     Additionally, the court finds from the credible evidence that USB flash drives were inserted into the Computer on, *inter alia*, the following dates:

March 14, 2016 (20 days after the Petition Date);

October 28, 2016 (two weeks after the Gianardi 2004 Examination);

November 27, 2016 (six weeks after the Gianardi 2004 Examination);

February 8, 2017 (two days after the Motion to Compel—Computer was filed); and

February 9, 2017 (three days after the Motion to Compel—Computer was filed).[116]

The court can reasonably infer, from the coincidental timing, facts, and circumstances here that those USB flash drives were used to copy records of the Debtor's financial affairs and of his divorce, even though the Debtor claims not to have any back up disks or other storage devices. Even though the Court-Appointed Forensic Expert could not determine what data was copied, removed or deleted when the flash drives were used, he was able to conclude that a folder called

---

[115] To be clear, the Debtor ended up retaining another digital forensic expert to examine the Computer, Graciela Rubio of Protegga, LLC. While Ms. Rubio certainly seemed competent in her own right, the court did not hear anything to make it distrust the credibility of the Court-Appointed Forensic Expert. In fact, Ms. Rubio corroborated his testimony that 420 gigabytes of movie file data were written onto the hard drive of the Computer in December 2016 (while only adding that Ms. Gianardi had apparently copied movies onto the Computer at a few other points in time since 2011). *Id.* at p. 139 (line 25)-140 (line 3), p. 178 (line 23) through p. 179 (line 13) & p. 181 (lines 9-20). Ms. Rubio also challenged, to some extent, the Court-Appointed Forensic Expert's conclusions about the Fill Disc so-called "wiping tool" (suggesting primarily that it might not have filled up as much computer space as the Court-Appointed Forensic Expert suggested, and that it might have been used on a different device by a different user). But the court, again, did not hear anything on this point to make it distrust the credibility of the Court-Appointed Forensic Expert. There was no genuine dispute that, when one logs onto the Fill Disc site, it causes data to be downloaded onto a computer, filling up potentially unallocated space. *See* Exh. 38 pp. 22-26 (and attachments F & G thereto).

[116] *Id.* at p. 5 (¶ 6).

"Business Stuff" was accessed, along with files named acct.xlsx and CLAUDIA DIVORCE

SUIT.pdf.[117]

52.     The court also heard credible evidence, and hereby finds, that dozens of "live"

documents were nevertheless found on the Computer pertaining to the Debtor and his financial

affairs.  These were documents that had not earlier been produced by either Ms. Gianardi or the

Debtor and were responsive to the NMSIC's document requests (and despite Ms. Gianardi

stating she had no responsive documents).[118]  The Debtor did not do anything to protect and

preserve that information, even though he knew or at least he should have known that the

Computer contained information that was relevant to his financial affairs.

53.     The court finds that the depth of Ms. Gianardi's loyalty to the Debtor is deep.  It

was most evident from certain Skype logs of conversations between Ms. Gianardi and the Debtor

that were recovered from the Computer and presented at the Combined Sanctions Hearing.[119]

Notably, these Skype logs go on much longer than the time Ms. Gianardi allegedly was the

Debtor's personal assistant.  There are more than 10 pages of Skype logs reflecting conversations

***beyond*** the time of her employment (the most recent one being in 2017).  One Skype

conversation between the Debtor and Gianardi that occurred in May 2011 (apparently in the

midst of the Debtor's divorce proceedings) seems to particularly show the depth of Ms.

Gianardi's loyalty to the Debtor during that litigation. An excerpt of that conversation is included

below:

> Marc Correra: Hi
> Anita Gianardi: hi you OK?

---

[117] *Id.* at pp. 6-7 (¶ 7).

[118] *See, e.g.*, Exh. 78 and documents referenced therein, including Exhs. 21-69 & 83-87.

[119] *E.g.*, Exh. 59.

Marc Correra: yes
Marc Correra: i think i am going to be dead before this is over
Anita Gianardi: I hope not. I may be in jail
Marc Correra: dont worry
Marc Correra: I will always protect you
…
Anita Gianardi: am i in trouble?
Marc Correra: no
Marc Correra: dont worry
…
Marc Correra: Sorry you have to deal with this BS
Anita Gianardi: Me to but I am in until you no longer want or need me. It is a
pain though but you are worth it
Marc Correra: she makes everything so difficult
Anita Gianardi: Yup. I feel for you
…
Marc Correra: I will always have you back
Anita Gianardi: Can I say I have come to love you in a friend sort of way. Does
that make sense? (sun)
Marc Correra: Yes you can. I feel the same way towards you. Thanks. That
means a lot to me. [120]

54.     The court finds that the Debtor and Ms. Gianardi had a very close relationship—

beyond that of mere boss and personal assistant.  She was fiercely loyal to him and considered

him to be a close friend.  The Debtor confided in her with regard to his marriage, family, and

other relationships.[121]  Ms. Gianardi provided helpful testimony to the Debtor during his divorce

case (swearing to the authenticity of his prenuptial agreement with his ex-wife that had been

called into question—using the exact language the Debtor requested that she use).[122]  When

confronted with a Skype log between the Debtor and Ms. Gianardi,[123] the Debtor confirmed the

accuracy of the Skype log:

---

[120] *See* Exh. 59 for full Skype log.

[121] *See* DE # 344 (Transcript 6/14/18 Hearing, at p. 19 (line 4) through p. 27 (line 23)).

[122] *See* DE # 344 (Transcript 6/14/18 Hearing, at p. 65 (line 6) through p. 67 (line 15).  *See also* Exh. 66 and Exh. 59 (Skype Log, entry of April 8, 2013).

[123] *See* Exh. 59.

Q. And you said to her, "I will always have you back." And then she said, "Can I
say I have come to love you in a friend sort of way? Does that make sense?" And
then your response was, "Yes, you can. I feel the same way towards you. Thanks.
That means a lot to me." Did I read that accurately?
A. Yes.
Q. Were you telling the truth when you told Ms. Gianardi that you would always
have her back?
A. Yes.
Q. And do you believe that she was telling the truth when she told you that she had
come to love you in a friend sort of way?
A. I don't know.
Q. And were you telling the truth when you told her that you felt the same way?
A. Yes.[124]

55.     The Debtor's response to all of this is basically that he did not tell Ms. Gianardi to

do anything to the Computer. However, the Debtor admits retaining legal counsel for Ms.

Gianardi at his own expense.[125] And Ms. Gianardi did not show up to explain or corroborate any

of the Debtor's testimony. Her absence at the hearing on these matters, and her assertion of the

Fifth Amendment is convenient to the Debtor and his side of the story.[126] The court believes it is

reasonable to infer from the record before it that Ms. Gianardi intentionally manipulated the

Computer to put financial records of the Debtor out of reach, and the Debtor was an active

participant in the fraud and the spoliation of evidence that occurred here by Ms. Gianardi. The

court believes that, ever since the existence of the Computer was discovered during Ms.

Gianardi's Rule 2004 Examination, the Debtor and Ms. Gianardi have coordinated their efforts

to thwart the NMSIC's and the Trustee's attempts to obtain access to the Computer. Ultimately,

after the Computer was recovered, and Epiq was retained as the Court-Appointed Forensic

---

[124] *See* DE # 344 (Transcript 6/14/18 Hearing, at p. 27 (lines 7-22)).

[125] *E.g.,* Exh. 81; DE # 344 (Transcript 6/14/18 Hearing, at pp. 42-44).

[126] Ms. Gianardi invoked her Fifth Amendment privilege here, both in connection with her discovery requests
and in the Rule 11 agreement that was filed with the court. *See* Exh. 17 & Exh. 18.

Expert, Epiq confirmed that certain mass deletions of files occurred, and that actions were taken to fill the Computer's unallocated space making it impossible to recover deleted files.

56.     The Debtor has been evasive.  His failure to take steps to preserve information on the Computer or to notify the NMSIC or the Trustee of the Computer's existence cannot have been mere oversight.  Ms. Gianardi was the person he relied on for years (apparently even after the end of her employment) to provide him and others with information.  Furthermore, while it appears that Ms. Gianardi took steps to delete data and to make it impossible to recover deleted data from the Computer, it is the Debtor, not Ms. Gianardi, who had the most to lose if some or all of the deleted information on the Computer was recovered.

57.     The Debtor had a responsibility to preserve and produce the Computer which was indisputably property of the bankruptcy estate.  And he had an obligation as a debtor in this court to preserve records of his financial affairs.  The Debtor's obligations here do not merely arise under Rule 37 of the Federal Rules of Civil Procedure.  The Debtor's obligations here arise under the Bankruptcy Code.  Moreover, there was a court order telling the Debtor what he had to do and telling Ms. Gianardi what she had to do and what she had to produce.  The NMSIC and the Trustee have been prejudiced because they do not have a complete production of information and documents from the Debtor.

58.     The Debtor testified that anything that was ever on the Computer was also backed up and available on the cloud-based services he used.[127]  However, the Debtor provided no evidence whatsoever to corroborate that testimony and, in fact, the evidence showed that either

---

[127] *See* DE # 335 (Transcript 6/5/18 Hearing at p. 213 (line 7) through p. 217 (line 1); p. 231-239)) & DE # 344 (Transcript Hearing at p. 49 (line 22) through p. 55 (line 1)).

not to be true or, alternatively, that the Debtor did not turn over documents on the cloud that would have been responsive to the Debtor 2004 Order.

59.     The court found the Debtor's testimony regarding having all documents on the cloud that were ever on the Computer to be not at all credible.  The Debtor testified in his own Rule 2004 examination that he searched his cloud-housed documents and produced all that were responsive to the NMSIC's document requests[128]—and yet  hundreds of documents were found on the Computer that were not produced by the Debtor.

60.     The Debtor testified that he had "a few" conversations with Ms. Gianardi in October 2016 because she was just very concerned about getting pulled into this.[129]  When asked if they talked about the Computer, the Debtor said, "No. Only that I think that they wanted the computer or something.  I don't remember the --."[130]  He said that he never told her to wipe data off the Computer or not to turn it over to the Trustee.[131]  The court found this testimony to be evasive and not credible.

61.     As a result of Ms. Gianardi's actions, what the Trustee and creditors are confronted with is that: there were records relating to the Debtor's financial affairs that were potentially very important to the creditors, important to the Debtor's estate, which have been forever lost.  Unfortunately, there is no way to identify what those all were, but the court knows that they are gone and can never be recovered, at least from the Computer.  Only Ms. Gianardi and only the Debtor know what those records were.  One would think that if the Debtor still has

---

[128] *See* Exh. 6, p. 43 (line 20) through p. 45 (line 24).

[129] *See* DE # 335 (Transcript 6/5/18 at p. 224 (lines 14-25)).

[130] *Id*. at p. 225 (lines 1-4).

[131] *Id*. pp. 226-27.

those records or has them in the cloud that they would have been produced by now. But, this has not happened.

62.     It is of critical relevance here that it was the Debtor (through his lawyers), not Ms. Gianardi, that first reached out to retain new counsel for Ms. Gianardi after the Sanctions Motions were filed.[132]  Not only did the Debtor make arrangements with Ms. Gianardi's criminal defense lawyer to represent her in connection with the Sanctions Motions, but the Debtor agreed to pay for Ms. Gianardi's criminal defense lawyer, including the payment of a $30,000 initial retainer.[133]

*J.     Adverse Inferences.*

63.     The Epiq Report and the information recovered from the Computer are by themselves sufficient to support a finding that Ms. Gianardi intentionally spoliated evidence with the intent to make it unavailable to the NMSIC, the Trustee, and the court, and that she knowingly and willfully refused to comply with the Gianardi 2004 Order and, in bad faith, has intentionally interfered with the administration of this bankruptcy case.  As explained further below, the court may also infer Ms. Gianardi's intent to spoliate evidence from Ms. Gianardi's failure to appear and testify and produce evidence that might refute the NMSIC's and Trustee's direct evidence.

**III.     Conclusions of Law.**

*A.     Bankruptcy Subject Matter Jurisdiction and Venue.*

Bankruptcy subject matter jurisdiction exists over these contested matters pursuant to 28 U.S.C. § 1334(a), (b), and (e)(1).  These are core proceedings, pursuant to 28 U.S.C.

---

[132] *See* Exh. 5.

[133] *See* Exh. 7.

§157(b)(2)(A), possibly (e),[134] and (O). Thus, the bankruptcy court has statutory authority to enter final orders. Moreover, the court has determined that it has Constitutional authority to enter final orders in these matters, since they involve a dispute that could only arise in a bankruptcy case—that is, interference with property of a bankruptcy estate and spoliation of records that otherwise should have been provided to a bankruptcy trustee and estate creditors. Finally, venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

> **B.** *Ms. Gianardi's Eleventh-Hour Argument that the Bankruptcy Court Does Not Have Personal Jurisdiction Over Her.*

As earlier mentioned, Ms. Gianardi did not appear for the three-day Combined Sanctions Hearing (personally or through counsel). However, a Colorado lawyer, Laura A. Menninger (not admitted in the Northern District of Texas, either regularly or on a *pro hac vice* basis) did file, on **April 23, 2018**: (a) a "Special Entry of Appearance" on her behalf, "specially to contest this Court's jurisdiction to enforce the Rule 2004 Exam Order dated August 29, 2016 (Doc. 143) and any subsequent discovery pertaining to that Order";[135] and (b) a "Notice of Objection to Jurisdiction in Northern District of Texas and Request to Stay Proceedings related to Ms. Gianardi's Compliance with Rule 2004 Document Production."[136] This latter pleading stated that the Northern District of Texas lacks "personal jurisdiction" over Ms. Gianardi in that she "is not a party to this case and lacks sufficient connection with the Northern District of Texas to be subject to the Court's jurisdiction."[137] The pleading goes on to state that "no subpoena was ever

---

[134] This is a follow-up matter relating to, among other things, an order to turn over property of the estate, as referenced in 28 U.S.C. § 157(b)(2)(e).

[135] *See* DE # 295.

[136] *See* DE # 297.

