

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 19, 2019**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| MARC ANTHONY CORRERA | § | CASE NO. 16-30728-SGJ-7 |
| | § | |
| Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant

to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in contested matters by

Federal Rules of Bankruptcy Procedure 9014 and 7052.[1]

---

[1] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

## FINDINGS OF FACT

### A. Bankruptcy Proceeding

1.      Marc Anthony Correra (the "Debtor") commenced this bankruptcy case (the "Bankruptcy Case") by filing a petition for relief under chapter 7 of title 11 of the U.S. Code (the "Bankruptcy Code") on February 22, 2016 (the "Petition Date").

2.      The Debtor first filed his schedules of assets and liabilities (as amended, the "Schedules") and statement of financial affairs (as amended, the "Statements" or "SOFA") on March 14, 2016. The Debtor amended certain of the Statements and Schedules various times since March 14, 2016.

3.      On March 30, 2016, the chapter 7 trustee (the "Trustee") commenced the Bankruptcy Code § 341 meeting in this case (the "341 Meeting").

4.      The 341 Meeting was adjourned to May 4, 2016 and was concluded on that date.

### B. Relevant Evidence

5.      The Court's findings are based on the documents and information included in the New Mexico State Investment Council's (the "NMSIC") appendix [Docket No. 390] and supplemental appendix [Docket No. 417] (together, the "NMSIC Appendix") as well as the Debtor's appendix [Docket No. 413] (the "Debtor Appendix"). Included in the NMSIC Appendix was a stipulation pursuant to which the Debtor agreed to the authenticity and admissibility into evidence of substantially all of the NMSIC Appendix (*i.e.* the documents comprising NMAPP-0001 – 1007). The Debtor did not raise any objection to the consideration of the remaining documents comprising the NSMIC Appendix and the Court finds no basis to remove those documents from consideration. Similarly, NMSIC did not raise any objections to the consideration of the documents and information comprising the Debtor Appendix and the Court finds no basis to remove those documents from consideration.

**C.      The Debtor's Claimed Exempt IRAs**

6.      The Debtor's Schedule C identifies various assets as exempt (the "<u>Debtor's Claimed Exemptions</u>").  The Debtor's Claimed Exemptions comprise, *inter alia*, two accounts listed in the Debtor's Schedules as follows: (1) IRA: Interactive Brokers valued at $936,677.00 as of 2/1/16 (the "<u>Interactive IRA</u>") and (2) IRA: Phoenix Financial valued at $1,910,800.00 as of 12/31/15 (the "<u>Phoenix IRA</u>"), both of which the Debtor claims as exempt pursuant to Texas Property Code § 42.0021 (collectively, the "<u>IRAs</u>").

**D.      The New Mexico State Investment Counsel's Status and Involvement in the Case**

7.      The New Mexico State Investment Council (the "<u>NMSIC</u> ") is a State of New Mexico government entity responsible for investing certain public trust funds.  The NMSIC has, since the year 2011, been engaged in certain "pay-to-play" litigation against the Debtor, his father, and others. The "pay-to-play" litigation has yet to go to trial.  In the "pay-to-play" litigation, the NMSIC has alleged that the Debtor, through his father Anthony Correra—who was a close friend and political ally of former Governor of New Mexico Bill Richardson—developed business and social relationships with an individual named Gary Bland ("<u>Bland</u>"), who for many years served as the New Mexico State Investment Officer and as a member of the NMSIC. It is alleged that the Debtor exploited his relationship with Bland and others to obtain millions of dollars in fees from investment managers willing to pay for his influence—and his father's—in their pursuit of investments from the NMSIC in their hedge funds, private equity funds, etc.  The Debtor has allegedly admitted that, during Bland's tenure, he received more than $18 million in fees, directly or indirectly, from fund managers, investment advisors and other service providers doing business with the NMSIC. Through the "pay-to-play" litigation, the NMSIC is asserting claims against the Debtor for, *inter alia*, aiding and abetting Bland's breach of his fiduciary duties and unjust enrichment in connection with the actions taken by the Debtor.

8.      The NMSIC has been actively involved in the Debtor's case since at least March 2016 when it appeared through its counsel at the 341 Meeting.  In April 2016, NMSIC filed a motion to lift the automatic stay to allow it to continue pursuing the "pay-to-play" litigation [Docket No. 39].  In the Debtor's response to the lift stay motion [Docket No. 50] and in his related declaration the Debtor acknowledged the existence of NMSIC's suit and acknowledged that the "pay-to-play" litigation was one of the factors that lead to the Debtor's decision to file a bankruptcy petition.  The court granted NMSIC's lift stay motion authorizing it to liquidate its claims against the Debtor [Docket No. 75].  On January 31, 2017, NMSIC filed a proof of claim in the Claims Register asserting claims against the Debtor relating to, inter alia, the "pay-to-play" litigation. The Debtor has not filed an objection to NMSIC's proof of claim.

9.      In addition to filing a motion to lift the stay, NMSIC has filed motions seeking authority to obtain Bankruptcy Rule 2004 discovery from the Debtor, the Debtor's former assistant, the Debtor's accountant, and the Debtor's father [Docket Nos. 107, 108, 109, 151]. NMSIC also filed a motion seeking to compel the Debtor's former assistant to produce a computer [Docket No. 202] that she testified in her Rule 2004 examination was her work computer during her time working for the Debtor and ultimately filed a motion seeking the imposition of sanctions against the Debtor and his former assistant for spoliation in connection with actions taken with respect to the computer.

10.      The Debtor never raised any objection to NMSIC's standing as a creditor or party-in-interest to his chapter 7 case in any pleading or hearing prior to October 1, 2018 when the Debtor filed his response to NMSIC's Amended MSJ (defined below).

**E.    The Objection to Exemptions and the Procedural Posture of NMSIC's Partial Motion for Summary Judgment**

11.    On March 31, 2017, NMSIC filed its objection to certain of the Debtor's Claimed Exemptions [Docket No. 231].   On February 23, 2018, NMSIC filed a motion for partial summary judgment in connection with its objection to exemptions [Docket Nos. 260, 261, 262]. Pursuant to this Court's scheduling order entered on June 26, 2018 [Docket No. 345], NMSIC filed its amended motion for summary judgment on September 6, 2018 [Docket Nos. 388, 389, 390] (the "Amended MSJ").

12.    The Debtor filed his response to the Amended MSJ on October 1, 2018 [Docket No. 413] (the "Debtor's MSJ Response").  In the Debtor's MSJ Response, the Debtor for the first time raised an objection to NMSIC's standing and asserted that for the NMSIC to have standing in the context of a motion for summary judgment that NMSIC was required to show that no genuine dispute of material fact existed with respect to the claims NMSIC was asserting against the Debtor through NMSIC's proof of claim.

13.    On October 11, 2018, NMSIC filed its reply to the Debtor's response [Docket Nos. 416, 417] (the "NMSIC MSJ Reply").

14.    The Court originally set a hearing on the Amended MSJ for November 14, 2018. However, at a scheduling conference on October 23, 2018 the parties agreed to continue the November 14 hearing for approximately 30 days and the Court subsequently set a continued hearing date of December 19, 2018.  The hearing was subsequently rescheduled to January 22, 2019.  At the October 23, 2018 hearing the Court also granted a pending motion filed by the Debtor's counsel, Hunton Andrews Kurth LLP requesting authorization to withdraw as the Debtor's counsel.