[137] *Id.* at p. 1.

served on her related to the 2004 exam Order.  Thus, the Texas Bankruptcy Court does not have personal jurisdiction over Ms. Gianardi under Bankruptcy Rule 2004."[138]  The pleading recites that Ms. Gianardi lives and works in Colorado, she does not regularly conduct business in Texas, and she does not have the required "minimum contacts" to be subject to the jurisdiction of the Texas courts.[139]

There are a lot of concepts melded into the short pleading of Ms. Gianardi, and this court must unpack them one-by-one:

> First, the argument that the NMSIC's failure to obtain a *subpoena,* way back when it obtained the Gianardi 2004 Order, deprives the bankruptcy court of personal jurisdiction over Ms. Gianardi *fails* because—at this juncture—we are *way beyond compelling attendance or compelling production of documents at a Rule 2004 examination, from a non-party*.  Ms. Gianardi is now a party in a properly noticed contested matter, not a mere non-party in a discovery dispute.

> Second, the personal jurisdiction jurisprudence cited by Ms. Gianardi is in the context of federal diversity jurisdiction and the Fourteenth Amendment, and things are very different in the world of bankruptcy.  The proper analysis is not "minimum contacts" with the State of Texas.

> Third, even if personal jurisdiction was somehow a viable argument here, waiver of the argument applies.  Ms. Gianardi, while represented by counsel, participated for over 20 months in a discovery process mandated by the bankruptcy court, then subsequent litigation regarding examination of the Computer, without any reservation of rights or objection to this court's personal jurisdiction over her.

> (i)    *First, was a subpoena required to be served on Ms. Gianardi, pursuant to Bankruptcy Rule 2004(c)?  Restated, can the bankruptcy court now address Ms. Gianardi's violation of either the Gianardi 2004 Order or the Computer Compel Order, when she was not served with a subpoena back at the time of her Rule 2004 Examination?*

---

[138] *Id.* at p. 2.

[139] *Id.* at p. 3 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

The court will start by noting a general principle: a bankruptcy court "has abundant legal authority to order the retrieval of information concerning a debtor and his estate from persons and entities who are not parties in a bankruptcy case, *i.e.,* persons or entities who have neither filed a voluntary petition under section 301 of the Bankruptcy Code nor filed a proof of claim or interest under section 501 of the Bankruptcy Code.[140] Nevertheless, proper procedure and due process do matter; thus, the court will appropriately unpack Ms. Gianardi's arguments, beginning with the issue of whether the NMSIC was required to obtain a subpoena in connection with its Gianardi Rule 2004 Examination. Is it fatal to the NMSIC's request that Ms. Gianardi be sanctioned—for her alleged violation of the 2004 Order and/or destruction of records of the Debtor—that the NMSIC never obtained a subpoena along with its Rule 2004 Motion and Order? Rephrased, is the failure to obtain a subpoena as to Ms. Gianardi a "non-starter" here?

By way of background, Bankruptcy Rule 2004 of the Federal Rules of Bankruptcy Procedure is "the basic discovery device in bankruptcy cases."[141] Rule 2004(a) states that "[o]n motion of any party in interest, the court may order the examination of any entity."[142] It has

---

[140] *In re Teknek, LLC,* No. 05 B 27545, 2006 WL 2136046, at *1 (Bankr. N.D. Ill. Jun. 30, 2006). *See also* 11 U.S.C. § 542(e); Fed. R. Bankr. Pro. 2004(a)-(c) & 9016; Fed. R. Civ. Pro. 45(a)-(b).

[141] 9 COLLIER ON BANKRUPTCY ¶ 2004.01[1] (Richard Levin et al. eds., 16th ed.).

[142] The full text of Bankruptcy Rule 2004 reads as follows:

    **(a) Examination on Motion**

    On motion of any party in interest, the court may order the examination of any entity.

    **(b) Scope of Examination**

    The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. . . .

been stated that the scope of a Rule 2004 examination is exceptionally broad and the rule itself is peculiar to bankruptcy law and procedure because it affords few of the procedural safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure does.[143] "Third parties are subject to examination pursuant to Rule 2004 if they have knowledge of the debtor's affairs."[144] Courts tend to be reluctant to allow "escape from a Rule 2004 examination unless the party can show that the examination" would be "oppressive or burdensome."[145] "A rule 2004 exam has been explained as a broad investigation into the financial affairs of the debtor for the

---

**(c) Compelling Attendance and Production of Documents**

The attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial. As an officer of the court, an attorney may issue and sign a subpoena on behalf of the court for the district in which the examination is to be held if the attorney is admitted to practice in that court or in the court in which the case is pending.

**(d) Time and Place of Examination of Debtor**

The court may for cause shown and on terms as it may impose order the debtor to be examined under this rule at any time or place it designates, whether within or without the district wherein the case is pending.

**(e) Mileage**

An entity other than a debtor shall not be required to attend as a witness unless lawful mileage and witness fee for one day's attendance shall be first tendered. If the debtor resides more than 100 miles from the place of examination when required to appear for an examination under this rule, the mileage allowed by law to a witness shall be tendered for any distance more than 100 miles from the debtor's residence at the date of the filing of the first petition commencing a case under the Code or the residence at the time the debtor is required to appear for the examination, whichever is the lesser.

Fed. R. Bankr. Proc. 2004.

[143] *In re GHR Energy Corp.*, 33 B.R. 451, 453-54 (Bankr. D. Mass. 1983).

[144] *In re Ecam Publ'ns., Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991) (citing *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990)).

[145] 9 Collier on Bankruptcy ¶ 2004.01[8] (Richard Levin et al. eds. 16th ed.).

purpose of the discovery of assets of the estate and the exposure of fraudulent conduct."[146] The scope of a Rule 2004 examination is "unfettered and broad" and "is commonly recognized as more in the nature of a 'fishing expedition.'"[147] The purpose of the examination is to enable the trustee to discover the nature and extent of the bankruptcy estate. "Discovery under Rule 2004 is broader than that available under the Federal Rules of Civil Procedure."[148] Legitimate goals of Rule 2004 examinations include "discovering assets, examining transactions, and determining whether wrongdoing has occurred."[149]

With this background in mind, it should be obvious that a Rule 2004 examination of somebody like Ms. Gianardi—a long-time personal assistant to the Debtor—is not an unreasonable or impermissible undertaking. Rather, the issue is ***how*** is personal jurisdiction within the context of a Rule 2004 exam established over one who resides outside the district where the bankruptcy case is pending and who is not otherwise actually a ***party*** to the bankruptcy case? Analyzing the literal wording of Bankruptcy Rule 2004, subsection (a) makes clear that any party in interest who wants to examine ***any entity*** who may have information relating to the

---

[146] *2435 Plainfield Av. Inc. v. Township of Scotch Plains (In re 2435 Plainfield Av., Inc.),* 223 B.R. 440, 456 (Bankr. D. N.J. 1998) (citing *In re Symington,* 209 B.R. 678, 684 (Bankr. D. Md. 1997)).

[147] *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (citing *In re Wilchner*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)).

[148] *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708, 711 (Bankr. S.D.N.Y. 1991) (citing *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bkrtcy. E.D.N.Y. 1983)). *See also In re Sunridge Assocs.*, 202 B.R. 761, 762 (Bankr. E.D. Ca. 1996) ("The discovery rules available in adversary proceedings and in contested matters are more restrictive in scope with respect to requirements of relevance and to protections available to the party required to comply.").

[149] *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (citing *In re Strecker*, 251 B.R. 878, 882 (Bankr. D. Colo. 2000)). *See also In re Mantolesky*, 14 B.R. 973, 976-977 (Bankr. D. Mass. 1981) (holding that Rule 205 (Rule 2004's predecessor) "provides all interested parties a mechanism for the investigation and reconstruction of the debtor's affairs. That mechanism may cut a broad swath through the debtor's affairs, those associated with him, and those who might have had business dealings with him. Further, those persons who might have been closely connected with the debtor in his business arrangements, or who even participated in them, will most likely be exposed to the most extensive inquiry").

acts, conduct, property, liabilities or financial condition of the debtor (and the like), may file a motion with the bankruptcy court and obtain an order from the bankruptcy court requiring it. However, subsection (c) goes on to provide that the attendance of an entity for examination and for the production of documents, whether the examination is to occur within or without the district in which the bankruptcy case is pending, may be compelled as provided in Rule 9016 (*i.e.,* the Bankruptcy Rule that incorporates Fed. R. Civ. Proc. 45—describing subpoenas).  It appears to this court (and this is a mere anecdotal observation) that, oftentimes, parties in interest seeking Bankruptcy Rule 2004 examinations (and production of documents) simply go forward with a motion and order and do not bother with obtaining and serving a subpoena.  Is this a problem (*i.e.,* not obtaining and serving a subpoena), when a Bankruptcy Rule 2004 witness does not appear, testify and/or produce as ordered?  One might wonder why such "belts and suspenders" (*i.e.,* a subpoena as well as an order) would be necessary to enforce compliance?  The technical answer is that personal jurisdiction over a ***non-debtor third party witness in a Rule 2004 context*** is properly established by serving a subpoena pursuant to under Rule 45.  When an order is entered compelling a witness (who is not a debtor and is not otherwise a party-in-interest—such as a creditor who files a proof of claim) to submit to an examination pursuant to Rule 2004, a subpoena should be served, in addition to the order to compel attendance, as provided for in Rule 9016 (which makes applicable Fed. R. Civ. Proc. 45 in cases under the Bankruptcy Code).  To fully appreciate this, one should be mindful of the overall context.  Specifically, it is arguably an extraordinary thing—to take a deposition that is often referred to as a "fishing expedition," and to ask for documents, from a ***non-party witness*** who has not been sued, is not suing, and is possibly far away or otherwise somewhat detached from the bankruptcy court.  A subpoena is a very formal document, with many form and content requirements, that

(unlike a Rule 2004 motion and order) must be ***personally served*** on an individual (unlike a complaint initiating an adversary proceeding or a motion initiating a contested matter).[150] A subpoena is arguably more attention-grabbing to put someone on notice of what he or she is commanded to do and when. It also contemplates performance within 100 miles of where the deponent resides, is employed, or regularly conducts business.[151]

There are very few cases that deal with subsection (c) of Bankruptcy Rule 2004. Most of the cases seem to suggest or assume that subpoenas should be issued and served, in addition to the Rule 2004 order from the bankruptcy court.[152] While not addressing the exact question in the case at bar, of whether failing to obtain a subpoena in connection with a Rule 2004 examination of a non-party witness is fatal, the court in *In re Teknek* did provide some useful analysis generally on the topic of Rule 2004 exams of debtors versus non-parties.[153] In *Teknek*, a creditor

---

[150] *Compare* Fed. R. Civ. Proc. 45(b)(1) to Fed. R. Civ. Proc. 4 and Fed. R. Bankr. Proc. 9014.

[151] *See* Fed. R. Civ. Proc. 45(c)(1).

[152] *See, e.g., Raynor v. Greenlight Capital Qualified, L.P.,* No. 08-00801, 2008 WL 2224897, at *2-3 (Bankr. D. Neb. May 23, 2008) (after noting a dearth of case law that was enlightening on the topic of whether a subpoena must be issued in connection with a Rule 2004 motion and order, the court held that the law required a subpoena to be served upon the proposed examinee—a former officer of the debtors—prior to him being required to take any action); *In re Ecam Publ'ns., Inc.,* 131 B.R. 556, 558, 561 (Bankr. S.D.N.Y. 1991) (witnesses filed motion to quash Rule 2004(c) subpoenas after the scheduled date for the Rule 2004 examinations and as such were untimely; as court had already rescheduled the dates for the Rule 2004 examinations, the court treated motions as motions to limit the scope of the Rule 2004 examinations and ultimately denied such motions); *In re Tex. Int'l Co.,* 97 B.R. 582, 585-86 (Bankr. C.D. Cal. 1989) (noting that proper procedure under former Rule 45 for obtaining bankruptcy examination of witness residing outside district of where bankruptcy case was pending was to obtain examination order in district where underlying case is pending, file certified copy of order in district where witness to be examined resides, and to obtain issuance of subpoena from bankruptcy court in district where witness resides, compelling witness to attend examination in district where witness resides; disputes over the scope of the subpoena should be decided by the court in which the underlying bankruptcy case is pending); *In re Fred Ayers Co.,* 266 B.R. 557, 563-64 (Bankr. M.D. Ga. 2011) (holding that under a plain reading of Rule 2004(c) and Rule 45, the proper court to issue a subpoena is the court where the underlying bankruptcy case is pending; disagreeing with *Texas Int'l's* reliance on cases interpreting Bankruptcy Act § 21 a); *Stipp v. CML-NV One, LLC (In re Plise),* 506 B.R. 870, 873 (B.A.P. 9th Cir. 2014) (noting that after creditor's Motions for 2004 exams were granted, subpoenas were served on third parties pursuant to Rule 45)).

[153] *See In re Teknek, LLC,* No. 05 B 275 45, 2006 WL 2136046, at *1 (Bankr. N.D. Ill. Jun. 30, 2006). Note, this was a Memorandum Opinion denying a Motion to Reconsider a previously unpublished decision. This unpublished decision was then actually reversed and remanded by the Seventh Circuit in *In re Teknek, LLC,* 512 F.3d 342, 345 (7th Cir. 2007). Specifically, the Seventh Circuit held that the individual involved, Sheila Hamilton, was not

sought certain information pertaining to the debtor, Teknek, LLC, from an individual named Sheila Hamilton as "Debtor Representative"—and her capacity as a "debtor-representative" was unclear. The court distinguished between Rule 2004 examinations directed toward debtors versus non-debtor third parties:

> In this case, by filing the voluntary Chapter 7 petition, 11 U.S.C. § 301, the debtor Teknek LLC imposed upon itself a legal obligation to disclose recorded historical data relating to property of the estate to the trustee, § 521(4), Fed. R. Bankr.Pro. 4002. The trustee does not need to subpoena this information, because by virtue of being the "party" who filed and commenced the bankruptcy "case," the debtor has a legal obligation to turn over the information in its custody and control even in the absence of a subpoena. "It is not necessary that the debtor be formally subpoenaed to a Rule 2004 examination; an order of examination is sufficient." 10 Collier on Bankruptcy ¶ 9016.01, at 9016–2 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006).[154]

The court went on to suggest that a subpoena *is* necessary in the Rule 2004 context to exert personal jurisdiction over a ***nonparty witness*** and that "[f]ederal courts ***do*** require a certain type of personal jurisdiction over a nonparty witness in order to enforce a subpoena against such a person."[155] The court elaborated that the due process clause of the United States Constitution does not require a non-party witness to have "minimum contacts" with the district in which a federal action is pending. Instead, where a non-party witness has been subpoenaed for a deposition in a federal case, the appropriate inquiry is whether the witness has a "nexus to the activities being investigated in the underlying legal proceeding."[156] In *Teknek*, since the debtor

---

personally served in conjunction with a contempt hearing (she was in the country of Scotland and had not been ***personally*** served with the contempt motion as required by Fed. R. Civ. Proc. 4(f) and the Hague Convention; only her attorney that represented her in other matters had been served by mail, which was insufficient under Fed. R. Civ. Proc. 4(f) for a contested matter). Therefore, the bankruptcy judge lacked personal jurisdiction to hold her in contempt of court.