15.    The Court held a hearing on the Amended MSJ on January 22, 2019.  NMSIC and the Trustee's counsel appeared at the hearing for argument on the Amended MSJ.  Neither the Debtor nor a lawyer representing the Debtor appeared at the hearing.  Nevertheless, the Court considered the arguments raised by the Debtor through his counsel in the Debtor's MSJ Response.  NMSIC proceeded with its argument and the Court issued an oral ruling granting the Amended MSJ.

**F.    The Source of Assets in the Interactive IRA and the Phoenix IRA**

16.    The Debtor opened the Interactive IRA in January 2013 and opened the Phoenix IRA in July 2013.  However, prior to opening the Interactive IRA and the Phoenix IRA, the Debtor opened and closed a number of IRAs.  The contribution history produced by the Debtor (the "IRA History"), together with numerous account statements included in the NMSIC Appendix trace the flow of funds amongst the Debtor's various predecessor IRAs during the relevant time period between August 1, 2003 and the Petition Date.  The foregoing documents show that on August 1, 2003, the Debtor had a single IRA (the "BOA IRA") which was administered by Bank of America ("BOA").  The NMSIC Appendix Documents further show that between 2003 and the Petition Date, the Debtor opened a number of additional IRAs, including the following: (i) in 2005 an IRA administered by Millennium Trust or its predecessor (the "Millennium Trust IRA"); (ii) in 2007 an IRA administered by Merlin Securities (subsequently Wells Fargo) (the "Merlin IRA"); (iii) in 2013 the Interactive IRA; and (iv) in 2013 the Phoenix IRA.

17.    The account statements and related documents in the NMSIC Appendix also show that between August 1, 2003 and the Petition Date, the Debtor made the following new contributions to his IRAs totaling $264,000:

| Date | Contribution Amount | IRA |
|------|---------------------|-----|
| 4/21/2005 | $41,000 | BOA IRA |
| 04/18/2006 | $42,000 | BOA IRA |
| 4/17/2007 | $44,000 | BOA IRA |
| 10/14/2008 | $45,000 | Merlin IRA |
| 04/15/2009 | $46,000 | Merlin IRA |
| 10/12/2010 | $46,000 | Merlin IRA |

18. All of the assets in the Interactive IRA and the Phoenix IRA on the Petition Date are indirect proceeds of either (a) the BOA IRA funds held by the Debtor on August 1, 2003 or (b) contributions made by the Debtor between 2005 and 2010. All of the funds in the Merlin IRA were transferred to the Merlin IRA from either (x) the BOA IRA, (y) the Millennium IRA, or (z) the contributions made by the Debtor between 2008 and 2010. All of the assets in the Interactive IRA and the Phoenix IRA are from the Merlin IRA or the proceeds of the Merlin IRA. Since the 2010 contribution to the Merlin IRA, the Debtor has not made any contributions to any of his IRAs.

**G.     The Debtor's IRA Withdrawals**

19. In the Debtor's affidavit in support of his objection to the NMSIC's motion to lift the automatic stay, the Debtor stated that between 2013 and 2014 the Debtor "withdrew a net $422,500 from my exempt SEP-IRA account to cover my expenses."

**H.     The Debtor's Hedge Fund**

20. NMSIC and the Trustee allege that the Interactive IRA and the Phoenix IRA are not exempt due to prohibited transactions that occurred between predecessor IRAs and certain entities controlled by the Debtor. During the Debtor's 2004 examination, the Debtor referred to those entities collectively as a "hedge fund."

21. In 2003 the Debtor and two partners, Aaron Wang ("Wang") and Steven Linn ("Linn"), formed the following three entities that comprised the Debtor's hedge fund: L2 Capital

Partners, L.P. ("L2 Partners"); L2 Capital Management, LLC ("L2 Management"); and L2 Investment Advisers, LLC ("L2 Advisers").    According to the L2 Management Operating Agreement, L2 Management had three members: the Debtor, Aaron Wang, and Steven Linn. The the Debtor owned 60% of the membership interests in L2 Management making him a "majority member".    The Debtor was also the sole manager of L2 Management.    The L2 Advisers Operating Agreement and the L2 Advisers K-1s showed that the Debtor also owned a 60% membership interest in L2 Advisers, was the "majority member" of L2 Advisers, and was L2 Advisers' sole manager.    The Court finds that at all times between August 2003 and March 2008 the Debtor owned not less than 60% of the membership interests in L2 Management and L2 Advisors and that during that same period the Debtor was the majority member of both entities and the sole manager of both entities.

22.    The L2 Partners partnership agreement (the "L2 Partnership Agreement"), the L2 Partners private placement memorandum, and a related investor presentation, described L2 Partners as a limited partnership used by the Debtor and his partners to raise and invest capital. L2 Management was the general partner of L2 Partners and L2 Advisers was the investment manager for L2 Partners.    L2 Partners was required to pay fees to L2 Advisers in exchange for investment and management services.

I.    **The Hedge Fund Investors**

   (i)    *L2 Partners Investors in 2003*

23.    The L2 Partners 2003 K-1s and the L2 Partners 2003 tax return confirm that the Debtor, L2 Management, and the BOA IRA were the three initial investors in L2 Partners and the only investors during 2003.    The Debtor's initial investment was $1.5 million, while L2 Management's initial investment was $1,000.    In August of 2003, the Debtor transferred $500,000 from the BOA IRA to L2 Partners in exchange for partnership units in L2 Partners.

Therefore, in 2003, 100% of the equity interests in L2 Partners were owned by the Debtor and entities that he directly controlled.

24. The Court finds that, based on the L2 Partners 2003 K-1s and the L2 Partners 2003 tax return, the ownership of L2 Partners in 2003 was as reflected in the table below:

| Investor/Partner | 2003 Investment | Ending Capital Account | Ownership %[2] |
|---|---|---|---|
| Marc Correra (Individually) | $1,500,000 | $1,740,863 | 74.962% |
| Marc Correra (BOA IRA) | $500,000 | $548,878 | 24.987% |
| L2 Management | $1,000 | $1,160 | 0.049% |
| **TOTAL** | **$2,100,000** | **$2,290,901** | **100.00%** |

### *(ii)* *L2 Partners Investors in 2004*

25. The L2 Partners 2004 K-1s and the L2 Partners 2004 tax return show that three new investors purchased partnership units in L2 Partners in 2004: (i) an IRA owned by Anthony Correra invested $1,000,000; (ii) George Corey invested $500,000; and (iii) Vivian Wang invested $100,000. The Debtor also invested an additional $550,000 individually in L2 Partners in 2004. Anthony Correra is the Debtor's father.

26. The Court finds that, based on the L2 Partners 2004 K-1s and the L2 Partners 2004 tax return, the ownership of L2 Partners in 2004 was as reflected in the table below:

| Investor/Partner | 2004 Investment | Ending Capital Account | Ownership %[3] |
|---|---|---|---|
| Marc Correra (Individually) | $550,000 | $2,500,538 | 51.585% |
| Marc Correra (BOA IRA) | $0 | $625,282 | 12.359% |
| L2 Management | $0 | $14,396 | 0.026% |
| Anthony Correra (IRA) | $1,000,000 | $990,236 | 22.517% |
| George Corey | $500,000 | $551,086 | 11.258% |
| Vivian Wang | $100,000 | $101,211 | 2.251% |
| **TOTAL** | **$2,150,000** | **$4,782,749** | **100.00%** |

---

[2] As reflected in the applicable 2004 K-1s.
[3] As reflected in the applicable 2004 K-1s.