[154] *Teknek*, 2006 WL 2136046, at *3.

[155] *Id.* at *6 (citing *Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 416-19 (10th Cir. 1996) & *Michelman v. Hanil Bank, Ltd. (In re Jee)*, 104 B.R. 289, 293–94 (Bankr. C.D. Cal. 1989)).

[156] *Id.* at *6 (citing *Knowles*, 87 F.3d at 417-19).

and the examinee Ms. Hamilton had failed to clearly raise a personal jurisdiction issue in written or oral form until filing a motion to vacate or reconsider a ruling on an otherwise fully litigated contested motion, the court held that it was raised too late.[157]

The court in *In re Marathe* expressed similar sentiments.[158] *Marathe* involved a Florida Chapter 7 bankruptcy case of a husband and wife. The Chapter 7 trustee moved to conduct a Rule 2004 examination of the debtors' daughter who lived and worked in New York City and allegedly co-owned with the debtors a nonexempt, unencumbered apartment in New York City of unknown value. The trustee wanted to ask the daughter questions about the apartment. Apparently, no documents were requested. However, a subpoena for the Rule 2004 examination had been issued by an attorney in New York City who was employed as special counsel for the trustee, and the deposition had been scheduled to occur in New York City. The daughter opposed the relief sought and countered with a motion for protective order. The court initially granted the trustee's motion and denied the daughter's motion. The context of this opinion is a motion for reconsideration by the daughter. The daughter argued that she not only lived in New York, but also that she did not have minimum contacts with Florida and it would violate the Constitution's Due Process Clause for the Florida bankruptcy court to subject her to a Rule 2004 examination. The court denied the daughter's motion for reconsideration, concluding that a Rule 2004 examination of her was permissible and appropriate. The court did not focus so much on

---

[157] As mentioned in footnote 153, *supra*, the bankruptcy court's decision was reversed and remanded by the Seventh Circuit in *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007) solely due to the fact that the examinee, Sheila Hamilton, who was in the country of Scotland, had not been properly served in conjunction with the contempt hearing (*i.e.*, she had not been **personally** served with the contempt motion as required by Fed. R. Civ. Proc. 4(f) and the Hague Convention; only her attorney that represented her in other matters had been served by regular mail, which was insufficient under Fed. R. Civ. Proc. 4(f) for a contested matter). Therefore, the bankruptcy judge lacked personal jurisdiction to hold her in contempt of court.

[158] *See In re Marathe*, 459 B.R. 850 (Bankr. M.D. Fla. 2011).

the need for a subpoena; rather, it focused on the ability to order those with knowledge of the

debtor's affairs to testify, pursuant to Rule 2004, regardless of where the person is and regardless

of the fact that the person is a "non-party" (and the court implied that "non-party" means a

person who is neither the debtor nor a person who has filed a proof of claim).[159]  In so ruling, the

court offered the following legal reasoning:  (1) trustees and parties-in-interest in bankruptcy

cases may examine any person, including nondebtors, regarding matters that affect the

administration of the bankruptcy estate; (2) the daughter's attendance at an examination in New

York City would not violate her due process rights, because she had knowledge of property of

the bankruptcy estate, and because the examination would be conducted in the district in which

she resided; (3) the debtors' interest in the apartment was property of the estate, pursuant to

section 541 of the Bankruptcy Code and, under 28 USC. § 1334(e), the bankruptcy court has

exclusive jurisdiction over all property of the estate, wherever located, and over disputes

regarding whether specific property is property of the estate; "wherever located" is intended to

have "global reach";[160] (4) if an adversary proceeding were to be filed in the Florida bankruptcy

court regarding the apartment, Bankruptcy Rule 7004 would allow nationwide service of process

on the daughter (in New York—although the adversary proceeding would be filed in the Florida

bankruptcy court) and personal jurisdiction could be exercised over her "consistent with the

---

[159] *See also In re Mirant Corp.*, 326 B.R. 354 (Bankr. N.D. Tex. 2005).  In a situation in which an unsecured
creditors' committee requested a Rule 2004 examination of two investment bankers who had participated in case,
including by filing proofs of claim, and the investment bankers objected and argued that subpoenas must be issued
on them to compel production (which had not occurred) and that only a New York court (not the Texas bankruptcy
court) could issue an enforceable subpoena directed toward them, the court overruled the objection.  The court stated
that, during an earlier hearing, counsel for the investment bankers agreed that the court's oral direction could serve
in lieu of a subpoena and a court order would serve the same function as a subpoena.  Moreover, the court stated
that, while a true third party may be entitled to require a subpoena, the investment bankers here were true parties in
interest (having filed proofs of claim, participated, and being the targets of potential litigation).  Thus, it would be
"anomalous" to permit them to evade the court's reach.

[160] *Marathe,* 459 B.R. at 854 (citing *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 250 (S.D.N.Y.
2004)).

Constitution and laws of the United States"; specifically, minimum contacts with the state of Florida would not be necessary—rather the court would have personal jurisdiction over anyone who had sufficient minimum contacts with the United States; (5) here, there was no adversary proceeding filed (yet) against the daughter—Bankruptcy Rule 2004 is merely an investigatory tool prior to the filing of an adversary proceeding and is broad in scope, so that the trustee and parties can gather information (a motion for authority to conduct a 2004 examination may even be granted *ex parte*, without a hearing, without the advance notice typically required to be given in a contested matter); (6) the trustee had a reasonable need to conduct the examination; and (7) the court further stated that "requiring [the daughter] to attend the examination would not violate her due process rights under the United States Constitution, because [the daughter] had knowledge of property of the bankruptcy estate, and because attending the examination in her own district did not amount to an undue burden or a "constitutionally significant inconvenience."[161]

This court believes that, as a technical matter, a subpoena was required here in the case of Ms. Gianardi to ***compel her attendance at a Rule 2004 examination*** and to ***compel production of documents*** pursuant thereto. But it is not fatal to the NMSIC's ***current request*** that Ms. Gianardi be held in contempt of court and sanctioned—for her exercising control over the Computer and intentionally putting Debtor documents beyond the reach of the Trustee and creditors in this case. Why? First, this court believes that Ms. Gianardi waived any right to complain about a lack of subpoena when she sat for the Rule 2004 examination. If one voluntarily sits for a deposition, she waives any argument about the need for a valid subpoena.[162]

---

[161] *Id.* at 853-858.

[162] *Judicial Watch, Inc. v. U.S. Dep't of Commerce,* 196 F.R.D. 1 (D.C. 2000). This was a Freedom of Information Act case filed in Washington, DC by the Plaintiff, Judicial Watch, Inc., against the United States Department of

Not only did Ms. Gianardi sit for her Rule 2004 Examination without complaining about a lack of a subpoena, but she never even mentioned the lack of a subpoena as a potential problem until five months after her examination (on March 8, 2017) through her newly retained Texas bankruptcy counsel (not to be confused with her Colorado lawyer who sat in on the Gianardi 2004 Examination), in the Gianardi Objection to Motion to Compel—Computer.[163]  While her 15-page objection did make a brief argument, at paragraphs 4-9, that the dispute "should be determined in the bankruptcy court for the district in which Ms. Gianardi was requested to produce **documents**, the District of Colorado" (emphasis added), and further stated that, if the NMSIC had properly served a **subpoena** on Ms. Gianardi, this would be clear, the objection **never mentioned "personal jurisdiction"** or actually contested the bankruptcy court's personal jurisdiction over Ms. Gianardi.  The Gianardi Objection to Motion to Compel—Computer mostly complained that production of the Computer was intrusive and well beyond the scope of what is contemplated by Bankruptcy Rule 2004.  It also articulated privacy concerns with regard to the NMSIC or any forensic expert examining the Computer—given that Ms. Gianardi allegedly had a significant amount of her own personal data and pictures on it by this point.  Ms. Gianardi

---

Commerce.  A non-party, Mr. Trie, argued after a deposition for the first time that he was under no obligation to produce documents because he was never properly served with a valid subpoena and that he had agreed through his counsel to appear for his deposition voluntarily.  It appears that his argument was two-fold: he was arguing that he was not properly served and he was also arguing that something about the subpoena was invalid.  In any event, with regard to the defective-subpoena argument, the Plaintiff argued that Mr. Trie waived any argument about the subpoena's validity by failing to make a written objection within 14 days of service of the subpoena (the opinion does not recite any argument the Plaintiff may have made about "not properly served").  In ruling on Mr. Trie's arguments, the court stated that Mr. Trie waived any argument about the validity of the subpoena duces tecum by failing to object in writing within 14 days as required by Rule 45(c)(2)(B).  Additionally, the court found that, by voluntarily appearing at the deposition in Washington, D.C., Mr. Trie waived any objection to the subpoena based on lack of service.  "Notably, based on the record before the court, Trie made no objection to the document requests based on defective service at the time of the deposition." *Id.* at 2.  However, the court went on to conclude that waiver of a right as fundamental as the Fifth Amendment privilege is not to be lightly inferred and would not find waiver of his Fifth Amendment privilege as to production of the documents and sustained Mr. Trie's objection to production based on the Fifth Amendment.  He did not have to produce because of the applicability of the Fifth Amendment privilege.

[163] *See* DE # 211.

sought affirmative relief from the bankruptcy court to protect her personal information on the Computer, in the event the Motion to Compel—Computer was granted. Ms. Gianardi wanted to put restrictions on how the Computer would be searched (with search terms, and the like). On March 13, 2017, when the court held a hearing on the Motion to Compel—Computer, Ms. Gianardi appeared there through her Texas bankruptcy counsel (two lawyers), making a regular appearance—not a special appearance, thus seemingly not preserving any arguments of "lack of personal jurisdiction" that she might have had.[164] Ms. Gianardi's counsel represented, *"Your Honor, she is not opposed to having a forensic copy made. We prefer that. She wants every— she wants to get out of this mess, I mean two parties that don't trust each other. It's what happens after that that I hope we were going to get some kind of consensus today on."*[165] Ms. Gianardi's sole message (through her counsel to the bankruptcy court) was that she did not really want to produce the Computer but, if she had to, she wanted a search term protocol in place and, certainly at a minimum, a protective order to guard private information. At one point during the hearing on the Motion to Compel—Computer, Ms. Gianardi's counsel suggested the idea of an independent discovery examiner with regard to the examination of the Computer: *"Not to complicate things further, but may be the Court might want to give some consideration to, and I floated this idea, I didn't get much traction with it, to an independent discovery examiner that both parties could share the cost of. They would report directly to the Court with any issues that arise after the image is copied on what the, you know, search capabilities are, what are the challenges going to be, on getting them the documents that they need while still*

---

[164] *See* DE # 227 (Transcript of hearing held 3/13/17, p. 3 (lines 6-8)).

[165] *Id.* at p. 43 (lines 10-14) (emphasis added).

*protecting my client's privacy right.*"[166]  Nothing was said at this hearing about the bankruptcy court's authority (or lack thereof) to issue orders regarding turnover of the Computer—although Ms. Gianardi's counsel did express that this was all extremely inconvenient for her and that she preferred it be litigated in Colorado where Ms. Gianardi resided.[167]  In summary, Ms. Gianardi's "lack of subpoena/lack of personal jurisdiction" argument seems too little too late, after both voluntarily sitting for an examination and then responding to the Motion to Compel—Computer without ever using the words "lack of personal jurisdiction."

But as also mentioned earlier, *we are now well beyond the stage of a creditor simply seeking a Rule 2004 examination or production of documents with regard to a non-party*.  Ms. Gianardi is now a *party* in a contested matter, *not a mere non-party in a discovery dispute*.  If the NMSIC was, at this point, merely seeking to compel Ms. Gianardi to produce documents, there would be a problem—assuming waiver did not otherwise apply.  The NMSIC would need to have served a subpoena and then, if Ms. Gianardi continued to fail to produce, go to the compliance court, in the District of Colorado, to compel compliance.[168]  That court could rule on the issue or, alternatively, transfer the dispute to this court.  But when the NMSIC filed the Motion to Compel—Computer, things evolved.  That motion triggered something different than

---

[166] *Id.* at p. 54 (lines 17-25) (emphasis added).

[167] *Id.* p. 55 (lines 1-14).

[168] The court would note that Rule 45(f), which was enacted in 2013, states that "when the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances."  The advisory notes to Rule 45(f) provide some guidance as to when exceptional circumstances may exist: "The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion."

a mere motion to compel production of documents. It triggered a new contested matter which sought broader relief. Ms. Gianardi became a party (or respondent) at that point, who was in possession of property of the estate (the Computer) and records of the estate (any electronic data thereon pertaining to the Debtor). This was no longer about producing *her own* documents. She had something of the Debtor's to which the trustee and creditors were entitled to have access. Regardless of the title used on the Motion to Compel—Computer, it was tantamount to a motion to compel a turnover of records of the estate and/or property of the estate pursuant to section 542(e) of the Bankruptcy Code.[169] It was not a mere discovery dispute. Bankruptcy Rule 9014 sets forth the requirements for service on parties/respondents in contested matters—stating that a motion initiating a contested matter "shall be served in the manner provided for service of a summons and complaint by Rule 7004." Rule 7004, of course, permits service by First Class Mail and various other means—personal service is not required (as in the case of a subpoena on a non-party). Ms. Gianardi was properly served with the Motion to Compel—Computer as required by Rule 9014.[170] She responded.[171] She participated in a hearing thereon and an order was issued pursuant thereto, that was never appealed or otherwise challenged.