### (iii) L2 Partners Investors in 2005

27.   The L2 Partners 2005 K-1s and the L2 Partners 2005 tax return show that no new investments were made in L2 Partners in 2005. Statements from the BOA IRA and the Millennium Trust IRA show that in June 2005 the Debtor transferred the BOA IRA's partnership units in L2 Partners from the BOA IRA to the Millennium Trust IRA.

28.   The Court finds that, based on the L2 Partners 2005 K-1s and the L2 Partners 2005 tax return, the ownership of L2 Partners in 2005 was as reflected in the table below:

| Investor/Partner | 2005 Investment | Ending Capital Account | Ownership %[4] |
|---|---|---|---|
| Marc Correra (Individually) | $0 | $2,390,224 | 52.282% |
| Marc Correra (BOA IRA) | $0 | $597,697 | 13.073% |
| L2 Management | $0 | $13,761 | 0.300% |
| Anthony Correra (IRA) | $0 | $937,122 | 20.704% |
| George Corey | $0 | $521,528 | 11.522% |
| Vivian Wang | $0 | $95,781 | 2.116% |
| TOTAL | $0 | $4,556,113 | 100% |

### (iv) L2 Partners Investors in 2006

29.   The L2 Partners 2006 K-1s and the L2 Partners 2006 tax return show that in 2006 Maureen and Armand Fabiano (together, the "Fabianos") invested $200,000 in L2 Partners.

30.   The Court finds that, based on the L2 Partners 2006 K-1s and the L2 Partners 2006 tax return, the ownership of L2 Partners in 2006 was as reflected in the table below:

| Investor/Partner | 2006 Investment | Ending Capital Account | Ownership %[5] |
|---|---|---|---|
| Marc Correra (Individually) | $0 | $3,380,290 | 51.185% |
| Marc Correra (BOA IRA) | $0 | $845,273 | 12.799% |
| L2 Management | $0 | $105,776 | 1.601% |
| Anthony Correra (IRA) | $0 | $1,249,668 | 18.923% |
| George Corey | $0 | $694,378 | 10.514% |
| Vivian Wang | $0 | $127,529 | 1.931% |
| Fabianos | $200,000 | $201,029 | 3.044% |
| TOTAL | $200,000 | $6,603,943 | 100.00% |

---

[4] As reflected in the applicable 2005 K-1s.
[5] As reflected in the applicable 2006 K-1s.

*(v)* ***L2 Partners Investors in 2007***

31.     The L2 Partners 2007 K-1s and the L2 Partners 2007 tax return show that no new investments were made in L2 Partners in 2007.  The L2 Partners 2007 K-1s and the L2 Partners 2007 tax returns show that L2 Partners was liquidated and that its assets were distributed to the partners in 2007.  However, the L2 Partners bank statements show that the L2 Partners distributions did not occur until January and February of 2008.  The documents show that in mid-2007 Maureen and Armand Fabiano (together, the "Fabianos") withdrew their investment in L2 Partners.

32.     The Court finds that, for purposes of determining the ownership of L2 Partners in 2007, the amount identified in the "Withdrawals & Distributions" line-item in Part II L of each applicable K-1 is the appropriate amount for purposes of determining the ending capital account of each partner, except that with respect to the Fabianos, who withdrew their capital earlier in the year, the amount is zero and the amount withdrawn is listed as a negative number in the 2007 Investment column.  The ownership percentage is based on the Court's own calculation of the relative percentages based on the amounts included in the Ending Capital Account column.

33.     Based on the L2 Partners 2007 K-1s and the L2 Partners 2007 tax return, and the Court's modifications described above, the Court finds that the ownership of L2 Partners in 2007 was as reflected in the table below:

| Investor/Partner | 2007 Investment | Ending Capital Account | Ownership %[6] |
|---|---|---|---|
| Marc Correra (Individually) | $0 | $3,340,493 | 52.820% |
| Marc Correra (BOA IRA) | $0 | $835,325 | 13.208% |
| L2 Management | $0 | $106,683 | 1.687% |
| Anthony Correra (IRA) | $0 | $1,222,652 | 19.333% |
| George Corey | $0 | $694,378 | 10.980% |
| Vivian Wang | $0 | $124,771 | 1.973% |
| Fabianos | -$205,093 | $0 | 0% |
| TOTAL | -$205,093 | $6,324,302 | 100.00% |

## J.  Distributions to L2 Management and L2 Advisers

34.  The L2 Partnership Agreement provided for payment of annual management fees to L2 Advisers.  As evidenced by corresponding bank statements, wire instruction letters, and wire confirmations, L2 Advisers and L2 Management received not less than $196,161.46 in distributions and fees from L2 Partners between July 2004 and February 2007.  The Court finds that L2 Partners transferred the amounts shown in the table below to L2 Advisers or L2 Management, as applicable, on the dates identified:

| Transfer Amount | Date of Transfer | Entity Receiving Transfer |
|---|---|---|
| $3,482.26 | 07/28/2004 | L2 Advisers |
| $11,330.17 | 05/24/2005 | L2 Advisers |
| $3,883.19 | 10/21/2005 | L2 Advisers |
| $23,688.00 | 09/12/2005 | L2 Advisers |
| $3,605.07 | 08/05/2005 | L2 Advisers |
| $4,916.46 | 07/25/2006 | L2 Advisers |
| $15,000.00 | 05/04/2006 | L2 Advisers |
| $4,269.00 | 04/28/2006 | L2 Advisers |
| $3,886.08 | 02/03/2006 | L2 Advisers |
| $5,681.51 | 02/01/2007 | L2 Advisers |
| $5,894.39 | 04/25/2007 | L2 Advisers |
| $5,309.84 | 07/05/2007 | L2 Advisers |
| $5,215.49 | 10/19/2007 | L2 Advisers |
| $100,000.00 | 02/22/2007 | L2 Management |
| $196,161.46 | TOTAL | |

---

[6] As calculated by the Court.

35.     The Court also finds, based on a wire instruction letter and certain related bank statements, that L2 Management also received a distribution of $7,386.54 in January 2008.

**K.     Distributions to Investors**

36.     In its 2007 Tax Return, L2 Partners reported distributions to investors in the following amounts:

| Investor | Distribution |
|---|---|
| Anthony Correra IRA | $1,222,652 |
| Marc Correra (Individually) | $3,340,493 |
| Debtor's IRA | $835,325 |
| L2 Management | $106,683 |
| Fabianos | $205,093 |
| Wang | $124,771.31 |
| George Corey | $679,368 |
| **Total Returns** | **$6,514,385** |

37.     Notably, the L2 Partners bank statements and related wire instruction letters show that most of the distributions reported in the 2007 Return were actually distributed in 2008. The table below illustrates what the L2 Partners bank account statements show were the distributions from the L2 Partners bank account to the various investors in L2 Partners in 2008:

| Investor | Amount Returned | Return Date |
|---|---|---|
| Anthony Correra | $1,222,652.41 | 1/7/2008 & 1/22/2008 |
| Marc Correra (Individually) | $3,340,493.16 | 1/24/2008 |
| BOA IRA (Debtor's IRA) | $845,750.39 | 1/24/2008 |
| L2 Management | $7,386.54 | 1/29/2008 |
| Wang | $124,771.31 | 1/17/2008 |
| Phase3 | $680,067.49 | 1/14/2008 |
| **Total Returns** | **$6,221,121.30** | |

38.     The Court finds that the transfers as shown in the L2 Partners bank account statements and related documents, and reflected in the table above, occurred as described in the L2 Partners bank account statements.

## CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

39.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

40.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.     NMSIC Has Standing to Object to the Debtor's Exemptions**

41.     There is no requirement in the Bankruptcy Code or the Bankruptcy Rules that a person objecting to a debtor's exemptions must hold a claim against the debtor's estate. Both Bankruptcy Code § 522(l) and Bankruptcy Rule 4003(b)(1) provide that any party-in-interest may object to a debtor's claimed exemptions. Given NMSIC's extensive involvement in the case and the matters asserted in NMSIC's proof of claim, the Court concludes that NMSIC is a party-in-interest in the Debtor's chapter 7 case and therefore has standing to object to the Debtor's exemptions.

42.     Even if the Bankruptcy Code and/or Bankruptcy Rules required creditor status for parties seeking to object to a debtor's exemptions, NMSIC would have standing to object to the Debtor's exemptions because NMSIC holds claims against the Debtor and is therefore a creditor. Moreover, a creditor seeking summary judgment in connection with a matter that requires creditor status for standing is not required to show that, with respect to the claim underlying such creditor's creditor status, no genuine issue of material fact exists with respect to such claim or that the creditor is entitled to judgment as a matter of law with respect to such claim.

**C.     The Debtor's Request to Defer or Abate Consideration of the Motion for Summary Judgment is Denied**

43.     In the Debtor's MSJ Response, the Debtor, relying on Federal Rule of Civil Procedure 56(d)(1) and/or (3), requested that the Court defer or abate consideration of the

Amended MSJ to "afford [the Debtor] the opportunity to pursue his statutory rights to seek a retroactive exemption from the United States Department of Labor" with respect to any alleged prohibited transactions. *See* Debtor's MSJ Response ¶ 52.

44.     Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may…(1) defer considering the motion…[or] (3) issue any other appropriate order."

45.     The Debtor did not include "an affidavit or declaration" presenting essential facts in support of the Debtor's request as required by Rule 56(d). The requirement of an affidavit or declaration is not a mere technicality and the Debtor's failure to comply with that requirement is grounds by itself to deny the Debtor's motion to abate or defer consideration.

46.     Even if the Debtor had provided an affidavit or declaration, the affidavit or declaration would need to address why the Debtor has not previously requested authorization to seek an exemption. NMSIC first filed its objection to exemptions on March 31, 2017. The Debtor therefore knew of the potential prohibited transactions for, at least, 18 months before he filed the Debtor's MSJ Response. In the absence of an affidavit or declaration explaining why the Debtor chose not to seek the relief he is now requesting during the past 18 months, the Court sees no basis for granting the Debtor's request to abate or defer consideration of the Amended MSJ. The Debtor's request is therefore denied.

**D.     Summary Judgment Standard**

47.     "Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *see also* Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. An issue is only material if its resolution could affect the outcome of the adversary proceeding. *Wyatt v. Hunt*

*Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002). Further, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### *(i)* **There are no disputes over material facts.**

48. In the Debtor's MSJ Response, the Debtor did not raise any evidentiary objections to the documents and evidence included in the NMSIC Appendix. Moreover, included in the NMSIC Appendix was a stipulation pursuant to which the Debtor agreed to the authenticity and admissibility into evidence of substantially all of the NMSIC Appendix (*i.e.* the documents comprising NMAPP-0001 – 1007). The Debtor did not raise any objection to the consideration of the remaining documents comprising the NSMIC Appendix and the Court finds no basis to remove from consideration those documents. Similarly, NMSIC did not raise any objections to the consideration of the documents and information comprising the Debtor Appendix and the Court finds no basis to remove from consideration those documents.

### E. **The IRAs Are Not "*Qualified Accounts*" and Are Therefore Not Entitled to an Exemption under Bankruptcy Code § 522 or Texas Property Code § 42.0021**

49. Bankruptcy Code § 522(b) allows a debtor to exempt various types of property from being property of the estate. Bankruptcy Code § 522(b) includes a "federal exemption scheme", but also allows states to "opt out" of the federal exemption scheme. The Debtor cites Texas Property Code § 42.0021 as the basis for the IRAs' exempt status. Because Texas is an "opt out" state, its law governs whether the Debtor's interest in the IRAs are exempt. Texas Property Code § 42.0021 provides that an IRA is exempt from attachment, execution, or other seizure, but only if the IRA is "qualified" under the Internal Revenue Code. Tex. Prop. Code § 42.0021; *see also* 11 U.S.C. § 522(b) (incorporating state law exemptions into bankruptcy proceedings). Texas law requires an exemption claimant to prove that the property claimed as

exempt actually qualifies for the Internal Revenue Code exemption. *See In re Foster*, 360 B.R. 210, 214 (Bankr. E.D. Tex. 2006).

50.     An IRA is qualified if it is exempt from taxation under IRC § 408. While an IRA is presumed to have a favorable determination from the IRS, parties may present evidence to establish that the IRA was improperly operated under applicable IRC provisions, thereby disqualifying the IRA funds from exempt status under either Bankruptcy Code § 522 or § 42.0021 of the Texas Property Code. *In re Plunk v. Yaquinto (In re Plunk)*, 481 F.3d 302 (5th Cir. 2007). A bankruptcy court is not bound by the presumption or even a previous IRS determination and is permitted to reach an independent decision regarding the IRA's qualified status. *Id.; In re Willis*, No. 07-11010-BKC, 2009 WL 2424548 at *6 (Bankr. S.D. Fla. Aug. 6, 2009). Accordingly, if a disqualifying event occurs, a court may, under Texas Property Code § 42.0021, determine that the IRA is no longer qualified based on those events. *In re Plunk*, 481 F.3d at 307.

51.     Whether an IRA is exempt from claims of a debtor's estate depends on, *inter alia*, whether the IRA engaged in or otherwise has been the subject of prohibited transactions pursuant to 26 U.S.C. § 4975 (hereinafter "IRC § 4975").  By engaging in prohibited transactions, an IRA loses its tax-exempt status within the meaning of 26 U.S.C. § 408 (hereinafter, "IRC § 408"). An IRA that has lost its tax-exempt status by engaging in prohibited transactions is not entitled to an exemption under Bankruptcy Code § 522 and/or Texas Property Code § 42.0021.

F.      **The IRAs or Their Predecessors Engaged in Prohibited Transactions**

52.     Under IRC § 408(e)(2)(A), if a plan "engages in any transaction prohibited by section 4975," the plan ceases to qualify as an individual retirement account as of the first day of

such taxable year. 26 U.S.C. § 408(e)(2)(A).[7] "Plan" is defined in IRC § 4975(e) as, *inter alia*, "an individual retirement account described in section 408(a)."[8] IRC § 4975 prohibits "plans" from engaging in certain defined prohibited transactions. Therefore, an IRA that engages in a transaction prohibited by IRC § 4975 loses its qualified status and therefore its Bankruptcy Code § 522 exemption. *See In re Hughes*, 293 B.R. 528 (M.D. Fla. 2003); *In re Sutton-Robinson*, 472 B.R. 77, 85 (Bankr. D. Ariz. 2012).