---

[169] Arguably, an adversary proceeding should have been brought for a motion seeking relief under section 542 of the Bankruptcy Code. However, a party's failure to raise the issue of an adversary proceeding being needed results in the issue being waived. *Village Mobile Homes, Inc. v. First Gibraltar Bank. FSB (In re Village Mobile Homes, Inc.)*, 947 F.2d 1282, 1283 (5th Cir. 1991) ("Compliance with the requisites of an adversary proceeding may be excused by waiver of the parties").

[170] *See* DE # 205. The Certificate of Service shows the Motion to Compel—Computer was served via United States First Class mail upon Ms. Gianardi at her home address, her business address, and to her counsel of record who sat with her during the Rule 2004 Examination. The court concludes this was proper service, pursuant to Bankruptcy Rule 9014 and 7004(b)(1), for the contested matter initiated against Ms. Gianardi via the Motion to Compel—Computer.

[171] *See* DE # 211.

Then things *further* evolved. Yet another contested matter was filed with Ms. Gianardi as a party/respondent, on February 23, 2018, when the Gianardi Sanctions Motion was filed.[172] Once again, Bankruptcy Rule 9014 sets forth the requirements for service on parties/respondents in contested matters—stating that a motion initiating a contested matter "shall be served in the manner provided for service of a summons and complaint by Rule 7004." Rule 7004, of course, permits service by First Class Mail and various other means—personal service is not required (as in the case of a subpoena on a non-party). Ms. Gianardi was properly served with the Gianardi Sanctions Motion as required by Rule 9014.[173] Two months after the Gianardi Sanctions Motion was filed, Ms. Gianardi, for the first time, raised a personal jurisdiction argument. But, by this point—in the context of a second contested matter against her that had been properly served on her pursuant to Bankruptcy Rules 7004(b)(1) and 9014—the personal jurisdiction argument had no merit.

> (ii)    *Personal Jurisdiction in Bankruptcy Contested Matters and Adversary Proceedings.*

To further explain why Ms. Gianardi's personal jurisdiction argument has no merit in the context of the contested matters now before the court, the court will elaborate on Bankruptcy Rule 7004 (which is incorporated into bankruptcy contested matters through Bankruptcy Rule 9014), as well as case law addressing personal jurisdiction and due process as it relates to parties against whom relief is sought in bankruptcy cases.

---

[172] *See* DE ## 263 & 263.

[173] *See* DE ## 264 & 265. The Certificates of Service show that the Gianardi Sanctions Motion was served via United States First Class mail upon Ms. Gianardi at her home address, her business address, to her counsel of record who sat with her during the Rule 2004 Examination and to her Texas counsel who represented her in connection with the Motion to Compel—Computer. The court concludes this was proper service, pursuant to Bankruptcy Rule 9014 and 7004(b)(1), for the contested matter initiated against Ms. Gianardi via the Gianardi Sanctions Motion.

Case law discussing the issue of personal jurisdiction most often arises in the context of adversary proceedings. Bankruptcy Rule 7004 entitled "Process; Service of Summons, Complaint"[174] provides:

> . . .
>
> **(d) Nationwide service of process**
>
> The summons and complaint and all other process except a subpoena may be served anywhere in the United States.
> . . .
>
> **(f) Personal Jurisdiction**
>
> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code. . . .[175]

Under these provisions, personal jurisdiction may be established over a defendant in an adversary proceeding (or respondent in a contested matter) if: (1) service is effectuated in accordance with Bankruptcy Rule 7004 or Fed. R. Civ. Proc. 4, (2) the proceeding arises under the Bankruptcy Code or arises in or relates to a bankruptcy case (*i.e.,* the court has subject matter jurisdiction), and (3) the court's exercise of jurisdiction is consistent with the Constitution and laws of the United States.

But what does it mean in the unique world of bankruptcy for the court's exercise of personal jurisdiction to be "consistent with the Constitution and laws of the United States"? Service of process is the physical means by which personal jurisdiction is obtained over a party.

---

[174] To be clear, Bankruptcy Rule 9013 provides that only a written "motion" is necessary to commence a contested matter (not a summons and complaint), but the motion is served in the same manner as a summons and complaint would be served in an adversary proceeding.

[175] Fed. R. Bankr. P. 7004(d), (f).

And Title 11 employs Rules 4(a), (b), (c)(1), (d)(1), (e)-(j), (l), and (m) for service of process in an adversary proceeding (or for service of a motion in a contested matter). But how does the Constitution potentially constrain a federal court's power to acquire personal jurisdiction via nationwide service of process? This is not focused upon very frequently in bankruptcy jurisprudence.[176] The answer is that, typically, in the bankruptcy context, courts do not measure Constitutional sufficiency under a "minimum-contacts" test with the forum state, as articulated in the famous *International Shoe* case.[177] Rather, because matters in bankruptcy generally fall within ***federal question jurisdiction*** (that is, they involve matters that arise under the Bankruptcy Code, or arise in or are related to a bankruptcy case), and because the applicable rules of procedure permit nationwide service of process, many courts simply hold that the analysis stops there and that Fed. R. Bankr. Proc. 7004(d) extends personal jurisdiction over any person who has sufficient minimum contacts **with the United States**. Some courts have referred to this as the "national contacts" test.[178]

---

[176] *See generally Nordberg v. Granfinanciera, S.A. (In re Chase & Sanborn Corp.),* 835 F.2d 1341, 1344 (11th Cir. 1988), *rev'd on other grounds sub nom. Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33 (1989) (discussing personal jurisdiction concepts in bankruptcy, but in the context of a non-United States citizen defendant).

[177] *See Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945). Taking a walk down memory lane to our law school days (for this judge, that "lane" being Dean Page Keeton Boulevard, Austin, Texas), originally, due process required the "presence" of the person in the state before a court possessed personal jurisdiction over such person. *See Pennoyer v. Neff,* 95 U.S. 714 (1877). *International Shoe* expanded this rule by permitting jurisdiction if the person had sufficient minimum contacts with the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe,* 326 U.S. at 316.

[178] *See, e.g., Am. Freight System, Inc. v. Temperature Sys., Inc. (In re Am. Freight Sys., Inc.),* 173 B.R. 739, 741 (Bankr. D. Kan. 1994) (stating that "service pursuant to the Rule [7004(d)] gives . . . [the court] personal jurisdiction over any entity that has minimum contacts with the United States, without regard to the entity's contacts with the state in which the Court happens to sit"); *Hatchrite Corp. v. Chesterfield Fin. Corp. (In re Hatchrite Corp.),* 211 B.R. 58, 61 (Bankr. E.D. Okla. 1997) (noting that "[t]he minimum contact test had no relevance because § 1334 provided it with federal question jurisdiction"); *Adams v. Medical Accounts Receivable Solutions, Inc. (In re Coram Healthcare Corp.),* No. 00-3299, 2003 WL 22948234, at *2 (Bankr. D. Del. Dec. 12, 2003) ("When a federal statute or rule, such as Rule 7004(d), permits the service of process beyond the boundaries of the forum state, then the issue is whether the party has sufficient contacts with the United States, not any particular state."). *See also Diamond Mortg. Corp. of Ill. v. Sugar,* 913 F.2d 1233, 1244 (7th Cir. 1990) (stating that defendant's contacts with the state were "simply irrelevant" because there were sufficient contacts with the United States to subject the defendants to in personam jurisdiction); *Owens-Ill., Inc. v. Rapid Am. Corp. (In re Celotex Corp.),* 124 F.3d 619, 630 (4th Cir. 1997)

Other courts have rejected such a "national contacts" test and determined that due process requires more—specifically, that the fairness and reasonableness requirements of the Fifth Amendment must be considered.[179]  A bankruptcy opinion that does a fine job of explaining this was issued in the *Texas Reds* case.[180]

In *Texas Reds*, a Texas resident, Ms. Miller, had entered into an agreement to purchase assets in a New Mexico bankruptcy case.  The New Mexico bankruptcy court approved the agreement and then Ms. Miller defaulted.  Later, the bankruptcy trustee sued Ms. Miller for breach of contract in an adversary proceeding in the case.  Ms. Miller moved to dismiss the adversary proceeding, arguing lack of personal jurisdiction over her.  The court denied her motion, finding it had personal jurisdiction over her.  The court first stated that a plaintiff in an adversary proceeding bears the burden of establishing the existence of personal jurisdiction.  The court noted the plaintiff must satisfy three requirements:  (1) service of process had been effectuated in accordance with Bankruptcy Rule 7004 or Fed. R. Civ. Proc. 4, (2) the proceeding arose under the Bankruptcy Code or arose in or related to a bankruptcy case (*i.e.,* in other words, there was federal question bankruptcy subject matter jurisdiction), and (3) the court's exercise of jurisdiction was consistent with the Constitution and laws of the United States.   Requirements (1) and (2) were easily met in the case.  With respect to requirement (3), the court started by

---

(stating that the question of minimum contacts with the forum state is irrelevant, explaining that "when an action is in federal court on 'related to' jurisdiction, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting."); *In re Marathe*, 459 B.R. 850, 855-56 (Bankr. M.D. Fla. 2011) (holding that personal jurisdiction under Rule 7004(f) meets constitutional concerns based on the defendant's contacts with the United States, rather than where bankruptcy court is located).

[179] *See, e.g., Travelers Cas. & Surety Co. v. Desselle (In re Fries)*, 378 B.R. 304, 310 (Bankr. D. Kan. 2007) (holding that where non-resident defendant had minimum contacts with the United States, personal jurisdiction could only be defeated by showing that it would be "so gravely difficult and inconvenient that [they] unfairly [are] at a severe disadvantage in comparison to [their] opponent.") (internal cites omitted).

[180] *See In re Tex. Reds, Inc.*, Adv. No. 09-1132, 2010 WL 1711112, at *2 (Bankr. D.N.M. April. 26, 2010).

noting that, in the world of bankruptcy, the court does not measure Constitutional sufficiency under a "minimum-contacts" test with the forum state, as described in *International Shoe*.[181] Rather, because the matters fall within federal question jurisdiction (*i.e.,* bankruptcy) and the applicable rules of procedure permit nationwide service of process, many courts simply hold that the analysis stops there and that Fed. R. Bankr. Proc. 7004(d) extends personal jurisdiction over any person who has sufficient minimum contacts with the United States. But the Tenth Circuit, where New Mexico sits, had rejected this so-called "national contacts" test[182] (which merely requires that the defendant have sufficient contacts with the United States, as opposed to the state in which the federal court is located), stating that due process requires something more. Specifically, the fairness and reasonableness requirements of the Fifth Amendment should be considered. The "Fifth Amendment is designed to protect 'litigants from the burdens of litigation in an unduly inconvenient forum.'"[183] Thus, in order to determine whether the bankruptcy court's exercise of personal jurisdiction comports with due process requires a two-step analysis. First, the defendant must demonstrate "constitutionally significant inconvenience" (in other words, the defendant's "liberty interests actually have been infringed" and the litigation would be gravely difficult in the chosen forum). The court noted this was a very difficult test to

---

[181] *Int'l Shoe*, 326 U.S. at 316.

[182] *See Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211 (10th Cir. 2000). In *Peay*—which was a case considering the question of nationwide service of process under ERISA—the Tenth Circuit rejected the so-called "national contacts" test which requires sufficient contacts with the United States as opposed to the state in which the federal court is located, stating that "[w]e are convinced that due process requires something more." *Id.* The Tenth Circuit reasoned that the fairness and reasonableness requirements under the Fourteenth and Fifth Amendments should not be disregarded entirely simply because jurisdiction is asserted under a federal statute that authorizes nationwide service of process. *Id.* at 1212. Rather, because the Fifth Amendment is designed to protect "individual litigants against the burdens of litigation in an unduly inconvenient forum," testing the constitutional sufficiency of personal jurisdiction based on nationwide service of process requires the plaintiff's choice of forum to be fair and reasonable to the defendant." *Id.*

[183] *Texas Reds*, 2010 WL 1711112, at *4.

meet, particularly in this age of instant communication and modern transportation, which lessen the burdens of litigating in an out-of-state forum. Second, if the defendant shows "constitutionally significant inconvenience," the court should then consider whether "'the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant."[184] Applying this standard, the bankruptcy court in *Texas Reds* held that the defendant, a resident of San Marcos, Texas—just one state away from New Mexico where the bankruptcy case was—did not show a constitutionally significant inconvenience under the Tenth Circuit's *Peay* test.[185] Further, even if Ms. Miller had established constitutionally significant inconvenience, the bankruptcy court found that the federal interest in litigating this proceeding before the bankruptcy court outweighed the burden imposed on Ms. Miller.

Another court that looked beyond the "national contacts" test was the Delaware bankruptcy court in a case called *In re DBSI*.[186] In the context of a plan trustee's post-confirmation fraudulent transfer avoidance action against a former insider of the debtor living in the State of Idaho, the Delaware bankruptcy court—in response to the defendant's motion to dismiss for lack of personal jurisdiction—first, looked to whether the defendant had sufficient contacts with the relevant forum, which pursuant to Bankruptcy Rule 7004(d), should be deemed the United States. After easily finding such sufficient contacts, the court looked to whether its exercise of personal jurisdiction would comport with "traditional notions of fair play and substantial justice."[187] This second inquiry required balancing the burdens placed upon the

---

[184] *Id.*

[185] *Peay,* 205 F.3d at 1212.

[186] *Zazzali v. Swenson (In re DBSI, Inc.)*, 451 B.R. 373 (Bankr. D. Del. 2011).

[187] *Id.* at 377.

defendant against the interest in furthering the policies of the Bankruptcy Code. The court held that, while litigating the case in Delaware may have been inconvenient to the defendant, such a burden would not outweigh the benefits of having the adversary proceeding heard in the trustee's selected forum. Moreover, the bankruptcy court noted that Congress obviously contemplated this issue in enacting 28 U.S.C. § 1409. Subsection (a) of 28 U.S.C. § 1409 specifically authorizes commencement of actions in the court in which the chapter case is pending. Subsection (b) of the statute allows for a very limited exception to the rule, *i.e.,* claims under $11,725 against non-insiders can only be brought in the district court for the district in which the defendant resides.[188] Thus, except for claims under $11,725 against non-insiders,[189] Congress had to know that most avoidance actions in large cases would result in an inconvenience to the defendants. Furthermore, since subsection (b)'s exception applies only to non-insider defendants, this further suggested that Congress contemplated insider defendants, such as the defendant in this case, being hauled into the court where the bankruptcy case was pending. For the aforementioned reasons, the bankruptcy court denied the defendant's motion to dismiss the adversary proceeding for lack of personal jurisdiction.[190]

To recap, Ms. Gianardi argues that this bankruptcy court lacks personal jurisdiction over her because: (a) she was not properly served (*i.e.,* no subpoena was served on her almost two years ago in connection with the Gianardi Rule 2004 Examination); and (b) she lacks minimum contacts with Texas. Ms. Gianardi's jurisdictional arguments fail. There is no dispute that Ms. Gianardi was properly served, pursuant to Fed. R. Bankr. Proc. 9014 and 7004, with the

---

[188] Effective April 1, 2016, 28 U.S.C. § 1409(b) was amended to change the amount to $12,850.