53. Under IRC § 4975(c), the term "prohibited transaction" means "**any direct or indirect**":

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

(B) lending of money or other extension of credit between a plan and a disqualified person;

(C) furnishing of goods, services, or facilities between a plan and a disqualified person;

---

[7] 26 U.S.C. § 408(e) provides as follows:

**(e) Tax treatment of accounts and annuities**
**(1) Exemption from tax**
Any individual retirement account is exempt from taxation under this subtitle unless such account has ceased to be an individual retirement account by reason of paragraph (2) or (3). Notwithstanding the preceding sentence, any such account is subject to the taxes imposed by section 511 (relating to imposition of tax on unrelated business income of charitable, etc. organizations).
**(2) Loss of exemption of account where employee engages in prohibited transaction**
**(A) In general** If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. For purposes of this paragraph—
(i) the individual for whose benefit any account was established is treated as the creator of such account, and
(ii) the separate account for any individual within an individual retirement account maintained by an employer or association of employees is treated as a separate individual retirement account.
**(B) Account treated as distributing all its assets**
In any case in which any account ceases to be an individual retirement account by reason of subparagraph (A) as of the first day of any taxable year, paragraph (1) of subsection (d) applies as if there were a distribution on such first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day).

[8] The Court finds that each of the IRAs meets the definition of an individual retirement account under IRC § 408 and that the IRAs, and their predecessors, were "plans" for purposes of IRC § 4975.

(D)    transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

(E)    act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own accounts; or

(F)    receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1) (emphasis added).

54.    A prohibited transaction is any transaction meeting the requirements of IRC § 4975(c), whether direct or indirect. A transaction may be a prohibited transaction if either (a) the transaction occurs directly between the IRA itself and the disqualified person or (b) the transaction does not directly involve the disqualified person, but results, either directly or indirectly, in some benefit to, transfer to, use by, or receipt by a disqualified person of either the income or assets of the plan or some other benefit as a result of the transaction.

*(i)*    ***The Debtor, His Father, L2 Partners, L2 Management, and L2 Advisers are Each Disqualified Persons with Respect to the IRAs and Their Predecessors***

55.    IRC § 4975(e)(2) identifies several classes of "disqualified persons." Disqualified persons include, fiduciaries (as defined below), persons providing services to the plan, officers and directors of an entity that is a disqualified person, and family members of any disqualified person.

56.    **The Debtor is a Fiduciary of the IRAs**. A "fiduciary" is defined as any person who:

a.    exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

      b. renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

      c. has any discretionary authority or discretionary responsibility in the administration of such plan.

IRC § 4975(e)(3). The owner of an IRA that manages the investments in the account is a fiduciary and a disqualified person with respect to the owner's IRA for purposes of IRC § 4975(e). *See Flahertys Arden Bowl, Inc. v. Comm'r*, 115 T.C. 269, 273 (2000) (stating that an individual is a fiduciary because "he directs the management of the plans' assets…."); *Harris v. Comm'r*, 1994 WL 12316, at *1 (T.C. Jan. 19, 1994) ("[t]he owner of an IRA account is considered a 'disqualified person….'").

    57.    In his Rule 2004 Examination, the Debtor testified that he was the person that directed and managed the investments in his IRAs and the predecessors to the IRAs. *See* Appendix NMAPP-0982 to 0989; NMAPP-0978 to 0981. In the subscription documents pursuant to which the BOA IRA invested in L2 Partners, which were signed by the Debtor, the Debtor affirmed that he had "sole and absolute discretion to make investment decisions on behalf of the IRA and assumes full responsibility for such investment decisions." *See* Appendix NMAPP-0959. Therefore, the Debtor is a fiduciary, and thus a disqualified person, for purposes of IRC § 4975(e)(2) with respect to the IRAs and their predecessors.

    58.    **Anthony Correra (the Debtor's Father) is a Disqualified Person**. IRC § 4975(e)(2)(F) provides that "a member of the family" of a fiduciary is a disqualified person. IRC § 4975(e)(6) provides that "[f]or purposes of paragraph (2)(F), the family of any individual shall include his spouse, ancestor, lineal descendant, and any spouse of a lineal descendant." Anthony Correra is the Debtor's father and is thus an "ancestor" of the Debtor. As an ancestor of the Debtor, Anthony Correra is a disqualified person for purpose of IRC § 4975.

59. **L2 Management and L2 Advisers are Disqualified Persons**. The term "disqualified person" under IRC § 4975(e)(2) also includes "a corporation, partnership, or trust or estate of which (or in which) 50% or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, or (ii) the capital interests or profits interest of such partnership…is owned directly or indirectly, or held by" *inter alia*, a "fiduciary", "a person providing services to the [IRA]", "an employer any of whose employees are covered by the [IRA]". *See* IRC § 4975(e)(2)(G).

60. The Debtor owned 60% of the membership interests in both L2 Advisers and L2 Management. He was also the sole manager of each. Because (i) the Debtor is or was a fiduciary of the IRAs and their predecessors, and (ii) because the Debtor owned more than 50% of the capital and the voting rights of L2 Advisers and L2 Management, both L2 Advisers and L2 Management are disqualified persons under IRC § 4975(e)(2)(G).

61. **L2 Partners is a Disqualified Person**. In 2003, the Debtor individually and L2 Management owned 100% of the partnership interests in L2 Partners not owned by the BOA IRA. The Debtor's 2004 K-1 from L2 Partners shows that at the end of 2004 the Debtor individually owned over 51% of the capital interests and partner interests in L2 Partners. The Debtor's 2005 K-1 from L2 Partners shows that at the end of 2005 the Debtor individually owned over 52% of the capital interests in L2 Partners. The Debtor's 2006 K-1 from L2 Partners shows that at the end of 2006 the Debtor individually owned over 51% of the capital interests in L2 Partners. The L2 Partners 2007 Tax Return shows that of total distributions of $6,514,385 made in 2007, the Debtor individually received $3,340,493, which amounts to more than 51% of the total capital distributions from L2 Partners. Because the Debtor individually owned more

than 50% of the capital and/or partner interests in L2 Partners from 2003 through 2007, L2 Partners is a disqualified person.

### (ii)    The "Plan Asset Rule," Applies to L2 Partners

62.    The "plan asset" rule is contained in 29 C.F.R. 2510.3-101 and applies to IRC § 4975 (the "Plan Asset Rule").  Rule 2510.3-101 provides that where more than 25% of the total equity interests in a non-operating company (such as a hedge fund) are owned by one or more benefit plans (including IRAs),[9] then the assets of the underlying non-operating company are treated as "plan assets" – i.e. as the assets of the IRA.  While the application of the Plan Asset Rule is somewhat technical, the basic premise of the Plan Asset Rule is not – if the Plan Asset Rule applies to an entity, the transfers by that entity are treated as if they were transfers from the applicable IRA itself.

63.    Persons who exercise control over an entity to which the Plan Asset Rule applies are considered fiduciaries of the IRA or other plan that holds an investment in the entity and are therefore disqualified persons.  See 29 CFR 2510.3-101(a)(2) ("any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.").