[189] *DBSI, Inc.*, 451 B.R. at 378.

[190] *Id.*

contested matters initiated by: (a) the Motion to Compel—Computer, and (b) the Gianardi

Sanctions Motion. No subpoena, summons or complaint—and no personal service—was

required in connection with these contested matters. Moreover, there can be no dispute that Ms.

Gianardi has minimum contacts with the United States. Finally, even if due process requires

more than a simple application of the "national contacts" test often applied in the unique world

of bankruptcy, the court concludes that "traditional notions of fair play and substantial justice"[191]

are not violated with this court's exercise of personal jurisdiction over Ms. Gianardi. The court

concludes that there is no "constitutionally significant inconvenience" (in other words, her

liberty interests do not appear to have been infringed and there is no reason to conclude that the

litigation is gravely difficult in Texas). Any burden placed upon Ms. Gianardi is outweighed by

the interest in furthering the policies of the Bankruptcy Code—one of which is to address all

issues pertaining to property of the estate and financial records of a debtor in one central forum.

While litigating these issues in Texas may have been inconvenient to Ms. Gianardi (even with

the Debtor apparently paying for her counsel), such a burden would not outweigh the benefits of

having the contested matters heard in the forum presiding over the Debtor's case.

   *(iii)* *Waiver.*

   Finally, even if the lack of a subpoena early on, or other factors could suggest a personal

jurisdiction problem, this court additionally concludes that Ms. Gianardi waived her argument

that this court lacks personal jurisdiction over her. Neither Ms. Gianardi nor her counsel ever

raised any objection to the court's personal jurisdiction over Ms. Gianardi until she filed, on

April 23, 2018: (a) a "Special Entry of Appearance" on her behalf, "specially to contest this

Court's jurisdiction to enforce the Rule 2004 Exam Order dated August 29, 2016 (Doc. 143) and

---

[191] *Id.* at 377.

any subsequent discovery pertaining to that Order"[192]; and (b) a "Notice of Objection to Jurisdiction in Northern District of Texas and Request to Stay Proceedings related to Ms. Gianardi's Compliance with Rule 2004 Document Production."[193] These pleadings argued for the first time that the Northern District of Texas lacks "personal jurisdiction" over Ms. Gianardi in that she "is not a party to this case and lacks sufficient connection with the Northern District of Texas to be subject to the Court's jurisdiction."[194] The pleadings recite that Ms. Gianardi lives and works in Colorado, she does not regularly conduct business in Texas, and does not have the required "minimum contacts" to be subject to the jurisdiction of the Texas courts.[195]

First, to be clear, Ms. Gianardi never, for more than a year, objected to the method by which she received the Rule 2004 Order (or the lack of a subpoena therewith). In fact, in a September 7, 2016, letter from her to the NMSIC's counsel, Ms. Gianardi acknowledged receipt of the Rule 2004 Order, simply stating that she had no documents to produce.[196] Ms. Gianardi appeared, with counsel, for the Rule 2004 Examination in compliance with the Rule 2004 Order, and she later retained counsel in Texas to appear on her behalf in connection with the Motion to Compel—Computer (which, as this court has stated, initiated a contested matter against Ms. Gianardi for the first time), without any reservation of objections to personal jurisdiction. The Motion to Compel—Computer was properly served on Ms. Gianardi, in compliance with

---

[192] *See* DE # 295.

[193] *See* DE ## 296 & 297.

[194] *Id.* at p. 1.

[195] *Id.* at p. 3 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

[196] *See* Exh. 5.

Bankruptcy Rule 9014 and 7004(b)(1) for an individual in a contested matter.[197] It was at this point in time that Ms. Gianardi became a "party" in the bankruptcy case. Finally, Ms. Gianardi complied with the Computer Compel Order and provided the Chapter 7 Trustee and Epiq with access to the Computer. Now, after over 20 months of active involvement in this court's proceedings, she contends in the newest contested matter (again, properly served on her in compliance with Bankruptcy Rule 9014 and 7004(b)(1)) for the first time that the court lacks personal jurisdiction over her.

Objections to personal jurisdiction may be waived.[198] Ms. Gianardi never invoked any jurisdictional objection for over 20 months and, in fact, during the entire period acknowledged the court's personal jurisdiction over her by complying with certain aspects of the court's orders and retaining counsel to appear on her behalf before this court. Ms. Gianardi clearly and unequivocally waived any argument that this court lacks personal jurisdiction over her.[199] Ms. Gianardi's lengthy participation in the court without objection is a waiver of any objection to this court's personal jurisdiction over her. Ms. Gianardi cannot participate in court proceedings and now, over 20 months later, object to the court's personal jurisdiction over her because those

---

[197] *See* DE # 205. The Certificate of Service shows the Motion to Compel—Computer was served via United States First Class mail upon Ms. Gianardi at her home address, her business address, and to her counsel of record who sat with her during the Rule 2004 Examination. The court concludes this was proper service, pursuant to Bankruptcy Rule 9014 and 7004(b)(1), for the contested matter initiated against Ms. Gianardi via the Motion to Compel—Computer.

[198] *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). *See also Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 667 (5th Cir. 2000) ("[A] defendant may waive its personal jurisdiction defense, thereby consenting to jurisdiction. Usually a party waives personal jurisdiction by failing to raise the issue when filing a responsive pleading or making a general appearance."); *Tinley v. Poly-Triplex Techs., Inc.*, No. 07-cv-01136, 2009 WL 812150, at *3 (D. Colo. March 26, 2009) (because Rule 12(b) defenses should be presented at the first available opportunity, a party may waive a defense of lack of personal jurisdiction by its conduct in the litigation, even if the defense is properly preserved in the answer).

[199] *See, e.g., Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 196 F.R.D. 1, 2 (D. D.C. 2000) (finding that voluntarily appearing for deposition waived objection to lack of service of a subpoena).

proceedings have not unfolded the way she had hoped. Put another way, Ms. Gianardi may not "pull [her] personal jurisdiction defense 'out of the hat like a rabbit.'"[200] She has subjected herself to the jurisdiction of this court and has waived any objection to this court's exercise of personal jurisdiction over her.

C.    *Section 105 of the Bankruptcy Code as a Basis for Relief with regard to the Gianardi Sanctions Motion.*

Having resolved the personal jurisdiction arguments, the court now turns to the merits of, first, the Gianardi Sanctions Motion and, second, the Debtor Sanctions Motion.

As earlier noted, the NMSIC seeks a finding of contempt and imposition of sanctions against Ms. Gianardi for her alleged violation of the Gianardi Rule 2004 Order and, more generally, for her actions taken with respect to the Computer. The Gianardi Sanctions Motion recites that Ms. Gianardi violated the Gianardi 2004 Order when she failed to produce the documents on the Computer that were responsive to the Gianardi 2004 Order and, more importantly, when she ***intentionally destroyed relevant evidence with a so-called wiping tool and also copied 420 gigabytes of movie files onto the Computer***. Ms. Gianardi is alleged to have performed these acts even though she was aware that the NMSIC was seeking to recover the deleted files, had agreed not to take further action to delete files or otherwise compromise the Computer, and knew and understood that parties-in-interest in the Debtor's bankruptcy case were seeking to recover the deleted files. Ms. Gianardi's actions made it impossible to recover deleted data and are alleged to have been willful and ostensibly intended to impede the ability of parties in the Debtor's bankruptcy case from obtaining relevant information. Therefore, it is argued, Ms. Gianardi should be held in contempt and sanctioned, including the payment of the NMSIC's and

---

[200] *See Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.,* No. 99-4042, 2000 WL 147392, at *2 (10th Cir. Feb. 4, 2000) (unpublished) (quoting *F.D.I.C.. v. Oaklawn Apartments*, 959 F.2d 170, 176 (10th Cir.1992)).

the Trustee's attorneys' fees. The NMSIC references both Fed. R. Civ. Proc. 37(e) and 70(e) as being potential bases for relief with regard to the Gianardi Sanctions Motion,[201] but then goes on to argue section 105 of the Bankruptcy Code as the basis for relief.[202]

The court does not think Rule 37(e) applies here with regard to Ms. Gianardi. [203] Even though the underlying facts seem to involve precisely what Rule 37(e) addresses—a failure to preserve electronically stored information in the anticipation or conduct of litigation[204]—the reality is that Ms. Gianardi was *not a party yet* when she manipulated the Computer. She was a non-party witness at that point in time. It was not until February 2017—when the Motion to

---

[201] *See* DE ## 264 & 265, ¶ 3.

[202] *Id.* at ¶¶ 30-36.

[203] Fed. Rule Civ. Proc. 37(e)—which was part of the amendments to the Fed. Rs. Civ. Proc., which became effective December 1, 2015, and applies in bankruptcy contested matters, by virtue of Fed. R. Bankr. Proc. 7037 and 9014(c)—provides as follows:

> (e) **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> > > (A) presume that the lost information was unfavorable to the party;
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > > (C) dismiss the action or enter a default judgment.

[204] The amended Rule 37(e) authorizes courts to issue sanctions where four conditions are met: (1) electronically stored information ("ESI") should have been preserved in the anticipation or conduct of litigation; (2) the ESI is lost; (3) the loss of the ESI is due to a *party's* failure to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced through additional discovery. If those four conditions are met, the next step in the inquiry is to determine whether (1) the non-offending party has been prejudiced from the loss of ESI and/or (2) the offending party acted with the intent to deprive another party of the information's use in the litigation. If there is prejudice, Rule 37(e)(1) allows the court to "order measures no greater than necessary to cure the prejudice." If the offending party acted with intent, Rule 37(e)(2) allows the court to (a) presume that the lost information was unfavorable to the party, (b) instruct the jury that it may or must presume the information was unfavorable to the party, or (c) dismiss the action or enter a default judgment. Kevin Broughel, et al., *The New Federal Rule of Civil Procedure 37(e): What Have The First Three Months Revealed?* (March 2, 2016), http://www.paulhastings.com/publication-items/details/?id=89a3e869-2334-6428-811c-ff00004cbded.

Compel-Computer was filed—seeking access to property of the estate and/or to the Debtor's data in Ms. Gianardi's possession and control—that Ms. Gianardi became a "party" for the first time in the bankruptcy case.  Rule 37(e) applies only to parties.[205]

Moreover, Fed. R. Civ. Proc. 45(g) does not apply here.  Rule 45(g) permits a court to hold in contempt a ***person*** (not just a party) who, having been served with a subpoena, fails to obey it without adequate excuse or fails to obey an order related to the subpoena.   As earlier noted, no subpoena was ever served on Ms. Gianardi.  Additionally, the court notes, anecdotally, that courts have grappled with their authority to impose sanctions on non-parties for discovery abuses generally.[206]

But the court has concluded that it is not without tools here to address what happened to the Computer.  As earlier mentioned, this is not a mere discovery dispute at this point.  Rather, this dispute involves an act of intentional destruction of property of the estate and an overt effort to make records of the Debtor inaccessible.  The court has inherent powers and authority under section 105 of the Bankruptcy Code[207] to address abuses of judicial process and bad faith conduct, even when specific rules or statutes are not otherwise up to the task.  A court's inherent power to sanction those before it "stems from the very nature of courts and their need to be able

---

[205] Although never really explained, the court assumes that the NMSIC cited Rule 70(e) in the Gianardi Sanctions Motion (applicable in bankruptcy cases pursuant to Fed. R. Bankr. Proc. 7070, and which simply states that the court may hold a disobedient party in contempt for failure to perform an act that is required) as just one more possible tool to address disobedience herein.  The court does not find the rule to be terribly relevant here.

[206] *See, e.g., Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) (suggesting that it is unclear whether the inherent power to sanction discovery abuses extends to abuses committed by non-parties).

[207] 11 U.S.C.A § 105(a) (West, Westlaw through P.L. 115-223) ("The court may issue any . . . judgment that is necessary or appropriate to carry out the provision of this title. . . .").

to manage their own affairs so as to achieve the orderly and expeditious disposition of the

cases."[208]  As the Supreme Court has stated:

> There is . . . nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the sanctioning provisions. . . . [I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.[209]

Similarly, courts also have the inherent authority to enforce their own injunctive

decrees.[210]  "The mandate of an injunction issued by a federal district court runs nationwide" and

"[v]iolation of an injunctive order is cognizable in the court which issued the injunction

---

[208] *U.S. v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir. 1991) (citing *Chambers v. NASCO,* 501 U.S. 32, 49 (1991)). *See also Pereira v. Felzberg,* No. 96 Civ. 7957, 1997 WL 698186, at *5-6 (S.D.N.Y. Nov. 7, 1997) (district court found that a bankruptcy trustee could obtain attorney's fees and expenses incurred in the bankruptcy proceeding pursuant to court's inherent equitable powers, which are available to address dilatory, bad-faith conduct by persons appearing before the court (citing *Chambers,* 501 U.S. at 50); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766 (1980); *Milltex Indus. Corp. v. Jacquard Lace Co., Ltd.,* 55 F.3d 34, 38 (2d Cir. 1995); *Int'l Brotherhood of Teamsters,* 948 F.2d at 1345; *Cruz v. Meachum,* 159 F.R.D. 366, 368 (D.Conn. 1994); *Monaghan v. SZS 33 Assocs., L.P.,* 148 F.R.D. 500, 508, n. 11 (S.D.N.Y. 1993)).