64.    The two primary inquiries in determining whether the Plan Asset Rule applies to an entity are (i) whether the entity in which the IRA has invested is an "operating company" and (ii) whether "benefit plan investors" have a "significant" equity participation in the entity. Rule 3-101(a)(2) provides that:

---

[9] Rule 3-101 applies to "benefit plan investors". A benefit plan investor includes "any plan described in section 4975(e)(1) of the Internal Revenue Code" which includes IRAs.

when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that -

(i) The entity is an operating company, or

(ii) Equity participation in the entity by benefit plan investors is not significant.

Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

29 CFR 2510.3-101(a)(2). Where neither exception in sub-part (i) or (ii) of Rule 3-101(a)(2) are met with respect to an investment by an IRA in a company (i.e. the company is not an operating company and the equity ownership of the IRA in the company is significant), the Plan Asset Rule applies to all of the underlying assets of that company. This means that the assets of the company must be treated as if they were the assets of the IRA (the plan) itself when analyzing whether a prohibited transaction has occurred. Therefore, if a transfer is made by such a company, the transfer is treated as if it were a transfer from the IRA itself. In other words, if the person receiving the transfer is a disqualified person *vis-à-vis* the applicable IRA, the transfer from the company to that person is a prohibited transaction for purposes of IRC § 4975.

65. **Plan Asset Rule Analysis Part 1: Whether the Entity in Question is an "Operating Company."** The Plan Asset Rule distinguishes between an IRA investment in an operating company vs. an investment in a non-operating company. An operating company is defined in Rule 3-101(c) as:

an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" includes an entity which is not described in the

preceding sentence, but which is a "venture capital operating company" described in paragraph (d) or a "real estate operating company" described in paragraph (e).

29 C.F.R. 2510.3-101(c). To qualify as an operating company, the company must be "primarily engaged… in the production or sale of a product or service other than the investment of capital." *Id.* A company, such as a hedge fund, that engages primarily in investing its own capital in public or private securities is not an operating company.

66. **Plan Asset Rule Analysis Part 2: Whether the IRA's Investment in the Entity in Question is "Significant."** An investment is significant for purposes of the Plan Asset Rule if "25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors." *Id.*[10] An IRA qualifies as a benefit plan. Further, when determining the percentage ownership of "benefit plan investors", the ownership of certain persons must not be included in the calculation. For example, (a) the equity interests of persons with "discretionary authority or control" of the assets of the entity in which the IRA has invested, and (b) the equity interests of any affiliates of such persons must not be included in the "significance" calculation. *See* 29 C.F.R. 2510.3-101(f)(1) ("the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.").[11]

---

[10] *See* 29 CFR 2510.3-101(f)(1). "Equity participation in an entity by benefit plan investors is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors (as defined in paragraph (f)(2)). For purposes of determinations pursuant to this paragraph (f), the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded."

[11] For purposes of 29 CFR 2510.3-101(f)(1), "[a]n "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. For purposes of this paragraph (f)(3), 'control', with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person." 29 CFR 2510.3-101(f)(3).

67.     Therefore, an IRA's investment in an entity is "significant" if the IRA holds 25% or more of any class of equity interests in that entity.   In calculating the IRA's percentage ownership in the entity, the ownership interests of the following parties must not be included in the calculation: (a) persons with discretionary authority or control over the entity and (b) the affiliates of any such persons with discretionary authority or control over the entity.

68.     **L2 Partners Is Not an Operating Company.** As a "hedge fund", L2 Partners was strictly an investment company. L2 Partners did not own or operate any businesses, but rather was strictly engaged in the purchase and sale of securities with the funds invested by its limited partners.   The L2 Partners subscription documents and private placement memorandum conclusively confirm that L2 Partners was not an operating company. For example, in the Private Placement Memorandum, L2 Partners is described as "a Delaware limited partnership that seeks to generate high returns by pursuing a quantitative investment model that primarily invests in equity securities of U.S. Businesses."   A limited partnership that invests primarily in debt and equity securities of companies for which it does not perform any management functions is a prototypical example of a non-operating company as it does not engage in "the production or sale of a product or service other than the investment of capital." 29 C.F.R. 2510.3-101(c).

69.     **The IRA Investment in L2 Partners Was "Significant".** In determining whether the $500,000 investment made by the BOA IRA in 2003 was "significant" (i.e. that it constituted 25% or more of the total investment in L2 Partners), the equity interests of the following persons must not be included in the calculation:

(i) persons with "discretionary authority or control" of the assets of L2 Partners;[12]

(ii) any person who "provides investment advice for a fee (direct or indirect)" with respect to the assets of L2 Partners,[13] or

---

[12] 29 C.F.R. 2510.3-101(f)(1).

(iii) any affiliate of persons described in (i) or (ii).[14] Affiliates include "any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person."[15]

70.    Investments by L2 Management must be disregarded in determining the significance of the BOA IRA's investment in L2 Partners.  In the L2 Partners' Private Placement memorandum, L2 Partners disclosed that L2 Partners' "day-to-day operations [were] managed by its general partner, L2 Capital Management, LLC, a Delaware limited liability company."  L2 Management thus had "discretionary authority" over L2 Partners and could "exercise a controlling influence over the management or policies of" L2 Partners and its assets.

71.    Investments by L2 Advisers must be disregarded in determining the significance of the BOA IRA's investment in L2 Partners.   First, the L2 Partners Private Placement Memorandum confirmed that L2 Advisers provided investment advice to L2 Partners.  Second, L2 Advisers is an affiliate of L2 Management as it is under common control with L2 Management (the Debtor was 60% shareholder and sole manager of each).

72.    Investments by the Debtor must also be disregarded in determining the significance of the BOA IRA's investment in L2 Partners.  The Debtor owned 60% of both L2 Management and L2 Advisers and was the sole manager of both L2 Management and L2 Advisers.  Therefore, the Debtor qualifies as an affiliate of each.[16]

73.    **The Plan Asset Rule Applied to L2 Partners in 2003.**  The BOA IRA's 2003 K-1 from L2 Partners suggests that the BOA IRA held 24.987506% of the total investment in L2

---

[13] *Id.*

[14] *Id.*

[15] 29 CFR 2510.3-101(f)(3).

[16] Because the Debtor's father appears to have invested through his own IRA, the Debtor's father's investment would technically also be counted in determining the percentage of the total equity interests in L2 Partners that were held by benefit plans.  However, because the percentage owned by the Debtor's IRA exceeds the 25% threshold on its own, the interests in L2 Partners owned by the Debtor's father's IRA have not been included in the calculations provided in this pleading.

Partners. *See* Appendix NMAPP-0735. However, the only other two investors were the Debtor and L2 Management and both must be disregarded for purposes of determining whether the BOA IRA investment in L2 was significant. When the investment of the Debtor and L2 Management are disregarded as required by 29 C.F.R. 2510.3-101(f)(1), in 2003 the BOA IRA held 100% of the non-disregarded equity interests in L2 Partners. As a result, beginning in 2003 the Plan Asset Rule applied to the BOA IRA's investment in L2 Partners. The assets of L2 Partners must therefore be treated as if they were the assets of the BOA IRA for purposes of IRC § 4975. Consequently, any transfer of assets from L2 Partners must be viewed as a transfer of assets from the BOA IRA.

74. **The Plan Asset Rule Applied to L2 Partners in 2004.** At the end of 2004, the equity interests of the six partners in L2 Partners totaled $4,782,749. Of that amount, $2,514,934 constituted disregarded equity interests held by the Debtor and L2 Management. The equity interests of the remaining four partners totaled $2,267,815, with $625,282 comprising the BOA IRA's share of equity interests in L2 Partners, which constituted over 27.5%. Therefore, during 2004, the Plan Asset Rule continued to apply to the assets of L2 Partners and those assets must be treated as if they were the assets of the BOA IRA for purposes of IRC § 4975.