[209] *Chambers,* 501 U.S. at 50. In *Chambers,* the Supreme Court addressed a federal district court's inherent power to impose financial sanctions for abuses of the judicial process against a non-party sole shareholder and director of company-party. Specifically, the company had been sued for specific performance of a sale contract, and Chambers (along with the assistance of his attorneys) had engaged in tactics to prevent consummation of the sale. The district court had assessed attorney's fees for bad faith conduct against Chambers, and after being affirmed by the Fifth Circuit, certiorari was granted. In affirming the Fifth Circuit, the Supreme Court held that, although a scheme for assessing sanctions was provided for by both statute and rule, the scheme did not displace the trial court's inherent power to assess sanctions. While Congress has the authority to limit the exercise of the inherent power of lower federal courts because those courts were created by act of Congress, the Supreme Court does "not lightly assume that Congress" had intended to do so. Significantly, the Supreme Court held that a district court could resort to inherent power to punish abuse of the judicial system even when there existed statutory mechanisms for imposing punishment for the specific type of abuse in question. There is, therefore, nothing in the other sanctioning mechanisms that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules. To be clear, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the Supreme Court held that a court ordinarily should rely on the Rules rather than the inherent power. But if, in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

[210] *Waffenschmidt v. Mackay,* 763 F.2d 711, 716 (5th Cir. 1985).

regardless of where the violation occurred."[211]   An injunction binds not only parties subject

thereto, but also nonparties who act with the enjoined party.[212]  It has also been noted that

section 362 of the automatic stay is, in essence, an injunction precluding not just collection

actions and activities, but interference with or exercises of control over property of the estate.[213]

It is certainly not a stretch to suggest that a blatant and improper exercise of control over

property of the estate occurred in the case at bar.

A decision to invoke the court's inherent power to sanction requires a finding that bad

faith or willful abuse of the judicial process occurred.[214]   The finding of bad faith must be

supported by clear and convincing proof.[215]   A court must exercise caution in invoking its

inherent power, and it must comply with the mandates of due process, both in determining that

the requisite bad faith exists and in assessing fees.  When considering an award of sanctions

pursuant to its inherent powers, a bankruptcy court may look to Rule 37 as a guide to determine

the proper level of response to the contemnor's offense.[216]

---

[211] *Id.* (citing *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) & *Stiller v. Hardman,* 324 F.2d 626, 628 (2d Cir. 1963).

[212] *Waffenschmidt*, 763 F.2d at 717.

[213] *See, e.g., Gruntz v. County of L.A. (In re Gruntz),* 202 F.3d 1074, 1081-82 (9th Cir. 2000) (The automatic stay is self-executing, effective upon the filing of the bankruptcy petition. . . . The automatic stay is an injunction issuing from the authority of the bankruptcy court); *In re Colonial Realty Co.*, Civ. No. 3:91-200X(JAC), 1991 WL 487192, at *2 (D. Conn. Dec. 30, 1991) (The automatic stay of 11 U.S.C. section 362 operates as an injunction against, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."); *Richard v. City of Chicago*, 80 B.R. 451, 453 (N.D. Ill. 1987) (Additionally, § 362 operates as an injunction against interference with the Bankruptcy Court's jurisdiction over petitioning debtors.); *In re Builders Group & Dev. Corp.*, No. 13-04867(ESL), 2013 WL 6198203, at *5 (Bankr. D.P.R. Nov. 27, 2013) (the automatic stay acts as an injunction to protect the property of the estate and becomes operative by the mere filing of a bankruptcy petition).

[214] *Cadle Co. v. Moore (In re Moore)*, 739 F.3d 724, 729 (5th Cir. 2014).

[215] *Id.* at 730.

[216] *Pereira*, 1997 WL 698186, at *6.

73

The court concludes that Ms. Gianardi received reasonable notice and due process with regard to: (a) what the expectations of the parties and the court were in these bankruptcy contested matters, (b) what type of relief was being requested against her, and (c) what might happen to her. She has been aware of the bankruptcy case since at least July, 2016.[217] She received proper notice of the Motion to Compel—Computer.[218] She received proper notice of the Gianardi Sanctions Motion which asked the court to impose sanctions upon her (including possibly payment of the NMSIC's and the bankruptcy Trustee's attorney's fees) for spoliation of evidence under section 105 of the Bankruptcy Code or other authority. The court concludes that Ms. Gianardi was fully aware that parties considered the Computer important and necessary for the administration of the bankruptcy case.[219] The court concludes that Ms. Gianardi acted in bad faith and in willful abuse of the bankruptcy judicial process. Thus, monetary sanctions are appropriate.

The fact that Ms. Gianardi was not a party in the Correra bankruptcy proceedings until the Motion to Compel—Computer was filed and served on her in February 2017 did not permit her to disregard the bankruptcy court process, of which she was fully aware, with impunity. Ms. Gianardi's behavior provides an instance where the court's inherent powers are necessary to address illegitimate conduct that might otherwise slip between the provisions of the Federal Rules. Her bad faith conduct is intertwined with the Debtor's and, therefore, may be addressed by the court's inherent power.[220] The evidence is unrefuted that the Debtor and Ms. Gianardi

---

[217] *See* DE # 216. *See also* Exh. 5.

[218] *See* DE ## 202, 203 & 205.

[219] *See* Exh. 7, pp. 133-134.

[220] *Chambers*, 501 U.S. 50-51; *Hotel St. George Assocs. v. Morgenstern*, 819 F. Supp. 310, 322 (S.D.N.Y. 1993) (inherent powers are particularly where conduct at issue is not covered by other sanctioning provisions); *Leventhal*

talked the morning of her Rule 2004 examination and on at least a few occasions since then (by their own admissions).[221] The evidence is clear and convincing that Ms. Gianardi knew the Computer was highly important and she promised to leave it alone.[222] The evidence is clear and convincing that Ms. Gianardi and her counsel (paid for by the Debtor) significantly delayed and resisted providing access to the Computer. There is clear and convincing evidence that the Computer was purchased by the Debtor's funds or one of his company's funds for his benefit—it was, without a doubt, the Debtor's. The evidence was clear and convincing that the Debtor and Ms. Gianardi have been very close on a personal basis. The evidence was clear and convincing that Ms. Gianrdi has been willing to do whatever the Debtor told her to do in connection with his legal problems and litigation. The evidence was clear and convincing that Ms. Gianardi eventually, after entry of the Computer Compel Order, gave the impression of complying with it, but only after crucial information was wiped and the Computer's hard drive stuffed with 420 gigabytes of movie files. The Epiq Report was wholly credible on this point. Based on the findings in the Epiq Report, it is apparent that, after her Rule 2004 Examination, Ms. Gianardi intentionally took steps to obstruct the bankruptcy investigative process and make it impossible to recover discoverable documents that she had deleted from the Computer. The court concludes that this was bad faith obstructionism, undertaken at the direction of, and in affiliation with, the Debtor.

---

*v. New Valley Corp.*, 148 F.R.D. 109, 111 (S.D.N.Y. 1993) (court's inherent power to impose sanctions for bad faith conduct must "continue to exist to fill the interstices").

[221] *See, e.g.,* Exh. 6, p. 69.

[222] *See* Exh. 7, pp. 133-34.

As earlier stated, a federal court has the inherent power to sanction a party who has abused the judicial process.[223]  The spoliation of evidence is one such abuse.[224]  Spoliation is the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.[225]  Generally, a party claiming spoliation of evidence must show the following elements: (1) that the party had an obligation to preserve the electronic evidence at the time it was destroyed; (2) that the electronic evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant and favorable to the party's claim such that a reasonable trier of fact could support that claim.[226]  A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.[227]  When evidence is either willfully or intentionally destroyed in bad faith, that fact alone is sufficient to demonstrate the third prong of relevance.[228]

Ms. Gianardi, although not a "party" in these proceedings until February 2017—approximately two months after she manipulated the Computer to hide Debtor documents (in December 2016)—stated in her October 2016 2004 Examination that she was aware of the litigation between the Debtor and the NMSIC.  More importantly, once she was informed at the 2004 Examination and through subsequent communications between the NMSIC and her counsel that the NMSIC desired to recover data she deleted from the Computer, she had a duty to

---

[223] *Ashton v. Knight Transp., Inc.,* 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011).

[224] *Id.*

[225] *Id.*

[226] *U.S. v. Parks (In re Krause)*, 367 B.R. 740, 766 (Bankr. D. Kan. 2007).

[227] *Ashton*, 772 F. Supp. at 800.

[228] *Id.* at 767.

preserve that evidence, particularly in light of the Gianardi 2004 Order and her agreement at the Gianardi 2004 Examination to preserve the Computer. Ms. Gianardi's combined near-simultaneous acts of using the wiping tool and filling the Computer's hard drive with movies demonstrates that Ms. Gianardi acted with the intent to make it impossible to recover data deleted from the Computer. Moreover, given the breadth of the document requests contained in the Gianardi Rule 2004 Order, as well as the NMSIC's requests to recover the Computer in the hopes of retrieving deleted files, Ms. Gianardi knew that the evidence was relevant to matters in the bankruptcy case and likely unfavorable to the Debtor, her close friend and former boss.

     (i)    *The Adverse Inference Request as to Ms. Gianardi, Based on Her Supposed Fifth Amendment Privilege Assertion.*

The NMSIC has requested that this court draw adverse inferences against both Ms. Gianardi and Mr. Correra, under relevant circuit-level authority, based upon Ms. Gianardi's invocation of her Fifth Amendment privilege.[229] As earlier mentioned, on May 30, 2018, the NMSIC filed a Notice of Agreement Regarding Deposition of Anita Gianardi (the "Letter Agreement").[230] The Letter Agreement signed by both counsel for the NMSIC as well as counsel for Ms. Gianardi provided that, in connection with any deposition of Ms. Gianardi with regard to both the Gianardi Sanctions Motion and the Debtor Sanctions Motion, Ms. Gianardi would assert her Fifth Amendment privilege against self-incrimination in response to any question relating to the Sanctions Motions. Based upon the Letter Agreement, the NMSIC

---

[229] *See, e.g., F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969 (5th Cir. 1995) (court allowed adverse inference to be drawn against party based upon non-party witness's invocation of the privilege against self-incrimination, noting that district courts should evaluate these situations on a "case-by-case basis" and only where there was independent evidence corroborating the relationships that existed between the invoking witness and the party); *Libutti v. United States*, 107 F.3d 110 (2d Cir. 1997) (articulating non-exclusive four factor test for determining whether it is appropriate under Rule 403 for a trial court to draw an adverse inference from the invocation of the Fifth Amendment by a non-party).

[230] *See* DE # 321.

requested that this court find that Ms. Gianardi had properly invoked her Fifth Amendment privilege and that this court should draw adverse inferences against both Ms. Gianardi and the Debtor with regard to the Sanctions Motions. The court does not agree.

There is ample case authority providing that an individual may not make a "blanket refusal" to answer questions, but instead must affirmatively assert the privilege "with sufficient particularity to allow an informed ruling on the claim."[231] In the *Palma* case from this district, the district court made some important statements about the invocation of the Fifth Amendment privilege, noting that the Fifth Amendment has been interpreted as protecting an individual from being compelled "to produce evidence which may later be used against him as an accused in a criminal action."[232] This privilege may be asserted in any proceeding, including a civil proceeding.[233] An individual may not make a "blanket refusal" to answer questions, but instead must affirmatively assert the privilege "with sufficient particularity to allow an informed ruling on the claim."[234] "He is obliged to answer those allegations that he can and to make a specific claim of the privilege as to the rest."[235] "A court must make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not

---

[231] *Toyota Motor Credit Corp. v. Palma*, Civ. No. 3:07-CV-1248-B, 2007 WL 4165706, at *2 (N.D. Tex. Nov. 26, 2007) (J. Boyle). *See also United States v. Malnik*, 489 F.2d 682 (5th Cir.), *cert. denied*, 419 U.S. 826 (1974); *Longoria v. County of Dallas, TX*, No. 3:14-CV-3111-L, 2015 WL 3822233, at *2-*6 (N.D. Tex. June 19, 2005) (J. Horan).

[232] *Palma*, 2007 WL 4165706, at *2 (citing *Maness v. Meyers*, 419 U.S. 449, 461 (1975) (citations omitted)).

[233] *Palma,* 2007 WL 4165706, at *2 (citing *Maness*, 419 U.S. at 464).

[234] *Palma*, 2007 WL 4165706, at *2 (citing *N. River Ins. Co. v. Stefanou*, 831 F.2d 484, 486-87 (4th Cir. 1987)).

[235] *Palma*, 2007 WL 4165706, at *2 (citing *Stefanou*, 831 F.2d. at 486).

the privilege is well-founded."[236]  The Fifth Amendment is not a "self-executing mechanism"

and may be waived or lost if not asserted in a timely fashion.[237]

      Similarly, in *Malnik*, the Fifth Circuit held in dicta that "a blanket refusal to answer all

questions is unacceptable" for purposes of asserting a party's right against self-incrimination.[238]

In *Malnik*, the IRS had issued a summons against an individual taxpayer, Alvin Malnik,

requiring him to give testimony and produce books and records for the investigation of his tax

liability for certain tax years.  After rescheduling several times, counsel for Malnik had conferred

with the IRS Assistant Regional Counsel, whereupon both agreed that Malnik would not appear

personally at all.   In fact, the IRS agreed to accept, instead of an appearance and production, a

written statement signed by Malnik and his attorney to the effect that, had Malnik personally

appeared, he would have asserted "appropriate constitutional privileges."  More than seven

months later, the IRS filed a petition with the district court to enforce the previously issued

summons, which the district court denied.  The IRS appealed, and the Fifth Circuit affirmed,

finding that the mutual agreement between the IRS and Malnik that Malnik need not comply

with the demand of the summons effectively waived the IRS' right to subsequent judicial

enforcement of the summons.  But, as part of this holding, the Fifth Circuit importantly noted in

*dicta* that these types of "blanket" refusals to answer questions based on the Fifth Amendment

were procedurally improper for purposes of Malnik invoking his Fifth Amendment privilege.

Moreover, the Fifth Circuit noted that Malnik should have been required to attend and raise his

constitutional claims as to specific questions because it was impossible to anticipate every

---

[236] *Palma*, 2007 WL 4165706, at *2 (citing *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976)).

[237] *Palma*, 2007 WL 4165706, at *2 (citing *Maness*, 419 U.S. at 466).