75. **The Plan Asset Rule Applied to L2 Partners in 2005.** At the end of 2005, the equity interests of the six partners in L2 Partners totaled $4,556,113. Of that amount, $2,403,985 constituted disregarded equity interests held by the Debtor and L2 Management. The equity interests of the remaining four partners totaled $2,152,128, with $597,697 comprising the Millennium Trust IRA's[17] share of equity interests in L2 Partners, which constituted over 27.7% of the non-disregarded equity interests in L2 Partners. Therefore, during 2005, the Plan Asset

---

[17] As previously noted, in June 2005 the Debtor appears to have transferred the BOA IRA's partnership interests in L2 Partners to the Millennium Trust IRA.

Rule continued to apply to the assets of L2 Partners and those assets must be treated as if they were the assets of the Millennium Trust IRA for purposes of IRC § 4975.

76. **The Plan Asset Rule Applied to L2 Partners in 2006.** At the end of 2006, the equity interests of the seven partners in L2 Partners totaled $6,603,943. Of that amount, $3,486,066 constituted disregarded equity interests held by the Debtor and L2 Management. The equity interests of the remaining five partners totaled $3,117,877, with $845,273 comprising the Millennium Trust IRA's share of equity interests in L2 Partners, which constituted over 27% of the non-disregarded equity interests in L2 Partners. Therefore, during 2006, the Plan Asset Rule continued to apply to the assets of L2 Partners and those assets must be treated as if they were the assets of the Millennium Trust IRA for purposes of IRC § 4975.

77. **The Plan Asset Rule Applied to L2 Partners in 2007.** In 2007, the equity interests of the six partners in L2 Partners totaled $6,514,385. Of that amount, $3,447,176 constituted disregarded equity interests held by the Debtor and L2 Management. *Id.* The equity interests of the remaining five partners totaled $3,067,209, with $835,325 comprising the Millennium Trust IRA's share of equity interests in L2 Partners, which constituted over 27.2% of the non-disregarded equity interests in L2 Partners. Therefore, during 2007, the Plan Asset Rule continued to apply to the assets of L2 Partners and those assets must be treated as if they were the assets of the Millennium Trust IRA for purposes of IRC § 4975.

78. **The Plan Asset Rule Applied to L2 Partners in 2008.** In 2008, the equity interests of the six partners in L2 Partners totaled $6,514,385. Of that amount, $3,447,176 constituted disregarded equity interests held by the Debtor and L2 Management. The equity interests of the remaining five partners totaled $3,067,209, with $835,325 comprising the Millennium Trust IRA's share of equity interests in L2 Partners, which constituted over 27.2% of

the non-disregarded equity interests in L2 Partners. *Id.* Therefore, during 2008, the Plan Asset Rule continued to apply to the assets of L2 Partners and those assets must be treated as if they were the assets of the Millennium Trust IRA for purposes of IRC § 4975.

### (iii) *The Initial Transfer from the BOA IRA to L2 Partners Was a Prohibited Transaction*

79.     IRC § 4975(c)(1)(D) provides that "any direct or indirect…transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan" constitutes a prohibited transaction.

80.     In 2003, the only investors in L2 Partners were the Debtor in his individual capacity, L2 Management, and the BOA IRA. When the BOA IRA transferred $500,000 to L2 Partners in August 2003, the Debtor, in his individual capacity, or indirectly as the manager of L2 Management, owned 100% of the capital and partnership interests in L2 Partners. Because the Debtor is a fiduciary of the BOA IRA, the Debtor was a disqualified person at the time of the transfer. Further, because a disqualified person (the Debtor) owned more than 50% of the equity interests in L2 Management and was also the sole manager of L2 Management, L2 Management was a disqualified person. Because disqualified persons owned 100% of the capital and partnership interests in L2 Partners when the BOA IRA transferred the $500,000 to L2 Partners, the transfer was a prohibited transaction.

81.     Because the BOA IRA engaged in a prohibited transaction, the BOA IRA lost its qualified status as of the date the transfer occurred. Because the BOA IRA lost its qualified status, the Debtor is not entitled to claim the BOA IRA nor any successor IRA as an exempt asset. Except for minimal IRA contributions made by the Debtor since 2003, all of the funds in the Debtor's current IRAs are ultimately derived from the BOA IRA. Therefore, the IRAs are not entitled to any exemption under Bankruptcy Code § 522.

### (iv) Each Transfer of L2 Partners' Assets to L2 Management, L2 Advisers, or the Debtor Constituted a Prohibited Transaction under IRC § 4975

82.     Because the Plan Asset Rule applied to the assets of L2 Partners at all times during 2003 through 2008, the assets of L2 Partners must be treated as the assets of the BOA IRA or the Millennium Trust IRA (as applicable) for purposes of determining whether the IRAs engaged in prohibited transactions. Therefore, any distribution of the property or assets of L2 Partners to any disqualified person vis-à-vis the IRAs constituted a prohibited transaction.

83.     L2 Partners paid approximately $200,000 to L2 Advisers and L2 Management between 2004 and 2007. Because L2 Advisers and L2 Management are both disqualified persons, each transfer from L2 Partners to either L2 Advisers or L2 Management constituted a prohibited transaction pursuant to IRC § 4975(c)(1)(D), (E), and/or (F). Moreover, the final transfer of $3,340,493.16 by L2 Partners to the Debtor in January 2008 constituted a prohibited transaction pursuant to IRC § 4975(c)(1)(D), (E), and/or (F). Similarly, the transfers in January 2008 to the Debtor's father, Anthony Correra, likewise constituted prohibited transactions pursuant to IRC § 4975(c)(1)(D).

### G.     Payments by L2 Partners to L2 Management and L2 Advisors did not constitute "the payment of reasonable expenses for administering the plan" pursuant to IRC § 4975(d)(2)

84.     IRC § 4975(d)(2) creates an exception for certain kinds of transfers that would otherwise be prohibited transactions to the extent those transfers constitute "reasonable compensation" paid by a plan to a disqualified person "for office space, or legal accounting, or other services necessary for the establishment or operation **of the plan**..." IRC § 4975(d)(2) (emphasis added). The exception is expressly limited to expenses and services of the plan itself.

85.     The court's decision in *Ellis v. CIR*, 787 F.3d 1213 (8th Cir. 2015) is instructive. In *Ellis v. CIR* the owner of an IRA owned 50% of an LLC that employed the owner. The IRS

alleged that the salary the owner received from the LLC constituted a prohibited transaction. The owner contended that the salary was exempt from treatment as a prohibited transaction pursuant to IRC § 4975(d)(10) which creates an exemption for transfers that constitute a "receipt by a disqualified person of any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan…". IRC § 4975(d)(10) The court rejected this argument, however, noting that "this exemption applies only to compensation for services rendered in the performance of plan duties. [The LLC] compensated [the owner] for his services as general manager of the company, not for any services related to his IRA. Section 4975(d)(10) is therefore inapplicable to this dispute." *Ellis v. CIR*, 787 F.3d at 1217.