[238] *Malnik*, 489 F.2d 682.

question and conclude that each would present an issue of self-incrimination. While holding that the IRS had waived its right to enforce the summons, the Fifth Circuit did note that the IRS could still issue a separate subpoena relating to the same subject matter, whereupon enforcement would not be barred by application of any res judicata principles, thus leaving the door open to potential future discovery against Malnik.[239]

In short, where "a deposition is sought, the availability of the privilege is not a ground for vacating the notice of the deposition," but, rather, "[t]he proper procedure is for the deponent to attend the deposition, to be sworn under oath, and to answer those questions he or she can answer without running a risk of incrimination," and, "[i]n this way a record can be made and the court can determine whether particular questions asked did entitle the deponent to claim the privilege."[240] Based upon the pertinent legal principles articulated in the above-cited authority, this court concludes that the Letter Agreement between the NMSIC and Ms. Gianardi did not serve as a proper invocation of Ms. Gianardi's Fifth Amendment privilege against self-incrimination and thus, cannot subsequently be used as a means to draw an adverse inference

---

[239] *Malnik*, 489 F.2d at 688, n. 6. *See also Longoria*, 2015 WL 3822233, at *2-*6 (Magistrate Judge Horan noted that the Fifth Circuit has held that "[a] blanket refusal to answer questions at [a] deposition on the ground that they are privileged is an improper invocation of the fifth amendment, irrespective of whether such a claim is made by a plaintiff, defendant, or a witness." *S.E.C. v. First Fin. Grp. of Tex., Inc.*, 659 F.2d 660, 668 (5th Cir.1981) (internal quotation marks omitted). Furthermore, the Fifth Circuit "has held that such a blanket assertion of the privilege is insufficient to relieve a party of the duty to respond to questions put to him, stating that even if the danger of self-incrimination is great, (the party's) remedy is not to voice a blanket refusal to produce his records or testify. Instead, he must present himself with his records for questioning, and as to each question and each record elect to raise or not to raise the defense." *Id.* "Requiring a party to object with specificity to the information sought from him permits the district court to rule on the validity of his claim of privilege. A party is not entitled to decide for himself whether he is protected by the fifth amendment privilege. Rather, this question is for the court to decide after conducting a particularized inquiry, deciding, in connection with each specific area that the questioning party seeks to explore, whether or not the privilege is well-founded." *Id.* (internal quotation marks omitted)).

[240] *Longoria*, 2015 WL 3822233, at *5.

against Ms. Gianardi or Mr. Correra for purposes of the Sanctions Motions. Such a blanket refusal to answer questions (even if mutually agreed upon) is simply procedurally improper.[241]

### (ii) A More General "Adverse Inference" Rule.

Notwithstanding the above analysis, there is a more general "adverse inference" concept in case law that the court believes applies here—separate and apart from the possibility of there being an adverse interest that can be drawn from an assertion of a Fifth Amendment privilege. Specifically, it has been held, more generally, that "[f]ailure of a party to provide evidence peculiarly available to that party supports the inference that the truth would be damaging."[242] Relatedly, when a party fails to call a witness who may reasonably be assumed to be favorable to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge.[243] Making such an inference is within the court's

---

[241] The court also notes that Ms. Gianardi answered certain written discovery in connection with the Gianardi Sanctions Motion. *See* Exh. 17 & DE # 327-8 (Ms. Gianardi's May 4, 2018 Objections and Responses to the NMSIC's (A) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding) and (B) Interrogatories and Request for Production of Documents). Within her responses to this written discovery, Ms. Gianardi, again, asserted her Fifth Amendment privilege against self-incrimination. The court notes that these responses were signed by Ms. Gianardi's Colorado counsel, Ms. Menninger, and were not specifically sworn under oath by Ms. Gianardi. Accordingly, they were also procedurally improper. *See, e.g., Longoria*, 2015 WL 3822233, at *5 ("[t]he proper procedure is for the deponent to attend the deposition, ***to be sworn under oath***, and to answer those questions he or she can answer without running a risk of incrimination") (emphasis added); *Malnik*, 489 F.2d at 685 (a subject of a subpoena should appear before the interrogating officer and ***under oath*** specifically claim his constitutional rights as to particular questions while answering others not presenting a threat of self-incrimination) (emphasis added).

[242] *U.S. v. Knox*, 68 F.3d 990, 995 (7th Cir. 1995) (where there was no direct evidence demonstrating the existence of an agreement to commit extortion or to commit bankruptcy fraud, the evidence was held to be more than adequate to support an inference that such an agreement had been reached); *Deutsche v. Osborne (In re Osborne)*, 257 B.R. 14, 19 n.7 (Bankr. C.D. Cal. 2000) (the court noted that the failure of a party to provide evidence peculiarly available to that party supported an inference that the truth would be damaging to that party) (citing *Knox*, 68 F.3d at 1000 & *In re Bicoastal Corp.*, 149 B.R. 212, 214 (Bankr. M.D. Fla. 1992) (wherein the court noted that, it is well established that the failure of a party to provide evidence peculiarly available to that party supports the inference that the truth would be damaging to the party)). *See also In re Vidana (Roemelmeyer v. Vidana)*, 19 B.R. 787, 788 (Bankr. S.D. Fla. 1982).

[243] *Hammeken v. Hammeken (In re Hammeken)*, 316 B.R. 723, 732 (Bankr. D. Az. 2004) (citing *Underwriters Lab., Inc. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir.1998)). *See also Continental Ill. Nat'l Bank & Trust v. Wooten (In re Evangeline Refining Co.)*, 890 F.2d 1312 (5th Cir. 1989) ("Under the adverse witness rule, a party's failure to call a witness under its control who could testify to material facts permits the court to draw an adverse inference against the party in control of the witness.").

discretion.[244]  The Fifth Circuit has stated that this so-called "uncalled witness rule" may only be

used when a witness has information "peculiarly within his knowledge" (rather than mere

"cumulative" testimony).[245]  Additionally, while the rule is unavailable when a party is "equally

available" to both parties, when the witness is connected in some way to one of the parties, and

when that witness would corroborate that party's theory of the case, then the witness is not to be

considered "equally available."[246]

The court believes that the NMSIC absolutely met its initial burden of proof with clear

and convincing testimony from the Court-Appointed Forensic Expert, Epiq, that the Computer

was tampered with in a big way, shortly after Ms. Gianardi's 2004 Examination, and during

which time the NMSIC was trying to negotiate an agreed protocol with Ms. Gianardi's and the

Debtor's counsel for its examination.  There was abundantly clear evidence that the Computer

was tampered with through the use of a wiping tool and through the sudden copying of 101

movies onto the hard drive in a one-week period—so as to make files previously deleted

inaccessible.  The NMSIC also produced clear and convincing evidence that the Computer was

the Debtor's and had been used for many years prepetition to store his files electronically.  Thus,

the NMSIC met its initial burden of showing an intentional spoliation of Debtor files that should

---

[244]*Evangeline Refinery,* 890 F.2d at 1321 ("The rule is discretionary and subject to an abuse of discretion standard.").  *But see Herbert v. Wal-mart Stores, Inc.,* 911 F.2d 1044, 1047-49 (5th Cir. 1990) (a Fifth Circuit panel questioned in strong terms whether the uncalled witness doctrine should have continuing vitality in cases governed by the Federal Rules of Evidence and the Federal Rules of Civil Procedure, but noted that it did not have authority to ignore existing precedent; a request for en banc rehearing was later denied).  The Fifth Circuit in subsequent opinions has acknowledged that the rule is still viable.  *See, e.g., King v. Ill. Cent. R.R.,* 337 F.3d 550, 556 (5th Cir. 2003); *U.S. v. Reyna,* 148 F.3d 540, 546 (5th Cir. 1998), *abrogated for other reasons in U.S. v. Vargas-Ocampo,* 747 F.3d 299 (5th Cir. 2014).

[245] *Floyd v. Option One Mortg. Corp. (In re Supplement Spot, LLC),* 409 B.R. 187, 206 (Bankr. S.D. Tex. 2009) (citing *Streber v. C.I.R.,* 138 F.3d 216, 221-222 (5th Cir. 1998)).

[246] *Floyd,* 409 B.R. at 206 (citing *U.S. v. Wilson,* 322 F.3d 353, 364, n.14 (5th Cir. 2003)).

have been produced in the bankruptcy case. The burden then shifted to Ms. Gianardi—with regard to the Gianardi Sanctions Motion—to prove otherwise. She chose not to appear and not to put on a case. She purported to exercise her Fifth Amendment Privilege not to testify. And she, of course, urged an eleventh-hour lack of personal jurisdiction argument (which this court has herein overruled). The court believes it can exercise its discretion to apply an adverse inference here. Ms. Gianardi failed to provide evidence that was "peculiarly available" to her as to the activity on the Computer in December 2016 and to rebut the Epiq Report—this failure to provide evidence can support an inference that the truth would be damaging to her.[247] The Debtor was paying her legal fees, so cost or expense in sitting for a deposition or testifying at trial was not an issue. There was no explanation offered such as health, family, or business reasons as to why Ms. Gianardi would not testify. We simply know that she wanted to exercise her Fifth Amendment privilege not to testify. Ms. Gianardi should not be considered "equally available" to the NMSIC as she was to herself or the Debtor—obviously—because of her connection to herself and to the Debtor. As noted earlier, the evidence was abundant that the Debtor and Ms. Gianrdi were and likely still are very close and she has been willing to do anything for him.

The court concludes, based on the abundant direct evidence and these adverse inferences it can draw, that Ms. Gianardi intentionally spoliated evidence—the Debtor's records—by

---

[247] *U.S. v. Knox*, 68 F.3d 990, 995 (7th Cir. 1995) (where there was no direct evidence demonstrating the existence of an agreement to commit extortion or to commit bankruptcy fraud, the evidence was held to be more than adequate to support an inference that such an agreement had been reached); *Deutsche v. Osborne (In re Osborne)*, 257 B.R. 14 (Bankr. C.D. Cal. 2000) (the court noted that the failure of a party to provide evidence peculiarly available to that party supported an inference that the truth would be damaging to that party) (citing *Knox*, 68 F.3d at 1000 & *In re Bicoastal Corp*., 149 B.R. 212, 214 (Bankr. M.D. Fla.1992) (wherein the court noted that it is well established that the failure of a party to provide evidence peculiarly available to that party supports the inference that the truth would be damaging to the party)). *See also In re Vidana (Roemelmeyer v. Vidana)*, 19 B.R. 787, 788 (Bankr. S.D. Fla. 1982).

tampering with the Debtor's Computer and making the records inaccessible. To be clear, the court is not so much finding and concluding that Ms. Gianardi violated the terms or spirit of the Gianardi Rule 2004 Order (which likely would require, at least initially, the commencement of an enforcement action in the District of Colorado) but, *rather is finding and concluding that her actions taken with respect to the Computer (i.e., property of the estate and records of the Debtor) constituted bad faith, intentional conduct that is worthy of sanctions pursuant to the court's inherent power and section 105 of the Bankruptcy Code*.

      *(iii)     Gianardi Sanctions.*

As earlier mentioned, when considering an award of sanctions pursuant to its inherent power, a bankruptcy court may look to Rule 37 as a guide to determine the proper level of response to the contemnor's offense.[248] Certainly, ordering Ms. Gianardi to pay the NMSIC's and the Trustee's reasonable attorney's fees (as requested) that they have incurred in connection with the spoliation of the Computer is well within the type of sanctions contemplated in Rule 37. The court will order Ms. Gianardi to pay the NMSIC's and the Trustee's reasonable attorney's fees associated with the spoliation of data on the Computer. A separate hearing on notice will be set for the NMSIC and the Trustee to present their attorney's fees and costs and Ms. Gianardi will have the opportunity to object.

      *D.     The Debtor's Potential Responsibility for All This: Rule 37(e) as a Basis for Relief with Regard to the Debtor.*

Having resolved the issues with regard to the Gianardi Sanctions Motion, the court now turns to the merits of the Debtor Sanctions Motion. Does the evidence and law support holding the Debtor accountable somehow (and imposing sanctions upon him potentially) when the

---

[248] *Pereira*, 1997 WL 698186, at *6.

Computer with his data on it was in Colorado—thousands of miles away from him in Paris at all times—and ostensibly under the control of his former assistant?

As earlier noted, the NMSIC urges the court to rule that the Debtor himself spoliated evidence by failing to preserve the Computer.  Specifically, it is argued that the Debtor either: (a) allowed his former assistant Ms. Gianardi to run a "wiping tool" on and copy massive amounts of movie files on the Computer; or (b) aided and abetted (encouraged?  instructed?) Ms. Gianardi in the use of the "wiping tool" and copying of movie files, to ensure that the deleted evidence could not be recovered from the Computer.  The court concludes that spoliation occurred here in which the Debtor had a role and for which the Debtor must be held accountable.

As earlier indicated, spoliation is the "destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[249]  A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.[250]  Once litigation is reasonably anticipated, a potential party to that litigation "must not destroy unique, relevant evidence that might be useful to an adversary."[251] This duty "arises not only during litigation but also extends to that period

---

[249] *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)); Black's Law Dictionary 1531 (9th ed. 2009); *U.S. v. Parks (In re Krause)*, 367 B.R. 740, 764 (Bankr. D. Kan. 2007) (defining spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation").

[250] *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010) (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008)); *Toth v. Calcasieu Parish*, No. 06-998, 2009 WL 528245, at *1 (W.D. La. Mar. 6, 2009) (citing *Zubulake v. UBS Warburg, L.L.C.*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)); *Krause*, 367 B.R. at 764 ("a duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation or should know that the evidence may be relevant to future litigation"); *Stillwater Liquidating LLC v. Net Five at Palm Point, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, Adv. No. 14-02245, 2017 WL 1956848, at *5 (Bankr. S.D.N.Y. May 10, 2017) ("Parties have a duty to preserve documents that they know or should know could be relevant to pending, imminent, or reasonably foreseeable litigation.").