86. Although the Debtor is seeking an exemption under a different sub-section of IRC § 4975(d), the analysis is the same. The Debtor has not provided any evidence that either L2 Advisers or L2 Management provided any services to the Debtor's IRA. On the contrary, the services provided by L2 Management and L2 Advisers were provided to L2 Partners, not the BOA IRA or any subsequent IRA. There is no record that L2 Management or L2 Advisers set up any of the Debtor's IRAs or provided any services whatsoever to the IRAs. Indeed, the BOA IRA existed long before either of L2 Partners, L2 Advisers, or L2 Management existed. Even if the Debtor were able to demonstrate that L2 Management or L2 Advisers did provide services to the BOA IRA or other IRAs, the Debtor would have to demonstrate that those services were "necessary for the establishment or operation of the" IRAs. The Debtor cannot make any such showing, and the exemption therefore does not apply.

**H.**     **Payments by L2 Partners to the Debtor and his father do not qualify for an exemption under § 4975(d)(9).**

87.     IRC § 4975(d)(9) creates an exception for certain kinds of transfers that would otherwise be prohibited transactions to the extent those transfers constitute a "receipt by a disqualified person of any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries." IRC § 4975(d)(9). The express language of IRC § 4975(d)(9) limits the exception to "benefit(s) to which he may be entitled as a participant or beneficiary in **the plan**." (emphasis added). The Debtor has not provided any evidence suggesting that the payments received by the Debtor and by his father in 2008 from L2 Partners were payments of a benefit to which the Debtor or his father were entitled to under the plan documents, which in this case would be the documents governing the Millennium Trust IRA. The payments received by the Debtor and his father were determined by reference to the L2 Partners partnership agreement and related documents, not the Millennium Trust IRA documents. Therefore, IRC § 4975(d)(9) is inapplicable.

**I.**     **The Proceeds of the BOA IRA and the Millennium Trust IRA Did not Regain Exempt Status When They Were Transferred to a New IRA.**

88.     The Debtor contends that even if prohibited transactions occurred with the BOA IRA and the Millennium Trust IRA, the IRAs in existence at the time the Debtor filed for bankruptcy were not the BOA IRA or the Millennium Trust IRA and therefore the IRAs in existence on the Petition Date are exempt.

89.     Under IRC § 408(e)(2)(A), if a plan "engages in any transaction prohibited by section 4975," the plan ceases to qualify as an individual retirement account as of the first day of such taxable year. 26 U.S.C. § 408(e)(2)(A). When a plan ceases to qualify as an individual retirement account, all of the funds in the account at the time also cease to qualify for an

32

exemption. Transferring the funds in an IRA that has lost its exemption to a new IRA does not eliminate the loss of exempt status. At best, the now taxable funds may be considered a contribution to the new IRA. However, a SEP IRA is bound by strict annual contribution limits. Contributions above the annual contribution limit are not entitled to any exemption. The Debtor made maximum contributions in each of 2005 through 2010. Therefore, none of the transfers of funds from the BOA IRA or the Millennium Trust IRA to the Merlin IRA may be considered contributions.

**J.    Treatment of the Debtor's New Contributions Between 2005 and 2010**

90.    The Debtor contends that even if prohibited transactions occurred with respect to the BOA IRA or the Millennium Trust IRA that the new contributions by the Debtor retained their exempt status. For the reasons stated below, the Court finds and concludes that none of the $264,000 in contributions between 2005 and 2010 are subject to an exemption.

91.    The six contributions between 2005 and 2010 fall into the following categories:

(1) Contributions to an IRA that subsequently engaged in a prohibited transaction:

    a.    April 21, 2005 contribution to the BOA IRA ($41,000)

(2) Contributions to an IRA that engaged in a prohibited transaction prior to the date of the contribution:

    a.    April 18, 2006 contribution to the BOA IRA ($42,000)

    b.    April 17, 2007 contribution to the BOA IRA ($44,000)

(3) Contributions to an IRA that did not engage in a prohibited transaction but that is entirely funded by non-exempt assets:

    a.    October 14, 2008 contribution to the Merlin IRA ($45,000)

    b.    April 15, 2009 contribution to the Merlin IRA ($46,000)

    c.    October 12, 2010 contribution made to the Merlin IRA ($46,000)

92.    The contribution in the first category became disqualified when the Debtor made a prohibited transaction after the April 21, 2005 transfer and before the BOA IRA transferred the partnership units in L2 Partners to the Millennium IRA or its predecessor.

93.    The contributions in the second category are also disqualified because the contributions were not contributions to an IRA.  Because the BOA IRA engaged in multiple prohibited transactions, the BOA IRA lost its exempt status and therefore the contributions to the BOA IRA in 2006 and 2007 were not contributions to an IRA.  In addition, the fact that the Debtor moved the partnership units from the BOA IRA to the Millennium Trust IRA and attempted to isolate the Millennium Trust IRA is evidence that the Debtor was aware that the BOA IRA engaged in prohibited transactions.  Therefore, the Court finds that the Debtor made the 2006 and 2007 contributions to the BOA IRA with the knowledge that the BOA IRA was no longer entitled to an exemption.

94.    Because the Debtor withdrew a net $422,500 from his IRA between 2013 and 2014, and because those amounts were treated at the time as if they were being withdrawn from an exempt IRA, the Court concludes that the $422,500 included the proceeds of the contributions made between 2008 and 2010.

## CONCLUSION

95.    Because the initial transfer from the BOA IRA to L2 Partners was a prohibited transaction, and because L2 Partners engaged in multiple prohibited transactions with L2 Advisers, L2 Management, the Debtor's father, and the Debtor himself, the BOA IRA and the Millennium Trust IRA lost their qualified status as of the first year of the date on which each of the foregoing transfers occurred.[18]  Because the BOA IRA and the Millennium Trust IRA lost

---

[18] Because a single prohibited transaction is all that must be proven to eliminate the tax exempt status of the IRAs, and therefore the exempt status under Bankruptcy Code § 522, upon the occurrence of the first prohibited

their exempt status, the Debtor is not entitled to claim the BOA IRA, the Millennium Trust IRA, nor any of the assets contained in either as exempt.

96.    Because all of the Debtor's contributions between 2005 and 2007 are not entitled to an exemption, the proceeds of those contributions are not entitled to an exemption.

97.    Because all of the Debtor's contributions between 2005 and 2010 are either not entitled to an exemption, or the proceeds of those contributions were withdrawn from the Debtor's IRA, neither those contributions nor the proceeds of those contributions are entitled to an exemption.

98.    Because the assets in the Phoenix IRA and the Interactive IRA consist entirely of the proceeds of either (a) the BOA IRA, (b) the Millennium Trust IRA, or (c) the contributions made by the Debtor between 2005 and 2010, the Phoenix IRA and the Interactive IRA are not entitled to an exemption under Bankruptcy Code § 522 or Texas Property Code § 42.0021.

99.    Because the Assets in the Phoenix IRA and the Interactive IRA are not entitled to an exemption under either Bankruptcy Code § 522 or Texas Property Code § 42.0021, the Phoenix IRA and the Interactive IRA, including all amounts contained in each, constitute property of the Debtor's chapter 7 bankruptcy estate.

100.    An order consistent with these Findings and Conclusions will be entered.

---

transaction the BOA IRA and each of its successors lost their exempt status. The Millennium Trust Account was never exempt because all of the funds placed in to the Millennium Trust Account were the proceeds of the BOA IRA's investment in L2 Partners.