[251] *Toth*, 2009 WL 528245, at *1 (quoting *Zubulake*, 220 F.R.D. at 216).

before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."[252]  The duty to preserve extends to the party's or potential party's employees "likely to have relevant information—the 'key players.'"[253] Additionally, "[d]ocuments are considered to be under a party's control 'if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement.'"[254]  Where a party no longer owns or controls potentially relevant evidence, the party has an obligation to provide the opposing party with notice of potentially relevant documents and information.[255]

The court concludes that, even if the Computer was not in the possession of the Debtor, he absolutely had the practical ability to obtain it from Ms. Gianardi—his close formal personal assistant (*i.e.,* a "key player" in his recent past) who had expressed in the past she would do anything for him.  The court additionally concludes that, even if the Computer was not in the possession of the Debtor, he nevertheless had a duty to inform the Trustee and/or the NMSIC of the existence of the Computer and the fact that it was likely to contain information relevant to the bankruptcy case.  Even if the Debtor was unaware of the Computer (or forgot that the Computer still existed) until ***after*** the Gianardi 2004 Examination, the Debtor had an obligation at that point forward to ensure its safekeeping and prevent the overwriting of data and the use of the wiping

---

[252] *Silvestri*, 271 F.3d at 591 (citing *Kronisch v. U.S.,* 150 F.3d 112, 126 (2d Cir. 1998)).

[253] *Toth*, 2009 WL 528245, at *1.

[254] *Ronnie Van Zant, Inc. v. Pyle*, No. 17 Civ. 3360, 2017 WL 3721777, at *8 (S.D.N.Y.  Aug. 23, 2017) (citing *In re NASDAQ Mkt. Makers Antitrust Litig.*, 169 F.R.D. 493, 530 (S.D.N.Y. 1996)).

[255] *Silvestri*, 271 F.3d at 591 ("If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation . . .") (citation omitted).

tool while the NMSIC was seeking access to the Computer. Spoliation implicates "both the duty to preserve and the breach of that duty through the destruction or alteration of the evidence."[256]

The court believes that the Debtor was fully aware that the Computer contained voluminous amounts of information relating to his personal and business finances, property, assets, and related dealings. He had every reason to know that it contained information relevant not only to the bankruptcy case, but to the Debtor's litigation with the NMSIC. He also knew or should have known that the Computer likely held evidence relevant to the investigation of the transfers between the Debtor and his father and other family members, as well as information about his IRA accounts, his hedge fund activities, and other matters relevant to an objection to exemptions. To be precise, the Debtor had multiple overlapping obligations to preserve documents relating to his finances, business dealings, and related matters going back almost a decade. Since at least 2009, the Debtor has been involved in investigations, civil litigation, and litigation with his ex-wife. All of those investigations and litigation involved, inter alia, his financial dealings and the financial dealings of his businesses. Moreover, since at least early in the Debtor's bankruptcy case, the Debtor—who was at all times represented by sophisticated bankruptcy counsel—was aware, or should have been aware, that, at a minimum, there was the material possibility that there would be litigation in the bankruptcy case relating to his previous financial dealings, transfers to his ex-wife, and transfers of money to his father and mother. Indeed, beginning at the first Section 341 Meeting of Creditors, the Trustee and the NMSIC began requesting documents and other information from the Debtor. The court did not find the Debtor's testimony to be either reliable or credible,[257] and the court fully believes that, from at

---

[256] *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 521 (D. Md. 2010).

[257] One of the consistent refrains throughout both the Gianardi 2004 Examination and the Debtor's testimony at the Combined Sanctions Hearing was some variation of "I don't remember" or "I can't recall."

least October 2016 and likely sooner, he knew that the Computer still existed and likely contained retrievable data relevant to the bankruptcy case. In fact, it strains credulity to speculate that the Debtor had absolutely nothing to do with his loyal personal assistant (who is not talking) suddenly copying useless data onto the Computer, overriding previously deleted files, at the exact moment the NMSIC and the bankruptcy Trustee were trying to obtain it—especially in light of Ms. Gianardi's history of assisting the Debtor in litigation, as demonstrated by the evidence.

The Debtor, at a minimum, failed to take the necessary steps to ensure the information on the Computer was preserved and, in fact, ***actively opposed the Trustee's and the NMSIC's efforts to recover the deleted evidence***. The Debtor paid for Ms. Gianardi to retain counsel to facilitate her ability to prevent the production and inspection of the Computer. Because of the Debtor's failure to preserve the Computer and the information it contained, virtually all of the information on the Computer has now been lost and is unrecoverable.

*(i)      Appropriate Sanctions Under Rule 37(e).*

The NMSIC has asked the court to impose sanctions on the Debtor, including, without limitation, by imposing an adverse inference with respect to a pending exemptions objection and requiring the Debtor to pay the attorneys' fees of the NMSIC and the Trustee. The NMSIC references Fed. R. Civ. Proc. 70(e) as being a potential basis for relief,[258] but then goes on to argue general case law regarding spoliation as the basis for relief.[259]

---

[258] *See* DE # 263, ¶ 3.

[259] *Id.* at ¶¶ 47-64.

As earlier noted, recently amended Rule 37(e)—which would apply to the Debtor since he has been a "party" at all times in his own bankruptcy case (and has been a party with respect to the Debtor 2004 Motion, the Motion to Compel—Computer, and the Debtor Sanctions Motion)[260]—provides that:

> (e) **Failure to Preserve Electronically Stored Information**. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>> (A) presume that the lost information was unfavorable to the party;
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>> (C) dismiss the action or enter a default judgment.[261]

To summarize, Rule 37(e) authorizes courts to issue sanctions where four conditions are met: (1) electronically stored information ("ESI") should have been preserved in the anticipation or conduct of litigation; (2) the ESI is lost; (3) the loss of the ESI is due to a party's failure to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced through additional discovery. If those four conditions are met, the next step in the inquiry is to determine whether (1) the non-offending party has been prejudiced from the loss of ESI, and/or (2) the offending party acted with the intent to deprive another party of the information's use in the litigation. If there is prejudice, Rule 37(e)(1) allows the court to "order measures no greater than necessary to cure the prejudice." But if the offending party acted with intent, Rule 37(e)(2) allows the court to (a) presume that the lost information was unfavorable to the party, (b) instruct the jury that it

---

[260] Rule 37(e) applies in bankruptcy contested matters, by virtue of Fed. R. Bankr. Proc. 7037 and 9014(c).

[261] *See* Fed. R. Civ. P. 37(e).

may or must presume the information was unfavorable, or (c) dismiss the action or enter default judgment.[262]

The ESI loss in the case at bar is not a situation of a technology upgrade resulting in an inadvertent loss of data or a routine procedure of some sort causing an unintentional loss. This was not a situation of operating systems being upgraded or periodic maintenance being performed on the Computer, and something going terribly awry. The evidence is clear that the Debtor's former, close personal assistant—at a time when she had been told that the Computer was going to be needed as part of the Debtor's bankruptcy case—suddenly filled the Computer's hard space with useless data from a wiping tool downloaded from the Internet and then copied 420 gigabytes of movie files (101 movies)—all within a one week period. Then, the personal assistant—whose legal fees are being paid by the allegedly income-less Debtor and who has a history of assisting the Debtor in litigation in the past—refused to testify about it all.

The court concludes that the data on the Computer should have been preserved by the Debtor both pursuant to his duties under sections 521(a)(3), 521(a)(4) and 542 of the Bankruptcy Code and in anticipation of litigation in the bankruptcy case regarding, among other things, his exemptions. Much of the ESI was lost. The loss was significantly due to the Debtor's failure to take reasonable steps to preserve it and likely due to his instructions to Ms. Gianardi to take the actions she did. And it appears the ESI cannot be restored or replaced through additional discovery. While the Debtor testified that he had backed-up all his documents on the Computer

---

[262] Kevin Broughel, et al., *The New Federal Rule of Civil Procedure 37(e): What Have The First Three Months Revealed?* (March 2, 2016), http://www.paulhastings.com/publication-items/details/?id=89a3e869-2334-6428-811c-ff00004cbded. It has been further noted that the idea behind recently amended Rule 37(e) "was to reserve severe sanctions for intentional spoliation," but parties still may be held accountable and imposed with sanctions if courts believe it is necessary to cure prejudice from unintended ESI loss. *See* Frank Harrison, *Potential Adverse Interest Instruction for Unintended Electronically Stored Information Spoliation May Suggest Limitations of Recently Amended Rule 37(e),* 65 THE FEDERAL LAWYER 49 (May 2018).

"to the cloud," the Debtor never produced an index or any backup documentation from the cloud to establish this. And while Ms. Gianardi testified she had made backup disks of the ESI for the Debtor, no one ever came up with those backup disks and the Debtor testified they did not exist. Thus, the four initial conditions of Rule 37(e) are met.

Next, the court also concludes that the NMSIC and the Trustee have been prejudiced from the loss of data from the Computer. They do not know what they do not know—in other words, there is no way of proving what data was covered up and irretrievably lost on the Computer due to Ms. Gianardi's actions. And neither the Debtor nor Ms. Gianardi are shedding any light on this. However, it is clear from Ms. Gianardi's Rule 2004 Examination testimony, the Skype Logs that were entered into evidence, and some of the live documents that the NMSIC did retrieve that Ms. Gianardi kept track of every detail of the Debtor's life. Thus, had the Computer not been tampered with, the Trustee and the NMSIC would have had plenty of data to piece together answers to major questions they have regarding transfers and validity of exemptions. This constitutes prejudice. Where prejudice exists, even if intent is not found, Rule 37(e)(1) allows the court to "order measures no greater than necessary to cure the prejudice."

       (ii)     *Intent and Adverse Inferences in that Regard.*

Finally, the court believes the Debtor acted with the intent to deprive the NMSIC and the Trustee the data for use in litigation. As earlier stated, it strains credulity to assume loyal Ms. Gianardi destroyed data on her own—given the past history of cooperation between these two.[263] If the Debtor had a role in this and acted with intent, Rule 37(e)(2) allows the court to presume

---

[263] Particularly since, Ms. Gianardi testified that she had spoken with the Debtor by phone on the morning of her examination and "probably" a few times about the Gianardi 2004 Examination. *Id.* at p. 9 (line 9) through p. 11 (line 13). The court has little reason to doubt that Ms. Gianardi and the Debtor have been in contact throughout this process.

that the lost information was unfavorable to the party or even dismiss an action or enter a default judgment. There is ample evidence to conclude that the Debtor had a role in this and acted with intent to keep the ESI on the Computer from the NMSIC, the Trustee, and the court. The Debtor did not reveal the existence of the Computer at his Section 341 meeting or in connection with his own Rule 2004 examination—it is hard to swallow that the Debtor forgot that his former personal assistant kept a computer that contained almost every detail of his life. Additionally, the Debtor, as mentioned, took specific actions to prevent the production of the Computer after the Trustee and the NMSIC discovered its existence. Not only did the Debtor raise his own objections to the imaging and examination of the Computer, he funded Ms. Gianardi's legal opposition as well. Moreover, because of the close connection between the Debtor and Ms. Gianardi, their respective loyalties to each other, the Debtor's influence over Ms. Gianardi, Ms. Gianardi's testimony that she has always acted at the Debtor's direction, and their admissions that they had talked a few times around the time of the Gianardi Rule 2004 Examination, the court believes that the Debtor directed Ms. Gianardi to use the wiping tool, copy the movie files or otherwise take steps to thwart the court's orders by making it impossible to recover deleted files from the Computer.

    *(iii)*    *Debtor Sanctions.*

The court will likewise impose on the Debtor a sanction of paying the NMSIC's and the Trustee's legal fees and costs—an obligation that will be joint and several with Ms. Gianardi's obligation.

Additionally, the Debtor shall either: (a) produce documents from his cloud account(s) and from disks and from USB storage that have not been previously produced and are responsive to all of the NMSIC's document request within twenty (20) days of the entry of this

Memorandum Opinion and Order, or else (b) appear and **SHOW CAUSE** why the court shall

not, as a further sanction under Rule 37(e), infer that the spoliated ESI would have been

unfavorable for the Debtor and would have established the invalidity of the exemptions he is

claiming, to which the NMSIC and the Trustee have objected. [264] The court is giving the Debtor

one more opportunity to provide the data on the Computer based on a belief that the data could

be available because of the following evidence at the Hearing:

> USB flash drives were inserted into the Computer on, *inter alia*, the following
> dates:
>
> March 14, 2016 (20 days after the Petition Date);
> October 28, 2016 (two weeks after the Gianardi 2004 Examination);
> November 27, 2016 (six weeks after the Gianardi 2004 Examination);
> February 8, 2017 (two days after the Motion to Compel-Computer was filed); and
> February 9, 2017 (three days after the Motion to Compel-Computer was filed).[265]

The court will have a follow up hearing on **September 24, 2018, at 1:30 p.m.,** at which

time the court will hear a presentation regarding attorney's fees and costs of the NMSIC and the

Trustee in this matter—which the court will review for reasonableness, so as to liquidate the

sanctions the court has herein imposed on both the Debtor and Ms. Gianardi. At such hearing,

the court will also expect a presentation as to whether the Debtor has restored or replaced or

produced somehow the documents that were on the Computer through his cloud account(s) or

disks or USBs or otherwise. If the Debtor has not, the court will, as a further sanction, fashion

an appropriate adverse interest to apply in the Exemption Objection litigation.

Based on the foregoing,

---

[264] *See* DE ## 231 & 232.

[265] Epiq Report at p. 5 (paragraph 6). There was, of course, other testimony that Ms. Gianardi and saved information on disks from time to time.

**IT IS ORDERED** that a follow-up hearing is set for **September 24, 2018, at 1:30 p.m.**, at which time the court will hear a presentation regarding attorney's fees and costs of the NMSIC and the Trustee in this matter—which the court will review for reasonableness, so as to liquidate the sanctions the court has herein imposed on both the Debtor and Ms. Gianardi.  The NMSIC and the Trustee shall file their written statements of fees and costs by <u>Monday, September 10, 2018, at 5:00 p.m. Central time.</u>  Any objection to their reasonableness shall be filed by the Debtor or Ms. Gianardi by <u>Friday, September 21, 2018, at 5:00 p.m. Central time</u>.

**IT IS FURTHER ORDERED** that within twenty (20) days of the entry of this Memorandum Opinion and Order, the Debtor shall either:  (a) produce documents from his cloud account(s) and from disks and from USB storage that have not been previously produced and are responsive to all of the NMSIC's document requests, or else (b) appear before this court on **September 24, 2018, at 1:30 p.m.,** and **SHOW CAUSE** why the court shall not, as a further sanction under Rule 37(e), infer that the spoliated ESI would have been unfavorable for the Debtor and would have established the invalidity of the exemptions he is claiming, to which the NMSIC and the Trustee have objected.

**### END OF MEMORANDUM OPINION AND ORDER ###**
